UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-157 |
| | ) | |
| vs. | ) | VOLUME I - REDACTED |
| | ) | |
| DAVID TATUM, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 2, 2023

APPEARANCES:

On Behalf of the Government:

     DANIEL CERVANTES, ESQ.
     MARK T. ODULIO, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

On Behalf of the Defendant:

     RYAN PATRICK AMES, ESQ.
     SeiferFlatow, PLLC
     2319 Crescent Avenue
     Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1                        I N D E X

2     GOVERNMENT'S WITNESSES                           PAGE

3     MARISA BROWN
          Direct Examination By Mr. Odulio              29
4         Cross Examination By Mr. Ames                 41

5     MICHAEL GREGORY
          Direct Examination By Mr. Odulio              47
6         Cross Examination By Mr. Ames                 53

7     DANIEL W. JACKSON
          Direct Examination By Mr. Cervantes           56
8         Cross Examination By Mr. Ames                 68

9     JASON WHITT
          Direct Examination By Mr. Cervantes           77
10

11                     E X H I B I T S

12    GOVERNMENT'S EXHIBITS

13    NUMBER                                         ADMITTED

14    1A ............................................... 32
      1B ............................................... 89
15    1C ............................................... 92
      1D ............................................... 93
16    1E ............................................... 96
      1F ............................................... 98
17    1G ...............................................100
      1H ...............................................102
18    1I ...............................................103
      1K ...............................................104
19    1M ...............................................104
      1J ...............................................105
20    1L ...............................................105
      1N ...............................................105
21    1O ...............................................115
      1P ...............................................116
22    2A ............................................... 32
      2B ...............................................109
23    2C ...............................................111
      2B ...............................................114
24    2E ...............................................116
      2F ...............................................117
25    2G ...............................................118

1                          E X H I B I T S

2    GOVERNMENT'S EXHIBITS

3    NUMBER                                        ADMITTED

4    2H ...........................................118
     2I ...........................................119
5    3A ............................................52
     3B ...........................................121
6    3C ...........................................121
     3E ...........................................123
7    3D ...........................................124
     3F ...........................................124
8    3G ...........................................126
     3H ...........................................127
9    3I ...........................................127
     3J ...........................................128
10   4A ............................................34
     5A ............................................34
11   9A ............................................36
     9B ............................................36
12   9C ............................................36
     9D ............................................36
13   9E ............................................36
     9F ............................................36
14   9G ............................................36
     9H ............................................36
15   9I ............................................36
     11 ...........................................106
16   12 ............................................64
     13A ...........................................50
17   13B ...........................................50
     13C ...........................................50
18   13D ...........................................50
     13E ...........................................50
19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           (Court back in session at 11:38 AM.)

3           THE COURT:  Are we ready for the jury?

4           MR. CERVANTES:  Yes, Your Honor.

5           (Jury entered the courtroom.)

6           THE COURT:  Please impanel the jury.

7           (All 14 jurors were duly impaneled.)

8           THE COURT:  All right.  Members of the jury, I want
9    to give you some preliminary instructions that I hope will
10   assist you during this trial.

11           As I've said several times already, it will be your
12   duty to find from the evidence what the facts are.  You and
13   you alone will be the judges of the facts.  You will then
14   apply those facts to the law as I give it to you.  But nothing
15   the Court may say or do during the course of the trial is
16   intended to indicate or should be taken by you as indicating
17   what I think your verdict should be.  I do not have an opinion
18   on that.  It's up to you.

19           The evidence from which you will find the facts will
20   consist of the testimony of the witnesses, documents and other
21   things received into the record as exhibits, and any facts
22   that the lawyers agree to or stipulate to or that the Court
23   instructs you to find.

24           Certain things are not evidence and should not be
25   considered by you as evidence.

1          The statements, arguments, and questions by the
2     lawyers are not evidence.

3          Objections to questions are not evidence.  Lawyers
4     have a duty to object when they believe evidence is being
5     offered that's improper under the rules of evidence.  You
6     should not be influenced by the objection.

7          If I sustain an objection, then the witness is not
8     allowed to answer the question.

9          If I overrule the objection, then the witness is
10    allowed to answer the question and you should treat that
11    answer as you would any other.

12         But if I sustain an objection and the witness is not
13    allowed to answer, don't guess what the answer should be.
14    That's not evidence.

15         If I exclude testimony -- sometimes something gets
16    by me.  So if I exclude something or strike some testimony,
17    you are to follow the Court's instructions on that and ignore
18    that piece of testimony.

19         Anything you see or hear outside this courtroom is
20    not evidence.  You will find the facts only from what you hear
21    by way of witnesses and exhibits during the course of the
22    trial.

23         As you know, this is a criminal case and there are
24    three basic rules that we went over during jury selection for
25    criminal cases.

First, the defendant is presumed innocent until proven guilty. The indictment against the defendant brought by the government is only an accusation and nothing more. It is not proof of guilt or anything else. So the defendant starts with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from drawing any inference against him if he chooses not to testify.

And third, the government must prove the defendant's guilt beyond a reasonable doubt. I will instruct you further on that point at the end of the trial.

The Court instructs you again that you are the sole judges of the credibility of the witnesses and the weight their testimony deserves. While there is no fast and hard rule as to how to judge the credibility of witnesses, I'll give you a few examples of what could lead your determinations.

One, whether the witness has any motive or reason for being truthful or untruthful.

Two, the witness's interest, if any, in the outcome of the case.

Three, whether there appears from the witness's

attitude or conduct any bias, prejudice, or feeling which may
cause that person's testimony to be influenced.

Fourth, whether the testimony bears what we call the
earmarks of truthfulness. That's the sort of thing you do
every day. You're talking to somebody and you make decisions.
You believe them or you don't believe them.

Next, to what extent, if any, the testimony is
corroborated or confirmed by other testimony which is not
questioned. Or to what extent, if any, it is corroborated or
confirmed by known or admitted facts.

And finally, you may also consider the intelligence
and mental capacity of a witness and the witness's opportunity
to have accurate knowledge of the matters to which the person
testifies.

You may believe all that a witness says, none of
what a witness says, believe some, not believe the rest. It's
entirely up to you.

There are two types of evidence that are permitted.
They're called direct and circumstantial evidence. The
classic example of those is if you are standing in a downpour
and you're getting soaking wet, that's direct evidence that
it's raining. If you went to bed last night and your driveway
was dry and this morning it's soaked, that's circumstantial
evidence that it rained last night. The law doesn't make any
distinction between direct and circumstantial evidence so long

1   as the jury finds beyond a reasonable doubt each of the

2   elements that the government is required to prove.

3         During the trial you are not to discuss this case

4   among yourselves or with anyone else.  You're going to get

5   tired of me saying that, but I'm going to say it almost every

6   time we break because it's very important.  Until you retire

7   to deliberate your verdict at the end of the case, you simply

8   are not to discuss this case among yourselves or with anyone

9   else.  And don't let anyone discuss it with you.  If anyone

10   approaches you and tries to discuss this case, bring it to my

11   attention immediately.

12         Obviously, I don't know if there's going to be any

13   press coverage of this; but if there is, don't watch it.

14   Don't read it.  We want you just as pure at the end of this

15   trial as you are right now.

16         Obviously, don't do any independent research about

17   any of these matters.  Stay off the internet for these

18   purposes.

19         And finally, don't form any opinions until all of

20   the evidence is in and you've heard the closing arguments of

21   the lawyers and you've heard the final instructions from the

22   Court.  Then you can start forming opinions.

23         Of course, if you wish, you may take notes during

24   the trial, but the notes are not a substitute for your memory.

25   We require that each of you remember all of the evidence, not

1  just what's in your notes.  And if you choose not to take
2  notes, that's fine too; but you can't rely on some other
3  juror's memory just because they took notes.  We need 12 of
4  you independently deciding this case.

5           Occasionally we have to do something called a
6  sidebar.  You saw one earlier this morning where I just
7  stepped to the side with the lawyers to handle something that
8  I think we can handle pretty quickly without excusing you to
9  the jury room.  But if there's something that I have to deal
10 with that will take longer than just that couple of minutes,
11 we'll excuse you to the jury room where you'll be more
12 comfortable.  But I try to keep those to a minimum.

13          The exhibits will come in electronically, which I
14 referenced earlier.  It will show up on your screens there.
15 And I want to describe for you how that process is because
16 there will be a time where everybody is seeing something on
17 their screen except for you.

18          The way it works is one of the lawyers will get a
19 witness to identify an exhibit.  Ask him what it is.  Do they
20 know what it is.  A few other foundation questions like that.
21 And then they ask that it be admitted into evidence.  And if I
22 admit it into evidence, then they may show it to you.  And the
23 reason for doing it that way is if the evidence is
24 inadmissible, I don't want you seeing it.  So don't think your
25 screens aren't working just because we're all looking at

1  something and you're not.  When it's admitted into evidence,

2  either of the counsel can show it to you at any time they

3  like, but not before.

4         All right.  So we're going to begin this trial now

5  and we'll start with opening statements.  As I said, the

6  statements of the attorneys are not evidence.  They're not

7  even argument at this point.  It's a forecast of what counsel

8  believe the evidence will be.  Trials are done one witness at

9  a time, one exhibit at a time, and it doesn't always make

10 sense to you why you're seeing and hearing what you're seeing

11 and hearing.  So the point of an opening statement is to give

12 you some context or to tell the story in sort of a broad brush

13 enough way that as you hear the evidence, it will make some

14 sense to you, and that's the point of the opening statements.

15        Defense counsel may give an opening statement as

16 well.  He doesn't have to.  It's entirely up to him.

17        And at the close of the government's case, the

18 defense, if they would like, would put on evidence.  But

19 again, as I said, they don't have to put on any evidence

20 because they don't have to prove anything because of the

21 presumption of innocence.

22        All right.  So we'll have opening statements, which

23 each side has been given up to 20 minutes, and then we'll take

24 our lunch break.

25        All right.  The jury is with the government for 20

1  minutes.

2          MR. CERVANTES:  This case is about a child

3  psychiatrist who possessed and accessed child pornography.

4  But he wasn't satisfied with that, so he made his own child

5  pornography.  And when the FBI asked him about his images of

6  child pornography, he admitted that he had them.  He admitted

7  that he knew that they were under 18.  And he admitted that he

8  masturbated to them.

9          You're going to see and hear evidence that the

10  defendant set up a hidden camera in a bathroom to record his

11  15-year-old cousin as she came into the bathroom, took her

12  clothes off, got into the shower, showered and left.

13          You're going to see and hear evidence that the

14  defendant had videos of child pornography depicting 11- to

15  13-year-old girls having sex with each other.

16          You're going to see and hear evidence that the

17  defendant had what are called modified images of child

18  pornography.  These are images that he got of clothed minors

19  from a website called teengallery.com.  He then took those

20  images, put them through another website, made them nude, and

21  saved them into his collection of pornography.

22          He didn't just stop with those pictures that he just

23  got on Teen Gallery.  He did it to girls that he knew

24  personally, and he took images of them when they were minors.

25  You're going to see those as well.

1          And you're also going to see the history that he has
2    on his computer under a user profile that's identified to him.
3    And this history has a list of 1,118 references to files.  And
4    there's something in common about each and every single file
5    listed:  the phrase pthc.  And you're going to hear that that
6    stands for preteen hardcore.
7          As a result of the defendant's conduct, he is
8    charged with three counts:
9          Possession and access with intent to view child
10   pornography.
11         Count two, production and attempt to produce child
12   pornography, and that's related to the 15-year-old cousin.
13   And production there is with respect to, as in a movie
14   producer, the maker of the video.
15         Number three, transportation of child pornography,
16   because that video that he made was made in Maine in a family
17   cabin and he transported it here to Charlotte, North Carolina.
18         I'm going to give you some background on the case.
19   Then we're going to talk about some of the child pornography.
20   And then I'm going to talk about the witnesses that you should
21   expect to hear from.
22         So on September 21, 2021, the FBI received a report
23   that there was a child psychiatrist in possession of child
24   pornography.  That child psychiatrist was identified as
25   Dr. David Tatum.

1          So the FBI got together to try to collect the

2     evidence.  They collected evidence from three different

3     places.

4          First, they met with the defendant's wife.  She gave

5     them two pieces of electronics that you're going to hear

6     about.  One is the defendant's phone, an iPhone, and the other

7     one is a hard drive that was password protected.

8          The second thing that they did was that they went

9     and they talked to the defendant himself at his place of work,

10    which was Atrium Health on Blythe Boulevard, and they talked

11    to him there.  And you're going to hear his statements because

12    that interview was recorded.

13         He said, quote, "I've searched for teens."  He said

14    he went to a website called Teen Gallery, he admitted that, to

15    find pictures of his victims.

16         He said that he went to a DeepFake website to adapt

17    and modify the pictures of teenagers.  He said he used a

18    picture of his girlfriend from high school.  He made her nude

19    and then said, quote, "I got off on it."  The FBI agent asked

20    him whether he meant that he masturbated to it and he said

21    yes.

22         He admitted that 75 percent of his patients were

23    children, which is evidence that you'll be able to consider to

24    show he knows what children look like.

25         He admitted that he is into, quote, "voyeuristic

videos," which he explained as, quote, "people being videotaped without their knowledge," like the video of his 15-year-old cousin that he made without her knowledge.

During the interview FBI agents seized two more pieces of evidence: a MacBook and a thumb drive.

While the FBI was interviewing Dr. Tatum, a separate team went to his house. His wife was there, opened the door, and agents went to his home office and from there they took an HP computer. These are the devices that you'll hear about throughout the trial.

So let's talk about child pornography. The government doesn't intend to play you every single minute of the videos. Two of them alone are each an hour long. Instead, the government will play the portions that we deem are necessary for you all to see what it is so that you can make your own mind up. But those videos in their entirety will be made part of the record in evidence.

So there's four types of child pornography that the defendant had. Let's talk about them.

So the first one is the production video. In 2016, July of 2016, Dr. Tatum and his family went to their cabin in Maine. It's a cabin on a pond called Songo Pond. And he set up a camera in a bathroom. You will see the video. He sets it up. His 15-year-old cousin -- and he leaves the bathroom. Shortly after, 20 seconds after, his 15-year-old cousin comes

into the bathroom.  She takes off her clothes and gets into
the shower.  Pay attention to the angle of the video.  You'll
see that it's coming from the bottom directed right toward the
crotch area.

In short, the evidence will show that he used his
15-year-old cousin.  Her name is M.C..  It will show that he
used M.C. to make this video.

You will know that he set it up because you'll see
the video.  And in the video, the first thing you see is
someone coming into the bathroom to set up the camera.  You'll
see that he puts it into an area.  You'll see that he adjusts
it.  You'll see that he takes a step back.  He then looks at
the angle with a slight lean, and you're going to see his face
on the video of him setting it up.  And then he flushes the
toilet as if to make it sound to anyone listening that he used
the toilet.  And then he leaves.  Twenty seconds later M.C.
comes in, showers, and leaves.  Guess who comes back 20
minutes later.  You'll see it's him who recovers the video.

You will know that it was his intent to make the
video of M.C..  He kept it all these years from 2016.  You'll
hear about the forensics; that he took that video from the
phone and then he put it in the hard drive that's password
protected.  It's password protected.  The government had to
send that hard drive to Quantico to get into it because no one
knew the password.

1          He kept it.  Pay attention to where he saved it.  He
2  saved the video in a folder with other pornography as his
3  library of materials.

4          And you'll also see evidence that he watched it with
5  his MacBook under his user profile named Morphus.  Morphus.
6  That is a profile associated to him because it is his Apple ID
7  that you'll see, morphus100@gmail.com.  And that same phone is
8  listed to him:  David's iPhone.

9          This video alone establishes all three counts.  This
10 video alone establishes that he produced the video -- that he
11 produced child pornography, I'm sorry; that he possessed child
12 pornography; and that he transported child pornography.  But
13 that's not it.  There's more.

14         So he had videos of teen girls having sex with each
15 other.  We'll have to play some of those for you as well.
16 Some of them the video clips are as short as five to ten
17 seconds.

18         One of those videos depicts, as I mentioned, two
19 girls approximately 11 to 13 years old on a bed totally naked
20 digitally penetrating themselves -- digitally meaning the
21 fingers -- and having sex with each other.

22         Two other videos of teens are also in his
23 electronics.  Some of them depict fully clothed, some of them
24 partially nude.  They display their genitals and they display
25 their pubic area in a, what's called, lascivious manner.

1        You'll also see the modified pictures of child
2   pornography.  Of course, adapted or modified pictures of child
3   pornography is still child pornography because it depicts the
4   minors in sexually explicit poses.

5        So you will see the images that the defendant used.
6   You will see what's called the water stamp at the bottom of
7   the pictures where it says Teen Gallery, which is consistent
8   with what he told the agents.  You will see that he did it
9   with his former -- with his ex-girlfriends.  These were
10  ex-girlfriends of his that he knew, that he dated when he was
11  in high school.  One of them is a picture of this girl at prom
12  with the defendant and he passed this picture through this
13  website and took the prom dress off.  That's actually the same
14  picture that the agents and him were talking about when he
15  said "yes, I masturbated to it."  The other picture is a group
16  of four girls, all underage, all of them, and he made all four
17  of them nude.

18       Then you will also see what I mentioned earlier
19  about this list of 1,118 files.  For example, I'll read three
20  of those file names for you.  The beginning of each of these
21  file starts with pthc.  "[PTHC] 6yo girl gets fucked with legs
22  in the air," "[PTHC] 8yo pussy pedo fuck-screwtop style,"
23  "[PTHC] Daddy fucks my 4yo cunt for first time."  1,118 of
24  these files, which is going to show you access with intent to
25  view.

1          Let's talk about the witnesses that you will hear in
2     this case -- or you will hear from.
3          Forensics, computer forensics.  What that means is
4     computer experts.  That's why the judge was asking you about
5     any experience with computers because we will present the
6     testimony of two experts, computer experts, who together have
7     analyzed thousands of devices.  And they will tell you how
8     they analyzed these devices.  They will tell you what they
9     found.  And the evidence will show beyond a reasonable doubt
10    why these are Dr. Tatum's devices and that the child
11    pornography is his.
12         For example, let's take the iPhone.  The iPhone runs
13    through the whole process of -- the whole case and it's a good
14    example of each one of these links.  The iPhone was used to
15    make the video.  When a video is made on an iPhone, it's given
16    a number.  Every picture, every video is given a number.
17    Number next, number next.  If you open a file for all of the
18    pictures saved in a phone, you'll see that list of all the
19    pictures saved.  That phone is registered to David.  David's
20    iPhone is what it says.  The Apple ID is Morphus.
21         When you look at the phone, the expert will show you
22    the videos for the 15-year-old, his cousin, are missing.
23    They're not in that list.  Where are they?  They're in the
24    encrypted hard drive that was password protected that law
25    enforcement had to send to Quantico to get into.

1          And you're going to see that that hard drive was
2    plugged into his MacBook, the MacBook that the FBI got from
3    him when they interviewed him.  That was one of the devices
4    they took from him.  And the MacBook, what it does is it has a
5    history.  It keeps a record of the things you plug into it.
6    So that the next time you plug something into it, it remembers
7    and it says, hey, I know this hard drive, let me help you.

8          And I'm going to show you these little thumbnails,
9    these little tiles of what each one of the pictures are in the
10   hard drive.  That way it makes it easier for you.  And you
11   don't see this.  It just happens.  But the MacBook keeps that
12   record.  And this MacBook has the record of the hard drive
13   being plugged into the MacBook and the folder where this video
14   of the 15-year-old cousin was saved.  And the user profile for
15   accessing that folder is Morphus, the same email registered to
16   the defendant that you see on the iPhone.

17              THE COURT:  Three minutes, Mr. Cervantes.

18              MR. CERVANTES:  Thank you, Your Honor.

19          You will also hear from some of his victims.  You're
20   going to hear from M.C..  You're going to hear from the prom
21   date that the defendant had.  Her name is E.H..  You're going
22   to hear from Jessica who's one of the girls that was in front
23   of the house.  They're going to identify themselves in these
24   pictures and you're going to hear from them.

25              And finally, you're going to hear in just a few

1  minutes the defendant's own voice when he was answering the
2  FBI's questions and saying what I told you he said.
3       And when you consider the evidence, you should find
4  that the defendant is guilty of all three counts.  Thank you.
5       THE COURT:  Mr. Ames.
6       MR. AMES:  Good afternoon, everybody.  I'm Ryan
7  Ames.  Appreciate, again, your attention.
8       You're going to hear a lot of evidence from a lot of
9  different people.  Some of it is going to be probably
10 difficult to hear.  Other stuff is going to be more technical.
11 There's a lot to this case.  But at the end of the day, the
12 government's primary theory and the thing you're going to hear
13 a lot about is basically that Mr. Tatum's a pervert and here's
14 all his devices and here's all the stuff that we found on
15 these devices.  What you're going to find a severe lack of is
16 material that meets the requirements of the statute.  You're
17 also going to see a lack of corroboration for some of the
18 assertions of the government.
19      For example, the government just stated that David
20 Tatum viewed this shower video on the MacBook.  There will not
21 be evidence of that.  There will be evidence of potentially
22 file paths related to supposed images that the government will
23 not show you because they don't have them.  But the data that
24 the government will present will not show any evidence of him
25 viewing anything.  It will show you evidence of attaching a

1  device at some point in time to another device and that is all

2  that it will do.

3          Further, they will not present evidence about who

4  attached that particular device to his MacBook.

5          Further than that, what you'll find here is that the

6  government will paint a broad picture of Mr. Tatum as a person

7  that has problems with sex addiction and porn addiction.  And

8  on that point they're correct.  We're not hiding the ball on

9  that.  Mr. Tatum has had an ongoing issue dealing with sex

10 addiction and pornography addiction.  He's been treated for

11 it.

12          The government is going to tell you all about his

13 pornography collection that is quite substantial but primarily

14 consisting of adult images with the exception, according to

15 the government, of a handful that they'll present which

16 include images that depict alleged minors' heads on the bodies

17 of adult women that were morphed and made by a computer

18 program.

19          In some instances they will present videos of

20 alleged pornography where they have not identified anyone in

21 the videos nor confirmed the ages of anyone in the videos.

22 They will not give you evidence that they were able to find

23 any known person through the various clearing houses that the

24 government uses to identify victims.  Nothing.  No hits came

25 back.  Nothing.  They sent multiple videos, multiple images to

NCMEC. None of it came back as flagged in the millions upon millions upon millions upon millions of flagged images that they match with MD5 hash codes. Zero came back positive for child pornography. Zero.

The government is going to show you and share with you images that, quite frankly, they're going to allege are child pornography, but they are not. They are showing images of people literally just standing there.

The Court will give you instructions at the end on what the law is and how you define pornography and, in particular, how you define child pornography. It's complicated. You'll need to listen carefully because it's complicated. It's not as simple as a naked person that might be under 18. It's no where near that easy.

Listen carefully to the answers that David Tatum gives. They said first thing up is they're going to show you here shortly an interview they did in a parking lot outside of his job where he admitted to creation of child pornography of minors. No, he didn't. He acknowledged he made a couple of images in this website involving a high school girlfriend, a college girlfriend, a couple other people. There was some other images that he made from the website Teen Gallery whose ages are unclear and he doesn't know how old they are and never stated otherwise. Clearly stated to them, "I don't know how old they are. It could be a close call, I don't know. I

don't know for sure."  It was never his purpose or intention

specifically to look for that.  That's what he tells them.

He also admits straight up, "I'm a voyeur."  That's

what he's into.  That's his thing.  It's not children; it's

voyeurism.  And you'll hear all kinds of stuff about that,

about setting up cameras and so on and so forth.

So again, listen carefully to the evidence because

what he's on trial for is not being a pervert.  That's not a

crime in this country or this state.  It is not a crime to

possess adult pornography so long as it doesn't violate the

laws of any jurisdiction.  And generally speaking, the

government will talk all about adult pornography that he had.

But they will not produce copious amounts of child pornography

because there wasn't any.

This is someone they are saying is a known sex

addict, a known pornography addict, a person that amassed a

giant collection of well-organized, well-polished pornography

on some hard drive and they're going to produce for you a

handful of images that are the most borderline that they could

find out of thousands upon thousands as far as whether or not

these people -- how old they are.

So listen carefully and look carefully at the

evidence the government will present.  Listen carefully to the

definitions.  Listen carefully to how and why the government

is presenting certain exhibits from their experts.  And listen

1  carefully to what the evidence actually is of opening or

2  viewing.  They're going to say there's a login by someone.

3  They're going to say there's some metadata that says something

4  with a date on it.  They're not going to present evidence that

5  David Tatum literally watched the video.  I promise they will

6  not show that because simultaneous with that time stamp, there

7  are going to be hundreds of other videos at the same time.  So

8  unless he's got a hundred heads and a hundred computers --

9  again, listen carefully to the evidence and listen carefully

10  to the statute.  Your job is to find the facts, make sure they

11  comport with the statute, and keeping in mind that David Tatum

12  is presumed innocent throughout and it's the government's

13  burden to prove all of these things.

14         So, again, I thank you for your time and your

15  attention.  These cases are never easy and I do appreciate it

16  that no matter how uncomfortable things can get in any trial

17  like this, we appreciate your time and David appreciates your

18  service.  And I guess we will move on from there and I

19  appreciate it.  Thank you.

20         THE COURT:  All right.  Members of the jury, we're

21  going to take our lunch break now.  Of course, the usual

22  rules.  Don't discuss this case among yourselves and certainly

23  don't let anyone else discuss it with you.  As I said, if you

24  get approached by anyone, let me know immediately.  Don't do

25  any independent research.  Don't make up your minds.  Leave

1  your note pads in the jury room.  Never take them outside the

2  building at night or on our breaks.

3          I'll ask you to be back at 1:30 and so you're free

4  to go until then.

5          Everyone remain seated until the jury clears the

6  floor.

7          But Ms. Giambalvo, I'd ask for you to stay just a

8  couple minutes after everyone else leaves.

9          JUROR NO. 7:  Okay.

10          THE COURT:  All right.  You're free to go.

11          (All jurors except Juror Number 7 exited the

12  courtroom.)

13          THE COURT:  You can sit back down.

14          JUROR NO. 7:  What?

15          THE COURT:  You can sit back down.

16          I was informed during our morning break that you

17  have a work conflict tomorrow.

18          JUROR NO. 7:  Just from 8:30 to 9:00.

19          THE COURT:  Okay.  But you're not going to be able

20  to make that work commitment.  We're going to start tomorrow

21  morning at 9:00.  We went over that this morning, which is why

22  I made it clear to all the jurors that our schedule would be

23  9:00 to 5:00 and asked if that made jury service impossible

24  for anyone and you didn't tell us that it did, so you're not

25  going to be able to make that work commitment tomorrow.  I

1  wanted to give you as much heads up as possible so you can
2  plan around it.  Just wanted you to know.
3          Mr. Whelan, can you let her out with the rest of the
4  jurors.
5          And please be back at 1:30.  Thank you.
6          (Juror Number 7 exited the courtroom.)
7          THE COURT:  Will the witnesses be sequestered?
8  There hasn't been a motion, but I'm asking.
9          MR. AMES:  Your Honor, I actually haven't received
10  the list.
11          THE COURT:  It was filed this morning.
12          MR. CERVANTES:  I have an extra copy for defense.
13          THE COURT:  I'm not asking -- take care of that
14  during the lunch break.
15          Are the witnesses going to be sequestered?
16          MR. CERVANTES:  Yes, Your Honor.  Without a motion,
17  that's fine.
18          THE COURT:  All right.  Make sure that they are,
19  then.
20          All right.  We'll be in recess until --  yes, sir.
21          MR. CERVANTES:  On this issue in particular, we were
22  going to raise it after the first witness testifies, but we
23  might as well now.  Is it okay when -- after Special Agent
24  Marisa Brown testifies -- she's the first witness -- may she
25  remain in the courtroom?

1          THE COURT:  Any witness can remain in the courtroom

2    after they testify, but they won't be allowed to be recalled

3    if they sit through any of the other testimony.

4          MR. CERVANTES:  Understood.

5          THE COURT:  So that's entirely up to you.  Once

6    they've testified they can stay.

7          MR. CERVANTES:  Thank you, Your Honor.

8          THE COURT:  All right.  We're in recess until

9    12:30 -- excuse me, 1:30.

10          (Lunch recess at 12:20 PM.)

11    TUESDAY AFTERNOON, MAY 2, 2023

12          (Court back in session at 1:27 PM.)

13          (Jury not present.)

14          THE COURT:  All right.  Counsel, apparently juror

15    number 7 had a bit of a meltdown during the lunch break after

16    being informed that she would not be permitted to make her

17    meeting, her business meeting tomorrow and all of the jurors

18    are present except for her now.  Part of her meltdown during

19    the lunch break was to ask the courtroom deputy what happens

20    if she doesn't show up tomorrow.

21          The Court is concerned that she will not be focused

22    during this trial in addition to her self-admitted ADHD and

23    concerns that she would become bored and unable to pay

24    attention to the evidence.  With this work concern and the

25    meltdown that's been described to me, the Court is very

1  concerned that she will not be a good juror for this case.  I
2  was a little surprised when she was jointly selected, frankly.
3  But I would entertain a joint motion to exclude -- to excuse
4  that juror.  That leaves us with just one alternate, but it's
5  a short trial.
6       MR. AMES:  I would be okay with that, Your Honor.  I
7  feel like it could become a worse problem if it's not nipped
8  in the bud, I suppose, and I would have no objection to doing
9  it jointly.
10      MR. CERVANTES:  No objection, Your Honor.
11      THE COURT:  All right.  Then if you would inform
12 Letha that Juror Number 7 is not needed.  She may be excused.
13      THE CLERK:  She did show up, though.
14      THE COURT:  She can still be excused.
15      And then bring the rest when they're ready.
16      (Jury entered the courtroom.)
17      THE COURT:  All right.  Welcome back, members of the
18 jury.  You'll notice we're without Juror Number 7.  She's been
19 excused.  So we're down to one alternate.  I hope everybody
20 stays healthy and no emergencies come up, but we have at least
21 one backup if necessary.
22      You may call your first witness.
23      MR. ODULIO:  Your Honor, the United States calls
24 Marisa Brown.
25           MARISA BROWN, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. ODULIO:

Q.   Good afternoon, ma'am.

A.   Good afternoon.

Q.   Can you please state your name and spell your last name for the court reporter.

A.   Marisa Brown, B-r-o-w-n.

Q.   Where are you employed?

A.   The Federal Bureau of Investigation.

Q.   What's your position there?

A.   I am a special agent.

Q.   What's your assignment, Agent Brown?

A.   The Crimes Against Children and Human Trafficking Squad.

Q.   Is that in Charlotte, North Carolina?

A.   Yes.

Q.   Tell the jury what the Crimes Against Children and Human Trafficking Squad does.

A.   We investigate child exploitation, child pornography, and human trafficking.

Q.   What's your relationship to the United States versus David Tatum matter?

A.   I am one of the case agents.

Q.   Direct your attention, Agent Brown, to September 21, 2021.  Did you receive a report about an individual named David Tatum?

1   A.   Yes.

2   Q.   What was that generally?

3   A.   The report alleged --

4           MR. AMES:  I'm going to object to hearsay.

5           THE COURT:  Overruled.  The testimony is not being

6   offered to show the truth of what she's about to say but to

7   inform the jury as to why she did what she did afterwards.

8           MR. AMES:  Thank you, Your Honor.

9           THE COURT:  You may proceed.

10          THE WITNESS:  The report alleged that David Tatum

11  had child pornography on his computer.

12  Q.   Based on that did you take certain action?

13  A.   Yes.

14  Q.   And was that action prompt?

15  A.   Yes.

16  Q.   Can you explain to the jury why that was prompt?

17  A.   It was reported that David Tatum was a child

18  psychiatrist.

19  Q.   Directing your attention now to the next day,

20  September 22, 2021.

21       Did you have a meeting with an individual named Kimberly

22  Tatum?

23  A.   Yes.

24  Q.   And what was that meeting about?

25  A.   It was to obtain more information related to the report.

1  Q.    And can you tell the jury who Kimberly Tatum is.

2  A.    Kimberly Tatum was the wife of David Tatum.

3  Q.    And at the time of the meeting, where did she live?

4  A.    She lived at 13021 Pumpkin Way Drive in Mint Hill, North

5  Carolina.

6  Q.    And who did she live with?

7  A.    She lived with her husband, David Tatum, and their

8  daughter C.T..

9  Q.    At the meeting did you receive certain electronic devices

10 from Kimberly Tatum?

11 A.    Yes, we did.

12         MR. ODULIO:  Your Honor, may I approach?

13         THE COURT:  You may.

14         MR. ODULIO:  Thank you, Your Honor.

15 Q.    Do you have an item there marked for identification only

16 as Government's Exhibit 1A?

17 A.    Yes.

18 Q.    And what is that?

19 A.    This is a My Passport Ultra external drive.

20 Q.    And you received that at this meeting?

21 A.    Yes.

22 Q.    Do you also have Government's Exhibit 2A there?

23 A.    Yes.

24 Q.    And same question, did you receive that at the meeting?

25 A.    Yes.

1  Q.   What is that generally?

2  A.   This is an iPhone and a case.

3  Q.   Were those items ultimately reviewed as part of this

4  investigation?

5  A.   Yes, they were.

6          MR. ODULIO:  Your Honor, we'd move 1A and 2A.

7          THE COURT:  They're admitted.

8          (Government's Exhibits Nos. 1A and 2A were received

9  into evidence.)

10  Q.   Later on that afternoon did you have an opportunity to

11  interview David Tatum?

12  A.   Yes, we did.

13  Q.   Do you see him in court today?

14  A.   I do.

15  Q.   Could you identify him, please, by where he's seated and

16  an article of clothing.

17  A.   He's seated at the defense table in a grayish suit.

18          MR. ODULIO:  Your Honor, if the record could reflect

19  that Agent Brown has identified the defendant.

20          THE COURT:  The record does so reflect.

21          Members of the jury, I suspect that at some point

22  during this witness's testimony, you're going to hear that the

23  defendant gave a statement to the FBI.  Whether this statement

24  was voluntarily given and, if so, what weight to give it is

25  entirely up to you.  In other words, these are questions of

1  fact which are up to a jury to decide.  In determining whether

2  the statement was voluntary and what weight to give it, if

3  any, you should consider what we call the totality of the

4  circumstances.  In making this important determination, you

5  may consider, for example, whether the statement was adduced

6  by a promise or threat.  And you may also consider any other

7  factor which your common sense tells you is relevant to the

8  issue of voluntariness.

9          You may proceed.

10          MR. ODULIO:  Thank you, Your Honor.

11 BY MR. ODULIO:

12 Q.  So in relation to the meeting with Kimberly Tatum, again,

13 when did you meet with David Tatum?

14 A.  We met with David Tatum in the early evening around 5:00

15 or 6:00.

16 Q.  And where did that take place?

17 A.  It took place in the parking garage of his employment at

18 Atrium Health in Charlotte, North Carolina.

19 Q.  Why did it take place in the parking garage?

20 A.  We met with him after work to not interrupt his day at

21 work.

22 Q.  And was that at 1000 Blythe Boulevard?

23 A.  Yes.

24 Q.  Could you tell the jury who was present for that

25 interaction.

1 A.    Myself, Special Agent Scott Atwood, Task Force Officer

2 Aleta Dunbar, and David Tatum.

3 Q.    Okay.  Now, in connection with that interview, were

4 certain devices seized from Dr. Tatum?

5 A.    Yes.

6 Q.    I think you have what's marked for identification only as

7 Government's Exhibit 4A.

8 A.    Yes.

9 Q.    Tell the jury, please, what that is.

10 A.    This is a thumb drive with Medical College of Wisconsin

11 on one side.

12 Q.    And Government's Exhibit 5A?

13 A.    Yes.

14 Q.    What is that?

15 A.    This is a MacBook laptop.

16 Q.    And those were seized from Dr. Tatum in that interaction?

17 A.    Yes.

18 Q.    Have they been in the custody of the FBI since?

19 A.    Yes.

20 Q.    And were they also analyzed in connection with this

21 matter?

22 A.    Yes.

23          MR. ODULIO:  Your Honor, we'd move 4A and 5A.

24          THE COURT:  They're admitted.

25          (Government's Exhibits Nos. 4A and 5A were received

1  into evidence.)

2  Q.   Where did the interview take place, Agent Brown?

3  A.   The interview took place in Agent Scott Atwood's vehicle.

4  Q.   And where were you seated?

5  A.   I was seated in the driver seat.

6  Q.   And where was Dr. Tatum seated?

7  A.   Dr. Tatum was in the back seat.

8  Q.   Was there anyone else present -- or where were the other

9  participants in the interview?

10 A.   Agent Atwood was also in the back seat.  And then when

11 Task Force Officer Aleta Dunbar arrived, she sat in the

12 passenger seat.

13 Q.   Okay.  Was -- could you describe the vehicle.  Were the

14 doors locked?  Were the windows up?  Could you give us an idea

15 of what was happening here.

16 A.   Yes.  The windows were down and the doors were unlocked.

17 Q.   And before you began, was it clear whether -- or did you

18 tell Dr. Tatum whether or not he was free to leave?

19 A.   Yes.  Before the interview when we were standing outside,

20 we asked Dr. Tatum if he wanted to speak with us and he

21 agreed.  We went into Agent Atwood's vehicle and told him that

22 the windows were down, the doors were unlocked and he was free

23 to go at any time, that he was not under arrest.  And at one

24 point in the interview, Agent Atwood and Dr. Tatum left the

25 vehicle and then returned to the vehicle to finish the

MARISA BROWN - DIRECT

1  interview.

2  Q.   Okay.  And at the end of the interview, was -- did the

3  defendant leave?

4  A.   Yes, he did.  The defendant left at the end of the

5  interview and drove away.

6  Q.   Okay.  Are you familiar generally with Government's

7  Exhibits 9A through 9I?

8  A.   Yes.

9  Q.   Did you examine them and listen to them before you came

10  into court today?

11  A.   Yes.

12  Q.   Would you tell the jury what those are generally.

13  A.   These are excerpts from that interview.

14  Q.   And are the excerpts a fair and accurate depiction of the

15  interview and the recording?

16  A.   Yes.

17        MR. ODULIO:  Your Honor, we'd offer 9A through 9I.

18        THE COURT:  They're admitted.

19        (Government's Exhibits Nos. 9A, 9B, 9C, 9D, 9E, 9F,

20  9G, 9H, and 9I were received into evidence.)

21  Q.   We'll play those in a second, Agent Brown.  Let me just

22  ask, were you present throughout the entire interview?

23  A.   Yes, throughout the entire recorded portion.

24  Q.   Before court today did you also become familiar with

25  Government's Exhibits 10A through 10I?

1   A.   Yes.

2   Q.   And what are those generally?

3   A.   Those are transcripts corresponding to the excerpts from

4   the interview.

5   Q.   Okay.  And are the transcripts a fair and accurate

6   depiction of what was said during the interview?

7   A.   Yes.

8   Q.   Do the trans -- does the transcript identify the speakers

9   in the interview?

10   A.   Yes.

11   Q.   And does it do that by initials?

12   A.   Yes, it does.

13   Q.   Who is DT?

14   A.   DT is David Tatum.

15   Q.   Who is SA?

16   A.   SA is Scott Atwood.

17   Q.   Who is MB?

18   A.   MB is Marisa Brown.

19   Q.   And tell the jury who AD was.

20   A.   AD was Aleta Dunbar.

21   Q.   Okay.  The last set of questions before we go into this

22   is, are you familiar with Government's Exhibits 9A1 through

23   9I1?

24   A.   Yes.

25   Q.   Are those demonstratives of the audio sync with the

1  transcripts?

2  A.  Yes.

3  Q.  And are you familiar with those and have you reviewed

4  those prior to your testimony today?

5  A.  Yes, I did.

6          MR. ODULIO:  Your Honor, we'd like to publish those

7  one at a time now with the Court's permission.

8          THE COURT:  All right.  Do these have transcripts

9  attached to them?

10         MR. ODULIO:  They have transcripts -- it's the audio

11  with the transcripts attached to them.

12         THE COURT:  Members of the jury, the transcripts are

13  provided as an aid to the audios that you will hear.  If you

14  discern any difference between what you heard and what you

15  read in the transcripts, you should go with what you hear as

16  the audio is the better evidence.

17         You may proceed.

18         MR. ODULIO:  So we'll ask my co-counsel to pull up

19  9A1.

20  Q.  As he does that I'll ask Agent Brown:  Agent Brown, were

21  questions asked about Dr. Tatum's interactions with patients?

22  A.  Yes.

23         MR. ODULIO:  We'll publish now 9A1 with the Court's

24  permission.

25         THE COURT:  You may.

1          (Government's Exhibit Number 9A1 was published.)

2   Q.   I'm going to ask you now, Agent Brown, were questions

3   asked about using a DeepFake website to modify pictures of

4   children to make them nude?

5   A.   Yes.

6          MR. ODULIO:   Publishing Government's Exhibit 9B1.

7          (Government's Exhibit Number 9B1 was published.)

8   Q.   Agent Brown, were questions asked about whether the

9   defendant searched for images of teens?

10  A.   Yes.

11         MR. ODULIO:   I'm going to publish now 9C1.

12         (Government's Exhibit Number 9C1 was published.)

13  Q.   Turn now to Government's Exhibit 9D1 and ask you, Agent

14  Brown, whether questions were asked concerning the defendant

15  modifying pictures of an ex-girlfriend?

16  A.   Yes.

17         MR. ODULIO:   9D1.

18         (Government's Exhibit Number 9D1 was published.)

19  Q.   We'll move on to 9E1 and I'll ask Agent Brown whether

20  questions were asked concerning voyeurism?

21  A.   Yes.

22         MR. ODULIO:   This is Government's Exhibit 9E1.

23         (Government's Exhibit Number 9E1 was published.)

24  Q.   Agent Brown, I'll ask you before we go to 9F1, were

25  questions also asked about the use of hidden cameras?

MARISA BROWN - DIRECT

1    A.    Yes.

2            MR. ODULIO:  This is Government's Exhibit 9F1.

3            (Government's Exhibit Number 9F1 was published.)

4    Q.    We'll go to 9G1.  Agent Brown, were questions asked about

5    the use of a thumb drive to save pictures that the defendant

6    had put through the DeepFake website?

7    A.    Yes.

8            MR. ODULIO:  This is Government's Exhibit 9G1.

9            (Government's Exhibit Number 9G1 was published.)

10   Q.    Two more.  We'll move now to 9H1.  And I'll ask you,

11   Agent Brown, if questions were asked about searching for

12   images on a website called Teen Gallery?

13   A.    Yes.

14           MR. ODULIO:  Government's 9H1.

15           (Government's Exhibit Number 9H1 was published.)

16   Q.    And finally, Agent Brown, on to 9I1.  Were additional

17   questions asked about whether the defendant used a USB drive

18   to save images?

19   A.    Yes.

20           MR. ODULIO:  This is Government's 9I1.

21           (Government's Exhibit Number 9I1 was published.)

22   Q.    Agent Brown, the devices you have there before you,

23   ultimately in connection with your investigation, was a search

24   warrant obtained to conduct a review and a forensic

25   examination of those devices?

A.    Yes.

Q.    And was an individual named Jason Whitt the forensic examiner who analyzed those devices?

A.    Yes, he was.

Q.    And again, 4A and 5A before you there were obtained from the defendant at the interview?

A.    Yes, the thumb drive and the MacBook computer.

Q.    And 1A and 2A were that morning from Kimberly Tatum?

A.    Yes.  The iPhone and the My Passport Ultra external drive.

        MR. ODULIO:  Your Honor, no more questions.

        THE COURT:  You may cross examine.

                    CROSS EXAMINATION

BY MR. AMES:

Q.    Agent Brown, good afternoon.

A.    Good afternoon.

Q.    The interview -- or session you had with Mr. Tatum that afternoon -- or evening, approximately how long did it last?

A.    I don't recall the exact length of the interview. Approximately two hours.

Q.    So it was pretty comprehensive.  It delved into other topics and questions.  Or was it mostly focused on these specific images?

A.    I work child pornography investigations so when I conduct an interview, the questions involve possession and

1  transportation of child pornography.

2  Q.   So there were additional questions that were asked about

3  searches and things that he looked for and what his general

4  predilection was toward pornography, right?  Just what his

5  interests were.

6       MR. ODULIO:  Your Honor, I'm going to object to

7  this.  I don't know if it's just the nature of the question,

8  but I'm going to object.

9       THE COURT:  Under hearsay rules, Mr. Ames, you may

10  ask the witness what she asked, but you may not elicit from

11  her what statements Mr. Tatum made to her.

12       MR. AMES:  Understood.  Thank you, Your Honor.

13  Q.   Did you ask David about any additional interests as far

14  as pornography?

15  A.   In relation to the line of questioning that we do during

16  interviews, we ask questions related to electronic devices:

17  how images are stored and what types of images and media we

18  might find on the devices that we are seizing.

19  Q.   Did you ask him if he ever purposefully or intentionally

20  sought out pornography of minors?

21  A.   I don't recall the exact questions that were asked; but

22  to my recollection, the questions, as you can see from the

23  transcripts, were based on possession of child pornography.

24  Q.   Right.  But my question was, did you ask him if he

25  actively, intentionally searched for child pornography?

1   A.   I don't recall if that exact question was asked; but
2   because of my work as a crimes against children investigator,
3   that's a question that is typically asked during these types
4   of interviews.
5   Q.   But you don't recall if it was.
6   A.   I don't recall at this time.
7   Q.   Okay.
8   A.   But I did ask questions related to child pornography and
9   the possession of child pornography.
10  Q.   And the images here that are being discussed, did he ever
11  acknowledge that he knew definitively or knew even with any
12  sort of certainty the ages of these people?
13          MR. ODULIO:  Same objection, Your Honor.
14          THE COURT:  Sustained.
15  Q.   Did you ask him about what -- the ages of anybody in any
16  images that are on this thumb drive you're investigating?
17  A.   Yes.  In particular, one of the excerpts -- David Tatum
18  told us that one of the images was of his minor ex-girlfriend
19  and that he made that image nude and then masturbated to that
20  image.
21  Q.   And did you ask him about other images that were put
22  through the DeepFake that were not of minors?
23  A.   Yes.
24  Q.   How many cases have you investigated with regard to this
25  type of material in general?

1  A.   I don't know the exact number, but I've been on the
2  Crimes Against Children Squad for about three and a half
3  years.
4  Q.   And as part of your experience in that, fair to say that
5  you're probably well versed in kind of the world of digital
6  pornography on the internet?
7  A.   Most of my cases involve some type of electronic
8  component, whether it be the internet, an electronic storage
9  device.
10 Q.   So -- I mean, what are some examples of popular
11 pornography websites that have come up in cases before that
12 are legal?
13          MR. ODULIO:  Objection, scope.  Or objection.
14          THE COURT:  I'll overrule it, but I don't see the
15 need to explore this particularly far.
16          MR. AMES:  Understood, Your Honor.
17          THE WITNESS:  I investigate people who have a sexual
18 interest in children and not those interested in legal
19 pornography.
20 Q.   Okay.  Well, is it the case that teens is a pretty common
21 search term for legal pornography?
22 A.   I don't know that answer.
23 Q.   You don't know.  So on a website like Porn Hub, for
24 example, is that a common category on their website, teens, as
25 a category?

1    MR. ODULIO:  Objection, Your Honor.

2    THE COURT:  Overruled, if you know.

3    THE WITNESS:  I don't know.

4  Q.   What about voyeurism, is that a common category?

5  A.   I'm not very familiar with Porn Hub.

6  Q.   Is there a website you are familiar with?

7  A.   Where you download child pornography, yes, which is the

8  cases that I investigate.

9  Q.   Okay.  So is it -- is it fair to say that you don't

10 know -- do you know any popular search terms on adult legal

11 pornography websites?

12 A.   No.

13    MR. ODULIO:  Objection.  Relevance to this, Judge.

14    THE COURT:  Overruled.  You may answer.  Do you

15 know?

16    THE WITNESS:  No.

17 Q.   Okay.

18 A.   I investigate child pornography.

19 Q.   So how do you distinguish between whether or not somebody

20 is searching for things -- for example, is -- whether that

21 person is searching for something legal in adults versus

22 something that's not?

23 A.   Child pornography is of people under the age of 18.

24 That's what we investigate.  And it's -- once you see an image

25 of child pornography, it looks like a child, someone under the

1  age of 18.

2  Q.  Understood.  But you indicated -- or there was questions

3  about things that he was interested in and -- voyeurism or

4  teens were categories, correct?

5  A.  Yes.

6  Q.  And that he looked at pornography in those categories

7  which he stated were common.

8           MR. ODULIO:  Objection, Your Honor.

9           THE COURT:  Sustained.

10          MR. AMES:  Understood, Your Honor.

11 Q.  Did you ask him any questions about what the images

12 themselves looked like that were morphed?

13 A.  Yes.  It was a nude image of his minor ex-girlfriend.

14 Q.  Do you know anything about how that process works?

15 A.  What process?

16 Q.  The morphing of an image.

17 A.  To my understanding, it's a website and you put an image

18 through the website and then it makes the people in the image

19 appear nude.

20 Q.  So they're not actually nude, just computer-generated

21 nude.

22 A.  The body of the person in the photo was nude.  Was that

23 the question?

24 Q.  Yeah.

25 A.  Okay.

MICHAEL GREGORY - DIRECT

1  Q.   So --
2  A.   The body -- the image -- the people in the image appeared
3  nude once you put it through the site.
4           MR. AMES:  No further questions, Your Honor.
5           THE COURT:  Any redirect?
6           MR. ODULIO:  Nothing, Your Honor.  Thank you.
7           THE COURT:  You may stand down.
8           (Witness stepped down.)
9           THE COURT:  You may call your next witness.
10          MR. ODULIO:  Your Honor, the United States calls
11  Michael Gregory.
12          MICHAEL GREGORY, GOVERNMENT WITNESS, SWORN,
13                    DIRECT EXAMINATION
14  BY MR. ODULIO:
15  Q.   Good afternoon, sir.  Please tell the jury your name and
16  spell your last name for the court reporter.
17  A.   Michael Gregory.  Last name is G-r-e-g-o-r-y.
18  Q.   And what do you do for a living?
19  A.   I'm a special agent with the FBI.
20  Q.   What's your assignment, Agent Gregory?
21  A.   I work crimes against children for the Charlotte field
22  office.
23  Q.   What is crimes against children?  What's that portfolio?
24  A.   I work matters pertaining to child pornography, human
25  trafficking, and missing children.

MICHAEL GREGORY - DIRECT

1   Q.   How long have you been in that role?

2   A.   For about the past eight years.

3   Q.   I'm going to draw your attention to September 22, 2021.

4   Do you recall that day?

5   A.   I do.

6   Q.   Were you assisting in a matter involving the

7   investigation of David Tatum?

8   A.   I was.

9   Q.   Where were you that day?

10  A.   I was providing assistance of a consent search at the

11  residence that Mr. Tatum shared with his wife.

12  Q.   And is that 13021 Pumpkin Way Drive in Mint Hill, North

13  Carolina?

14  A.   That's correct.

15  Q.   And what was the nature of the investigation generally?

16  A.   Child pornography.

17  Q.   You said you were assisting in the investigation.  What

18  in particular were you doing there at 13021 Pumpkin Way Drive?

19  A.   I was conducting what we call a consent search of that

20  residence.

21  Q.   What were you searching for?

22  A.   We were searching for electronic devices.

23  Q.   And why generally were you searching for electronic

24  devices?

25  A.   Investigations involving child pornography currently deal

1    with digital media, that is, media that can be stored on

2    desktop computers, laptops, iPads, thumb drives; any type of

3    electronic device that digital media can be stored, shared, or

4    transported with.

5    Q.    I'd like to show you now what's marked for identification

6    only as Government's Exhibit 13A.

7          Are you familiar with that document?

8    A.    Yes, sir, I am.

9    Q.    What is it?

10   A.    That's the residence that we conducted the search,

11   specifically the residence that was shared by Mr. Tatum.

12   Q.    And is that a fair and accurate depiction of the

13   residence, a photo of it?

14   A.    That is.

15   Q.    I'm going to show you another series of photos and we'll

16   move all of these in.

17         We'll show you now what's been marked for identification

18   as 13B.

19         Tell us generally what that is.

20   A.    So that is a room that is on the ground floor, the first

21   floor of the residence.  As you enter into the house to the

22   right, this was the first room to the right, which would be

23   consistent with, like, a home office.

24   Q.    Okay.  And then the ensuing photos which are 13C, 13D,

25   and 13E, are you familiar with those and tell us what those

1  are at a high level.

2  A.   So again, these are just other pictures or other views of

3  that same room which was consistent with a home office inside

4  that residence that we did the consent search.

5  Q.   Okay.  And those are fair and accurate depictions of the

6  images -- fair and accurate depictions of the place that you

7  searched there?

8  A.   They are.

9        MR. ODULIO:  Your Honor, we'd move in 13A, B, C, D,

10  and E.

11        THE COURT:  They're admitted.

12        (Government's Exhibits Nos. 13A, 13B, 13C, 13D, and

13  13E were received into evidence.)

14        MR. ODULIO:  Permission to publish, Your Honor.

15        THE COURT:  You may.  Once admitted, you may publish

16  at your pleasure.

17  Q.   Let's take a look at 13A and let's orient the jury,

18  please, to what we're looking at here, Agent Gregory.

19      What is this?

20  A.   So this is the very front of the house; again, the

21  residence at 13021 Pumpkin Way Drive that we conducted the

22  consent search.  This would be the very front of the house on

23  the sidewalk entering into the front residence -- or front

24  door of the residence.

25  Q.   Show you now what's been admitted as Government's Exhibit

MICHAEL GREGORY - DIRECT

1   13B.

2       What is 13B?

3   A.   So this is a view of the, again, room that's consistent

4   with a home office.  This is the view that one would see as

5   they have just entered the residence and turned to their

6   immediate right to enter this room.

7   Q.   13C, please.

8   A.   So this is a view of the room facing back into the house

9   to the viewer's left, is where you would have entered into

10  this room.

11  Q.   13D, please.

12  A.   So this is a view of the piece of furniture that's

13  consistent with a hutch that's just back behind the desk that

14  contains a desktop computer on the bottom -- on the floor,

15  along with a monitor on the very top.  But again, this is what

16  you're looking at is the hutch which is against the far back

17  window from the most previous picture.

18  Q.   And did you seize -- you mentioned a computer.  Did you

19  seize that computer in connection with your activity that day?

20  A.   That's correct.

21  Q.   And finally 13E.  What is 13E, sir?

22  A.   So 13E, this is the view between the desk and the hutch,

23  the hutch that you just saw in the previous picture.  You'll

24  see that there are three medicine bottles that are on top of

25  the desktop that contain the name David Tatum on the medicinal

MICHAEL GREGORY - DIRECT

1   bottles.

2   Q.   Did you see anything else, other literature or documents,

3   in the office just as you were looking around?

4   A.   I noted there was some medical literature, various

5   medical types of literature on the -- in the bookshelves.

6            MR. ODULIO:   Your Honor, permission to approach the

7   witness.

8            THE COURT:   You may.

9   Q.   Sir, I think we've got what's marked for identification

10  as Government's Exhibit 3A.

11       Do you see that?

12  A.   You talking about the computer in front of me?   I

13  apologize.

14  Q.   Yes.   Do you see the sticker on top that says 3A?

15  A.   I do.

16  Q.   Tell the jury what that is.

17  A.   This is the desktop computer that was seized from that

18  room, again, consistent with the home office that you just saw

19  pictures of previously.

20  Q.   And after it was seized was that entered into evidence

21  and maintained by the FBI?

22  A.   It was.

23            MR. ODULIO:   Your Honor, we offer 3A.

24            THE COURT:   It's admitted.

25            (Government's Exhibit Number 3A was received into

1  evidence.)

2  Q.   Did you have any other further involvement with that

3  computer after it was seized?

4  A.   No, sir.

5          MR. ODULIO:  No further questions, Your Honor.

6          THE COURT:  You may cross examine.

7                      CROSS EXAMINATION

8  BY MR. AMES:

9  Q.   What's the process of transporting it -- transferring it

10  to government custody?

11  A.   Once we seized it at the site where it's been located, we

12  do paperwork on scene in which we log what was -- what was

13  seized, when it was seized, where it was seized.  Then it's

14  transported back to our office where it's maintained at our

15  office space until further analysis.

16  Q.   Who else was present at the search of the home?

17  A.   Government wise or...

18  Q.   Everybody.

19  A.   With the FBI we had two other special agents, another FBI

20  professional, support employee, and there were four people

21  with -- to include Ms. Tatum located also in the residence.

22  Q.   Approximately what time was this search conducted?

23  A.   This was approximately at 6:30 PM that night.

24  Q.   And who was it that had you go over to -- instructed you

25  to go do this search?

1  A.    It was conversations that we had with the case agents

2  that requested assistance in going to search this house.

3  Q.    Who were those case agents?

4  A.    Special Agent Marisa Brown and Special Agent Scott

5  Atwood.

6  Q.    What did they tell you about what they were wanting you

7  to do in this search?

8  A.    It was already agreed upon to do a consent search at the

9  residence because they were going to be at another site.  So

10 we were divvying up tasks and which I was going to be at the

11 location previously identified.

12 Q.    Did they tell you what tasks that they were in the

13 process of performing?

14 A.    I don't recall.

15 Q.    Was -- approximately what time did you leave?  How long

16 did it take before it was all over?

17 A.    We were there for approximately an hour and a half, so

18 roughly 8:00 PM that night.

19 Q.    So around 6:30 to around the 8:00 time frame?

20 A.    Correct.

21 Q.    And simultaneously the case agents were doing something

22 else?

23 A.    Correct.

24 Q.    And you're not a hundred percent sure what they were

25 doing.

MICHAEL GREGORY - CROSS

1   A.   Yes, sir.

2   Q.   Do you know whether or not they were with David Tatum?

3          MR. ODULIO:  Objection.

4          THE COURT:  Sustained.  He's answered that.

5   Q.   Was there any particular -- was there any conversation

6   about what time to go over to the residence?

7          MR. ODULIO:  Objection.

8          THE COURT:  Overruled.

9          THE WITNESS:  I don't recall a particular time being

10  discussed, what time we needed to be there, on or about, so I

11  can't really answer that.  I'm not sure.

12  Q.   Did you reach out to anybody at the residence in advance

13  to let them know you were on the way or anything?

14  A.   I don't recall.

15  Q.   During the pendency of the search, did you have any

16  contact with any of the case agents while you were doing --

17  conducting it?

18  A.   I don't recall during the search.  Maybe after the

19  search, but I can't say for certain that we discussed anything

20  while the search was occurring.

21  Q.   What rooms in total did the search consist of?

22  A.   So because this was a consent search, we could only

23  search areas in which the person allowing us to search had a

24  shared space.  So we searched, I believe, up to four rooms

25  that were shared by Ms. Tatum and Mr. Tatum.

1      MR. AMES:  No further questions at this time, Your

2 Honor.

3      THE COURT:  Any redirect?

4      MR. ODULIO:  Nothing, Your Honor.  May he be

5 excused?

6      THE COURT:  You may.  You may stand down.

7      THE WITNESS:  Thank you, Your Honor.

8      (Witness stepped down.)

9      THE COURT:  Call your next witness.

10      MR. CERVANTES:  The United States calls Daniel

11 Jackson.

12         DANIEL W. JACKSON, GOVERNMENT WITNESS, SWORN,

13                   DIRECT EXAMINATION

14 BY MR. CERVANTES:

15 Q.   Sir, can you please introduce yourself to the jury and

16 spell your last name.

17 A.   Yes.  Hello.  I am Daniel W. Jackson, J-a-c-k-s-o-n.

18 Q.   How are you employed?

19 A.   I am employed by the FBI Digital Evidence Laboratory in

20 Quantico, Virginia.

21 Q.   What's your current assignment?

22 A.   My current assignment is electronics engineer, forensic

23 examiner.

24 Q.   How long have you been working for the FBI?

25 A.   For 31 years.

DANIEL JACKSON - DIRECT

1   Q.   During that time what is the nature of the work that
2   you've done for the FBI?
3   A.   The first year I examined telephone systems to see if
4   they had been compromised by having listening devices placed
5   in the systems, basically to make sure that phones, when there
6   were classified discussions, were clear.  But after that
7   year -- that program was a joint operation between
8   intelligence agencies, the FBI and CIA and such.
9       Then I went into the digital evidence laboratory as an
10  electronics technician.  I worked as that, as a forensic
11  technician, for a few years.  I finished my associate degree
12  in electronics and my bachelor's degree in computer science
13  and I became an engineer forensic examiner.  And so for 30
14  years I've been doing this kind of work, electronic device
15  forensics.
16  Q.   I'd like to talk to you about your experience in
17  performing forensic examinations of electronic devices.
18      As part of your job, do you perform forensic examinations
19  of digital evidence?
20  A.   Yes, I do.  That is my mission.
21  Q.   What are forensic examinations?
22  A.   So when I started in the early '90s, it was in
23  electronics.  We were the only forensic electronics
24  engineering lab in the country.  So we would look at anything
25  that any law enforcement agency, department, state, local,

1   federal, wanted an exam on.  So at that time there was not

2   cell phones, which quickly took over the market in the '90s.

3   So I would perform examinations on FM radios that they were

4   using, walkie-talkies to do bank robberies, shocking devices

5   that were being used to torture people that had been

6   kidnapped.

7       But quickly -- then quickly our main cases started

8   becoming digital diaries, PalmPilots in the '90s.  Young folks

9   might not remember what those are.  In those cases my job was

10  develop and to access the data that was password protected.

11  And that has evolved into phones, pushing out the need for

12  PalmPilots.  So I've done that same work.  And that's been the

13  major part of my career.  The last six years I've specialized

14  in hard drives that are damaged or locked and accessing the

15  data on them.

16  Q.  Where is your lab located?

17  A.  It is in Quantico, Virginia, on the FBI campus which is

18  located within the Quantico Marine Corps base.

19  Q.  Do you also perform data extractions from digital

20  devices?

21  A.  Yes, I do.  I am -- we are accredited by ANSI, the

22  American National Standards Institute, to do forensic exams of

23  digital evidence.  And for that I use those procedures for

24  extracting and making a forensic one-for-one copy of digital

25  evidence.

DANIEL JACKSON - DIRECT

1  Q.   What does it mean to do data extraction?

2  A.   Data extraction.  So if I get a hard drive in that is

3  broken or locked -- if it's broken, I fix it.  There is a

4  circuit board on there that can fail.  There are read/write

5  heads that can fail.  If it's locked, I bypass the password

6  using different methods.  Some are just locked -- some hard

7  drives are just locked and other hard drives are locked and

8  encrypted or just encrypted.  So if I can get by the security,

9  then it's just an open hard drive and I make a forensic copy

10 of it, which is a one-for-one copy.

11 Q.   So you alluded to this a moment ago, but as part of your

12 job you have experience getting into hard drives that are

13 password protected and encrypted?

14 A.   Yes.  Yes, that's -- that's a big -- that's a large

15 portion of my work.

16 Q.   Approximately how many devices have you been able to

17 access that were password protected and encrypted?

18 A.   Most phones now are encrypted so I would say there's --

19 not just password protected, but the data.  In the old days I

20 would get by the password which is usually not too complex and

21 then I'd just copy out the data.

22 Q.   Mr. Jackson, I'm sorry --

23 A.   I'm sorry.

24 Q.   I'm sorry to interrupt.  Just roughly in terms of number

25 of devices for the --

1  A.   I'm sorry.  I'm sorry.  I'd say about two thousand.

2  Maybe fifteen hundred, two thousand.

3  Q.   So you mentioned a one-for-one copy in something that you

4  had said earlier.  So can you explain to the jury what it

5  means when you make a copy of that data.

6  A.   So in computer forensics it's -- usually the first step

7  of our work is to make a forensic copy.  It's called -- it's

8  called a forensic image in the field.  And that is whether you

9  get a memory stick, like let's say an SD card from a camera,

10  or a hard drive, that is put on an approved tool that is

11  approved and tested, validated.  We have a whole department

12  that tests and validates our tools.  Plus we share with other

13  law enforcement agencies that they've tested and validated

14  through ANSI that I mentioned earlier, the American National

15  Standards Institute.  They have a whole -- so I'm making a

16  forensic -- a one-for-one copy.  Each -- each block of data is

17  checked before it is copied.

18       And then after all the data is copied, it is checked

19  again through a mathematical formula and that gets us what we

20  call a digital fingerprint or a hash and that way we know --

21  we know we have a one-for-one copy.  And when anybody else

22  wants to make a copy to work on it, this is -- what I make is

23  usually called a master copy and other people, if they make a

24  copy of it, they should do the same forensic procedure and

25  check the digital fingerprint because, you know, you're

1  moving -- you're moving, let's say, 2 billion blocks of data.

2  You know, you want to make sure all that data copied

3  correctly.

4  Q.   Sir, I'd like to just briefly touch on your training.

5  A.   Sure.

6  Q.   So do you have specialized training in the field of -- or

7  I guess the skill of making copies of devices?

8  A.   Yes, I do.  I am -- by the FBI I am -- through our

9  quality assurance program, I have taken the training and

10 completed testing, and I'm tested every year as a follow-up

11 test just to make sure that I get the results that I'm

12 supposed to get on a piece of media.

13 Q.   Have you testified as an expert in court before?

14 A.   Yes, I have.  Around ten times.

15          MR. CERVANTES:  Your Honor, at this time the

16 government tenders Mr. Jackson as an expert in the extraction

17 and forensic examination of digital evidence.

18          THE COURT:  Any objection?

19          MR. AMES:  Not to that, Your Honor.

20          THE COURT:  All right.  The Court recognizes this

21 witness as an expert in those fields.

22          Members of the jury, I don't know if this witness is

23 going to offer any opinions or whether he's just going to tell

24 you what he did for you to judge whether he was qualified to

25 do what he did.  Normally witnesses aren't allowed to render

1  opinions.  And like I said, I don't know if he's going to or

2  not.  But the rules do allow an expert to render an opinion if

3  scientific, technical, or other specialized knowledge might

4  assist the jury in understanding the evidence or determining a

5  relevant fact.  However, merely because someone is qualified

6  as an expert and offers an expert opinion does not require you

7  to accept that opinion.  Just as with any other witness, it is

8  solely within your responsibility as jurors to decide whether

9  and to what extent an expert opinion is credible.

10        In assessing the credibility of expert testimony,

11  you should consider whether the witness's training and

12  experience are sufficient to support the testimony in

13  question.  And you should also consider whether the expert's

14  opinions were based on adequate information, sound reasoning,

15  and good judgment.

16        You may proceed.

17  BY MR. CERVANTES:

18  Q.   Did you perform a forensic analysis in the case against

19  David Tatum?

20  A.   Yes.

21  Q.   Did you apply the steps and techniques that you just

22  described in this case?

23  A.   Yes.

24  Q.   How did you get involved?

25  A.   It is my job to do these kind of cases.  They come into

DANIEL JACKSON - DIRECT

1  our digital evidence laboratory and they get assigned to me.

2  At the time I was the only person doing this work.  And that's

3  how I became involved in the case.

4  Q.   Did you receive a device?

5  A.   Yes.  I received a locked hard drive in this case.

6  Q.   Do you remember what kind of hard drive it was?

7  A.   It was a Western Digital hard drive, My Passport.

8         MR. CERVANTES:  May I approach, Your Honor?

9         THE COURT:  You may.

10 Q.   I've handed you what has been admitted as Government's

11 Exhibit 1A.  It has that sticker in the bottom.

12      Do you recognize it?

13 A.   Yes.  This is an external hard drive and this is what I

14 received as the evidence for this case.

15 Q.   Did you receive instructions or requests related to that

16 hard drive?

17 A.   Yes.  I received instructions to access all the data on

18 this piece of evidence, this hard drive.

19 Q.   And why is that?  Was it accessible to begin with or not?

20 A.   It was password locked and I -- even though that comes in

21 in the field saying that this can't be accessed, I -- the

22 first thing I do in a case like this is connect it and verify,

23 yes, it is password locked.  I have a tool that will tell me

24 if it is locked that I used on this case.

25 Q.   And did that tool tell you that it was locked?

1    A.    Yes.  It was locked with a password, a WD password.

2    Q.    What does it mean to be encrypted?

3    A.    Encrypted -- a drive -- here we go on one that's open.

4    Q.    Wait, I'm sorry.  What you're holding in your left hand

5    has not been admitted yet.

6    A.    May I use this to show -- to explain the part that's

7    locked on a hard drive?

8    Q.    So let's go through the process of admitting it first.

9    So you're holding something in your left hand.  All right.

10   Now both hands.  What is that?

11   A.    This is the forensic copy I made of this hard drive.

12   And --

13          MR. CERVANTES:  Your Honor, the government moves

14   Exhibit 12 in evidence.

15          THE COURT:  It's admitted.

16          (Government's Exhibit Number 12 was received into

17   evidence.)

18   Q.    Go ahead.

19   A.    So when a hard drive is -- the difference between a hard

20   drive encrypted and a hard drive locked, the controller board

21   on a hard drive can lock where you cannot access the data

22   which is all stored here on magnetic platters that spin like a

23   record, but they're obviously this big.  This is a little bit

24   smaller hard drive.  It's called a laptop size hard drive

25   where this is a desktop one, but they have the same parts.

1  They're just smaller.

2      So this circuit board can be locked.  So you cannot read

3  anything from it unless you send the password to it.  It will

4  unlock and you can -- then you can use it like a regular hard

5  drive.

6      So that was a locked drive.

7      An encrypted drive -- if a drive is just encrypted, you

8  can see the data here, but it is all scrambled with an

9  encryption key -- encryption algorithm.  And then if you enter

10 a password with that, that generates the key and that

11 descrambles the data and then you can see it in the clear.

12     So encrypted is scrambled with a mathematical algorithm,

13 the data, but it's accessible.  And a locked hard drive has a

14 feature in the hard drive, in the controller circuit board,

15 that doesn't let you access the data on the platters.  So

16 there are two types of -- two types of cases I work with

17 regularly.

18 Q.  Drawing your attention to 1A, the other one.

19 A.  Yes, sir.

20 Q.  The My Passport hard drive.  Was that passport encrypted?

21 A.  Yes.  When -- this is -- this is the WD features for this

22 hard drive for -- for this hard drive.  When you set a

23 password in this hard drive, it does lock the controller

24 board, but it also encrypts the data on the drive.  So if I

25 were able somehow to look at just the data, it would all be

DANIEL JACKSON - DIRECT

1  scrambled, which -- anyway, doing research I have gone through
2  that step and looked at data and it's all scrambled.
3  Q.   Were you able to unlock that My Passport?
4  A.   I was.  I was able to unlock it.  In this certain drive
5  there is a flag in here that says that it's -- that there's a
6  password.  And when there's a password it's encrypted.  In
7  this particular drive I can access the low level operating
8  system, what we call the -- its modules.  I mean, each one of
9  these are -- each one of these devices are like a
10 minicomputer.  They have a microprocessor and they perform the
11 functions to unlock and decrypt the data.
12      So on this one -- on this specific drive, you can, if you
13 can access the -- where the modules are stored, which is the
14 operating system -- if you load Windows, it's the actual
15 operating system of the drive.  If you can access that, you
16 can reset the encryption flag which turns off the password.
17 And also, once you reboot it it automatically decrypts the
18 data, which my -- so my tool lets me access -- the tool that I
19 use lets me perform that procedure, turn off that flag and
20 then reboot it.
21 Q.   Once you unlocked the device and was able to access the
22 unscrambled data, what did you do next?
23 A.   Then that's the -- then that's usually the challenging
24 part.  Sometimes it's easy; sometimes it's not.  This -- we
25 have a commercially available tool that does this, that

1  unlocks the drive.

2       So then I have an open drive and it's just -- it's just,

3  okay, I've gone to that.  I make a forensic copy of it using

4  an accredited tool.  I make that copy.  Check that the -- that

5  the tool produces a log that's written to the drive with the

6  data and it passed.  And I have completed my work, my mission

7  for this case.  Unlock the drive, make a copy of the drive.

8  Q.   In your opinion --

9  A.   Those are my two major tasks.

10 Q.   I'm sorry?

11 A.   Those are my two major tasks that I have for a case like

12 this that I completed.

13 Q.   So drawing your attention now to the other exhibit, 12.

14 A.   It's -- yes.  Yes, sir.

15 Q.   In your opinion, is that a one-for-one copy of the My

16 Passport hard drive?

17 A.   It is.  And I would argue it's not an opinion; that it is

18 a fact.  It passed a known highly used tool in computer

19 forensics and it made a one-for-one copy.

20 Q.   What did you do after you did this work?

21 A.   After I do this work, I send it back to the contributor,

22 which was our FBI office in Charlotte, North Carolina.

23 Q.   Did you have any further involvement in this case?

24 A.   I did not.

25            MR. CERVANTES:  No further questions.

1          THE COURT:  You may cross examine.

2                    CROSS EXAMINATION

3  BY MR. AMES:

4  Q.   Hi, sir.  The Western Digital drive that you were sent --

5  I understand you've done a lot of investigations.  Have you

6  done this work with that type of drive specifically before?

7  A.   Yes.  I've seen this five, ten times.  I see so many hard

8  drives all day, I don't -- but yes, I did.  I have seen it

9  before and performed this procedure in other cases that have

10 not gone to trial.

11 Q.   Do you know whether or not or recall if -- are there

12 different varieties or versions of this type of device?  Are

13 they more or less similar?

14 A.   Yes.  Yes.  There are many -- there are -- there are

15 similar drives like this and they -- they evolve.  So the tool

16 that I use won't work on your drives, the method.  So we have

17 to develop a different method or the manufacturer of this

18 commercially available tool has to.  So yes.  Yes, sir.

19 Q.   I guess how do you -- what's the process of you

20 determining which devices or which tools you need to use based

21 on a specific drive?  How do you determine that?

22 A.   Well, it's -- that part is fairly easy because there's

23 only one main accepted tool that does this type of work

24 that -- I've worked with forensic labs and data recovery

25 companies across the globe.  I've been to, most recently,

DANIEL JACKSON - CROSS

1   Tokyo working with their federal police on -- we all use a
2   tool called PC-3000 made by ACE Lab in Europe.  And once --
3   once you plug this in, it will usually tell you the family,
4   the version of the drive, so you'll know -- you'll know
5   where -- which method to go with.
6   Q.   Okay.  So the program tells you that.  Do you recall with
7   this drive or be able to tell us what information it gave you
8   about the drive as far as...
9   A.   It gives me -- I'm sorry, I'd be -- I just always know I
10  can plug in a similar drive into my tool and it gets me -- it
11  gives me the model of the drive, the firmware that the drive
12  is running, and the family of the manufacturer.  The family
13  like in this Western Digital, they give them names like Diablo
14  and, you know, so many different names.  And that's a family
15  of drives.  It's all using the operating -- same operating
16  system.  And then they can -- as each model goes, they can
17  tweak that operating system within that family.
18  Q.   Do you recall which operating system or family that this
19  particular device was  --
20  A.   I do not.  I could find that for you back in the lab very
21  quickly, but I -- it's something I don't capture in my notes
22  because I've never been asked it.  I know where I can get it
23  from if somebody had a question.
24  Q.   You mentioned about newer -- some newer devices might use
25  a different type of testing, I believe.  Correct me if I'm

1  wrong about that.  But there are some devices you're saying --
2  newer types of devices require something slightly different.
3  A.   When you're getting into locked drives and -- mainly
4  locked drives on my tool, each -- just like with each iPhone,
5  the manufacturer of the commercial tool has to buy it, reverse
6  engineer it, write a program for it and push it out to us.  So
7  the steps and the menu that you have to click through would be
8  different with each new model hard drive.  And the very newest
9  hard drives they don't have a method for yet because they
10  haven't reverse engineered how the drive works.
11  Q.   Do you have any notion of, like, how old this particular
12  device is based upon your analysis?
13  A.   I could open it and see if there's a date.  I could crack
14  it open and I could tell you the date code on it, but I
15  don't -- I don't know off the top of my head.  They do put a
16  date code on the drives where -- and we have in the past
17  contacted Western Digital to see -- we've had some specific
18  drives that are broken and we need replacement parts and we
19  have contact with their engineering and their legal department
20  and we've called them up and they've been able -- you know, in
21  high profile terrorism cases, they've even been able to tell
22  us who the drive was sold to, Best Buy, and we can go to Best
23  Buy and see who bought that.
24       But I don't have off the top of my head when this drive
25  was made.  It looks like just from me working in the lab, it

DANIEL JACKSON - CROSS

1  looks like it's several years old: three, four, five.

2  Q.   And that information about where -- this isn't a

3  terrorism case, but would that be Western Digital has that or

4  would that be maybe the place where everything was bought

5  would have that, or both?

6  A.   Western Digital would have who they sold it to, whether

7  it was Best Buy, Dell, their computers, their hard drives.

8  There's only two major manufacturers of hard drives left in

9  the world.  There used to be ten or so.  But just Seagate and

10 Western Digital.

11      And they -- I had to -- I had to testify on a terrorism

12 case in Mumbai, India, for the government of India and for

13 that we did contact them and they did -- they did track down

14 who they sold it to.  And then it's up to the FBI to go to who

15 they sold it to, or since that was an international case,

16 another international police agency, to see if there was any

17 records from that, you know.

18              MR. AMES:  No further questions, Your Honor.

19              THE COURT:  Any redirect?

20              MR. CERVANTES:  No, Your Honor.

21              THE COURT:  Thank you, sir.  You may stand down.

22              THE WITNESS:  Thank you.  Do I leave these specimens

23 here?

24              MR. CERVANTES:  If you could bring them back to me,

25 that would be good.

1            (Witness stepped down.)

2            THE COURT:  All right.  Members of the jury, let's

3   take our midafternoon break.  It's a little early, but my hope

4   is that after this break we can just plow through until about

5   5:00.  But, of course, if you need an additional break in the

6   afternoon, let me know that as well.

7            I'm sure you have the rules memorized by now, but do

8   not discuss this case among yourselves.  Don't start forming

9   any opinions.  And don't do any independent research.  And

10  we'll be back with you in about 15 minutes.

11           (Jury exited the courtroom.)

12           THE COURT:  We'll be in recess for 15 minutes.

13           MR. CERVANTES:  Your Honor, just a housekeeping

14  measure for administrative purposes.  The next witness is our

15  most lengthy witness.  It's the next forensic examiner.  I

16  estimate his direct is somewhere around three hours.

17           THE COURT:  So be it.

18           MR. CERVANTES:  Okay.

19           (Brief recess at 2:52 PM.)

20           (Court back in session at 3:08 PM.)

21           (Jury not present.)

22           THE COURT:  Do you have something?

23           MR. CERVANTES:  Yes, Your Honor.  So this witness,

24  part of what he's going to testify will be related to the

25  404(b) slash 412 issues that we discussed.

DANIEL JACKSON - CROSS

1          THE COURT:  Yes.

2          MR. CERVANTES:  So how would the Court like me to

3   flag that?

4          THE COURT:  At what point during his testimony do

5   you anticipate that?

6          MR. CERVANTES:  So just before getting into certain

7   videos, for example, what I could do is I could pause and ask

8   the Court to provide an instruction.

9          THE COURT:  All right.  That would be fine.

10          MR. CERVANTES:  Would the Court want me to do that

11   for -- there's basically three sections.  So one is a video of

12   the cousin that was also recorded in that same bathroom.  So

13   we want to show the jury that video.

14          Another one is the patient that he recorded under

15   the table.  I say he.  Obviously that's disputed.  The patient

16   that he recorded under the table.

17          And the third would be the adults pictured in a

18   folder, the folder where he kept his modified victims.  During

19   the last hearing defense counsel, I understood, withdrew that

20   objection because that's part of his theory, but I don't know

21   if the Court still wants to instruct.

22          THE COURT:  If there's no objection to that, then

23   the Court wouldn't issue an instruction at that point.

24          MR. AMES:  Your Honor, I think back then it was that

25   the admission of adult images is not inculpatory in our

1  belief.

2          I would -- so it's clear, the evidence thus far has

3  been of devices, with no corroboration whatsoever, being

4  handed to them by purportedly Kimberly Tatum.  And the

5  physical device is what Kimberly Tatum gave them and that's --

6  one so far has been introduced into evidence.  And what is the

7  foundation even before we get here for the contents of the

8  devices?  If the testimony and the evidence is introduced to

9  say I got this from this person, it is what I got, fine.  The

10 contents of the devices, there's been no groundwork laid

11 whatsoever as far as authenticating that these are devices

12 that supposedly came -- contain pornography.  There's no

13 attribution of any kind whatsoever.

14         THE COURT:  I think that's what we're about to hear,

15 that these devices contain child pornography.

16         MR. AMES:  We have not heard a single word about

17 where they came from, whether or not there was actually

18 consent to turn over any of these devices, in particular with

19 respect to the Western Digital drive that was not part of that

20 consent search that was taken out of -- this is all proffered.

21 I mean, we've heard zero evidence about it, only a proffer

22 that this was taken out of a bag that belonged to David

23 supposedly by his wife.  It's password protected and

24 encrypted.  She doesn't have access to it nor the password to

25 it.  No access to it.  It's not a shared or joint device.

1          THE COURT:  Well, as I understand it, there's going

2     to be forensic evidence linking the device and its contents to

3     Mr. Tatum; is that correct?

4          MR. CERVANTES:  Yes, Your Honor.

5          THE COURT:  So we're going to let that play out.  To

6     the extent you're making an objection, I guess you are, it's

7     overruled and we can take it up again if you think it's

8     necessary.

9          MR. AMES:  If I may, and one other note if I could,

10    Your Honor, that in the discovery process, the indicia of

11    reliability that Kimberly Tatum had -- again, this is perhaps

12    getting into a suppression motion, but what I'm being told now

13    by this forensic analyst is that this is a device or a drive

14    that is a few years old.  That the statement from Kimberly

15    Tatum that was proffered -- again, never actually

16    introduced -- was that this device used to belong to her when

17    she was in grad school and no indication of when grad school

18    was.  I can proffer it was well more than a few years ago when

19    this supposed device that supposedly she backed her laptop on.

20    She graduated grad school in 2012.

21          THE COURT:  None of this makes any difference, you

22    realize.

23          First of all, the witness said he didn't know how

24    old the hard drive was.  He offered to open up the exhibit and

25    tell you exactly what the hard drive said.  You didn't take

1  him up on it.  And to the extent that you're making an

2  argument along the same lines that you have, that is overruled

3  and we can take it up again at an appropriate time if there is

4  another appropriate time.

5          MR. AMES:  So it's my understanding the testimony

6  here from the analyst is of all of the devices and the

7  authentication for them was that they were handed to the

8  government by Kimberly Tatum supposed -- that's the

9  foundation.

10         THE COURT:  My understanding, Mr. Ames, is that the

11  government is going to solicit testimony from a forensic

12  examiner that will have a digital link to this defendant.

13         Thank you.

14         MR. AMES:  Thank you, Your Honor.

15         THE COURT:  Mr. Cervantes, if this really is going

16  to go roughly three hours, if you would, perhaps in

17  coordination with Mr. Odulio, try to find a time close to 5:00

18  on either side for a natural break.  I mean, I could try to

19  guess, but if you, not to break up your direct examination

20  overly much, could keep an eye out for some natural break in

21  the testimony.

22         MR. CERVANTES:  Yes, Your Honor.  I suspect that a

23  natural break would be in between devices.

24         THE COURT:  All right.  Well, I'll look to you for

25  that.

JASON WHITT - DIRECT

1          Please bring the jury.

2          (Jury entered the courtroom.)

3          THE COURT:  All right.  Members of the jury, I don't

4   want you to think we just took a second lunch or anything.  I

5   try to take advantage of you being out of the courtroom to

6   handle some things that I have to do outside of your presence

7   so I'm not bringing you in and out all the time.  So rest

8   assured we were working and got back to you as soon as we

9   could.

10          All right.  Please call your next witness.

11          MR. CERVANTES:  The United States calls Jason Whitt.

12          JASON WHITT, GOVERNMENT WITNESS, SWORN,

13                    DIRECT EXAMINATION

14  BY MR. CERVANTES:

15  Q.   Good afternoon, sir.

16  A.   Good afternoon.

17  Q.   Can you please introduce yourself to the jury and spell

18  your last name for the record.

19  A.   My name is Jason Whitt.  Last name is W-h-i-t-t.

20  Q.   How are you employed?

21  A.   I am employed with the Federal Bureau of Investigation.

22  Q.   And what's your current assignment?

23  A.   My current assignment is a senior digital forensic

24  examiner.

25  Q.   How long have you been in that role?

1    A.    So I've been a digital forensic examiner since I started

2    with the bureau in August 2010.  I was certified as an

3    examiner in 2012.  And then I received my senior digital

4    forensic examiner certificate in 2017.

5    Q.    And so you've been a senior forensic examiner since 2017?

6    A.    Yes, sir.

7    Q.    What did you do before the FBI?

8    A.    So before the FBI I was a police officer in Wilmington,

9    North Carolina, where my duties included working patrol.  I

10   also was a detective working crimes against children.  And

11   also worked as a task force officer with the FBI with the

12   Wilmington Police Department working crimes against children

13   matters also.

14   Q.    In your role as a forensic examiner, are you responsible

15   for reviewing child exploitation cases?

16   A.    Yes, sir, I am.

17   Q.    How long have you been doing that?

18   A.    Reviewing child exploitation matters?

19   Q.    Yes, please.

20   A.    I've been doing it since I started with the bureau in

21   2010.

22   Q.    So let's talk -- I'm sorry.  Before we get to that, your

23   educational background.  Do you have any degrees?

24   A.    I do.  I have a degree in management information systems

25   from the University of North Carolina at Wilmington.

JASON WHITT - DIRECT

1  Q.   Let's talk about some general concepts first.  When we
2  talk about electronics, what are forensics?
3  A.   So forensics is using policies and procedures to retrieve
4  files off a computer in a way that keeps the files pure so it
5  retains all the information, dates and times.
6  Q.   What is an artifact?
7  A.   So a digital artifact, you'll hear me probably say.  A
8  digital artifact is that file whether the file would be a
9  document, a video image.  We refer to them as retrieving the
10 digital artifacts.
11 Q.   What is metadata?
12 A.   So metadata is information about data.  So if you have an
13 image or a document, there is metadata associated with that
14 document that tells you who the author might be, when it was
15 created, that type of thing.
16 Q.   Let's talk about your experience conducting forensic
17 examinations.  Do you have experience in that area?
18 A.   Yes, sir, I do.
19 Q.   What does it mean to do a forensic examination?
20 A.   So a forensic examination, you would take a -- let's talk
21 about a hard drive, a piece of digital media.  You would take
22 that hard drive and you would use policies and procedures to
23 make a forensic image of that hard drive.  Now, what I mean by
24 policies and procedures is you put it behind a write blocker,
25 which is a piece of hardware that will not allow me to change

1  that hard drive.  Once that hard drive is behind a write
2  blocker where I cannot make any changes, we make a forensic
3  image of that hard drive.
4      And think of a forensic image kind of like if you have a
5  favorite book.  You're making a photocopy of it for a friend.
6  All your notes, all your bent pages, maybe you spilt coffee on
7  it, anything of that nature, when you take a photocopy of it,
8  you're going to capture all those things on that book.
9      So a forensic image of a digital media or hard drive is
10 exactly that.  It's a bit-for-bit copy of the digital media
11 where at that point we have a hash value assigned to it.  So
12 the hash value, once we create the forensic image, it assigns
13 a hash value which is a mathematical algorithm which tells me
14 that this hard drive, this is a fingerprint of the hard drive.
15 So if I would go into the hard drive and I would change a
16 pixel in one of the images, that hash value would change,
17 like, completely.  So as long as we have the hash value, we
18 can validate our forensic image and tell it is pure and it
19 hasn't changed since the day we took the forensic image of it.
20 Q.  Do you also perform data extractions from digital
21 evidence?
22 A.  I do.
23 Q.  Can you explain to the jury what that means and what that
24 process is like.
25 A.  Yes, sir.  So once we have the forensic image, we then

JASON WHITT - DIRECT

1  use forensic software -- there's a bunch of them out there --
2  to extract the digital artifacts from the hard drive, from the
3  forensic image of the hard drive.  And then we put them into
4  let's call them containers.  We put all the documents in
5  containers, all the images, all the media, all the OS
6  artifacts into a container so that the case agent, or whoever
7  is going to review it, can easily review the information from
8  the forensic image.
9  Q.  What kinds of digital devices do you work with?
10  A.  So digital devices, I'll work with hard drives,
11  externals, thumb drives, servers, cell phones.  Anything
12  that's digital we work with.
13  Q.  And where is it that you work exactly?
14  A.  So I work in the Charlotte field office here in
15  Charlotte, North Carolina, in the FBI office.
16  Q.  When you copy a device, what is the point in time that
17  you copy?
18  A.  So once we copy a device, once we retrieve the device
19  from evidence, that is the time that we create the -- or
20  that's the time we create the forensic image.  So once we
21  create it, there's no writing to it.  Once we have an image,
22  we can always go back and test it or pull more artifacts from
23  it if need be.
24  Q.  What steps do you take to ensure that the copy you make
25  is not altered as you review the data from the copy?

JASON WHITT - DIRECT

1    A.   So we take a pre-hash, which I described to you.  It's

2    kind of like the fingerprint of the digital image.  And then

3    we take a post-hash.  So once we do all our forensic

4    examinations, pull the artifacts that we need, review it, we

5    take a post-hash.  So we run a piece of software, forensic

6    software, against the hard drive and take the hash value of

7    it.  We then compare it with the pre-hash so therefore we can

8    say this hard drive has not changed since day one to day

9    whenever we're done with the examination.

10   Q.   Approximately how many devices do you think --

11   approximately, do you think you have examined in your career?

12   A.   Over a thousand devices.

13   Q.   What percentage of your workload involves processing

14   evidence in child pornography or child exploitation cases?

15   A.   So child exploitation cases probably take about 80 to

16   85 percent of my time at the bureau.

17   Q.   In your career how many child pornography files have you

18   come across?

19   A.   In the years that I've been doing this, hundreds of

20   thousands of child exploitation images.

21   Q.   Based on your training and experience, have you come

22   across standard or repetitive name conventions in naming child

23   pornography files?

24   A.   I have.

25   Q.   Does that training and experience inform your techniques

JASON WHITT - DIRECT

1  in how you forensically analyze a device for child

2  pornography?

3  A.    Yes, sir, it does.

4  Q.    Can you explain what you mean by that.

5  A.    So when we start a child exploitation investigation or

6  examination on my end, there are certain terms that we run an

7  index search about.  And what an index search is is the

8  forensic software I was telling you about that reviews that

9  forensic image, it will go through and it will pull all the

10  words out that it sees inside of this hard drive, so there's

11  millions and millions of words; and it indexes them so that

12  way when we search these words, it will pull them up fast and

13  we can see where they're at.

14        So some of the search terms that I look for is pthc,

15  which means preteen hardcore.  There's other terms that we

16  look for called ray gold, LS models, pedo, pedophilia.

17  There's a bunch of search terms out there.  Those are the some

18  of the ones I start with running an index search.

19  Q.    Let's talk about the tools you use.  What tools are used?

20  A.    So we use, like, hardware drive -- hardware hard drive

21  duplicators or -- to create the forensic image of the hard

22  drives.  We also use software to process the forensic image,

23  whether it's AXIOM, whether it's Access Data, Cellebrite.  We

24  also use FTK Imager which helps us create those forensic

25  images also but also allows us to run those hash values again.

JASON WHITT - DIRECT

1  Q.   Can you describe what is AXIOM?

2  A.   AXIOM is a forensic software from Magnet.  They make

3  software so that you can load the forensic image into this

4  piece of software and start pulling out those digital

5  artifacts and putting them in those containers that we talked

6  about.

7  Q.   Is AXIOM a software that you use?

8  A.   It is.

9  Q.   Is it commercially available?

10  A.   Yes, sir, it is.

11  Q.   Have you attended training that was specifically related

12  to AXIOM?

13  A.   Yes, sir, I have.

14  Q.   Are you certified in using AXIOM as an analyst?

15  A.   Yes, sir, I am.

16  Q.   Let's talk about your training generally.  What kind of

17  training have you received for forensic examination of

18  devices?

19  A.   So when you start with the FBI, to get your certification

20  as a digital forensic examiner with them, it takes anywhere

21  from eight months to two years depending on when the classes

22  become available.  During that time I have taken over 200

23  hours of training with the bureau, whether it's Access Data --

24  access Data is another piece of forensic software like AXIOM.

25  So I've taken training in Access Data, internet forensics,

1    Windows forensics.  Got A-Plus certified, Net Plus certified
2    during my training.
3         Then after that you take a Capstone -- let's go back.
4    Then you must also do five searches and five examinations
5    under a mentor or a coach.  Then after you've completed all
6    that training, after you've completed your searches and your
7    examinations, you then do a Capstone course where they give
8    you like a mock investigation or mock hard drive that you have
9    to image with the policies and procedures you learned and pull
10   out those digital artifacts.
11        Once that is completed, we have to go to another training
12   called moot court where we are put on the stand and we have to
13   testify to our findings.  After that you're certified as an
14   examiner with the FBI.
15        And then we are given training throughout the year.  So
16   every year we try to take at least one, maybe two trainings.
17   I have training in X-waves, which is another forensic
18   software, EnCase, another forensic software, SANS training,
19   which I have been trained in advance cellphone forensics,
20   hacking tools, network forensics.  And then also I'm trained
21   in AXIOM Magnet, again, the software that I used for this
22   case, and the tool itself, advance forensics, cell phone
23   forensics with them also.
24   Q.   Last area on your background.  Certifications, do you
25   hold any?

1  A.   I do.

2  Q.   What kind?

3  A.   So I hold certifications from the bureau for my digital

4  forensics.  I also hold two SANS certifications for the

5  advanced forensics, Windows forensics, and the smartphone

6  forensics.  Also hold some certifications from AXIOM or Magnet

7  AXIOM also.

8       MR. CERVANTES:  Your Honor, the government tenders

9  Mr. Whitt as an expert in the extraction and forensic

10 examination of digital evidence.

11      THE COURT:  Any objection?

12      MR. AMES:  I don't object to that, Your Honor.

13      THE COURT:  All right.  The Court recognizes this

14 witness as an expert in those areas.

15      And, members of the jury, you'll remember my

16 instructions about judging the opinions of a qualified expert.

17      You may proceed.

18 BY MR. CERVANTES:

19 Q.   Did you perform a forensic analysis in the case against

20 David Tatum?

21 A.   Yes, sir, I did.

22 Q.   Did you apply the steps and techniques that you just

23 described in this case?

24 A.   Yes, sir, I did.

25 Q.   Can you explain how you first got involved.

JASON WHITT - DIRECT

1  A.    I got a request from Special Agent Brown to start the
2  forensic examinations of certain digital pieces of evidence.
3  Q.    Can you -- well, Your Honor, may I approach?
4          THE COURT:   You may.
5  Q.    I've placed in front of you Exhibit 1A.  Do you recognize
6  it?  Can you look through that pile there and look at the
7  stickers.
8  A.    1A, yes, sir.
9  Q.    Okay.  What is it?
10 A.    It is a My Passport, Western My Passport external drive.
11 Q.    All right.  Did you examine that device?
12 A.    Yes, sir, I did.
13 Q.    Okay.  Can you look through the rest of the devices and
14 let us know -- they've already been admitted so can you let us
15 know whether you recognize these devices?
16 A.    Yes, sir, I recognize each one.
17 Q.    Okay.  What are they?
18 A.    They are the pieces of digital media that I forensically
19 examined.
20 Q.    Okay.  So we're going to break these down and let's talk
21 about what you found with respect to each device.
22 A.    Yes, sir.
23 Q.    First let's talk about Exhibit 1A.
24      And if you could put next to it Exhibit 12.
25 A.    Yes, sir.

JASON WHITT - DIRECT

1  Q.   So what are these two exhibits?

2  A.   So Exhibit 1A is the Western Digital My Passport

3  external.

4       And Exhibit 12 is a forensic image of the Western Digital

5  encrypted device.

6  Q.   Could I ask you to lay Exhibit -- the tower, can you lay

7  it on its side so we -- the tower in front of you so that we

8  can see your face and the jury can see you.

9            (Witness complied.)

10 Q.   Thank you.

11      And Exhibit 12, what is that?

12 A.   Exhibit 12 is a hard drive containing the forensic image

13 of the encrypted device.

14 Q.   Where did you get Exhibit 12 from?

15 A.   It was shipped to us from headquarters into evidence and

16 I retrieved it from evidence.

17 Q.   And what happened with that device?

18 A.   So once we -- Exhibit 12?

19 A.   Yes.

20 Q.   So once we had this device, we copied the forensic image

21 over and we end up running -- we didn't end up.  We ran

22 forensic software against the forensic image provided to us.

23 Q.   Where did you get Exhibit 12 from?  From who?

24 A.   From evidence.  I retrieved it from evidence.

25 Q.   Okay.  So Exhibit 1A, was it password protected?

JASON WHITT - DIRECT

1   A.    Exhibit 1A was not password protected.

2         Strike that, sorry.  Exhibit 1A was password protected.

3   Sorry.  This is the hard drive we sent to headquarters to be

4   decrypted.

5   Q.    Okay.  What is Exhibit 12, then?

6   A.    Exhibit 12 is the forensic image of Exhibit 1A.

7   Q.    Do you know who created Exhibit 12?

8   A.    Dan Jackson.

9   Q.    And so in your scope of work, did you examine Exhibit 12?

10  A.    I did.

11  Q.    So before talking about what was on this exhibit, Exhibit

12  12, are there any indications on the outside of the My

13  Passport hard drive that would inform you on whether the

14  device was shipped or transported in interstate or foreign

15  commerce?

16  A.    Yes, sir, there is.

17  Q.    I'm showing you what has been marked for identification

18  as Government's Exhibit 1B.

19        Do you recognize that?

20  A.    Yes, sir, I do.

21  Q.    What is it?

22  A.    It is the My Passport, Exhibit 1A.

23              MR. CERVANTES:  Government moves 1B into evidence.

24              THE COURT:  It's admitted.

25              (Government's Exhibit Number 1B was received into

1   evidence.)

2   Q.   Is there -- I've zoomed into a portion of the photograph.

3   Can you read what that says at the bottom.

4   A.   "Product of Malaysia."

5   Q.   And what does this indicate to you?

6   A.   That this was made in Malaysia.

7   Q.   So now let's get into what was in the device.

8        What steps did you --

9            MR. AMES:  Your Honor, sorry.  Was item 12 admitted

10  into evidence --

11           THE COURT:  It was.

12           MR. AMES:  -- at some point?

13           THE COURT:  It's been admitted.

14           MR. AMES:  Item 12?

15           THE COURT:  Yes, item 12 was admitted.

16           MR. AMES:  Okay.

17           THE COURT:  You may proceed.

18  BY MR. CERVANTES:

19  Q.   So let's talk about what you found in the My Passport

20  hard drive.

21  A.   Yes, sir.

22  Q.   Okay.  What steps did you take to analyze it?

23  A.   So once I received the forensic image of the My Passport,

24  I copied the image over and I ran it through our AXIOM Magnet

25  software, forensic software.

JASON WHITT - DIRECT

1    Q.   What did you do next?

2    A.   I then started extracting the digital artifacts out of it

3    and started examining it and flagging anything that could be

4    potential child pornography.

5    Q.   Did you flag anything that could be potential child

6    pornography in the My Passport hard drive?

7    A.   I did.

8    Q.   I'm showing you what has been marked for identification

9    as Government's Exhibit 1C.

10        Do you recognize it?

11   A.   Yes, sir.  It is a video, ls.avi.

12   Q.   Is this -- one moment.

13        How do you recognize this video?

14   A.   Because I flagged it.

15   Q.   Is this a video that came from the My Passport?

16   A.   It is.

17   Q.   You mentioned that you recognize it as a video called

18   ls.avi.

19   A.   Yes, sir, I do.

20   Q.   What does that mean?

21   A.   So LS, as we talked about those common search terms, LS

22   is a common search term for LS models.  I don't know exactly

23   what it means.  A lot of people say it means, like, Lolita

24   series.  But LS models is a common search term or a common

25   term for child pornography.

JASON WHITT - DIRECT

1        MR. CERVANTES:  The government moves 1C in evidence.
2        THE COURT:  It's admitted.
3        (Government's Exhibit Number 1C was received into
4    evidence.)
5        MR. CERVANTES:  Your Honor, permission to publish
6    short portions of this, the first ten seconds, and then
7    another portion of five seconds.
8        MR. AMES:  Your Honor, I'm still renewing the
9    objection to foundation for --
10       THE COURT:  Understood.  You have a continuing
11   objection on the foundation.  Overruled.
12       MR. AMES:  Thank you, Your Honor.
13       THE COURT:  You may proceed.
14       (Government's Exhibit Number 1C was published.)
15       MR. CERVANTES:  For the record, I played from the
16   beginning to the first ten seconds.
17       I'm moving to minute 1:15 and playing from 1:15 to
18   1:20.
19       (Government's Exhibit Number 1C resumed.)
20   Q.   Did you watch the video until the end?
21   A.   I did.  Usually with these videos I will skim through
22   them.  I usually try not to watch them, you know, second for
23   second.  The reason that I do skim through them is a lot of
24   times child pornography may be spliced together where they
25   take multiple videos and splice them together.  So I did

JASON WHITT - DIRECT

1 review this video to the end by skimming through it.

2 Q.   Do these girls continue to engage in the conduct that we

3 just saw until the end of the video?

4 A.   Yes, sir, they do.

5 Q.   How long is the video?

6 A.   If I could see my notes or a video screenshot, I could

7 tell you.

8 Q.   Is the video approximately eight minutes?

9 A.   To the best of my recollection, it is, yes, sir.

10 Q.   Did you find any videos recording a female in a bathroom?

11 A.   I did.

12 Q.   I'm showing you what has been marked for identification

13 as Government's Exhibit 1D.

14      Do you recognize that?

15 A.   Yes, sir, I do.

16 Q.   Is this video -- did this video come from the My

17 Passport?

18 A.   Yes, sir, it did.

19 Q.   How long is this video?

20 A.   This video is 12 minutes and 4 seconds.

21           MR. CERVANTES:  The government moves 1D into

22 evidence.

23           THE COURT:  It's admitted.

24           (Government's Exhibit Number 1D was received into

25 evidence.)

JASON WHITT - DIRECT

1    MR. CERVANTES:  For the record, I'm playing the
2    first 41 seconds.
3         (Government's Exhibit Number 1D was published.)
4    Q.   I'd like to draw your attention to the right half of this
5    screen.  Can you see what is depicted in the right half of the
6    screen?
7    A.   It appears to be an orange or red canvas bag with a black
8    border.
9         MR. CERVANTES:  Okay.  Continuing to play from 41 to
10   49.
11        (Government's Exhibit Number 1D resumed.)
12   Q.   I stopped it at 49 seconds.
13        Did you hear sounds in the video?
14   A.   Yes, sir.  You can hear a toilet flushing.
15   Q.   Did you see him -- this individual use the bathroom?
16   A.   No, sir, I did not.
17        MR. CERVANTES:  Continuing at 49 seconds.
18        (Government's Exhibit Number 1D resumed.)
19        MR. CERVANTES:  I paused it at 53 seconds.  I'm
20   going to ask you to do some math in a moment.
21        Continuing to play.
22        (Government's Exhibit Number 1D resumed.)
23   Q.   I've paused it at 1 minute and 11 seconds.
24        Can you -- what's the difference in time there?
25   A.   Approximately 18 seconds.

1    MR. CERVANTES:  Continuing to play at 1 minute and
2  11 seconds.
3          (Government's Exhibit Number 1D resumed.)
4          MR. CERVANTES:  I paused it at 3:05.  I'm advancing
5  to 8:05.  And I'm going to skip around here until 11:10.
6          8:21; 8:32; 8:48; 9:03; 9:19; 9:30; 9:41; 9:54;
7  10:06; 10:19; 10:30; 10:41; 10:56; 11:09.
8          Paused it at 11:13.
9  Q.   Can you describe what's happening in the video.
10 A.   The white female appears to be exiting the bathroom.
11         MR. CERVANTES:  Continuing at 11:13.
12         (Government's Exhibit Number 1D resumed.)
13 Q.   Pausing at 11:52.
14      How much time was that in between?
15 A.   What was the first number?
16 Q.   11:13.
17 A.   11:13 to 11:52 is 39 seconds.
18         MR. CERVANTES:  Continuing to play.
19         (Government's Exhibit Number 1D resumed.)
20 Q.   What is metadata?
21 A.   So metadata is data about data, information about a file
22 or information embedded in a file or a video.
23 Q.   Was there metadata that you reviewed in relation to the
24 video that we just saw?
25 A.   Yes, sir, there was.

JASON WHITT - DIRECT

1   Q.   I'm showing you what has been marked for identification
2   as Government's Exhibit 1E.
3        Do you recognize this?
4   A.   Yes, sir, I do.
5   Q.   What is it?
6   A.   This is a screenshot from the AXIOM forensic software
7   referencing file IMG_3666.MOV.
8   Q.   Does it fairly and accurately depict the metadata related
9   to the video we just watched?
10  A.   Yes, sir.
11            MR. CERVANTES:  Government moves 1E into evidence.
12            MR. AMES:  Your Honor, again, objection to both
13  hearsay and foundation.  There's been no explanation as to
14  what this even is.
15            THE COURT:  Overruled.  It's admitted.
16            (Government's Exhibit Number 1E was received into
17  evidence.)
18  Q.   So starting from the top, I'm going to zoom in to certain
19  portions as we talk, okay?
20  A.   Yes, sir.
21  Q.   So the first portion that I'm going to zoom into is
22  across the very top.
23        What is that?
24  A.   So what Magnet AXIOM does, instead of showing you the
25  full video or the first screen of it, still of it, it will

1  actually go through and pull out certain thumbnails at certain

2  times giving you a preview.  And this is the preview that it

3  would show for this file.

4  Q.   Okay.  So scrolling to then the file name.  Can you --

5  does this tell you what the name of the file is?

6  A.   It does.

7  Q.   What is it?

8  A.   The name of this file is IMG_3666.MOV.

9  Q.   I want to talk about EXIF data.  What is that?

10  A.   So EXIF data is stored with the image.  It can contain a

11  lot of information from the created date, what camera it was

12  taken from, GPS coordinates.  It can even record things like

13  shutter speed and altitude.

14  Q.   And zooming into the bottom of this exhibit where it says

15  EXIF data, can you tell from this data what date the video was

16  created?

17  A.   The created date registered for this file is 7/18/2016.

18  Q.   I've highlighted that for the record.

19       Can you talk a little bit about the GPS latitude,

20  longitude, altitude information towards the bottom of this

21  EXIF data.

22  A.   The GPS is the global positioning that we use for getting

23  around town, like the GPS in our car, Google Maps, Apple Maps.

24  So when you take a picture with an iPhone, if you have the

25  option turned on, it will actually record your GPS location,

JASON WHITT - DIRECT

1  where the image was taken.

2  Q.   In looking at Exhibit 1E, is that the GPS information

3  we're looking at now?

4  A.   Correct.

5  Q.   Did you put this information into a website to see what

6  location would come up?

7  A.   I did.

8  Q.   I'm showing you what has been marked for identification

9  as Government's Exhibit 1F.

10      Do you recognize that?

11  A.   I do.

12  Q.   What is it?

13  A.   The screenshot from Google Maps.

14  Q.   Does it fairly and accurately reflect the screenshot that

15  you took from Google Maps?

16  A.   It does.

17           MR. CERVANTES:  Government moves 1F into evidence.

18           THE COURT:  It's admitted.

19           (Government's Exhibit Number 1F was received into

20  evidence.)

21  Q.   So a moment ago we were talking about the EXIF data and

22  the GPS coordinates.  So I'm going to bring that back up just

23  a little bit zoomed to the side.

24      And can you explain to the jury what they're looking at

25  in Government's Exhibit 1F on the right side of the screen.

JASON WHITT - DIRECT

1   A.    So the right side of the screen is a pond called Songo
2   Pond and around it you'll see some boxes, which those are
3   properties, usually, located around the Songo Pond.
4   Q.    Did you type in the GPS coordinates into this website to
5   see what would come up?
6   A.    I did.
7   Q.    All right.  Is that reflected here in Exhibit 1F?
8   A.    It is.
9   Q.    Where?
10  A.    Up at the top left-hand corner.
11  Q.    So in comparison to 1E, what are we looking for to
12  compare?
13  A.    So the GPS longitude and latitude, that is what you enter
14  in, and you enter it in in a way that the latitude comes first
15  and longitude second.
16  Q.    Did you find another bathroom recording?
17  A.    I did.
18          MR. CERVANTES:  Your Honor...
19          THE COURT:  Members of the jury, you're about to see
20  and hear some evidence that the defendant engaged in uncharged
21  bad conduct in the past.  The law allows this kind of evidence
22  for certain limited purposes.  For example, this evidence may
23  properly be considered to prove the defendant's motive,
24  opportunity, intent, preparation, plan, knowledge, identity,
25  or absence of mistake or accident.  Keep in mind the limited

1  purpose for which this evidence is admitted.  Most
2  importantly, do not conclude from this evidence that the
3  defendant has bad character in general.  Nor should you
4  conclude that because the defendant may have engaged in bad
5  conduct in the past, that he is more likely to have committed
6  the crimes with which he is now charged.
7          You may proceed.
8  BY MR. CERVANTES:
9  Q.   I'm showing you what has been marked for identification
10 as Government's Exhibit 1G.
11        Do you recognize that?
12 A.   I do.
13 Q.   Is this a video that came from the My Passport hard
14 drive?
15 A.   It is.
16        MR. CERVANTES:  Your Honor, the government moves 1G
17 into evidence.
18        THE COURT:  It's admitted.
19        (Government's Exhibit Number 1G was received into
20 evidence.)
21 Q.   How long is -- how long is this video?
22 A.   Eight minutes and one second.
23 Q.   I'm going to play the first 31 seconds..
24        (Government's Exhibit Number 1G was published.)
25 Q.   I've stopped it at 30 seconds.

1    I just want to draw your attention to the bottom half of
2 this screen.  Can you describe what you see.
3 A.   So you see an orange or red canvas bag with a black
4 border.
5 Q.   Is that bag consistent with the bag that you previously
6 described --
7 A.   It is.
8 Q.   -- in the first bathroom video?
9 A.   Yes, sir, it is.
10 Q.   So that we're clear about what we're talking about, when
11 I ask you about this video, is it all right with you if I call
12 it the second bathroom video and then the bathroom video that
13 we just saw with the blond-haired girl, can we call that the
14 first bathroom video?
15 A.   Yes.
16 Q.   All right.  I'm going to just play from minute 7:00 to
17 7:05 and then we'll be done with this video.
18            (Government's Exhibit Number 1G resumed.)
19 Q.   Did you find metadata for this second bathroom video?
20 A.   I did.
21            MR. CERVANTES:  When I switch between video and
22 images, there's a delay, so please excuse the delay.
23 Q.   I'm showing you what has been marked for identification
24 as 1H.
25            Do you recognize that?

1  A.    Yes.  It is a screenshot from the Magnet AXIOM software.

2  Q.    Does it fairly and accurately represent the metadata

3  associated with the second bathroom video?

4  A.    It does.

5              MR. CERVANTES:  Government moves 1H into evidence.

6              THE COURT:  It's admitted.

7              (Government's Exhibit Number 1H was received into

8  evidence.)

9  Q.    I'm zooming in on the file name.  Can you read that for

10 the record, please.

11 A.    The file name is IMG_3696.MOV.

12 Q.    I'm also pulling up 1E at the same time to compare the

13 two exhibits and ask you a question about it.

14       So I'm zooming in on the EXIF data for 1E.

15       So remind us, what is 1E?

16 A.    1E is the video of the first bathroom video.

17 Q.    The metadata for the first bathroom video?

18 A.    The metadata for the first bathroom video.

19 Q.    Okay.  And 1H is the metadata for the second bathroom

20 video?

21 A.    Correct.

22 Q.    What date was the first bathroom video created and what

23 is the date of the second bathroom video?

24 A.    The first bathroom was 7/18 of 2016 and the second was

25 7/19/2016.

JASON WHITT - DIRECT

1  Q.   And with respect to the GPS coordinates for both of these

2  videos, are they the same, not the same, or something else?

3  A.   They are very close.  They are not the same.

4  Q.   I want to move on to a set of three other videos.

5          MR. CERVANTES:  Your Honor...

6          THE COURT:  Members of the jury, you're going to

7  hear the same sort of evidence that I just talked about and it

8  should be considered by you for the limited purposes that I

9  described earlier.

10 Q.   I'm showing you what has been marked for identification

11 as Government's Exhibit 1I.

12         Do you recognize that?

13 A.   I do.

14 Q.   What is it?

15 A.   It is a video of a young female.

16 Q.   Did this video come from the My Passport hard drive?

17 A.   It did.

18         MR. CERVANTES:  The government moves 1I into

19 evidence.

20         THE COURT:  It's admitted.

21         (Government's Exhibit Number 1I was received into

22 evidence.)

23         MR. CERVANTES:  For the record, this is a 2 minute

24 and 25 second video.  The government is playing it in its

25 entirety.

1    (Government's Exhibit Number 1I was published.)

2 Q. I'm showing you what has been marked for identification

3 as Government's Exhibit 1K.

4   Do you recognize it?

5 A. I do.

6 Q. Is this a video that you retrieved from the My Passport

7 hard drive?

8 A. It is.

9    MR. CERVANTES: Government moves 1K into evidence.

10    THE COURT: It's admitted.

11    (Government's Exhibit Number 1K was received into

12 evidence.)

13 Q. How long is this video?

14 A. Forty-one seconds.

15    (Government's Exhibit Number 1K was published.)

16 Q. I'm showing you what has been marked for identification

17 as Government's Exhibit 1M.

18   Do you recognize this video?

19 A. I do.

20 Q. Is this a video you retrieved from the My Passport?

21 A. It is.

22    MR. CERVANTES: Government moves 1M into evidence.

23    THE COURT: Admitted.

24    (Government's Exhibit Number 1M was received into

25 evidence.)

JASON WHITT - DIRECT

1  Q.   How long is this video?

2  A.   Thirty-one seconds.

3        (Government's Exhibit Number 1M was published.)

4  Q.   Did you find metadata related to these videos?

5  A.   I did.

6  Q.   Showing you what has been marked for identification as

7  Government's Exhibit 1J.  And if you'll allow me a moment, I'm

8  going to pull up another two so we'll do three at one time,

9  okay?  1L and 1N.

10       I'm showing you what has been marked for identification

11  as 1J, 1L, and 1N.

12       Do you recognize these?

13  A.   I do.

14  Q.   What are these?

15  A.   These are the details for the three videos from the AXIOM

16  Magnet forensic software.

17       MR. CERVANTES:  The government moves these exhibits

18  into evidence.

19       THE COURT:  They're admitted.

20       (Government's Exhibits Nos. 1J, 1L, and 1N were

21  received into evidence.)

22       MR. AMES:  I'm sorry, I didn't -- what are they?

23       THE WITNESS:  So each screenshot -- if you look at

24  the one at the top, it says Image 1089, then you have

25  IMG_1090, and you have IMG_1091.  Those are the three videos

JASON WHITT - DIRECT

1    that we just watched.  These are the screenshots of the
2    details of these images or the metadata from the AXIOM
3    forensic software.
4              THE COURT:  You may proceed.
5              MR. CERVANTES:  Thank you, Your Honor.
6    Q.   So let's go through the file names of these.  What is the
7    file name of the first one?
8    A.   The file name of the first one is IMG_1089.MOV.
9    Q.   And are these in sequential order to the way that we
10   viewed them a moment ago?
11   A.   They are
12   Q.   Okay.  So I zoomed in on the file names for each.  What
13   are the file names for all three?
14   A.   IMG_1089.MOV, IMG_1090.MOV, and IMG_1091.MOV.
15   Q.   I'm showing you what has been marked for identification
16   as Government's Exhibit 11.
17             MR. CERVANTES:  Your Honor, the government moves
18   this exhibit into evidence pursuant to a business record
19   notification certification that was filed on April 9, 2023, at
20   docket entry 35.
21             THE COURT:  It's admitted.
22             (Government's Exhibit Number 11 was received into
23   evidence.)
24   Q.   So I'd like to ask you to read out a couple portions of
25   this document and then we're going to do some comparisons to

1    the exhibit on the left, 1J, okay?

2    A.    Yes, sir.

3    Q.    So first, I want to zoom into the -- you had said earlier

4    that the date of videos can be found in the EXIF data?

5    A.    Correct.

6    Q.    So what is the date of the first video that we saw, the

7    series which was marked as Exhibit 1I?

8    A.    The first date for which exhibit?

9    Q.    I'm sorry.  That was a bad question.

10        What is the date of the video that we -- the first video

11   that we looked at in the series of three that was directed up

12   the skirt of a female?

13   A.    Creation date is 6/17/2015.

14   Q.    Turning to Government's Exhibit 11, zooming in at the

15   top, what is the date of this record?

16   A.    6/17/2015.

17   Q.    What is the name of the patient?

18   A.    F.L..

19   Q.    What is the date of birth for Ms. F.L.?

20   A.    X/XX/1997.

21   Q.    So on 6/17/2015, the date of the video, how old would

22   F.L. have been?

23   A.    She would be 18 years old.

24   Q.    By how many days?

25   A.    Five.

1  Q.   Can you read -- can you read the portion of the document

2  that I've highlighted and zoomed in.

3  A.   "Provider Tatum, David."

4  Q.   And the encounter date next to it?

5  A.   6/17/2015.

6  Q.   I'm going to go to page 4.

7       Can you read the portion I've highlighted.

8  A.   "F.L. is a pleasant 17YO," or year old, "white female who

9  I saw individually today."

10 Q.   I'm going to scroll to page 5.

11      Under school history, can you read the portion that I've

12 highlighted.

13 A.   "She is in 12th grade at Penfield HS."

14 Q.   I'm going to keep scrolling to page 7.

15      Can you read the portion that I've highlighted.  One

16 moment.  Here we go.

17 A.   "Length of visit:  Duration of face-to-face visit with

18 patient-60 minutes."

19 Q.   I'd like to move on to a different device.

20      Can you hold up Exhibit 2A, the iPhone.

21           (Witness complied.)

22 Q.   Thank you.

23      Is there an indication on the outside of the device that

24 would inform you on whether the device was shipped or

25 transported in interstate or foreign commerce?

JASON WHITT - DIRECT

1  A.   There is.

2  Q.   I'm showing you what has been marked for identification

3  as Government's Exhibit 2B.

4       Do you recognize that?

5  A.   I do.

6  Q.   What is it?

7  A.   It is an iPhone 6 that I examined.

8  Q.   Does it fairly and accurately reflect that iPhone?

9  A.   It does.

10           MR. CERVANTES:  The government moves 2B in evidence.

11           THE WITNESS:  It's admitted.

12           (Government's Exhibit Number 2B was received into

13  evidence.)

14  Q.   I'm zooming in to a portion of the picture.  Can you read

15  where it is assembled and designed.

16  A.   "Assembled in China.  Designed by Apple in California."

17           MR. AMES:  Your Honor, I'll just note -- I'll renew

18  the objection to hearsay in all of this.

19           THE COURT:  So noted.  Overruled.

20           Go ahead.

21  Q.   So let's talk about how pictures are saved on an iPhone.

22  Can you explain that to the jury.

23  A.   So any time you use an iPhone or even an Android and use

24  the camera app to take a picture, it saves it into the DCIM

25  folder which stands for digital camera images.

1   Q.   The same goes for videos?

2   A.   The same for videos.

3   Q.   Is there a particular naming convention that's given to

4   these images and videos?

5   A.   So they do.  They name them in order starting with, like,

6   001 up into the thousands.  So you can go into, like, 1,000 to

7   1,099, 2,000 to 2,999.

8   Q.   Did you take steps to determine whether the bathroom

9   videos and the up-skirt videos were on the iPhone?

10  A.   I did.

11  Q.   What did you do to confirm it?

12  A.   So I went to -- first I ran an index search.  And then

13  when that came back I didn't find any hits for any movies.  I

14  then went to where it would be stored at on the file system on

15  the phone itself, so I then went to the DCIM folder.  And then

16  I went to the corresponding folders for the videos.

17  Q.   And you're doing this to see if the bathroom videos and

18  up-skirt videos are still on the phone?

19  A.   Correct.

20  Q.   Were they listed?

21  A.   I did not see them in the folders.

22  Q.   I'm showing you what has been marked for identification

23  as Government's Exhibit 2C.

24       Do you recognize that?

25  A.   I do.

JASON WHITT - DIRECT

1  Q.   What is it?

2  A.   So this is a screenshot from the Magnet AXIOM program.

3  This is actually a screenshot of the file system.  So in the

4  phone itself there are files and folders that are stored in

5  certain places.  So in this we go through the file system on

6  the phone and I scrolled all the way down to where the DCIM

7  folder is, opened up the DCIM folder, and I viewed where they

8  could be or should have been in the folders represented.

9              MR. CERVANTES:  Government moves 2C in evidence.

10             THE COURT:  It's admitted.

11             (Government's Exhibit Number 2C was received into

12  evidence.)

13  Q.   So the jury didn't have this displayed for them until

14  just a moment ago.  It's just a formality.  But can you --

15  where should I go to help them understand what you just said?

16  A.   So as you scroll down where it says -- right above where

17  it's highlighted, above that is the DCIM folder that I was

18  speaking of.  Inside a DCIM folder you have different folders

19  as you see:  100 Apple, 101 Apple, 102 Apple.  And these are

20  where the files are stored, the images or videos.  And each

21  one of those folders represents a naming convention.  Like the

22  100 folder houses 0 to 999, the 101 folder houses 1,000

23  through 1,999, and so on.

24  Q.   Do you remember the file names for the two bathroom

25  videos?

JASON WHITT - DIRECT

1   A.    I do.

2   Q.    What were they?

3   A.    IMG_3666 and IMG_3696.

4   Q.    Zooming in on the list of images, are either of the

5   bathroom videos still in the list of images and videos?

6   A.    No, sir, they are not.

7   Q.    How would someone go about transferring a video from the

8   iPhone to the My Passport?

9   A.    So there's a few ways.  You can upload or -- to the Cloud

10  your videos and then you can access it from a computer where

11  the Passport might be plugged into and downloaded from your

12  iCloud.  You can also copy it -- you can hook your iPhone up

13  to the Mac or any computer.  You can also copy and paste the

14  folders out of the phone into another device.

15  Q.    If you copied and pasted, what would that do?

16  A.    So copy and paste is just that.  You make a copy of the

17  file and you paste it into a new storage device whether a

18  computer or an external.  But it would remain there.  You

19  would not delete it if you did a copy and paste.

20  Q.    So if you did a copy and paste, the videos would still be

21  in this list.

22  A.    Correct.

23  Q.    So since the videos are not in this list, was it

24  transferred using a copy and paste?

25  A.    No.

JASON WHITT - DIRECT

1  Q.   If you drag and drop, what does that do?

2  A.   So drag and drop is just like a copy and paste.  It's

3  just a -- instead of highlighting the file and right clicking

4  on it or hitting command C for copy and paste, drag and drop

5  does the same thing as a copy and paste.

6  Q.   Since the bathroom videos are not listed here, was a drag

7  and drop used?

8  A.   I do not think so.

9  Q.   For the bathroom videos not to be in the phone anymore,

10  what would the user have to have done?

11  A.   So to have the files not in here, you would either have

12  to do a cut and paste so you would actually cut the file out

13  and paste it into a new one which then it would remove it from

14  the list.  Or once you have completed your copy and paste, or

15  however you got the file off, you would have to delete it to

16  remove it.

17  Q.   In your opinion, is that what would have happened here to

18  remove both of the bathroom videos from the iPhone?

19  A.   One of those two options.

20  Q.   Based on this evidence and your review of the videos, in

21  your expert opinion, was this the phone that was used to make

22  the bathroom recordings?

23  A.   It appears so, yes, sir.

24  Q.   Did you look to see if the same can be said of the

25  up-skirt videos, the set of three videos?

JASON WHITT - DIRECT

1   A.    I did.

2   Q.    I'm showing you what has been marked for identification

3   as Government's Exhibit 2D.

4        What is that?

5   A.    It is a screenshot from the file system of the DCIM

6   folder from the AXIOM or Magnet AXIOM forensic software.

7            MR. CERVANTES:  The government moves 2B in evidence.

8            THE COURT:  It's admitted.

9            (Government's Exhibit Number 2B was received into

10  evidence.)

11  Q.    Do you remember the file names of the three videos?

12  A.    I do.

13  Q.    What are they?

14  A.    They are IMG_1089, 1090, and 1091.

15  Q.    Zooming into that particular area of the list of images

16  and videos, do you see those videos listed here?

17  A.    No, I do not.

18  Q.    In your expert opinion, was this the iPhone that was used

19  to make the up-skirt recordings?

20  A.    Yes, sir, it appears so.

21  Q.    All right.  So let's talk about attribution.  What is

22  that?

23  A.    So attribution is information about someone that

24  interacts with the computer or the user folder.

25  Q.    What does it tell you?

JASON WHITT - DIRECT

1  A.   It tells you who operates the computer or who is using

2  that user account.

3  Q.   I'm showing you what has been marked for identification

4  as Government's Exhibit 1O.  And first I want to talk to you

5  about the My Passport, okay?  Did you find attribution

6  evidence in the My Passport?

7  A.   I did.

8  Q.   Okay.  Do you recognize Exhibit 1O?

9  A.   I do.

10  Q.   What is it?

11  A.   It's a Jet Blue boarding pass for Tatum, David.

12  Q.   Did you get this from the My Passport?

13  A.   I did.

14       MR. CERVANTES:  Government moves 1O in evidence.

15       THE COURT:  It's admitted.

16       (Government's Exhibit Number 1O was received into

17  evidence.)

18  Q.   Can you read the name on the boarding pass.

19  A.   Name is Tatum, David.

20  Q.   Showing you what's been marked for identification as

21  Government's Exhibit 1P.

22       Do you recognize this?

23  A.   I do.

24  Q.   Is this a document that came from the My Passport?

25  A.   It is.

1    MR. CERVANTES:  Government moves 1P in evidence.

2    THE COURT:  Admitted.

3    (Government's Exhibit Number 1P was received into

4 evidence.)

5 Q.   Can you explain to the jury what this is.

6 A.   It is a 2010 Federal Tax Return from TurboTax.

7 Q.   And what is the name that I've highlighted?

8 A.   David A. Tatum.

9 Q.   Let's talk about attribution for the iPhone.  Did you

10 find attribution there?

11 A.   I did.

12 Q.   Showing you what's been marked for identification as

13 Government's Exhibit 2E.

14    Do you recognize that?

15 A.   I do.

16 Q.   Is this a document that came from the iPhone?

17 A.   Yes, sir, it is.

18    MR. CERVANTES:  Government moves 2E in evidence.

19    THE COURT:  It's admitted.

20    (Government's Exhibit Number 2E was received into

21 evidence.)

22 Q.   Can you read the entirety, so from university all the way

23 to June 2016.

24 A.   "University of Rochester, School of Medicine and

25 Dentistry and Strong Memorial Hospital.  David Arthur Tatum,

1  D.O. has served as a fellow in the Child and Adolescent

2  Psychiatry Program from July 1, 2014 to June 30, 2016 and has

3  faithfully and honorably discharged the duties of the

4  position.  In Witness Whereof, the signatures and the Seal

5  have been affixed below on this 30th of June, 2016."

6  Q.  I'm showing you what has been marked for identification

7  as Government's Exhibit 2F.

8      Do you recognize that?

9  A.  I do.

10  Q.  Is this a document that came from the iPhone?

11  A.  It is.

12      MR. CERVANTES:  Government moves 2F in evidence.

13      THE COURT:  It's admitted.

14      (Government's Exhibit Number 2F was received into

15  evidence.)

16  Q.  What is this document?

17  A.  Appears to be some sort of schedule from Carolinas

18  HealthCare System.

19  Q.  And who is -- can you read the portion that I've

20  highlighted.

21  A.  "Dr. David Tatum, MD, Carolinas HealthCare System,

22  Department of Psychiatry."

23  Q.  Showing you what's been marked for identification as 2G.

24      Do you recognize this document?

25  A.  I do.

JASON WHITT - DIRECT

1   Q.   Did this document also come from the iPhone?

2   A.   It did.

3           MR. CERVANTES:  Government moves 2G in evidence.

4           THE COURT:  Admitted.

5           (Government's Exhibit Number 2G was received into

6   evidence.)

7   Q.   Can you please read the top portions that I've

8   highlighted.

9   A.   "Faculty Candidate Interview Schedule, David Tatum, MD,

10  Senior Instructor (CPEP) Candidate."

11  Q.   I'm showing you 2H.

12       Do you recognize that?

13  A.   I do.

14  Q.   Is this a picture that came out of the iPhone?

15  A.   It is.

16           MR. CERVANTES:  Government moves 2H in evidence.

17           THE COURT:  Admitted.

18           (Government's Exhibit Number 2H was received into

19  evidence.)

20  Q.   What is this?

21  A.   A New York state driver's license.

22  Q.   For whom?

23  A.   Tatum, David A.

24  Q.   Did you find owner information in relation to the iPhone?

25  A.   I did.

JASON WHITT - DIRECT

1  Q.   Can you explain to the jury, what does owner information
2  mean specifically in relation to an iPhone?
3  A.   So owner information, when you create an account with an
4  iPhone, you have to put in a name and/or an Apple iCloud
5  account or an email address associated with an Apple iCloud
6  account.
7  Q.   I'm showing you 2I marked for identification.
8       What is it?
9  A.   This is a screenshot from the Magnet AXIOM program
10  reference to the device or the owner of the iPhone 6.
11  Q.   Does this fairly and accurately represent the owner
12  information for the iPhone?
13  A.   It does.
14          MR. CERVANTES:  The government moves 2I in evidence.
15          THE COURT:  It's admitted.
16          (Government's Exhibit Number 2I was received into
17  evidence.)
18  Q.   I want to talk to you about two specific parts, and I'm
19  going to zoom in.
20       Can you please read the device phone name.
21  A.   The device phone name is David's iPhone.
22  Q.   And the Apple ID?
23  A.   The Apple ID is morphus100@gmail.com.
24          MR. CERVANTES:  Your Honor, we're moving to the HP,
25  another device.  I think I could do it in half an hour.

1    THE COURT:  Okay.  Take what time you need.

2    MR. CERVANTES:  Thank you.

3  Q.  Next I'd like to talk to you about the HP computer.  Can

4  you -- I won't ask you to lift it because it seems like the

5  heaviest of all, but can you just point to what I'm talking

6  about.

7  A.  The HP computer (indicating).

8  Q.  Okay.  That big tower?

9  A.  Yes, sir.

10  Q.  Do you know if there's any indication on the hard drive

11  of this device that would inform you on whether the device was

12  shipped or transported in interstate or foreign commerce?

13  A.  There is.

14  Q.  Now, can you see the hard drive from just looking at it

15  right now?

16  A.  No, sir.

17  Q.  What would you have to do?

18  A.  I removed the side of the desktop computer to access the

19  hard drive.

20  Q.  And have you been able to see the hard drive inside of

21  the computer?

22  A.  I have.

23  Q.  Showing you what's been marked for identification as

24  Government's Exhibit 3B.

25    What is that?

1   A.   That is the hard drive inside of the HP desktop computer.

2   Q.   It's a picture of the hard drive?

3   A.   Picture of the hard drive.

4         MR. CERVANTES:   The government moves 3B in evidence.

5         THE COURT:   It's admitted.

6         (Government's Exhibit Number 3B was received into

7   evidence.)

8   Q.   Can you read the bottom part of the zoom out.

9   A.   "Product of Thailand."

10   Q.   Did you review any videos identified as child pornography

11   in the HP hard drive?

12   A.   I did.

13   Q.   I'm showing you what has been marked for identification

14   as Government's Exhibit 3C.

15       What is it?

16   A.   It is a video that I saw flagged on the HP desktop.

17   Q.   Did this video come from the HP computer?

18   A.   It did.

19         MR. CERVANTES:   The government moves 3C in evidence.

20         THE COURT:   It's admitted.

21         (Government's Exhibit Number 3C was received into

22   evidence.)

23   Q.   Actually, one more question before we advance.   How long

24   is -- how long is this video?

25   A.   The video is 56 minutes and 22 seconds.

1    MR. CERVANTES:  Okay.  I'm going to advance to
2  11:40, from 11:40 to 11:50.  One moment while I do that.
3         (Goverment's Exhibit Number 3C was published.)
4         MR. CERVANTES:  Pausing at 11:50.  I'm advancing to
5  minute 13.
6  Q.   So in minute 13 I want to ask you whether you can see
7  their faces for the brief seconds that I'm going to play the
8  video, okay?
9  A.   Yes, sir.
10        MR. CERVANTES:  Playing from 12:59 to 13:05, 13:06.
11        (Government's Exhibit Number 3C resumed.)
12  Q.   Were you able to see their faces?
13  A.   Yes, sir.
14  Q.   Have you seen or skimmed through the rest of the video?
15  A.   I have.
16  Q.   Does it continue to show these two girls engaging in
17  sexual intercourse?
18  A.   Sexual activities, yes, sir.
19  Q.   Okay.  Like what?
20  A.   Touching each other, that kind of sexual activity.
21  Q.   Okay.  Was there another video on the HP that you
22  reviewed?
23  A.   Yes, sir.
24        Showing you what has been marked for identification as
25  Government's Exhibit 3E.

JASON WHITT - DIRECT

1       Do you recognize it?

2   A.   I do.

3   Q.   Is this a video that came from the HP?

4   A.   It is.

5   Q.   How long is this video?

6   A.   Fifty minutes and 15 seconds.

7            MR. CERVANTES:  Publishing.

8            THE COURT:  You haven't admitted it.

9            MR. CERVANTES:  I'm sorry.  Government moves 3E in

10  evidence, Your Honor.

11           THE COURT:  It's admitted.

12           MR. CERVANTES:  My apologies.

13           (Government's Exhibit Number 3E was received into

14  evidence.)

15           MR. CERVANTES:  Publishing.

16           (Government's Exhibit Number 3E was published.)

17           MR. CERVANTES:  And we'll stop for a moment and

18  advance to 5:30, from 5:30 to 5:45.

19           (Government's Exhibit Number 3E resumed.)

20           MR. CERVANTES:  Advancing to minute 30:20, from

21  30:20 to 30:45.  Publishing.

22           (Government's Exhibit Number 3E resumed.)

23  Q.   Were you able to pull metadata for these two videos?

24  A.   I was.

25  Q.   Showing you what has been marked for identification as

JASON WHITT - DIRECT

1  Government's Exhibits 3D and 3F.

2      Do you recognize them?

3  A.   Yes, sir.

4  Q.   What are they?

5  A.   These are screenshots from the Magnet AXIOM forensic

6  software.

7  Q.   Do they fairly and accurately represent the metadata for

8  videos?

9  A.   Yes, sir.

10 Q.   Which videos?

11 A.   The videos that we just saw.

12      MR. CERVANTES:  Government moves 3D and 3F in

13 evidence.

14      THE COURT:  They're admitted.

15      (Government's Exhibits Nos. 3D and 3F were received

16 into evidence.)

17 Q.   So I'd like to ask you about the -- first of all, let's

18 get the file name for a moment on both of these videos.

19      Can you read the first one that I've called out.

20 A.   Vidweb_174.avi.

21 Q.   And the second.

22 A.   Vidweb_172.avi.

23 Q.   Now, let's talk about source.  What does that tell you?

24 A.   The source is going to be the folder path where the file

25 was located.

JASON WHITT - DIRECT

1  Q.   Can you explain that a little bit more.

2  A.   Sure.  So the source that we have up on the screen,

3  that's where the 1B1 is the evidence item.  That is the

4  forensic image that we created of the hard drive.  In that we

5  go to the OS, which is where the Windows operating system is

6  stored in that partition.  Then we go to Users, Morphus,

7  folder Desktop, folder New Desktop, folder Board Review,

8  folder RAPID REVIEW.  And inside the folder RAPID REVIEW, the

9  video Vidweb_172.avi is located.

10  Q.   So the user for this computer, how can you tell what the

11  user is by looking at this file path?

12  A.   So you can see under the user, the user that is in the

13  file path is Morphus.

14  Q.   Okay.  Is that for both videos?

15  A.   That is for both videos, yes, sir.

16  Q.   Are there other instances where you saw that user name?

17  A.   Yes.

18  Q.   Pulling up what's been admitted as Government's Exhibit

19  2I.

20       Do you recall that?

21  A.   I do.

22  Q.   Is this another instance of seeing the word Morphus?

23  A.   Yes, sir, it is.

24  Q.   Okay.  And what is that from?

25  A.   This is from the iPhone 6.

JASON WHITT - DIRECT

1  Q.   Can you explain what an index search is.

2  A.   So an index search is where the forensic software goes

3  through and pulls out all the words and puts them in an index,

4  whether it's one letter or multiple letters or even letters

5  and numbers.  And that allows us that when we search the

6  computer, that when we pull it up, it can quickly show us

7  where it's at.  So it makes an index of every word, character,

8  inside the computer.

9  Q.   Did you do an index search for pthc in the HP?

10  A.   I did.

11  Q.   Did you get any hits?

12  A.   I did.

13  Q.   I'm showing you what has been marked for identification

14  as Government's Exhibit 3G.

15       What is that?

16  A.   This is a screenshot from the Magnet AXIOM program

17  reference to the search or index search I did for pthc.

18            MR. CERVANTES:  Government moves 3G in evidence.

19            THE COURT:  It's admitted.

20            (Government's Exhibit Number 3G was received into

21  evidence.)

22  Q.   Can you explain -- does this exhibit help you explain the

23  hit that you saw after searching for pthc in the HP?

24  A.   Yes, sir, it does.

25  Q.   How so?

1  A.   So in the search of pthc under the user Morphus is an

2  NTUSER.DAT, which an NTUSER.DAT stores user settings,

3  configurations for that user.

4       So if you move down to the location where I found the hit

5  for the pthc, you will see Software\Microsoft\Windows\Current

6  Version\Explorer\WordWheelQuery\17.  And what the word wheel

7  is is if you open File Explorer in Windows and you go over to

8  the right top corner, there's a search box.  If you search a

9  name there, your word wheel will record what you searched.

10 And in this instance it was pthc.

11 Q.   What user was logged into the HP when the search for pthc

12 was conducted?

13 A.   Morphus

14 Q.   Did you find attribution evidence in the HP?

15 A.   I did.

16 Q.   I'm showing you what has been marked for identification

17 as Government's Exhibits 3H and 3I.

18      Do you recognize them?

19 A.   Yes, sir, I do.

20 Q.   Are these documents that came from the HP?

21 A.   Yes, sir, it is.

22           MR. CERVANTES:  Government moves 3H and 3I in

23 evidence.

24           THE COURT:  They're admitted.

25           (Government's Exhibits Nos. 3H and 3I were received

1  into evidence.)

2  Q.   What are these two documents?

3  A.   They are H&R Block Advantage paperwork for, appears to

4  be, tax information.

5  Q.   And can you read the highlighted portions that I've made

6  on the document.

7  A.   "Prepared for David A. Tatum 4/10/2013" and "Prepared for

8  David A. Tatum."

9  Q.   I'm showing you what has been marked for identification

10  as Government's Exhibit 3J.

11       Do you recognize that?

12  A.   I do.

13  Q.   What is it?

14  A.   It is a document that was on the HP.

15            MR. CERVANTES:  Government moves 3J in evidence.

16            THE COURT:  It's admitted.

17            (Government's Exhibit Number 3J was received into

18  evidence.)

19  Q.   What is this document?

20  A.   Appears to be a resume.

21  Q.   For whom?

22  A.   David Arthur Tatum.

23            MR. CERVANTES:  Your Honor, this may be a good

24  stopping point.

25            THE COURT:  All right.  Members of the jury, it's a

little bit early, but I asked the prosecutor to let me know a
logical break on either side of 5:00. And I'm led to believe
that the next line of questioning would take us further beyond
5:00 than I'm sure you would like to go and even further than
I would like to go. So we're going to take our break for the
evening.

Tonight's going to be a challenge for you because if
you see anybody after you leave here, they're going to want to
know what you did today. And here's what you're going to tell
them: I was selected to serve on a federal jury, period.
You're not going to tell them anything else: what kind of
case it is, not civil or criminal. And you can tell them that
the judge said I am not allowed to talk to anybody about this
or let anyone talk to me about this. Because the amazing
thing is if you tell them even just a little bit, they're
going to start telling you their opinions. Based on what, I
don't know because they don't know anything about this case;
but they'll have opinions and they'll be anxious to share them
with you. So when the trial is over, you can talk or not talk
to whoever you want, but not while it's going on. So just lay
all the blame on me if you'd like. That's fine.

Of course, don't discuss this case with anyone.
Don't do any independent research. Don't start making up your
minds. The trial is just getting started so keep an open mind
until all the evidence is closed and you begin your

1  deliberations.

2         Leave your jury notes in the jury room and we'll see

3  you tomorrow morning at 9:00.  And we can't start until you're

4  all here so out of respect for one another, please be on time.

5         Everyone remain seated while the jury clears the

6  floor.

7         (Jury exited the courtroom.)Morphus

8         THE COURT:  You may stand down.

9         (Witness stepped down.)

10         THE COURT:  Anything we can address this evening,

11  use our time profitably?

12         MR. CERVANTES:  Sure, Your Honor.  Given the defense

13  opening, we would propose an additional instruction that

14  may -- the Court may want to instruct us to research more or

15  consider its own research.  And the instruction would be along

16  the lines of the issue that defense argued at opening, that

17  the minors were modified on an adult body.  And there's case

18  law that says that it doesn't matter whether the modification

19  is to an adult body or a minor's body.  The body is -- as long

20  as the minor is identifiable as a minor, you have nudified the

21  minor.  And if it meets the definition of sexually explicit

22  conduct or lascivious nature of the picture, that's a separate

23  issue.  But it doesn't cease to be child pornography simply

24  because, for example, the image was modified to be on the body

25  of clearly, let's say, a 30-year-old woman.  I think there's a

factual issue here.  We disagree with the defense.  The bodies
to us look appropriate for the face and we think that the
bodies are minors.  But legally the jury should be instructed
that that is of no moment.

       THE COURT:  Yeah, when I was going through the
jointly proposed jury instructions, I thought that that was an
instruction that would be needed but was missing, but then I
thought maybe you all knew more about the case than I did so I
was looking for something unnecessary.  But the Court would
welcome the submission of a proposed instruction.  Please get
together with Mr. Ames and see if you can jointly propose an
instruction.  And if Mr. Ames dissents from the government's
version of instructions, please note that and file it as you
did your other jury instructions.

       MR. CERVANTES:  Yes, Your Honor.

       MR. AMES:  That's fine, Your Honor.

       THE COURT:  Anything else?

       MR. CERVANTES:  Not from the government.

       THE COURT:  All right.

       THE COURT SECURITY OFFICER:  Still waiting, Your
Honor.  Just a couple of stragglers.

       THE COURT:  All right.  Well, I can go out a
different door so the Court is adjourned for the day.
Everyone please remain in the courtroom until the court
security officer informs you that the jury has cleared the

1    floor.

2              All right.  See you tomorrow at 9:00.

3              (Evening recess at 4:47 PM.)

4                              *****

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT
2    WESTERN DISTRICT OF NORTH CAROLINA
3    CERTIFICATE OF REPORTER
4
5
6            I, Cheryl A. Nuccio, Federal Official Realtime Court
7    Reporter, in and for the United States District Court for the
8    Western District of North Carolina, do hereby certify that
9    pursuant to Section 753, Title 28, United States Code, that
10   the foregoing is a true and correct transcript of the
11   stenographically reported proceedings held in the
12   above-entitled matter and that the transcript page format is
13   in conformance with the regulations of the Judicial Conference
14   of the United States.
15
16           Dated this 13th day of September 2023.
17
18
19                           s/Cheryl A. Nuccio
20                           Cheryl A. Nuccio, RMR-CRR
                             Official Court Reporter
21
22
23
24
25
```