UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-157 |
| | ) | |
| vs. | ) | VOLUME II - REDACTED |
| | ) | |
| DAVID TATUM, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 3, 2023

<u>APPEARANCES</u>:

On Behalf of the Government:

    DANIEL CERVANTES, ESQ.
    MARK T. ODULIO, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    RYAN PATRICK AMES, ESQ.
    SeiferFlatow, PLLC
    2319 Crescent Avenue
    Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

I N D E X

| GOVERNMENT'S WITNESSES | PAGE |
|---|---|

JASON WHITT
    Direct Examination By Mr. Cervantes          140
    Cross Examination By Mr. Ames                175

M.D.
    Direct Examination By Mr. Odulio             264

E.H.
    Direct Examination By Mr. Odulio             268

M.C.
    Direct Examination By Mr. Cervantes          271

E.S.
    Direct Examination By Mr. Odulio             274
    Cross Examination By Mr. Ames                280

F.L.
    Direct Examination By Mr. Cervantes          281

| DEFENDANT'S WITNESSES | PAGE |
|---|---|

SCOTT ATWOOD
    Direct Examination By Mr. Ames               307

E X H I B I T S

GOVERNMENT'S EXHIBITS

| NUMBER | ADMITTED |
|---|---|

1D1 .........................................273
4B ..........................................141
4C ..........................................141
4D ..........................................142
4E1 .........................................143
4G1 .........................................147
4G2 .........................................147
4G3 .........................................147
4F1 .........................................150
4H1 .........................................151
4H2 .........................................151
4H3 .........................................151

1                                 E X H I B I T S

2    GOVERNMENT'S EXHIBITS

3    NUMBER                                              ADMITTED

4    4H4  ...........................................151
     4H5  ...........................................151
5    4H6  ...........................................152
     4E5  ...........................................157
6    4F9  ...........................................158
     4F13 ...........................................158
7    4F10 ...........................................266
     4F2  ...........................................270
8    5B  ............................................153
     5F  ............................................155
9    5G  ............................................156
     5K  ............................................162
10   5L  ............................................163
     5H  ............................................165
11   5C  ............................................166
     5D  ............................................169
12   5E  ............................................174
     8  .............................................145

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2    WEDNESDAY MORNING, MAY 3, 2023

3                 (Court called to order at 8:58 AM.)

4                 (Jury not present.)

5                 THE COURT:  Good morning, all.

6                 ALL COUNSEL:  Good morning, Your Honor.

7                 THE COURT:  Are the jurors here, Meg?

8                 THE CLERK:  Yes, sir.

9                 THE COURT:  Are we ready for the jury?

10                MR. ODULIO:  Your Honor, we have one housekeeping

11   matter we would like to bring to the Court's attention.

12                THE COURT:  All right.

13                MR. ODULIO:  Your Honor, in the 404 filing that the

14   government submitted and the Court ruled on, with respect to

15   the proposed witness E.S. in our factual description in the

16   filing, we indicated that E.S. was the person who was

17   videotaped in the bathroom.  This is the second bathroom

18   video.

19                THE COURT:  Right.

20                MR. ODULIO:  In trial preparation we learned that

21   E.S. was not the person videotaped.  It was another cousin.  I

22   don't think this would operate to affect any other part of the

23   Court's ruling with respect to E.S.'s proposed testimony.

24   It's just going to be what we outlined in our proffer -- or in

25   the motion.  That's unchanged.  But she is going to testify

1    that "that is my cousin K.C. on that video."

2              So we just wanted to give that to the Court.

3    Obviously, we alerted counsel to that.  I don't -- I can't

4    conceive how that would operate to impact the Court's 404

5    analysis, but didn't want to presume that so wanted to raise

6    it.

7              THE COURT:  And so her testimony is going to be that

8    she confronted Mr. Tatum about that incident and he made some

9    sort of admission with respect to it.

10             MR. ODULIO:  No, Your Honor.  That testimony is

11   going to be the same, but that videotape was relating to

12   Ms. E.S. when she was 15 years old.  The part that I'm

13   clarifying is the second bathroom video that was played

14   yesterday in the cabin in Maine was not E.S..  It was her

15   cousin K.C..  So --

16             THE COURT:  Is there any testimony upcoming with

17   respect to that second video?

18             MR. ODULIO:  The second bathroom video?

19             THE COURT:  Yes.

20             MR. ODULIO:  Yes, that will be Ms. E.S..  And she

21   will identify her cousin K.C. and identify the bathroom and

22   identify the defendant.  And then the second part of her

23   testimony will be, "Hey, I confronted the defendant about a

24   video he made of me when I was a child."  And, again, that

25   will -- is in line with what's reflected in our pleading.

1          THE COURT:  Okay.  I see.

2          Mr. Ames, do you want to be heard on that?

3          MR. AMES:  Your Honor, yeah.  I guess it's my

4  understanding the distinction is that when the government was

5  under the impression that this was E.S. in this other video,

6  presumably the testimony would have been that's me and this

7  happened and establish -- corroborating that.  And now the

8  testimony, I guess (inaudible).

9          THE COURT REPORTER:  I'm sorry, Mr. Ames, will you

10  pull your microphone a little bit closer.

11          MR. AMES:  Oh, I'm sorry.

12          Just to make sure I have that correct is that her

13  initial -- originally the testimony presumably would have been

14  related to identifying herself in a video and recounting a

15  prior conversation with Mr. Tatum.  Today what will now be

16  presumably the testimony is reviewing this other video that

17  isn't her and recounting a conversation.  Is that --

18          THE COURT:  And apparently identifying the person in

19  the video.

20          MR. AMES:  Identifying the person in the video.

21  Okay, yeah.  I guess, Your Honor, as far as the 404 is

22  concerned, I guess I would agree it doesn't change in any

23  particular way the analysis there of whether or not that's

24  relevant, her speaking about one video versus another.

25          THE COURT:  The Court agrees and appreciates you

1    clarifying that for me.

2              MR. ODULIO:  One last thing, Your Honor.  We did

3    agree overnight on a proposed jury instruction.  That's been

4    filed with the Court and emailed to your clerk.

5              THE COURT:  I pulled it up as I was walking down.

6    I'll try to find time this morning to read it.

7              MR. AMES:  Yes, Your Honor.  And if we can address

8    that.  I would like to be heard briefly on it just because I

9    don't think that the Fourth Circuit has specifically addressed

10   the issue; but we've cited, I think, all the case law from any

11   circuit we could find, which is a total of four on the issue

12   of the underlying image of the explicit conduct, whether

13   there's a requirement of being minor versus adult, which I

14   believe Mr. Odulio cited all of those as well in the proposal.

15             THE COURT:  Okay.  Well, either during the morning

16   break or the lunch break.  By then I will have had a chance to

17   read it and we can talk about it some more.

18             MR. AMES:  Thank you, Your Honor.

19             THE COURT:  Bring the jury, please.

20             MR. ODULIO:  Your Honor, can we bring the witness in

21   too?

22             THE COURT:  Yes.

23             (Witness resumed the witness stand.)

24             (Jury entered the courtroom.)

25             THE COURT:  Good morning and welcome back.  I trust

JASON WHITT - DIRECT

1    you withstood the inquisitive last night and abided by the

2    Court's instructions.

3           It may look like we're late, but nobody was late.

4    We were just taking up some things that didn't have anything

5    to do with your deliberations.

6           You may continue your examination.

7           MR. CERVANTES:  Thank you, Your Honor.

8    JASON WHITT, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

9                  DIRECT EXAMINATION (Cont'd.)

10   BY MR. CERVANTES:

11   Q.   Good morning, Mr. Whitt.

12   A.   Good morning.

13   Q.   When we were last talking yesterday, we were about to get

14   into a new device.

15   A.   Yes, sir.

16   Q.   Would you please hold up for the jury Exhibit 4, the

17   thumb drive.

18           (Witness complied.)

19           THE COURT:  I believe that's 4A.

20           MR. CERVANTES:  4A.  Thank you, Your Honor.

21   Q.   Thank you.

22       Is there any indication on the outside of the device that

23   would inform you on whether the device was shipped or

24   transported in interstate or foreign commerce?

25   A.   The only thing on the outside of the device is there is a

JASON WHITT - DIRECT

1  marking for the "Medical College of Wisconsin."  And on the

2  other side there is a "Department of Psychiatry."  There's no

3  markings as to where it was manufactured.

4  Q.   I'm showing you what has been marked for identification

5  as Government's Exhibits 4B and 4C.

6        Do these -- do you recognize these pictures?

7  A.   I do.

8  Q.   Do these -- what is it?

9  A.   It is the thumb drive with the markings of "Medical

10 College of Wisconsin" and the other one is "Department of

11 Psychiatry."

12        MR. CERVANTES:  The government moves 4B and 4C into

13 evidence.

14        THE COURT:  They're admitted.

15        (Government's Exhibits Nos. 4B and 4C were received

16 into evidence.)

17 Q.   Did you flag images of child pornography on this thumb

18 drive?

19 A.   I did.

20 Q.   Were those images organized in any particular way?

21 A.   The images were in folders, different folders.

22 Q.   Okay.  And what kind of images of child pornography did

23 you find?

24 A.   So the images of child pornography that I found on here,

25 they are going to be altered or modified from an original

JASON WHITT - DIRECT

1  image or a source image.  And then you'll see the images where
2  they were modified or altered to appear -- or to be child
3  pornography.
4  Q.   I'm showing you what has been marked for identification
5  as 4D.
6       Do you recognize it?
7  A.   I do.
8  Q.   What is it?
9  A.   So this is a screenshot of four folders inside the thumb
10  drive.
11            MR. CERVANTES:  The government moves 4D in evidence.
12            THE COURT:  It's admitted.
13            (Government's Exhibit Number 4D was received into
14  evidence.)
15  Q.   So let's talk about what you found.  First of all, if you
16  can just talk a little bit about the folder path.  So if
17  someone were to insert this thumb drive into the MacBook, how
18  is it that they would get to this screen?
19  A.   So if you inserted this thumb drive into a MacBook, you
20  would see -- it would give it a letter or a volume.  So you
21  would see the letter H or the volume mounted as USB disk
22  depending on which system you plugged it into.
23       Inside of that you would click on the folder MCW2, and
24  then it would open up more folders.  Then you would find the
25  folder PCS_files.  Then inside that folder you would find

JASON WHITT - DIRECT

1  Sample.  And inside that folder you would look for MGNweb,

2  w-e-b.  And then inside of that folder you would see these

3  four folders.

4  Q.   All right.  So we're going to talk about three of these

5  folders.  First we're going to talk about the CPT, then we're

6  going to talk about the SSV, and then we'll talk about the

7  EMOR.  Okay?

8  A.   Yes, sir.

9  Q.   I'm showing you what has been marked for identification

10 as Government's Exhibit 4E1.

11     What is that?

12 A.   This is a screenshot of the CPT folder.

13         MR. CERVANTES:  Government moves 4E1 in evidence.

14         THE COURT:  Admitted.

15         (Government's Exhibit Number 4E1 was received into

16 evidence.)

17 Q.   Okay.  Can you describe what we're looking at here.

18 A.   So inside of here there's 24 images.  There are going to

19 be original images that I will reference to as original or

20 source images.  And then you're going to see images of the

21 original that have been altered to be child pornography.

22 Q.   So are there -- you're saying that there are pairs?

23 A.   There are pairs.

24 Q.   So I'm pulling up a pair of pictures.  Do you agree that

25 this is a set?

JASON WHITT - DIRECT

1  A.   I do.

2  Q.   Which one -- you said that they were original and then

3  modified.

4  A.   Correct.

5  Q.   The original being the one on the left and the modified

6  on the right?

7  A.   Correct.

8  Q.   Pulling up another.  Is this a pair?

9  A.   Yes, sir.

10 Q.   Is this a pair?

11 A.   Yes, sir.

12 Q.   Is this a pair?

13 A.   So the image on the right and the image on the far left

14 in the left box are a pair.

15 Q.   And the image --

16 A.   The image on -- I'm sorry.

17 Q.   -- that I've circled in red?

18 A.   So that image appears to be cropped from the image on the

19 left in the left-hand box.

20 Q.   Is this a pair?

21 A.   Yes, sir, it is.

22 Q.   Is this a pair?

23 A.   Yes, sir.

24 Q.   Is this a pair?

25 A.   Yes, sir.

JASON WHITT - DIRECT

1  Q.   Is this a pair?

2  A.   Yes, sir.

3  Q.   Now, I'd like to draw your attention to the bottom right

4  of this picture.  What do you see there?

5  A.   So it is a watermark or a banner for Teen Gallery.  At

6  the bottom I believe it's .com.

7  Q.   Did you find the -- any originals from these three that

8  I've pulled up?

9  A.   Yes, sir, I did.

10 Q.   In this folder?

11 A.   No, sir.

12 Q.   I'm showing you what has been marked for identification

13 as Government's Exhibit 8.

14      Do you recognize that?

15 A.   I do.

16 Q.   What is it?

17 A.   It is a screen shop -- screenshot of the website

18 deepsukebe.io/en.

19          MR. CERVANTES:  The government moves Exhibit 8 into

20 evidence.

21          THE COURT:  It's admitted.

22          (Government's Exhibit Number 8 was received into

23 evidence.)

24 Q.   Why did you take this screenshot?

25 A.   So Special Agent Brown advised me that some of these

JASON WHITT - DIRECT

1   images may be altered by this website.

2   Q.   Okay.  And did you find evidence that some of the

3   pictures we just looked at had indicia of being modified by

4   this website?

5   A.   I did.

6   Q.   I'm going to pull up the last exhibit that we were just

7   looking at and I'm going to zoom in on one of the pictures.

8        Is there something about this picture that catches your

9   eye?

10  A.   There is.

11  Q.   What is it?

12  A.   So if you look at the top of the picture on the left, you

13  will see the magenta or pink banner on the top and bottom, but

14  also the middle of the picture where you see the white bar to

15  show what is selected on the website appears to be consistent

16  with the website itself.

17  Q.   Zooming into another picture, is your testimony the same

18  about that picture?

19  A.   Yes, sir, it is.

20  Q.   Next I'd like to talk to you about the contents of the

21  SSV folder.

22       I'm showing you what has been marked for identification

23  as Government 4G1.

24       Do you recognize it?

25  A.   I do.

JASON WHITT - DIRECT

1  Q.   What is it?

2  A.   It is a screenshot of some of the files in -- or some of

3  the files in the folder SSV.

4  Q.   I'm going to show you two more and then ask to move these

5  in.  One second.

6       Government's Exhibit 4G2, what is that?

7  A.   It is a screenshot of some of the other files in the

8  folder SSV.

9  Q.   Third one, 4G3.  Do you recognize that?

10 A.   Yes, sir.  It's a screenshot of the files -- the

11 remaining files in the folder of SSV.

12           MR. CERVANTES:  Government moves 4G1, 4G2, and 4G3

13 in evidence.

14           THE COURT:  They're admitted.

15           (Government's Exhibits Nos. 4G1, 4G2, and 4G3 were

16 received into evidence.)

17 Q.   Starting with 4G1, what are we looking at here?

18 A.   Some of these are -- these are the first files that are

19 in the folder of SSV.

20 Q.   Did you identify some of the unmodified pictures that we

21 just looked at in this folder?

22 A.   I did.

23 Q.   Is this one?

24 A.   Yes, sir.

25 Q.   Is this another one?

JASON WHITT - DIRECT

1  A.   Yes, sir.

2  Q.   Are these two more?

3  A.   Yes, sir.

4  Q.   The remaining pictures here that I have not called your

5  attention to, did you find that those were modified?

6  A.   I did not.

7  Q.   Pulling up 4G2, did you find any of the modified pictures

8  in their unmodified form in this folder?

9  A.   I did.

10 Q.   Is this one?

11 A.   Yes, sir.

12 Q.   Is this another one?

13 A.   Yes, sir.

14 Q.   Is this another one?

15 A.   Yes, sir.

16 Q.   How about this one?

17 A.   Yes, sir.

18 Q.   And this one?

19 A.   Yes, sir.

20 Q.   Showing you 4G3.  Same questions.

21      Is this one?

22 A.   It is.

23 Q.   At the bottom of this picture, do we see the same water

24 stamp for Teen Gallery?

25 A.   Yes, sir, we do.

JASON WHITT - DIRECT

1   Q.   Is this another one?

2   A.   It is.

3   Q.   Same issue with the watermark?

4   A.   Yes, sir.

5   Q.   Is this another one?

6   A.   Yes, sir.

7   Q.   How about the watermark?

8   A.   Same, Teen Gallery.

9   Q.   And I just want to go back and double check.

10       4G2, is there a watermark on this picture?

11  A.   Yes, sir.

12  Q.   Do you need me to zoom in closer?

13  A.   There is a watermark.  Appears to be Teen Gallery, yes,

14  sir.

15  Q.   Next I want to talk about the contents of the EMOR

16  folder.

17       I'm showing you what has been marked for identification

18  as 4F1.

19       Do you recognize it?

20  A.   I do.

21  Q.   What is it?

22  A.   It is the contents or the files inside the EMOR file,

23  4F1.

24            MR. CERVANTES:  The government moves 4F1 in

25  evidence.

JASON WHITT - DIRECT

1    THE COURT:  It's admitted.

2    (Government's Exhibit Number 4F1 was received into

3  evidence.)

4  Q.   What are we looking at here?

5  A.   Again, what we're looking at here is source folders or

6  source files and then those files being altered or modified.

7  Q.   So I'm going to take a couple minutes just to zoom into a

8  few pictures.

9    So I've zoomed in on several of the pictures in there.

10  Do you recognize these to be similar or sets?

11  A.   Yes, sir.

12  Q.   I'm going to zoom in on another set of pictures.

13    Do you recognize these to be sets?

14  A.   I do.  Minus the one female on the far left is cut out of

15  the one on the right.

16  Q.   Yesterday I asked you questions about attribution.

17  A.   Yes, sir.

18  Q.   Did you look for attribution in the thumb drive?

19  A.   I did.

20  Q.   I'm showing you what has been marked for identification

21  as Government's Exhibits 4H1 through 4H4.

22    Do you recognize them?

23  A.   I do.

24  Q.   Did these pictures come from the thumb drive?

25  A.   They did.

1    MR. CERVANTES:  Government moves 4H1 through 4H4 in
2  evidence.
3    THE COURT:  They're admitted.
4    (Government's Exhibits Nos. 4H1, 4H2, 4H3, and 4H4
5  were received into evidence.)
6  Q.   I'm going to show you one more that I couldn't fit on the
7  screen.
8    Do you recognize this one?
9  A.   I do.
10  Q.   Did this come from the thumb drive?
11  A.   It did.
12  Q.   4H5.
13    MR. CERVANTES:  Government moves 4H5 in evidence.
14    THE COURT:  It's admitted.
15    (Government's Exhibit Number 4H5 was received into
16  evidence.)
17  Q.   Showing you what has been marked for identification as
18  Government's Exhibit 4H6.
19    Do you recognize this?
20  A.   I do.
21  Q.   Did this document come from the thumb drive?
22  A.   Yes, sir.
23    MR. CERVANTES:  Government moves 4H6 in evidence.
24    THE COURT:  It's admitted.
25    (Government's Exhibit Number 4H6 was received into

1  evidence.)

2  Q.   What does this letter appear to be to you?

3  A.   It's a letter addressed to a Dr. David Arthur Tatum from

4  Wake Forest University, Department of Psychiatry and

5  Behavioral Medicine.

6  Q.   Okay.  Last device.  Can you hold up the MacBook, please.

7       (Witness complied.)

8  Q.   And that's marked as Government's Exhibit 5A?

9  A.   Yes, it is.

10  Q.   Is there any indication on the outside of the device that

11  would inform you on whether the device was shipped or

12  transported in interstate or foreign commerce?

13  A.   Yes, sir.

14  Q.   Showing you what has been marked for identification as

15  Government's Exhibit 5B.

16       Do you recognize it?

17  A.   I do.

18  Q.   What is it?

19  A.   It is the back of the MacBook describing where it's

20  assembled and designed by and also contains the serial number.

21  Q.   Where is it designed and assembled?

22  A.   Designed by Apple in California and assembled in China.

23       MR. CERVANTES:  Government moves 5B in evidence.

24       THE COURT:  It's admitted.

25       (Government's Exhibit Number 5B was received into

JASON WHITT - DIRECT

1   evidence.)

2   Q.   All right.  What are user profiles?

3   A.   So user profiles, when you have a computer, when you

4   first log in or when you open it up, you can create your own

5   user profile.  It just allows you to have multiple users on a

6   computer that you can separate yourself or your information.

7   But a user profile is a profile you create or somebody creates

8   for you on a computer.

9   Q.   Did you find multiple user profiles on the MacBook?

10  A.   I did.

11  Q.   To what extent did that impact your search?

12  A.   User profiles do not impact my search.

13  Q.   Can you explain.

14  A.   So when we go into a computer, we talked about index

15  searches.  When I first run an index search or I go in and

16  look for videos or images of child pornography, I don't look

17  what user generated them or where it's stored at first.  I run

18  the index search and then I go wherever the evidence leads me.

19  Q.   And afterwards can you then see what user profile is

20  associated with the piece of evidence that you found?

21  A.   Yes, sir.  Once they are flagged we'll go through and

22  then once we get the folder path, we will see what user they

23  are stored under.

24  Q.   Did you find information in the MacBook that it was used

25  to access child pornography?

JASON WHITT - DIRECT

1   A.   I did.

2   Q.   What user profiles were associated with that evidence?

3   A.   So there was two, a David Tatum and a Morphus.

4   Q.   Is that the same -- spelled in the same way as the

5   Morphus that we discussed yesterday from the iPhone?

6   A.   Yes, sir, it was.

7   Q.   Just to be sure, pulling up Government's Exhibit 2I

8   that's already in evidence.  Can you remind the jury what this

9   is.

10  A.   So this is the details of the owner information for the

11  iPhone 6.

12  Q.   Okay.  And when you discussed Morphus, is it the same

13  spelling that you see here in the Apple ID?

14  A.   Yes, sir.

15  Q.   All right.  Previously we looked at evidence and then we

16  talked about attribution, but for this device we're going to

17  do it backwards.  We're going to talk about attribution first,

18  okay?

19  A.   Yes, sir.

20  Q.   Did you find any attribution in the MacBook?

21  A.   I did.

22  Q.   Showing you what has been marked for identification as

23  Government's Exhibit 5F.

24       What is that?

25  A.   It is a document from the MacBook.

JASON WHITT - DIRECT

1          MR. CERVANTES:  Government moves 5F in evidence.

2          THE COURT:  Admitted.

3          (Government's Exhibit Number 5F was received into

4    evidence.)

5    Q.   Can you -- can you read the top of the document.

6    A.   The top of the document.  "David Arthur Tatum, D.O.,

7    13021 Pumpkin Way Drive, Mint Hill, North Carolina 28227."

8    Q.   Okay.  What does this document purport to be?

9    A.   Appears to be a resume.

10   Q.   I'm going to move this over and bring back 2I that we

11   were just looking at.

12        On this resume, what's the phone number that Dr. Tatum

13   lists on his resume?

14   A.   The phone number is (315)447-4594.

15   Q.   And what is the phone number associated with the iPhone

16   that we previously discussed that you said was used to record

17   the two bathroom videos and the up-skirt videos?

18   A.   The device's phone number recorded is 1(315)447-4594.

19   Q.   I'm showing you what has been marked for identification

20   as Government's Exhibit 5G.

21        Do you recognize this?

22   A.   I do.

23   Q.   What is it?

24   A.   This is a screenshot from the AXIOM Magnet forensic

25   software reference to a user on the MacBook.

JASON WHITT - DIRECT

1    MR. CERVANTES:  Government moves 5G in evidence.

2    THE COURT:  It's admitted.

3    (Government's Exhibit Number 5G was received into

4  evidence.)

5  Q.   I'm highlighting the top part of the artifact

6  information.  What is the user name associated?

7  A.   The user name is davidtatum, one word.

8  Q.   And the full name?

9  A.   The full name is David Tatum.

10  Q.   Is there a way to determine whether the thumb drive or

11  the My Passport -- can you hold up both of those.

12  A.   This is the thumb drive and the My Passport.

13  Q.   Is there a way to determine whether either of those

14  devices were plugged into the MacBook?

15  A.   There are.

16  Q.   Can you describe, what are thumbnails?

17  A.   So thumbnails -- when you plug in a device into your

18  computer, whether, again, it's a Mac or a Windows, you can --

19  the computer itself will go out, look at the files and create

20  a thumbnail from it and put it into a thumbnail cache so that

21  whenever you plug the drive back in, it can access these

22  thumbnails faster so it won't slow down your computer.

23  Q.   So in trying to determine whether one of these devices

24  was plugged into the Mac, what do you do?

25  A.   So in this we will look for common, like, file paths.  We

1    will also look for folders that we saw on another drive.  We
2    will also do an index search.
3    Q.    This morning we talked about the folder path, for
4    example, to those folders that have the CPT, the SSV, and the
5    EMOR.  Would you be able to look for that folder path in the
6    Mac?
7    A.    Yes, through an index search, yes, sir.
8    Q.    Okay.  So let's -- I'm going to move in some exhibits and
9    then compare them to some exhibits we've already talked about,
10   okay?
11   A.    Yes.
12   Q.    So I'm going to show you what's been marked as
13   Government's Exhibit 5 -- I'm sorry, 4E5.
14         What is that?
15   A.    It is a screenshot for the details for the -- or from the
16   MacBook.
17   Q.    Okay.  For an image?
18   A.    For a thumbnail, yes, sir.
19              MR. CERVANTES:  Government moves 4E5 in evidence.
20              THE COURT:  It's admitted.
21              (Government's Exhibit Number 4E5 was received into
22   evidence.)
23   Q.    I'm going to show you two more before publishing to the
24   jury, okay?
25         I'm showing you what's been marked for identification as

JASON WHITT - DIRECT

1  4F9.

2      Do you recognize that?

3  A.   I do.

4  Q.   What is it?

5  A.   It is a screenshot from the Magnet AXIOM forensic

6  software for the details of a thumbnail.

7          MR. CERVANTES:  Government moves 4F9 in evidence.

8          THE COURT:  It's admitted.

9          (Government's Exhibit Number 4F9 was received into

10  evidence.)

11  Q.   Showing you 4F13.

12      What is that?

13  A.   It is a screenshot from the Magnet AXIOM software for the

14  details of a thumbnail.

15          MR. CERVANTES:  Government moves 4F13 in evidence.

16          THE COURT:  It's admitted.

17          (Government's Exhibit Number 4F13 was received into

18  evidence.)

19  Q.   All right.  So I am showing you Government's Exhibit 4D

20  that's been admitted in evidence.  Can you remind us what this

21  is.

22  A.   So this is the -- how you would get to these folders.

23  When you plug in the thumb drive, you would see the MCW2

24  folder, the PCS_files folder, the Sample folder, and the

25  MGNweb folder.  And inside that folder you would see the four

1  listed folders.

2  Q.   All right.  So I'm going to move this over and then we're

3  going to talk about some other exhibits, okay?

4       4E5.  What is 4E5?

5  A.   4E5 is the screenshot for the Magnet AXIOM forensic

6  software for the details of that thumbnail.

7  Q.   Where?  On the MacBook?

8  A.   From the MacBook.

9  Q.   Okay.  So the image on the right is from the MacBook.

10  The image on the left is from the thumbnail -- the thumb

11  drive.

12  A.   Correct.

13  Q.   Can you tell on Government's Exhibit 4E5, the one on the

14  right, what the folder path is?

15  A.   I can.

16  Q.   What is it?

17  A.   So the folder path that lists thumbnails associated to it

18  is from Volumes, USB disk, MCW2, folder PCS_files, folder

19  Sample, folder MGNweb, w-e-b, folder CPT.

20  Q.   Is that the same folder path in the thumb drive for the

21  CPT folder?

22  A.   It is.

23  Q.   I'm showing you 4F9.

24       Can you tell us what we're looking at here.

25  A.   It is the Magnet AXIOM forensic software details for this

JASON WHITT - DIRECT

1  thumbnail for the MacBook.

2  Q.   And the thumbnail being depicted at the top?

3  A.   The thumbnail being depicted at the top, yes, sir.

4  Q.   So the same -- is your testimony the same about where

5  this is coming from, the MacBook?

6  A.   Yes, sir.

7  Q.   What is the folder path for this thumbnail?

8  A.   The folder path for this thumbnail is Volumes, USB disk,

9  MCW2, which is where the folder would start, PCS_files, folder

10 Sample, folder MGNweb, folder EMOR.

11 Q.   Is this the same folder path as the thumb drive for the

12 EMOR folder?

13 A.   Yes, sir.

14 Q.   Showing you 4F13.

15      What is this?

16 A.   This is a screenshot from the Magnet AXIOM forensic

17 program for the thumbnail shown at the top from the MacBook.

18 Q.   What is the folder path to this thumbnail?

19 A.   The folder path for this folder is USB disk, MCW2,

20 PCS_files, folder Sample, folder MGNweb, w-e-b, folder EMOR.

21 Q.   Is that the same folder path as the folder path in the

22 thumb drive for the EMOR folder?

23 A.   It is.

24 Q.   So does the -- do the last three metadata exhibits that

25 we were just talking about, 4E5, 4F9, and 4F13, 4F13 being the

JASON WHITT - DIRECT

1    one that's depicted, do they give you a last access date

2    information?

3    A.   It does.

4    Q.   What does that mean?

5    A.   For the last access date for this is when the thumb drive

6    was plugged in and the MacBook actually saw these files.  So

7    it records the last access date of these thumbnails.

8    Q.   And what is the last access date for -- that's depicted

9    here for the thumbnail in 4F13?

10   A.   9/18/2021.

11   Q.   Based on this information, can you tell the jury the last

12   time that this MacBook was accessed -- this MacBook accessed

13   the folder in the thumbnail.

14   A.   So the last time that the MacBook accessed the thumbnail

15   would be 9/18/2021.

16   Q.   And in your opinion, can you tell whether that last

17   access is last accessed into the thumbnail -- the thumb drive

18   that's been admitted as Government's Exhibit 4A?

19   A.   Yes.  You would have to plug in the thumb drive for the

20   MacBook to actually access it.

21   Q.   Next let's talk about whether you found any evidence that

22   the My Passport was plugged into the MacBook.

23   A.   Yes, sir.

24   Q.   We're going to talk about the bathroom -- the first

25   bathroom video.

JASON WHITT - DIRECT

1    Did you find evidence that the first bathroom video was
2  plugged into -- that the My Passport was plugged into the
3  MacBook and the folder where the first bathroom video is
4  located was accessed?
5  A.   I did.
6  Q.   We're going to break that down in a moment, okay?
7  A.   Yes, sir.
8  Q.   Showing you what has been marked for identification as
9  Government's Exhibit 5K.
10   Do you recognize it?
11 A.   I do.
12 Q.   What is it?
13 A.   This is a screenshot for the -- for a thumbnail located
14 on the MacBook.
15        MR. CERVANTES:  Government moves 5K in evidence.
16        THE COURT:  It's admitted.
17        (Government's Exhibit Number 5K was received into
18 evidence.)
19 Q.   Can you explain to the jury what we're looking at here.
20 A.   So what we're looking at here is the thumbnail for a file
21 IMG_3666.MOV and the details that the Magnet AXIOM forensic
22 software pulled for it.
23 Q.   From this information can you tell whether the My
24 Passport was plugged into the MacBook to access the bathroom
25 video, the first bathroom video?

JASON WHITT - DIRECT

1   A.    Yes, sir.

2   Q.    And what is that information?

3   A.    So if you look at the folder path from where the movie or

4   the file was accessed from.

5   Q.    What does that tell you?

6   A.    It tells me from the Volumes/My Passport/User

7   Manuals/KOR/Dartmouth/Downloads/Modules is where the file was

8   accessed from, which is consistent with the My Passport.

9   Q.    Was the bathroom video saved in the folder marked

10  Modules?

11  A.    Yes.

12  Q.    Was the second bathroom video also saved in the Modules

13  folder?

14  A.    Yes, sir.

15  Q.    Showing you what has been marked for identification as

16  Government's Exhibit 5L.

17        Do you recognize that?

18  A.    I do.

19  Q.    What is it?

20  A.    It is a screenshot of the thumbnail from the Magnet AXIOM

21  forensic software for the details of that thumbnail.

22            MR. CERVANTES:  Government moves 5L in evidence.

23            THE COURT:  Admitted.

24            (Government's Exhibit Number 5L was received into

25  evidence.)

JASON WHITT - DIRECT

1  Q.   Can you describe what we're looking at here for the jury.

2  A.   At the top part you are seeing a thumbnail for the file

3  IMG_3696.  And also the folder path is above it which is

4  Volumes/My Passport/User Manuals/KOR/Dartmouth/Downloads,

5  folder Modules.

6  Q.   Is this the same folder path you just described for the

7  first bathroom video?

8  A.   Yes, sir.

9  Q.   From this information can you tell whether the My

10  Passport was plugged into the MacBook to access the second

11  bathroom video?

12  A.   Yes, sir.

13  Q.   And was it?

14  A.   It was.

15  Q.   What is the last accessed date for this thumbnail?

16  A.   The thumbnail last accessed date is 9/10/2021.

17  Q.   Showing you what has been marked for identification as

18  Government's Exhibit 5H.

19       Do you recognize this?

20  A.   I do.

21  Q.   What is it?

22  A.   It is a screenshot of the details for a thumbnail located

23  on the MacBook from the Magnet AXIOM forensic software.

24            MR. CERVANTES:  Government moves 5H in evidence.

25            THE COURT:  Admitted.

JASON WHITT - DIRECT

1          (Government's Exhibit Number 5H was received into

2    evidence.)

3    Q.    Can you explain to the jury what this is.

4    A.    So on the top portion you will see a thumbnail of a video

5    from IMG_1089.MOV, and the folder path is Volumes/My

6    Passport/User Manuals/KOR/Dartmouth/Downloads, folder Modules.

7    Q.    Is this one of the up-skirt videos we saw yesterday?

8    A.    It is.

9    Q.    Is this the same folder path for both of the bathroom

10   videos?

11   A.    Yes, sir, it is.

12   Q.    Have you reviewed the folder path for the other two

13   videos -- the other two up-skirt videos?

14   A.    I have.

15   Q.    And is the folder path the same for those?

16   A.    Yes, sir, it is.

17   Q.    Is there any significance to the fact that the two

18   bathroom videos and the three videos of the patient all have

19   the same folder path?

20   A.    They were all stored in the same folder so that's where

21   they were saved to or put into.

22   Q.    We talked about index searches.  You've mentioned that a

23   couple times.  Can you just briefly touch on what that is.

24   A.    So an index search is when our forensic software sees a

25   forensic image, it goes out and creates, like, a log of all

1  the, like, strings of letters and numbers so that -- and it

2  puts it into a list so that when you run an index search, they

3  can be accessed faster.

4  Q.  Did you search for pthc in the MacBook?

5  A.  I did.

6  Q.  Did you get any hits?

7  A.  I did.

8  Q.  Showing you what's been marked for identification as

9  Government's Exhibit 5C.

10      What is that?

11  A.  This is the first page of the hits of pthc that we

12  exported.

13  Q.  How many hits were exported?

14  A.  1,118.

15         MR. CERVANTES:  Government moves 5C in evidence.

16         THE WITNESS:  It's admitted.

17         (Government's Exhibit Number 5C was received into

18  evidence.)

19         MR. AMES:  Your Honor, I know I have a standing

20  objection, but in particular with this, I just wanted to make

21  it clear that I'm objecting to hearsay, foundation, and

22  otherwise as before.

23         THE COURT:  Understood.  Overruled.

24  Q.  What do each of these rows represent?

25  A.  So each row is one hit for the term of pthc.

JASON WHITT - DIRECT

1  Q.   If we looked at any one of the rows in this document that
2  you said a moment ago has 1,118 rows, do they all have the
3  phrase pthc?
4  A.   Yes, sir.
5  Q.   Where are these coming from?
6  A.   These are coming from a QuickLook database to where a
7  volume was plugged in.  And what a QuickLook does is it goes
8  out into -- just like the thumbnail cache, it goes out and
9  sees when you plug it in, it makes a record of each file that
10 is located in the drive; and that's where you get the
11 QuickLook thumbnail cache from.
12 Q.   So this list, this information is stored in the MacBook?
13 A.   Correct.
14 Q.   Do you have any doubt that there was a device that was
15 plugged into the Mac that had files with those names in it?
16 A.   No, sir.
17 Q.   If there wasn't a device that had those files in it and
18 was connected to the MacBook, is there any other possible way
19 that these hits could have been found on the MacBook?
20 A.   No, sir, not to my knowledge.
21 Q.   I'd like to highlight three of the rows, 18 -- I'm sorry,
22 8, 13, and 30.  Would you please read each one of these.
23 A.   8, "[PTHC]6yo girl gets fucked with legs in the
24 air(1).JPG"; 13, "[PTHC]8yo pussy pedo fuck-screwtop
25 style!!.jpg"; and 30, "[PTHC]Daddy fucks my 4yo cunt for first

JASON WHITT - DIRECT

1  time(1).jpg."

2  Q.   Based on your training and experience, you said you've

3  reviewed over a hundred thousand files?

4  A.   Yes.

5  Q.   Does this naming convention for these files, is it

6  consistent with files you have previously reviewed as child

7  pornography?

8  A.   Yes.

9  Q.   What does the y-o after each one of these numbers stand

10  for?

11  A.   So y-o usually stands for years of age or years old.

12  Q.   What does pedo stand for?

13  A.   Pedophilia, pedophile.

14  Q.   Just to make sure that the document has all the pages

15  that we had discussed, I am going to -- or the rows, I'm going

16  to zoom to the -- or fast forward to the last page.

17       Can you confirm that 1,118 is the last row?

18  A.   Yes, sir.

19  Q.   PLIST file, what is that?

20  A.   A PLIST file is a properties list file that records

21  information of the user or information from the application

22  and stores it in the PLIST file.  So whenever you access that

23  application, it has your user settings or data about the

24  application already saved.

25  Q.   Did you find a PLIST file in the MacBook related to

JASON WHITT - DIRECT

1  recently played videos?

2  A.   I did.

3  Q.   Showing you what has been marked for identification as

4  Government's Exhibit 5D.

5       What is that?

6  A.   So this is a screenshot from the Magnet AXIOM forensic

7  software from the VLC PLIST.

8            MR. CERVANTES:  Government moves 5D in evidence.

9            THE COURT:  Admitted.

10           (Government's Exhibit Number 5D was received into

11  evidence.)

12  Q.   Let's talk about time frame for a moment before we get

13  into the content of this.

14       Does this PLIST contain any information about when these

15  files were played?

16  A.   No, it does not.

17  Q.   Does it have information about when it was first run?

18  A.   Yes, it does.

19  Q.   Okay.  And can you describe what that is.  What does that

20  mean?

21  A.   So inside the PLIST there are fields where it lists

22  certain dates that the programmers of VLC decided to record.

23  In this one you'll see VLCFirstRun, one word, and a date of

24  8/6/2019.

25  Q.   What does that tell you, if anything, about these videos?

1  A.   That these videos were either played on or after
2  8/6/2019.
3  Q.   So the information doesn't tell you specifically when
4  each video was played, but it does give you at least a range
5  of when they were played.
6  A.   Yes, sir.
7  Q.   And that range being what?
8  A.   The date that it was first run to the date that it was
9  seized.
10 Q.   Okay.  So between August 6, 2019, to September 22, 2021?
11 A.   Yes, sir.
12 Q.   I'm going to focus on a couple rows here.
13       Row 19.  Can you describe what we're looking at here and
14 what does this row tell you?
15 A.   So what you're looking at here is an entry into the
16 recently played media or the VLC PLIST.  This is a row that
17 signifies which file was played.  Where you see file and the
18 colon, and then it lists out the folder path and file name
19 that was accessed by VLC.
20 Q.   I'm highlighting the word Lolita.  Previously --
21 yesterday you testified about Lolita?
22 A.   Lolita is a common search term that I use to find
23 evidence of child pornography.
24 Q.   Why?
25 A.   It's always associated with it.  I don't know exactly

1  what it means.  But we always search for Lolita, pthc, pedo,
2  those type of words.
3  Q.   What does this tell you about where it was played from?
4  A.   So it was played from the Volumes/My Book/Data --
5  Q.   Well, what does it tell you about what device it was
6  played from?
7  A.   So it was played from a My Book, which My Book is a
8  Western Digital external device.
9  Q.   If row 19 is also listed in that document we just looked
10 at with 1,118 file names that have pthc in it, what would that
11 mean to you?
12 A.   That this was located on the My Book and also played
13 through the VLC program.
14 Q.   So let's see if row 19 is on that list that we just
15 looked at.
16      So I'm going to scroll to page 4 of this document.  I'm
17 going to draw your attention to row 96.
18      Is the file that was played that's described in row 19,
19 the blowout that's in the top, is it listed in the document
20 with 1,118 file names in it?
21 A.   Yes, sir.
22 Q.   So what does that mean to you?
23 A.   That this device was connected to the MacBook and viewed
24 through the VLC program.
25 Q.   I'm going to try two more.  Row 7 from Exhibit 5D.  I'm

JASON WHITT - DIRECT

1   going to go to page 16 in Exhibit 5D, row 450.

2       Can you read the name of the file in 450.

3   A.   "Vicky String Bikini Pthc 11Yo Pedofilia.mpg."

4   Q.   Does Vicky have any significance to you?

5   A.   So Vicky is a very common name for investigations into

6   child pornography.  It's a very common known victim.  You'll

7   see Vicky's name in a lot of the child exploitation cases that

8   I work.

9   Q.   And is this particular file, is it also listed in the

10  PLIST?

11  A.   It is listed in the PLIST, yes, sir.

12  Q.   So just to be clear, I'm highlighting the back end of

13  that file path.  What does this mean to you, the location of

14  the file?  How can you read that from this folder path?

15  A.   So the location of the file from My Book through all

16  those folders, Data/COMIC LO - Vol

17  40/Soul_of_Lolita_complex-Vol.1/ptm5/abemas2, folder A Day In

18  the Life, folder [Lcon] A Day In the Life - Chapter 4, folder

19  rtk, folder yup, folder lveogdstp, and then the file name of

20  Vicky String Bikini Pthc 11Yo Pedofilia.

21  Q.   So the file name would be the last part after the last

22  forward slash; is that correct?

23  A.   Yes, sir.

24  Q.   Everything before that is really a folder that you're

25  clicking through to get to the file.

JASON WHITT - DIRECT

1   A.   Correct.

2          MR. CERVANTES:  One moment.

3          (Pause.)

4   BY MR. CERVANTES:

5   Q.   Okay.  The last one we're going to do is row 11 from 5D.

6   We're going to see if this file is also listed in the list of

7   1,118 file names.  I'm going to go to page 16, row 441.

8          Can you read the name of the file listed in row 441.

9   A.   "Childlover - (Pthc) Sally - Medley Of Scenes (4yo to

10  8yo).mpg."

11  Q.   Does Sally have any significance to you?

12  A.   No, sir.

13  Q.   Is that sometimes common to come across names, what

14  appear to be proper names and not know what it is?

15  A.   Yes, sir.

16  Q.   But there are some names that you do come across a lot?

17  A.   Correct.

18  Q.   Which is what we discussed before.

19  A.   Yes, sir.

20  Q.   Is this -- so is this file listed in the PLIST?

21  A.   It is.

22          MR. CERVANTES:  For the record, I'm just

23  highlighting the back end of that folder path.

24  Q.   You previously mentioned that there were multiple

25  profiles in this MacBook.

JASON WHITT - DIRECT

1  A.   Yes, sir.

2  Q.   Which profile is this PLIST associated with?

3  A.   The profile that the PLIST is associated with is Morphus.

4  Q.   I'm showing you what has been identified as Government's

5  Exhibit 5E.

6       Do you recognize this?

7  A.   I do.

8  Q.   What is it?

9  A.   It's a screenshot from the Magnet AXIOM program reference

10 the details for the VLC PLIST.

11       MR. CERVANTES:  Government moves 5E in evidence.

12       THE COURT:  It's admitted.

13       (Government's Exhibit Number 5E was received into

14 evidence.)

15 Q.   Can you describe to the jury what we're looking at here.

16 A.   So at the top is the fields inside of the PLIST and on

17 the bottom is the details for the PLIST file itself.

18 Q.   So if we were to expand this by clicking on this arrow on

19 the left, what would happen?

20 A.   It would show you files from the recently played media

21 list.

22 Q.   And we were looking -- previously looking at the

23 breakdown of the recently played list, correct?

24 A.   Correct.

25 Q.   So I want to draw your attention to the bottom of this

1  document.

2        What does it tell you?

3  A.   This tells me the location for the video -- or for the

4  VLC PLIST.

5  Q.   Does this give you information about who the user was

6  that was logged in when the PLIST was created?

7  A.   So the PLIST is created under the user Morphus, yes, sir.

8            MR. CERVANTES:  No further questions, Your Honor.

9            THE COURT:  You may cross examine.

10                       CROSS EXAMINATION

11 BY MR. AMES:

12 Q.   Good morning.

13 A.   Good morning.

14 Q.   So obviously you gave us a lot of information.  I'll try

15 to do this is an organized fashion.

16       So again, with your background, you review a lot of these

17 types of cases, correct?

18 A.   Yes, sir.

19 Q.   You said you've gotten thousands -- or at least a

20 thousand devices or thousands?

21 A.   Thousands of devices, hundreds of examinations.

22 Q.   Can you briefly just kind of describe investigative wise

23 the process here.  For example, when you're searching devices

24 for evidence and child pornography and working with law

25 enforcement agents, what's that process like?  How does it

JASON WHITT - CROSS

1   begin?

2   A.   So after the agent seizes a device, they'll put in a

3   request for us to conduct a forensic examination on the

4   devices.

5   Q.   And have these devices been looked at before by anybody

6   or does it vary, or what's the...

7   A.   The devices, to the best of my knowledge, have not been

8   looked at by anybody.  We're the first ones to get them,

9   especially when it's an FBI case.

10  Q.   So in this particular case with these ones you've

11  described today, when was the first time that you reviewed the

12  contents?

13  A.   I'd have to review my logs when I reviewed it.

14  Q.   That's fine.  Do you have an estimate, ballpark?

15  A.   Around 2021, like after September.

16  Q.   So if you're doing an initial search, you mentioned --

17  you discussed flagging.  What is that in regard to?

18  A.   So flagging or either bookmarking, we'll use those terms

19  interchangeably about finding evidence of potential child

20  pornography that we will flag for further review.

21  Q.   Okay.  Does anyone else flag -- do any agents flag

22  anything or is that you doing it, or both?

23  A.   So it's both.

24  Q.   So there's some circumstances where an agent might have

25  flagged something.  For example, I recall your testimony on

1  one of the drives, the Western Digital, I believe, that you
2  noted one of the videos was flagged, correct?
3  A.    I'm trying to remember on the Western Digital.  I know on
4  the HP some of those were flagged and I reviewed them.
5  Q.    Sorry, you're right.  You're correct.  It was the HP
6  Pavilion.  So on the HP Pavilion, one of those images was
7  flagged, correct?
8  A.    Correct.
9  Q.    What was that in regard to?  Was that an agent flagging
10  it or something else?
11  A.    It was an agent that flagged it, yes, sir.
12  Q.    Do you know who the agent was who flagged that?
13  A.    I believe it was Special Agent Scott Atwood that flagged
14  it.
15  Q.    Okay.  So I guess in either case, either if you're
16  looking at it for the first time -- being the first person to
17  look at it or looking at it subsequently, your descriptions
18  here were categorizing some images as child pornography
19  specifically, correct?
20  A.    Correct.
21  Q.    So are you categorizing them in any other fashion?  Like
22  what are some other categories that you might put into your
23  analysis?
24  A.    We use potentially known victims, potential child
25  pornography, we use tags of S and M, tags of under 12 just to

1  identify the child pornography itself or potential child
2  pornography.
3  Q.   Some of the images, for example, we just went through on
4  the MacBook that had these morphed images, so to speak.  When
5  you're marking something or categorizing something as child
6  pornography or potential child pornography, is that just
7  because it involves nudity or is there something more to your
8  portion of that analysis?
9  A.   So mine is just when it involves nudity.  If it is more
10 than just the breast area, we tag it.  So when it shows
11 genitalia.  Or if there is a lot of images, we'll tag them all
12 together so any of the agents can go back and further review
13 them.
14 Q.   So in other words, do you know if you were the first one
15 to review the MacBook or was there an agent that reviewed that
16 one first, if you recall?
17 A.   I don't recall.
18 Q.   Hypothetically, if you were reviewing a device like that
19 first, your system of flagging images would be -- sounds like
20 you're casting a wide net, right?
21         MR. CERVANTES:  Objection, relevance.
22         THE COURT:  Overruled.  You may answer.
23         THE WITNESS:  So can you be more -- like casting a
24 wide net?
25 Q.   Sure.  You're saying basically if it's any nudity

JASON WHITT - CROSS

1  involving a potential minor more than just breast area, I

2  suppose, you're flagging those as child pornography or

3  potential child pornography, correct?

4  A.    Yes, sir, potential child pornography.

5  Q.    Just in general, are you doing an analysis -- it doesn't

6  sound like it, but correct me if I'm wrong.  It doesn't sound

7  like you're doing an analysis of the actual photo if it is

8  child pornography.  It's just that it needs to be reviewed

9  further.

10  A.    Yeah.  I mean, being that I review a lot of images, you

11  see a lot of them that are the same whether they are known

12  victims or unknown victims.  So when I do flag them, I am

13  flagging them as potential child pornography for the case

14  agents to review.

15  Q.    So like on the MacBook, for example, those three folders

16  you were testifying about, there's a number of images that

17  depict nudity, correct?

18  A.    Correct.

19  Q.    In circumstances like that, did you flag all images in

20  those folders that involved nudity or was there any

21  delineation between anything you would choose?

22  A.    I believe in that case any of the images that contained

23  nudity were flagged.

24  Q.    Okay.  And the flag that you use is child pornography or

25  potential or...

1  A.    Correct, yes, sir.

2  Q.    Okay.  But that -- so when you're stating that you -- I'm

3  flagging it as pornography or child pornography, is that your

4  determination that in fact it is child pornography or just

5  needs to be reviewed further?

6  A.    So it is not mine.  I review it to be potential child

7  pornography.  I know we use the term flagged as child

8  pornography.  Some of them you can tell whether it's an infant

9  or a young girl.  But, no, I don't make that determination.  I

10 flag them for review.

11 Q.    Understood.  So, you know, we just went through a series

12 of these morphed images.  Clearly some of those images

13 involved just the waist up, correct?

14 A.    Correct.

15 Q.    Or breast area.  No genitals involved in the picture.

16 A.    Correct.

17 Q.    Others included people standing and not really doing --

18 standing up and not really doing anything otherwise.

19 A.    I'd have to review them, but I know there were some that

20 were waist up, correct.

21 Q.    Were any of these involving intercourse or of a minor

22 depicted on that MacBook?

23         MR. CERVANTES:  Objection, vague.

24         THE COURT:  Overruled.  If you understand the

25 question, you can answer it.  If you need clarification, ask

JASON WHITT - CROSS

1  for that.
2          THE WITNESS:  So did I see any images involving
3  intercourse of a minor?
4  Q.   No, on the -- specifically those three folders on the
5  MacBook.  These are the morphed images that we're talking
6  about.
7  A.   Okay.
8  Q.   All I'm just trying to ask is these weren't -- there's
9  no -- the images that we're talking about that you're flagging
10  on that particular device, they're not images involving
11  bestiality or intercourse or anything like that, correct?
12          MR. CERVANTES:  Your Honor, objection to the extent
13  that it calls for a legal conclusion.
14          THE COURT:  Overruled.
15          THE WITNESS:  I did not see any images of
16  intercourse or bestiality in those photos.
17  Q.   Or anything -- oral sex or anal sex or anything like that
18  either, right?
19  A.   No, sir.
20  Q.   So the images are -- the images -- some of them are
21  standing.  Some of them are lying.  Some of them are sitting
22  in various positions.  And if it has nudity you're flagging it
23  for further review, correct?
24  A.   Correct.
25  Q.   Without a determination on your end because, again,

1  you're just assisting with gathering those images for further

2  review, right?

3  A.   I am.  But I will also categorize them.  There was one

4  image in there that I did categorize as child pornography.

5  Q.   Okay.  Sorry, there's one?

6  A.   There was one in there.

7  Q.   That you --

8  A.   That I remember, excuse me.

9  Q.   Okay.  There's one that you remember that you categorized

10  as child pornography.

11  A.   Correct.

12  Q.   What did you categorize the other ones as?

13  A.   Potential child pornography for the case agents to

14  review.

15  Q.   Okay.  So the distinction, then, there's these

16  categories.  And from your analysis -- and, again, regardless

17  of whether it was first or second or third or however

18  multiple -- presumably multiple times you might review devices

19  in some cases, right?

20  A.   Correct.

21  Q.   The tags or the flags on that particular thing was there

22  was one that you flagged as child pornography, other ones were

23  not flagged as child pornography.

24  A.   They were flagged as potential child pornography, yes,

25  sir.

1    Q.    Potential.  Okay.

2          Now, I'm not a Mac user so this is a little unfamiliar,

3    this quick thumbnail process.

4    A.    Uh-huh.

5    Q.    So a lot of the stuff we're talking about, really all --

6    I think practically all of it on this MacBook, the data you're

7    talking about is related to this QuickLook thumbnail cache

8    folder --

9    A.    Database.

10   Q.    -- database, right?

11         If you could remind me of the process of how that's

12   created.  It's a creation of a thumbnail for a specific Mac

13   operating system.

14   A.    So we can associate it with Windows too if that will help

15   you.

16         But what QuickLook is is once you plug in your hard

17   drive, it will go in there and create previews or thumbnails

18   of the files inside of the thumb drive or external.

19         We can reference it to a Windows machine if you are

20   familiar more with Windows to where when you plug in a thumb

21   drive, when you bring up the window of the files in there, you

22   can select how you view those thumb drives, whether it's in a

23   detailed list or with small thumbnails, medium thumbnails or

24   extra large thumbnails.  That creates this thumbnail database.

25   Q.    Yeah, actually that does make sense now.

JASON WHITT - CROSS

1    So the creation of these thumbnails from the -- so you
2    plug in the device, you open a folder.  Is it automatically
3    populating thumbnails for everything on a device or is it that
4    a folder has to be open for it to happen?
5    A.   So with QuickLook it actually creates them just by
6    plugging in a device.
7    Q.   And saves this ostensibly to the device you're plugging
8    it into.
9    A.   It saves the thumbnail cache to the device that you're
10   going to view or plug in the thumb -- like the thumb drive
11   into the computer.  It saves it to the computer.
12   Q.   Okay.  So automatically will populate these images that
13   are in a cache system so that they can be more quickly
14   accessed later if you're scrolling through a folder.
15   A.   Correct.  If you plug it in again, it will access those
16   thumbnails so it doesn't have to recreate it.  The reason they
17   do is because they end up clogging people's machines or
18   overloading the source.  So this way they only have to create
19   it once and they can reference the same image or thumbnail.
20   Q.   And so the images, for example, that we were talking
21   about on the MacBook specifically in those folders and things
22   you referenced, those aren't original actual images on the
23   device, but rather a creation of a thumbnail from a secondary
24   device; is that accurate?
25   A.   The originals referenced are not on the MacBook.  It is a

1  creation from the originals of the drive plugged in.

2  Q.   Okay.  And it's located in this QuickLook folder cache

3  thing, right?

4  A.   Thumbnail database, yes, sir.

5  Q.   Sorry, thumbnail database.

6       And that's a random kind of folder, right?  You said

7  something about it goes and it's under like kind of random

8  letters.

9  A.   Yes, sir.

10 Q.   These thumbnail images that are in there, are those

11 accessible just by -- can you open and browse through those

12 folders and pop the images up?

13 A.   I mean, if you had a program you could; but without a

14 certain program, no.

15 Q.   What kind of program is that?

16 A.   Just like you would have to find -- literally it would be

17 a QuickLook thumbnail viewer or any other program that would

18 access those.

19 Q.   Okay.  Like a specialized type of software to access them

20 if you wanted to browse through or preview those things.

21 A.   Correct.

22 Q.   The Magnet program that you use, that's called Magnet

23 AXIOM, correct?

24 A.   AXIOM, yes, sir.

25 Q.   Or AXIOM Magnet.  Just AXIOM?

1    A.    AXIOM is fine.

2    Q.    Obviously, if you were presenting them now, you were able

3    to access those thumbnail images?

4    A.    Correct.

5    Q.    Is that because your program has that special feature

6    that you can go in and see what the actual image is?

7    A.    Correct.  It will go into the database and pull the

8    thumbnails out.

9    Q.    Okay.  Now, there was also a list of file paths that

10   had -- a thousand and some odd file paths were introduced.

11   Where are any images of those?

12   A.    So there are no images in that QuickLook.  It just

13   retained the file path associated with them.

14   Q.    Okay.  So there are no images.  There's no date of when

15   this image was -- or this -- actually, it's not even an image.

16   It's a -- it's just a trace of some sort of thumbnail

17   allegedly.  Is that --

18   A.    No.  What it is is the file path for a thumbnail that was

19   created, but the thumbnail in that database is no longer

20   there.

21   Q.    Okay.

22   A.    But the file path is still there.

23   Q.    All right.  So it's literally just a file path and that's

24   it.

25   A.    Correct.

JASON WHITT - CROSS

1  Q.   There's no date.

2  A.   No, sir.

3  Q.   There's no image.

4  A.   No, sir.

5  Q.   There's no time frame of when it was created.

6  A.   Not that I could tell.

7  Q.   You mentioned -- discussing some of this, you talked

8  about last accessed dates, right?  So there's some metadata

9  that you talked about that said we can tell when this was last

10 accessed.

11 A.   Correct.

12 Q.   What does last accessed mean?

13 A.   So last accessed in a QuickLook means that when the

14 QuickLook thumbnail database last accessed those thumbnails.

15 Q.   Understood.  So when we say accessed or to access, last

16 accessed, what you're referring to is when the computer

17 accessed the cache folder.

18 A.   So for the computer to access that cache folder, the

19 thumb drive or an external, we'll call it a thumb drive, would

20 have to be plugged in and then it would recognize the folder

21 path or however it recognizes it, and then would access the

22 thumbnail database -- yeah, the thumbnail database for that

23 thumbnail.  So if you were going to pull up that folder, it

24 would already have the thumbnails ready.

25 Q.   Understood.  And that's, again, to speed up the process,

JASON WHITT - CROSS

1   more convenient, so that in the event the user wants to open
2   that folder, the thumbnails will populate faster?
3   A.   Correct.
4   Q.   So it does this automatically for you as part of the user
5   experience if you decide to click on a specific folder,
6   correct?
7   A.   Correct.
8   Q.   So it does not mean that you have to open the folder or
9   access anything within the folder, correct?
10  A.   To the best of my knowledge, that is correct.
11  Q.   So in other words, what the -- the last accessed date,
12  for example, you talked about -- and it's in evidence as
13  well -- IMG_3666.MOV, 3696, and then IMG_1089, some of those
14  you discussed had a last accessed date of 9/10/21; is that
15  correct?
16  A.   I believe so.  Without seeing it I believe so.
17  Q.   Do you recall the access time for each of those images?
18  A.   No, sir, I do not.
19          MR. AMES:  Is that something you can pull up real
20  quick?
21          MR. CERVANTES:  Whatever you need.
22          MR. AMES:  Just looking at the metadata on the 3666,
23  3696.  It was the screenshots of the metadata on these three
24  images.
25          I apologize, I should have written down those

JASON WHITT - CROSS

1  exhibits and I forgot to.

2          THE COURT:  Why don't we take our midmorning break

3  and let the lawyers get together on pulling up whatever

4  exhibits are needed for cross examination.

5          MR. AMES:  Thank you, Your Honor.

6          THE COURT:  I expect you can tell me the rules, but

7  I'm going to tell you anyway.

8          Do not discuss this case when you're in the jury

9  room.  Don't start making up your mind.  And obviously, don't

10 do any independent research.  And we'll be back within 15

11 minutes or so.

12         (Jury exited the courtroom.)

13         THE COURT:  You can step down.

14         (Witness stepped down.)

15         THE COURT:  All right.  We'll be in recess for 15

16 minutes.

17         (Brief recess at 10:22 AM.)

18         (Court back in session at 10:39 AM.)

19         THE COURT:  Are we squared away?

20         MR. AMES:  Yes, Your Honor.

21         THE COURT:  You can bring the jury.

22         (Jury entered the courtroom.)

23         THE COURT:  All right.  You may resume.

24                        JASON WHITT

25                  CROSS EXAMINATION (Cont'd.)

JASON WHITT - CROSS

1   BY MR. AMES:

2   Q.   All right.  So I think where we were, we were talking

3   about the last accessed date from metadata, right?

4       So previously you had testified about a series of three

5   images that had been last accessed on September 10 of 2021.

6   Do you recall that?

7   A.   Was it the images or the videos?

8   Q.   I'm sorry, it was three videos where the last accessed

9   date listed on these quick view thumbnails was 9/10 of 2021.

10  A.   Correct.

11  Q.   And I think I had asked you what time those last

12  accessed -- or what time the last accessed data had shown for

13  those, and I wanted to just review those to refresh your

14  memory on it if you couldn't recall.

15  A.   Okay.

16          MR. AMES:  5H, I, and J, just the metadata

17  screenshot.

18          MR. CERVANTES:  There is no 5HI.  5H?

19          MR. AMES:  Yes, that's it.

20  Q.   Okay.  So do you recall this?  This is one of the

21  government's exhibits.  Do you recall this one?

22  A.   I do.

23  Q.   What is this one?

24  A.   It is a screenshot for the thumbnail created of the file

25  name IMG_1089.

1 Q.   What this data shows is the thumbnail last accessed date

2 and time --

3 A.   Correct.

4 Q.   -- is September 10, 2021, at 5:28 AM.

5 A.   Correct.

6 Q.   Correct?

7      So that shows last accessed date.

8           MR. AMES:  And then there was a couple more, just

9 the next two.

10           MR. CERVANTES:  Which one?

11           MR. AMES:  The next one, 5...

12           MR. CERVANTES:  I need a number.

13           MR. AMES:  It's listed as 5I.

14           THE COURT:  It's not been admitted.  5I has not been

15 admitted.

16           MR. AMES:  5J then.

17           THE COURT:  J has not been admitted.

18           MR. AMES:  5K.

19           THE COURT:  That one has.

20           MR. AMES:  Okay.  5K.  Sorry, Your Honor.

21 Q.   Okay.  So this one over on the right, 5K, this is also a

22 screenshot of some metadata from AXIOM, correct?

23 A.   Correct.

24 Q.   And this is of a different file, 3666, right?

25 A.   Correct.

1  Q.   And this has an accessed date -- or last accessed date of
2  9/10/2021, correct?
3  A.   Correct.
4  Q.   That's also at 5:28 AM and 29 seconds.
5  A.   Correct.
6  Q.   So both of these were last accessed on the same day at
7  the exact same time, correct?
8  A.   So the folder that they were in or the thumb drive that
9  they were contained on -- the Passport, excuse me, the
10 external drive, was last accessed -- appears to be last
11 accessed at the same time.
12 Q.   Okay.  So I imagine, then, that with the way this
13 thumbnail procedure works, that when the device is plugged in
14 to the MacBook and it's populating these, as you stated
15 before, the last access means the computer accessing the
16 external device.
17 A.   To the best of my research, that is what it means.
18 Q.   And it's automatically kind of populating this stuff.  So
19 likely, then, it would follow that other images that have
20 these thumbnails, like these videos and others or any other
21 images or, you know, whatever the file is that might have a
22 thumbnail, all of these would have a last accessed 9/10/21,
23 5:28, or thereabouts, right?
24 A.   Should.
25 Q.   It would not require opening or viewing the file,

1    correct?

2    A.    To the best of my knowledge.

3    Q.    And nor does it even require opening the folder that the

4    file is in.

5    A.    To the best of my knowledge and research.

6    Q.    So what it perhaps tells us is that one device was

7    plugged into another.

8    A.    That the My Passport was plugged into the MacBook.

9    Q.    Okay.  At 9/10/21 at 5:28 AM it was plugged in and that's

10   what we can glean from this.

11   A.    Potentially.

12   Q.    Potentially?

13   A.    So when you look at times, these times, I don't know if

14   they were recorded in UTC time or if they were recorded in

15   Eastern Standard Time.

16   Q.    Fair point.  Can you describe what UTC time is and what

17   that relates to as far as EST?

18   A.    Sure.  So UTC time is where time is, like, zero.  Like,

19   think of it -- they call it Zulu, or GMT I believe another

20   term for it is.  So it's literally in the middle of the world.

21   And as you go back -- so think of it as a timeline.  As you

22   move forward towards Europe, it counts up, one, two, three,

23   four, as far as time zones go.  As you count back towards

24   North America, it counts as negative one, negative two,

25   negative three, and so on.  So Eastern Standard Time,

1  depending on whether we're in Daylight Savings Time, will be
2  negative four or negative five from UTC time.
3  Q.   So the benefit of UTC time is kind of -- it's uniformity
4  and organization to some extent as far as forensic analysis.
5  A.   So UTC time is recorded, yeah, for uniform and then --
6  because you want the right programs to be in a specific time
7  zone.
8  Q.   So in AXIOM, for example, there are certain instances
9  where you might see it specifically delineated this is UTC
10 versus EST or other time zones?
11 A.   Sometimes you can see where it is, yes, sir.
12 Q.   Is it ambiguous in other times or is it traditionally
13 something specific?
14 A.   It can be either/or.
15 Q.   Okay.  Do you know whether or not this is -- this 5:28 AM
16 is UTC versus Eastern?
17 A.   I do not.
18 Q.   Okay.  So it could be 5:28 AM or it could be UTC time
19 which means it could be four or five hours later.
20 A.   Depending, yes, sir.
21 Q.   Okay.
22 A.   It could actually -- if this was UTC time, it would be
23 5:28.  If it was Eastern Standard Time, it would be 1:00 in
24 the morning or midnight.
25 Q.   Okay.  So the UTC -- for the eastern time zone we're

1  going earlier --

2  A.    We're going back.

3  Q.    -- four or five hours depending on Daylight Savings as

4  well?

5  A.    Correct.

6  Q.    So hypothetically, 5:30 in the morning, roughly, or

7  12:30, 1:30, give or take, would be presumed if we believed

8  that that's the accurate time a device was accessed.

9  A.    Say that again, I'm sorry.

10  Q.    That was a big mouthful, sorry.

11        If we assume that this is correct, that the device was

12  accessed, it's either eastern time, thereabouts, at 5:30 AM.

13  Or if this is UTC, it means that the device was actually

14  accessed in our time zone at 1:30 AM or perhaps 12:30 AM

15  depending on Daylight Savings.  I don't know at that time of

16  year what it would be.

17  A.    Correct.

18  Q.    Does UTC take into account anything for Daylight Savings

19  or that would be on the conversion end depending on the time

20  zone you're in?

21  A.    The time zone.

22  Q.    Okay.  So these QuickLook things, it will populate on a

23  variety of devices.  We're talking here about, like, an

24  external hard drive or a thumbnail.  Are there some other

25  devices that it will populate these type of thumbnails for?

JASON WHITT - CROSS

1  A.    A device that you plug into the MacBook.

2  Q.    Is it any device that has -- or what kind of files or

3  thumbnails are created?  Is it more than just images or MOVs?

4  A.    It can be for documents, PDFs, those types of things.

5  Q.    Any other image types it could do or video types it could

6  possibly do?

7  A.    Sure.  I mean, any file that you can get a thumbnail

8  from.

9  Q.    Now, there are multiple devices that have been discussed

10  here.  It includes these thumb drives -- rather, thumb dive,

11  another hard drive, and so on.  Isn't it also the case that

12  encrypted or password protected drives also populate these

13  quick view thumbnails on the device when you plug it in?

14  A.    I don't know the answer to that.  I would believe that

15  you would have to decrypt it for it to access it, but I'm not

16  sure 100 percent.

17  Q.    Are you aware that Apple has had some significant issues

18  with privacy concerns based upon plugging in of devices that

19  are encrypted and it saving thumbnails in that data?

20  A.    No.

21  Q.    Okay.  And that -- I mean, are -- so you don't know for

22  sure whether or not a password protected or encrypted device

23  automatically will populate these things or what might trigger

24  it to populate these things.

25  A.    No.

1  Q.   Okay.  I guess regardless of that, plugging in is the
2  trigger point to populate them, correct?
3  A.   To the best of my knowledge, yes, sir.
4  Q.   So if I were to go to someone's computer with a thumb
5  drive and pop it in and open it up, whatever I've got on that
6  drive is going to create thumbnails.  It's going to create a
7  file path on my -- on the laptop, the computer I'm connecting
8  it to, correct?
9  A.   If you have access to the user, sure.  If you plug in
10 something, it would populate.
11 Q.   Okay.  And then, you know, you pop it out and it's there
12 and it remains there and presumably undetectable to a normal
13 user, correct?
14 A.   Correct.
15 Q.   Because you can't even look at them unless you have
16 specialized software.
17 A.   To the best of my knowledge, yes, sir.
18 Q.   So you'd never be the wiser.  Now, if one day somebody
19 comes in the sights of the federal government and you are
20 tasked with reviewing that device and you see in the cache
21 here a bunch of thumbnails, you're going to flag them and you
22 guys are going to do this process that you've done here,
23 correct?
24 A.   Correct.
25 Q.   In addition, it sounds like it includes potentially even

1  things that are no longer -- there are no thumbnails for or

2  other indicia of anything, just a file path, just the words,

3  correct?

4  A.   According to the pthc?

5  Q.   I'm just saying, yeah, that's an example.  But that -- to

6  be clear, those are in -- those are located in this cache

7  database?

8  A.   Correct.

9  Q.   But there's no thumbnail associated with any of them,

10  correct?

11  A.   No, sir, there's not.

12  Q.   There's no last accessed date associated with any of

13  them, correct?

14  A.   No, sir.

15  Q.   There's no creation date, nothing.  It's literally just a

16  string of words.  That's all that's there.

17  A.   To the best of my knowledge, in the database it is the

18  folder and path and the title of the file itself.

19  Q.   So all of those one thousand some odd images that you --

20  or one thousand some odd file paths, rather, that you

21  referenced and the government produced here, that's the extent

22  of their existence on the devices.  There's no other indicia

23  of it.  There's no thumbnail for any of that stuff, correct?

24  A.   Correct.  It's just the folder path and the file name.

25  Q.   Okay.  So you referenced there's multiple users on this

JASON WHITT - CROSS

1  MacBook laptop, correct?

2  A.   Correct.

3  Q.   You named a couple of them.  One was the David Tatum

4  profile.  There was another, Morphus, I believe.

5  A.   Yes

6  Q.   Are there any others?

7  A.   There are three others.  There's a guest account, a Kim

8  Tatum account, and I can't remember the last one.

9  Q.   Is guest kind of a default thing or does that have to be

10  made or...

11  A.   To the best of my knowledge, guest is the default one.

12  Q.   But there's an account for a Kim Tatum?

13  A.   There's an account for a Kim Tatum.

14  Q.   Who is Kim Tatum?

15  A.   I believe the wife of Mr. Tatum, David Tatum.

16  Q.   Have you ever met with her or spoken with her before?

17  A.   No, sir.

18  Q.   Okay.  Are you familiar with her at all just based upon

19  your review of these devices?

20  A.   Just from the review of the devices.

21  Q.   Are you familiar with her at all because of anything

22  involving the investigation?

23  A.   I mean, not outside the investigation.  You did hear talk

24  of, you know, who was --

25          MR. CERVANTES:  Objection, hearsay.

JASON WHITT - CROSS

1          THE COURT:  Sustained.

2          MR. AMES:  It's not for the truth of what they're

3   saying.

4          THE COURT:  Ask another question.

5          MR. AMES:  Understood, Your Honor.

6   Q.   So she has a login on the MacBook.  Does she have a login

7   or user input or name on any other devices that you've

8   reviewed in this case?

9   A.   Not that I can recall.

10  Q.   Does she -- have there been any files that you have

11  reviewed on devices that belong to her?

12  A.   There have been files that belong -- that I have seen

13  that belong to Mr. David Tatum and Kimberly Tatum.  But I

14  don't remember any of the files that belong just to her.

15  Q.   Okay.  On the MacBook -- so, for example, you provided

16  some things like a Jet Blue airline receipt and letter from

17  Wake Forest that, I suppose, are indicative of David Tatum

18  being a user of this device.  Is that the purpose,

19  essentially?

20  A.   Attribution, yes, sir.

21  Q.   Attribution.  Do you check for attribution of anybody

22  else in that process or are you mainly just looking for him?

23  A.   So I do not remember any attribution relating to

24  Kimberly, a Kimberly Tatum.

25  Q.   Did you look for any, though?

1  A.   When we were looking for it, the ones that popped out

2  were the resumes, the CVs, the boarding passes.  I do not

3  remember any other files with Kimberly Tatum.

4  Q.   I guess what I'm asking is that in -- what was the

5  purpose of doing that, looking for a file like that or files

6  like that to -- is it to establish use or ownership?  Or

7  what's the purpose?

8  A.   It is.

9  Q.   For both or...

10 A.   The files that we found for attribution were Mr. Tatum's.

11 There were also, you know, files of tax returns, joint tax

12 returns for a Kimberly Tatum and a David Tatum.

13 Q.   Okay.

14 A.   I did not find any files that I can recall that reference

15 a Kimberly Tatum.

16 Q.   I guess what I'm asking, were those looked for or was

17 your job to find an attribution for David specifically?

18 A.   We would have looked for them.  I mean, any attribution

19 we would have brought up.  To the best of my recollection, I

20 do not remember any attribution outside of those tax returns.

21 Q.   I mean, what would be some -- you've provided some

22 already, but what are some other examples of what would be

23 considered an attribution?  Like receipts or what else?

24 A.   Just receipts, documents, web pages, personal photos.

25 Q.   So let's say that you're going through, for example, this

JASON WHITT - CROSS

1  MacBook and you are looking for attribution and you find some
2  stuff like you produced here that involved David Tatum.  And
3  you also find some that involve other people, such as his
4  wife.  You're saying that that would be -- what do you do at
5  that point with that information?
6  A.   So when we take the MacBook, we saw that all the files
7  that we flagged were to a user name of David Tatum.  So we
8  look for attribution of a David Tatum -- or for who was using
9  that and it came back to David Tatum.  Since none of the
10 evidence led me to Kimberly Tatum's user profile, I did not
11 look for any, like, attribution for her or in that -- in her
12 profile because nothing led me there.
13 Q.   Understood.  And I understand, like, the purpose of what
14 you're looking for is not -- what I'm saying is, you're tying
15 the device to David due to his attribution, but there could be
16 other people that use the device, correct?
17 A.   So we tied it to Mr. Tatum or David Tatum through the
18 user name of David Tatum.  And we look for attribution of the
19 user name of David Tatum.
20 Q.   And one of those attributions was a joint tax return,
21 correct?
22 A.   I believe there was a joint tax return.  I do not
23 remember if it was on the external or the MacBook.
24 Q.   Do you know if David Tatum's login is password protected?
25 A.   There is a password.  I don't know exactly what it is.

1   There is a field for the password in the user information that
2   it hashes the password.  That's just how Mac records the
3   password.  But I do not know what that password would be.
4   Q.   Do you know that -- is that -- do you have to log in each
5   time you use the device or would it be something that once
6   it's logged in, it just kind of pops up when you open it?
7   A.   It all depends on the factors of the user settings how
8   that would work.
9   Q.   And would it be uncommon for a married couple to share a
10  login on the same computer?
11          MR. CERVANTES:  Objection, speculation.
12          THE COURT:  Overruled.
13          MR. AMES:  I'm asking --
14          THE COURT:  Go ahead.
15          THE WITNESS:  I wouldn't know.  I mean, I think
16  everybody is different so I would not know the answer to that.
17  Q.   What about this device, do you know whether or not this
18  was a device that Kimberly and David shared?
19  A.   Outside of the user name, I do not know.
20  Q.   Okay.  Did you review any files or images at all that
21  indicated that Kimberly Tatum was -- had access to this
22  device?
23  A.   Outside of the user name, I would not know.
24  Q.   On any other evidence that the government collected, did
25  you see anything else that might have indicated that she uses

JASON WHITT - CROSS

1  this device?

2          MR. CERVANTES:  Objection, vague.

3          THE COURT:  Overruled.  If you understand the

4  question, you may answer.

5          THE WITNESS:  Can you repeat it, please.

6  Q.   Sure.  I can rephrase it if it's easier to hear it.

7       You reviewed these devices, correct?

8  A.   Correct.

9  Q.   Did you review any other devices?

10 A.   I did.

11 Q.   What else did you review?

12 A.   There was a lot of visual evidence we reviewed.

13 Q.   How many total devices were collected in this case?

14 A.   I don't know.

15 Q.   Is it more than ten?

16 A.   I don't know.

17 Q.   Of what you recall, what are some of the devices you

18 recall either that you know were collected or that you

19 specifically reviewed?

20 A.   There was an iMac, the devices here.  I mean, a few.

21 Q.   Okay.  Do you recall any that there was an attribution to

22 Kimberly Tatum at all?

23 A.   I do not.  Outside of the user name on the MacBook

24 because that's where the evidence led us.  Outside the user

25 name I do not know of any.

1   Q.   So how would it -- what would it entail if you were
2   trying to look for that -- what are the steps you would take
3   to find an attribution like that or find indications that she
4   was a user of this device?
5   A.   So again, when we look for the evidence, we go to the
6   evidence where it leads us.  In this instance it led us to the
7   user of David Tatum.  When we go and look for attribution, we
8   look for the documents or history, whatever it might be, that
9   leads to the attribution of that account, user account.  And
10  all that I found outside -- to the best of my recollection,
11  all that I found was a joint tax return that had Kimberly's
12  name on it and also there was a user name on the MacBook for a
13  Kim Tatum.
14  Q.   Okay.  Did you look into when the last time Kimberly
15  Tatum had logged into the MacBook?
16  A.   I did not.
17  Q.   Would that be -- what would it take to find that
18  information in AXIOM?
19  A.   I would have to go back to my lab and look at it.
20  Q.   Okay.  Were there any devices that -- I understand the
21  process when you're interacting with agents and such and
22  assisting them either as the first looker or looking after
23  they've flagged things.  Do you know if there's any devices in
24  this case that any agent or other person in the investigation
25  has looked at that you have not?

JASON WHITT - CROSS

1  A.    I do not know.

2           MR. CERVANTES:  Objection, speculation and vague.

3           THE COURT:  Overruled, if you know.

4           THE WITNESS:  I do not know.

5  Q.    Outside of the thumb drives that you presented, are there

6  any additional thumb drives that were collected or seized by

7  the government?

8  A.    I do not know.

9  Q.    You don't know if there's any other thumb drives?

10 A.    Honestly, once we found this evidence, I focused on these

11 pieces of evidence and I cannot remember exactly what I

12 examined when it comes to the extra devices.

13 Q.    I'm sorry, I didn't actually -- if I misspoke, I

14 apologize.  I wasn't asking if you specifically even

15 necessarily reviewed them.  I'm just asking were there other,

16 for example, thumb drives that were collected in this case?

17 A.    I cannot remember.

18 Q.    Okay.  Do you remember any other device that was

19 collected in this case?

20 A.    All I remember is an iMac.

21 Q.    Did you ever make copies of any of the device data for

22 me?

23 A.    So I do remember there was the thumb drives from a

24 Kimberly Tatum that copies were made for you.

25 Q.    Okay.  Were there any other ones?

1  A.    There was another one that came from somewhere.

2  Q.    Okay.  And did you ever -- did you review those devices

3  or did you not review those devices?

4  A.    So outside of just making an image of them to, you know,

5  keep them pure, I mounted them for the agents and they would

6  go through them.  I have seen files on them.  But as far as,

7  like, reviewing them forensically, I did not.

8  Q.    Understood.  If you recall from -- I understand you

9  didn't review it thoroughly, you didn't review it in the

10  capacity you would other devices, but do you recall anything

11  that you observed on either of those?

12  A.    So I do remember some of the folder names, but I do not

13  recall every single thing on there.  Because again, I did not

14  forensically process that.

15  Q.    What are some examples of things that you may remember?

16  A.    There was some screenshots of a desktop, there was

17  folders with David's name on it, some emails.  That's

18  basically all I recall.

19  Q.    Do you recall seeing any -- you said pictures of a

20  desktop computer, I think you said.

21  A.    So I saw pictures of a screenshot of a computer on there.

22  Q.    Do you recall seeing any screenshots or pictures of

23  screenshots or anything of -- of the MacBook that's in

24  evidence?

25  A.    So I don't know exactly what the screenshots were of.  I

JASON WHITT - CROSS

1  do believe it was of the MacBook, but I do not recall.

2  Q.   And I understand you didn't -- you weren't doing the

3  analysis to attribute this device to anybody.  But your

4  understanding was that this was a device provided by Kimberly

5  Tatum, correct?

6  A.   Correct.

7  Q.   And it included pictures of a MacBook computer screen

8  that you believe is this one that's sitting next to you.

9  A.   I believe so.

10 Q.   So you also in your testimony talked about how you do

11 these keywords -- index searches, I think you said, right?

12 A.   Correct.

13 Q.   And you indicated that the user profile doesn't impact

14 that search, right?

15 A.   Not of the index search.

16 Q.   So you could do an index search that would encompass any

17 and all profiles on a system.

18 A.   Any file that the computer can access or the software can

19 access, it will look for it in any place.

20 Q.   And then once you find things that you may want to look

21 into further, you can determine and delineate which user

22 profile that may be associated with, right?

23 A.   Yes, sir.

24 Q.   So that may tell you where -- or to whom the computer was

25 logged into at the moment when some data was populated, but

1  does it tell you anything about who was actually using the
2  device?
3  A.   No, sir.  We don't look at who actually uses the device.
4  We look at the user name associated with the evidence.
5  Q.   And I suppose you can never be certain unless you had a
6  spy camera or something, but are there -- would there be ways
7  to maybe determine that based on the context of the data?
8  A.   As to what?  Like the context of...
9  Q.   So let's say, for example, you mentioned 6/29 of 2021
10 there was a VLC playlist.  Do you recall that part?
11 A.   Correct.  I don't think I mentioned the 6/29, but I do
12 know that date of 6/29.
13 Q.   It may have been on a screenshot here, but I believe -- I
14 believe the testimony was it was 6/29 was when this PLIST was
15 created and it was under the account Morphus.  Do you recall
16 that?
17 A.   So we discussed when it was first played.  But the PLIST
18 creation date does say 6/29.
19 Q.   Okay.  And there was an initial date.  So it was, like, I
20 can't remember exactly, but sometime in 2019.  And then the
21 PLIST creation date was June 29, 2021, correct?
22 A.   I think it was June 21.  I don't remember the exact date,
23 but...
24 Q.   So that's the date of creation and so that's similar, I
25 guess, to the quick view situation.  It's a list that's

JASON WHITT - CROSS

1    generated because a user does something with the VLC player.

2    A.   Correct.  I mean, without having to program the VLC

3    program, that's what I believe the recent play media to be and

4    the VLC PLIST.

5    Q.   So at that point in time -- so, for example, you'd

6    indicated that the user profile that was associated with this

7    was Morphus, I believe?

8    A.   Correct.

9    Q.   So that's an example.  Well, the context around that is

10   there's a -- that's one piece of context since there's a user

11   name or account Morphus that's on this device at the time,

12   correct?

13   A.   Correct.

14   Q.   And there could be other activity with that account or a

15   specific person that's around the same time frame that might

16   provide context also.

17   A.   So the evidence led us to Morphus.  We just saw the VLC

18   playlist and we -- that's what we focused on as far as being

19   played on the VLC program.

20   Q.   Understood.  And so in light of that, you know, you

21   see -- you see that it's what it is.  You see what account or

22   login it's under, and that is sufficient to draw the

23   conclusion that the user was David.

24   A.   No, the user was Morphus.

25   Q.   Okay.  And Morphus is who?

1   A.   With the associated names of Morphus to David's iPhone,
2   that's where it led us to believe that it was David's account.
3   Q.   Okay.  Or in other instances where you're doing an index
4   search and it comes back and it's under the David Tatum
5   account, the presumption is that it's David Tatum, correct?
6   A.   The user of David Tatum.
7   Q.   I'm sorry?
8   A.   The user of the account David Tatum.
9   Q.   Okay.  And -- but then how do you link the user account
10  to a human being?  Is that through that, you know, the Jet
11  Blue record and things -- tax records and such?
12  A.   We put in attribution, yes, sir.
13  Q.   So I guess what I'm asking is, is anything else done to
14  determine -- any other context who might be using the device
15  for that period of time other than what you already testified
16  to?
17  A.   No.  We just focused on the user accounts on the MacBook.
18  Q.   All right.  So if somebody else that was not David Tatum
19  put anything into this device and it populated a list like it
20  does here automatically --
21          MR. CERVANTES:  Objection, vague.
22          MR. AMES:  I haven't finished the question.
23          THE COURT:  Let's wait for that.
24  Q.   If anybody -- say I did it.  Just use me for now.  I go
25  to David's house, his computer is on or I know the password or

JASON WHITT - CROSS

1   I don't require a password because we don't even know if his
2   computer needs one.  Let's say that's the case.  And I've got
3   a drive or one of his drives, I don't know, one I find, and I
4   pop it into the device.  It's going to populate a number of
5   things, including a QuickLook thumbnail update and pop the
6   date and time right now in, correct?
7   A.   Correct.
8   Q.   So that if you analyze it the next day, what is it going
9   to look like?
10  A.   So it would look like what we see.
11  Q.   Okay.
12  A.   But in forensics we only look at the user accounts.  We
13  do not look at who was using the user account.  We go into
14  attributions and see who the user account had access to
15  through passwords and other files that are on there.
16  Q.   But you don't look for other possible user explanations,
17  is basically what you're saying.  So you wouldn't be looking
18  for me or context that might indicate that I did this and put
19  something in.
20  A.   Forensically, no.
21  Q.   Okay.
22  A.   We just focus on the user accounts forensically.
23  Q.   Now, forensically could it be done?  Could there be
24  evidence that is gathered in the data that you guys have that
25  could provide some context to who the user was?

1  A.    Like you were talking about earlier, without a spy cam
2  watching you do it, I'm not aware of any.
3  Q.    But you do it with attribution all the time.  We did it
4  with a 2010 Jet Blue printout of a ticket.  We also did it,
5  apparently, literally with a joint tax return which has two
6  people on it, not one.  So why is it not just as likely that
7  Kim Tatum can be attributed to that document?
8  A.    I found no evidence of Kim Tatum attribution on those
9  accounts outside of the tax returns.
10  Q.    But you didn't look for it either.  I understand your
11  position.  You're not -- that's not your purpose.  You're
12  given an instruction to look for things, correct?
13            MR. CERVANTES:  Objection, argumentative.
14            THE COURT:  Overruled.
15            THE WITNESS:  So repeat it one more time, I'm sorry.
16  Q.    So you're -- again, I understand an investigation evolves
17  in various ways.  Sometimes you're first; sometimes someone
18  else is first.  But you're looking for evidence of
19  attribution.  Are you looking for attribution of David or are
20  you looking just in general, whoever it may be, I'll come to
21  that conclusion after I sift through the data?
22  A.    Forensically we look for who has files on there.  If
23  there's files on there associated with somebody other than
24  David Tatum, we would have mentioned that.  We do know there
25  was a tax return, joint tax return.  For the files that I

JASON WHITT - CROSS

1   found on the MacBook, that came back to David Tatum.  And I
2   did not see any files that came back to Kimberly Tatum.
3   Q.   Okay.  But again, I want to clarify.  I don't want to --
4   in large part that's because you weren't specifically looking
5   for attribution of anyone else.
6            MR. CERVANTES:  Asked and answered.
7            THE COURT:  Sustained.  You've established it.
8   Q.   So we don't know if somebody else, Kimberly Tatum or
9   otherwise, is a person on any of these dates that may have
10  popped a device into that MacBook.
11  A.   Forensically we only look at the user accounts.
12  Q.   Okay.  In other words, we don't know.  We don't know who
13  the actual human being is that would have put anything into
14  the --
15           MR. CERVANTES:  Objection.  Asked and answered.
16           THE COURT:  Sustained.
17  Q.   So the other device -- some of the other devices, for
18  example, that you looked at, there was an HP Pavilion.  Do you
19  recall that device?
20  A.   I do.
21  Q.   And do you recall that was given to the government as
22  part of a consent search?
23  A.   I don't know exactly how it was given over.
24  Q.   If you don't, that's fine.
25  A.   I don't know.

1  Q.   Are you aware of whether or not anything -- any consent
2  search or any items were consensually given to the government
3  by Kimberly Tatum?
4          MR. CERVANTES:  Objection, speculation.
5          THE COURT:  If you know.
6          THE WITNESS:  I do not.  I do not know.  I know that
7  there were items -- I do know there were items given over.  I
8  do not know anything else other than that.
9  Q.   Okay.  There was another -- there was a series of
10 thumbnails as well of some of the -- these morphed images,
11 right?  I believe they were government exhibits as well.
12 These were -- you testified that they were accessed on
13 9/18/2021, all of which were, according to the screenshots,
14 about 4:20 -- 4:21 PM on the 18th of September.  Do you recall
15 that?
16 A.   If you can bring it up, I can...
17         MR. AMES:  I have it as 4E4.
18         MR. CERVANTES:  4E4 is not admitted.
19         MR. AMES:  Or 4E8.
20         MR. CERVANTES:  No, not admitted.
21         MR. AMES:  How about -- I'm sorry.  How about 4F13,
22 that's been admitted?
23         MR. CERVANTES:  Yes.
24 Q.   All right.  So here's just another example.  Last
25 accessed date.  There are a number of these that have 9/18,

1  4:21 PM as last accessed, correct?

2  A.   Correct.

3  Q.   And these are, again, not that -- you don't -- you don't

4  know who accessed -- or rather, sorry.  The access just means

5  that a device was plugged into another device and the computer

6  accessed whatever that thing was, correct?

7  A.   So, yeah, under the user account, yes, sir.

8  Q.   And there would similarly be presumably for the Western

9  Digital hard drive because you talked about that as well, and

10 the government was matching up some of these file names from

11 the Mac, again, that don't have any even thumbnail attached to

12 it, to something on the Western Digital drive and such.  So

13 that device as well would, the argument is, create some of

14 these same type of thumbnails if you pop something in, right?

15 A.   Are you referring to the Passport?

16 Q.   Yes.

17 A.   I do know that drive was encrypted.  I don't know how

18 QuickLook works for encrypted drives.  So I would not know

19 without somebody having the password to the encryption on the

20 Western Digital My Passport.

21 Q.   Okay.  I guess what I'm saying is, is it -- in your

22 investigation and analysis here, there's a claim, for example,

23 IMG_3666.MOV, among others, that have thumbnails or cache

24 stuff on other devices, but others -- why is there not any

25 other thumbnail or -- for some of these pthc things?  Why is

JASON WHITT - CROSS

1  there no new thumbnail or anything created?

2  A.   I don't know.

3  Q.   Is it because they don't exist on the Western Digital

4  hard drive?

5  A.   They are not there.  I don't know why they're not there.

6  They're not there.

7  Q.   So again, computer hard drive, regardless, no images.

8  It's just some words.  That's all it is.

9  A.   For the pthc search, yes.  It's folder paths and file

10  names.

11  Q.   And the government has presented a lot of stuff over the

12  past day here, images from these devices you're talking about.

13  What is preteen hardcore?  What's a preteen?

14  A.   Preteen is anybody under the age of what I would assume

15  to be 13.

16  Q.   And hardcore, you don't have to get too descriptive, but

17  pretty graphic hardcore sexual stuff, not just kind of Cinemax

18  softcore kind of stuff, right?

19  A.   I would assume that hardcore means hardcore, yes, sir.

20  Q.   And so there's been no preteen hardcore put into evidence

21  so far?

22  A.   Outside of the search terms?  There have been images of

23  potential child pornography, so I don't know exactly, like...

24  Q.   Something you describe as hardcore -- there's no preteen.

25  There's no hardcore.  There's images that have been introduced

1   or that you've investigated, but nothing that would --
2           MR. CERVANTES:  Argumentative, vague, and compound.
3           THE COURT:  Well, let's wait for him to finish.
4           MR. AMES:  I'll just withdraw, Your Honor.
5   Q.   You said you've done lots of reviews of thousands and
6   thousands of devices, correct?
7   A.   Correct.
8   Q.   You've seen a lot of bad stuff in your day, fair to say?
9   A.   Unfortunately, yes, sir.
10  Q.   You and I have sat down together and watched a lot of bad
11  stuff, correct?
12  A.   Correct.
13  Q.   Not in this case.  Others, just to be clear.
14       But as part of your job, you're seeing a whole lot of
15  things, sometimes multiple times same images, right?
16  A.   Correct.
17  Q.   On other -- you might three, four, five years apart see
18  the same series of photos, like you mentioned Vicky or
19  something, or some other ones, right?
20  A.   Correct.
21  Q.   Like pornography's general definition, you kind of know
22  it when you see it.  Or that's obscenity, rather.  But you
23  kind of know it when you see it.  With pthc do you kind of
24  know it when you see it?
25  A.   Preteen hardcore has been associated with images, in my

1  experience, with what you're referring to as hardcore images,
2  but also just images of teens standing around nude or doing
3  sexual acts to their self and so on.  So preteen hardcore does
4  not mean every image you see is going to be a hardcore version
5  of pornography with a child.
6  Q.   Understood.  So it's a search term, but it's not
7  necessarily always exactly descriptive of the underlying file
8  or image, is what you're saying, right?
9  A.   So preteen hardcore does to me represent child
10  pornography, in my training and experience, but it does not
11  mean that everything you see is going to be hardcore
12  pornography.
13  Q.   Understood.  Because sometimes it might be people
14  standing -- sometimes it might not even be pornography,
15  correct?
16  A.   I don't know that.  Every time that I have seen it
17  outside of one time -- or a few times has been children,
18  whether they are standing, whether they are with their legs
19  spread, whether it's hardcore, whether it's sexual acts.
20  Q.   Well, what's an example of when it wasn't?
21  A.   So there was one time or a few times -- it's very rare --
22  that you will see an image that has the term pthc in it, but
23  it is embedded in a lot of other terms.  I don't want to say
24  the terms here in court unless you need me to, but it is --
25  you'll have terms that associate itself with adult

1  pornography.  So you'll see, like, five or six terms that are
2  associated with adult pornography and then you'll see pthc.
3  And when you see that, sometimes you'll see pthc, but you know
4  it's going to be adult pornography by the terms that it is
5  with.  And that's where I've seen it on just very, very few
6  occasions.
7  Q.   There might be an example of something being mislabeled,
8  right?  Like it's labeled this, there's a file name, but the
9  actual file doesn't match the description fully.
10 A.   Can you be more specific?
11 Q.   Well, you just kind of gave an example, right?  You said
12 it's got some adult stuff, but it has pthc in there, so that
13 doesn't -- you're saying that there's -- you clicked that at
14 one point in time in another case, you opened it up and it
15 wasn't pthc, it was adult porn, right?
16 A.   So pthc being a term for child pornography.  No, it was
17 adult porn on those few occasions.
18 Q.   So all I'm saying is that a file name doesn't designate
19 what the file is.  You'd have to look at it to confirm, right?
20 A.   Correct.
21 Q.   Now, there's some other terms and stuff that I think you
22 mentioned either between yesterday and today.  There was Loli
23 stuff or --
24 A.   Lolita.
25 Q.   Lolita, yeah.  What do you know about any Lolita stuff?

1   A.   So Lolita, when you look at, like, LS models, it
2   starts -- when you see LS models we talked about, it can be
3   the Lolita series.  I don't exactly know what Lolita means.
4   But when you see LS models, the series of images usually
5   starts with one or two females, maybe multiple, and it starts
6   off to where they're posing; and then, you know, sometimes --
7   usually it leads into sexual acts either between the two
8   underage females or with somebody or an adult.
9   Q.   And are there -- that term, is that -- is that -- is
10  Lolita or some variant of it a term that comes up a lot in
11  other ways in your cases?
12  A.   Sure, I've seen it.
13  Q.   What are some examples maybe -- if you remember, what are
14  some other examples where you see that term or something
15  similar come up?
16  A.   I mean, the amount of images we look at, I do not
17  remember the names of every one of them so I can't answer that
18  question.  I don't know.
19  Q.   Like L-o-l-i, like Loli something -- hyphen something, is
20  that one that might come up?
21  A.   I don't know.
22  Q.   Or like -- are you familiar with, like, Lolicon or
23  anything like that?
24  A.   No.
25  Q.   Are you familiar with -- hold on.

JASON WHITT - CROSS

1    Are you familiar with any, I guess, non --
2 non-pornography but graphically -- graphically created
3 pornography?  Have you ever come across that?  Like completely
4 CGI generated, for example.
5 A.   Like an anime?
6 Q.   Yes.
7 A.   Like a cartoon?
8 Q.   Or something like that, yes.
9 A.   Yeah, I'm familiar with it.
10         MR. AMES:  The Court's indulgence real quick, Your
11 Honor.  I'm sorry.
12         (Pause.)
13 BY MR. AMES:
14 Q.   Have you had other cases in the past, I guess, that
15 involved any anime?  What is anime, I guess is the first
16 question.
17 A.   Anime is just basically a cartoon.  I mean, it can -- it
18 does not have to be pornography.  But it is, like, Japanese
19 animation or cartoons that can be a normal cartoon.  Sometimes
20 it can depict, you know, certain sexual scenes with girls that
21 may appear underage.  Sometimes they are where they are not
22 developed or girls that have a very young face that are very
23 developed.  So anime can literally be all over the place.
24 It's just a cartoon.
25 Q.   In general, I guess -- you can watch anime on Netflix,

JASON WHITT - CROSS

1  right, normal anime?

2  A.  Correct.

3  Q.  Right?

4      There's a subculture, a subset, that is a bit deranged,

5  fair to say?

6  A.  I mean, it is animated, sir.

7  Q.  So it's, I guess, a specific kind of subgenre that

8  involves images that, as you said, depict young or undeveloped

9  people doing sexual things, for example?

10 A.  Not all the time.  I mean, there is normal anime that, as

11 you say, you can watch on Netflix that has none of that.

12 There is anime that is just like you're watching a movie, a

13 cartoon movie.  But anime spans all the way down into child

14 pornography, what depicts child pornography.

15 Q.  But anime -- the implication with anime, though, it is

16 animated, right?  It's not -- when it's anime, it's not

17 live-action images.  It's cartoons.  It's drawings.

18 A.  Drawings.

19 Q.  In your cases that you've done, have you in other cases

20 encountered that kind of thing in your searches?

21 A.  Of course.

22 Q.  Did those have suggestive names sometimes that are

23 like -- describe what's in the images?

24 A.  I don't recall at this time.  I honestly do not know.

25 Q.  That's okay.  I'm asking about prior cases.

JASON WHITT - CROSS

1       So in total here, you know, there's the MacBook device

2   that, I think by all accounts, doesn't have any original or

3   actual images.  The only thing that's on this MacBook that we

4   can glean is that there's some of these thumbnail things in

5   the cache folder, correct?

6   A.    You're referencing images?

7   Q.    Yes.

8   A.    Correct.

9   Q.    And then the -- there's a thumb drive that has these

10  folders that you mentioned that had the morphed images, right?

11  A.    The morphed or altered images, yes, sir.

12  Q.    And what can you tell us about the specific -- any

13  specifics that you're aware of or researched about the

14  morphing process?  How does that site do that?

15  A.    Honestly, I do not know.  I did go to the site to try to

16  familiarize myself with it.  And I don't know outside of that

17  it is a computer program, an AI program, that, as they claim,

18  nudifies images.

19  Q.    And ostensibly what it sounds like from my understanding,

20  you can take any image of a clothed person, or so it claims,

21  and put it to this site and it will generate a new image that

22  makes the subject appear to be naked, correct?

23  A.    So I never tried it.  I don't know what it does with the

24  original.  But it does -- you will give a source -- from the

25  way I understand it, and I have not tried it, is you do give a

1  source image and then it will produce an image from the source
2  that is, they call it, nudified.
3  Q.    And so -- I mean, we've reviewed here today a series.
4  You matched them up side by side:  image one, image two;
5  clothed, unclothed.
6       The image that's being populated, the best we can tell,
7  is not -- it's AI generated.  It's generated by some sort of
8  code or AI or whatever it may be, right?
9            MR. CERVANTES:  Objection.  Asked and answered.
10            THE COURT:  Overruled.  Go ahead, take one more
11  shot.
12            THE WITNESS:  Yes, sir, a computer program.  So it
13  is a computer program that alters the image.
14  Q.    So where does -- do you know where the -- this new image
15  that's being created or being -- the nudified part where
16  they're talking about what looks like a naked person now, do
17  you know, are they drawing that from a pool of naked people
18  and adding them on top or do you know in any fashion how it
19  works?
20  A.    I do not.
21  Q.    Or if it's literally drawn by a computer just from
22  scratch in some fashion?
23  A.    I do not know.
24  Q.    And it seems, at least in the examples, to do a decent
25  job of finding the -- finding the right spots to add the

1   nudity, at least in the examples we've seen, correct?

2   A.   Sure.

3   Q.   Perhaps with the exception of the one where there's kind

4   of floating heads over here with the prom photo or something.

5   A.   Correct.

6   Q.   But -- so do you know if there's any user input on that

7   or is it just the kind of thing, in your review of this, just

8   pop it -- pop it in and click it, set it, forget it kind of

9   thing?

10  A.   I don't know.

11  Q.   All right.  Or any -- is there anything else you gleaned

12  at all that I've missed about how it works or looked into what

13  it does otherwise?

14  A.   I don't believe so.

15  Q.   All right.  The HP Pavilion device, this was -- I guess

16  this is, fair to say, an older kind of computer, a few years

17  old, the HP Pavilion?

18  A.   I really didn't look into it.  I don't know the answer to

19  that.  It is a desktop.

20  Q.   All right.  Did you do -- you did an investigation of

21  those -- the contents, though, looking for potential

22  pornographic materials, though, correct?

23  A.   On this one I just reviewed the flagged images.

24  Q.   Okay.  So you reviewed -- so you didn't do a full

25  forensic analysis.  You reviewed flagged images.

1  A.   So the full forensic analysis was completed as in making

2  a report for the special agents to review.  They reviewed the

3  report and flagged the images.

4  Q.   Okay.  So in other words, are you saying that you -- you

5  did an analysis, provided the results.  They flagged a couple

6  of them after they reviewed it?

7  A.   So I did not flag anything in here.  They flagged it.

8  Q.   Okay.  So you -- you copied the thing.  You did your

9  normal routine with regard to getting the data.  You went

10  through and did kind of the searches that you do.  And there

11  was nothing that was flagged by you at that time.

12  A.   So the only thing that was flagged by me on the HP

13  computer was the term of pthc in the word wheel.  I ran a

14  search term for that or an index search for it.

15  Q.   You're right.  So there was that.  But nothing else other

16  than that was flagged by you at that time, correct.  There was

17  nothing that popped up.

18  A.   To the best of my knowledge, yes.

19  Q.   You provided that report -- do you remember roughly when

20  you did that?

21  A.   I do not.

22  Q.   Was it recent or was it, like, last year, 2021?

23  A.   I mean, it depends on your definition of recent.  Within

24  a couple of months maybe.  I don't remember.

25  Q.   Okay.  But then at some point in time, you know, you

1  turned over your preliminary categorizations to the agents and
2  then you got it back later on to do kind of the official
3  work-up once you had some images flagged by them, right?
4  A.   I don't remember flagging anything in here.  I could
5  have, but I do not remember.  I just reviewed the files that
6  were flagged.
7  Q.   Okay.  And the files that were flagged, was it the two
8  files that were introduced in court?
9  A.   The two Vidweb, I think they're named.
10 Q.   Yeah.  Were those the only files that were flagged to
11 your recollection?
12 A.   To my recollection.
13 Q.   So, you know, you did your analysis and produced a report
14 to come to court.  As part of the investigation, is there
15 anything else that's done to try and identify or find who the
16 people might be in any of the images?
17 A.   You would have to talk to the agents about that, but I do
18 know they submit --
19            MR. CERVANTES:  Objection, speculation.
20            THE COURT:  Sustained.
21 Q.   Did you have specific knowledge in this case of whether
22 or not any agent has sent -- specific knowledge of agents
23 sending off requests for -- to any agency to try and identify
24 anybody?
25            MR. CERVANTES:  Objection.  Calls for hearsay.

1        THE COURT:  Overruled.  Are you aware of any such

2   requests?

3        THE WITNESS:  I am not.

4   Q.   What's an example of a place that that -- if a request

5   were to be made, where would you send it?

6        THE COURT:  Sustained.  He's already said he doesn't

7   know whether any were sent or not.

8        MR. AMES:  I'm sorry, Your Honor.  I may have

9   misspoke.

10  Q.   Are you aware of -- what's an example of a place where

11  the government might do --

12       MR. CERVANTES:  Objection.

13       THE COURT:  Sustained, relevance

14  Q.   What is NCMEC?

15       MR. CERVANTES:  Objection.

16       THE COURT:  Sustained.

17       MR. AMES:  I'm sorry?

18       THE COURT:  Sustained, relevance.

19       MR. AMES:  To ask what NCMEC is?

20       THE COURT:  Ask another question, Mr. Ames.

21       MR. AMES:  What's the objection, I'm sorry?  It's

22  relevance?

23       THE COURT:  Mr. Ames, there was an objection that

24  was sustained.

25       MR. AMES:  I'm sorry, Your Honor.  I understand.

1  BY MR. AMES:
2  Q.   Do you play any role or do -- as part of the
3  investigation, do you do anything or play any role in trying
4  to identify victims?
5            MR. CERVANTES:  Objection.
6            THE COURT:  Overruled.
7            THE WITNESS:  I do not play a role in identifying
8  victims.
9  Q.   Who does that part?
10 A.   The case agents.
11 Q.   In this case who did that part?
12 A.   I don't know.
13 Q.   How many agents were involved in this case?
14 A.   Two.
15 Q.   Who were they?
16 A.   Special Agent Marisa Brown and Special Agent Scott
17 Atwood.
18 Q.   So then presumably one or the other, or both, would be
19 tasked with trying to determine identities of any known or
20 potential victims.
21           MR. CERVANTES:  Objection.  Calls for speculation.
22           THE COURT:  Sustained.
23 Q.   Would it be anybody else other than them?
24           MR. CERVANTES:  Objection.  Calls for speculation.
25           THE COURT:  Sustained.

JASON WHITT - CROSS

1   Q.   As part of your review of devices, other than looking --
2   you know, some of the stuff you talked about already:
3   searching for certain search terms, looking for indicia of
4   pornographic titles and such.  Is there anything else that
5   you're looking for beyond what we've talked about in general?
6   A.   To flag potential pornography I look at the index
7   searches and actually look at the images themselves.
8   Q.   Are there any other searches done or any other kind of
9   investigation done traditionally or is that mostly what it is?
10  A.   Investigation on my part?  I just focus on the forensics
11  of it.  So outside of running the index searches, flagging
12  what I see as potential child pornography, that is either
13  handed -- or then it is handed over to the case agent for
14  review.
15  Q.   Is there any other software that you use -- you mentioned
16  AXIOM.  That's a -- I'm confused about this, honestly.  Is
17  Magnet the company and AXIOM the software?
18  A.   Correct.
19  Q.   And is that the software that the government uses
20  traditionally in these cases, or some version of it?
21  A.   There's multiple software out there that the examiner
22  chooses to use.  I choose to use Magnet AXIOM, or we'll call
23  it AXIOM.
24  Q.   So there's some other options you can use, but that's
25  your preferred one, I guess.

JASON WHITT - CROSS

1  A.    Correct.

2  Q.    And are there other things Magnet -- I guess AXIOM itself

3  does or other programs or applications by Magnet that you use

4  and utilize in these investigations even if it's rare, I

5  guess?

6  A.    I don't think so.

7  Q.    When you're in AXIOM, other than searching indexes,

8  there's a lot of things you can do, correct?

9  A.    As far as the index searches?

10  Q.    No, I'm saying other than the index searches, there's a

11  lot of stuff that you can look at in the AXIOM software when

12  you're analyzing a hard drive, for example.

13  A.    Correct.

14  Q.    Does the program, like, categorize and tag things or you

15  can tag things?

16  A.    So there -- the program will pick out hash values that it

17  will tag that has previously been tagged, and then also I will

18  go through and flag or tag images myself.

19  Q.    And you can search for types of events and such, right?

20  You can actually -- sorry.  You referred to artifacts earlier

21  yesterday.

22  A.    Correct.

23  Q.    And an artifact is just a thing on a computer and it can

24  be a variety of things, right?

25  A.    Anything on the computer.

JASON WHITT - CROSS

1  Q.    So it can be an image, it can be a thumbnail, it can be a

2  text document, it could be a record or a log of something,

3  right?

4  A.    Correct.

5  Q.    And you can search and categorize all kinds of things,

6  including quick view thumbnails that are no longer viewable by

7  a normal person, right?  As you said earlier.

8  A.    Correct.

9  Q.    So in your software you could -- did you do any other

10  investigations outside of, you know, like we talked about, an

11  index search here or looking for attribution and such?  Was

12  there any other -- did you look at anything else on the drives

13  that are outside of that?

14           MR. CERVANTES:  Objection.  Asked and answered.

15           THE COURT:  Just answer the question.

16           THE WITNESS:  Can you repeat it?

17  Q.    Other than the stuff you've talked about, did you use

18  AXIOM to review at any time or look for anything other --

19  outside of just specifically looking for images of

20  pornography?

21  A.    So when we first got the computer and did our forensic

22  analysis of it, my first step is to look for child

23  pornography.  Outside of that there are -- we look for

24  attribution which did lead into the documents, PDFs, and files

25  of that nature.

1  Q.    You mentioned too -- you said MD5.  What is that?

2  A.    It's a hash value.  There are different types of hash

3  values.  There's MD5, SHA-1, SHA-256.  The FBI uses MD5 for

4  their hash value, their hash algorithm.

5  Q.    And these -- I'm not going to put words in your mouth

6  because you are the expert in this, but that is basically kind

7  of like a fingerprint of an image that stays with the image

8  and you can hypothetically identify an image without even

9  seeing it based on that value, right?

10  A.    As long as the image has not changed.

11  Q.    Right.  Even one pixel, I think you said the other day.

12  A.    Would completely change it.

13  Q.    Right.  So you can basically have one image here, one

14  image there.  If the hash value is the same, then we know the

15  image is the same, right?

16  A.    Correct.

17  Q.    And this is utilized often by the FBI in their

18  investigations, correct?

19  A.    MD5 values are used to identify images or say that these

20  two images are the same.

21  Q.    Okay.  And you mentioned in AXIOM, AXIOM will tell you

22  what those hash values are, correct?

23  A.    They will.

24  Q.    And you can even do that on your own computer, right?

25  You can go to the more details or whatever in Windows, or

1  something, and it can show you what your MD5, SHA, other
2  values are.  There's a process for that, right?
3  A.   I don't know that process.
4  Q.   It's not a secret code, though.  It's attached to the
5  image.  It's populated.
6       How does that work?  How does the image get that code
7  attached to it?
8  A.   So it's some algorithm that, you know, I'm not aware of.
9  But it is a hash value.
10 Q.   So when you're going through and you're doing your
11 analysis, as part of that analysis, seeing these MD5 hash
12 codes -- or I think you said SHA, is that S-H-A-H?
13 A.   Just S-H-A.
14 Q.   S-H-A.  And that's another similar type of code, I guess?
15 A.   It's a different hash value.  It's a different algorithm
16 Q.   So that will populate.
17      Does AXIOM have the option or does it automatically flag
18 for you any hash values that are problematic in any fashion?
19 A.   So when it compares the hash values from the database,
20 you have to set it to look for the hash values.
21 Q.   What's the database?
22 A.   The database is just items that have been flagged prior
23 by other agents.  We can keep a database of them to make
24 review of this faster.
25 Q.   There's a database.  Is that like a local database here

JASON WHITT - CROSS

1   like in the Western District or FBI in general or...

2   A.    It's a database at FBI Charlotte.

3   Q.    FBI Charlotte.

4         So, for example, you guys get a case and let's say, for

5   example, you find a bunch of illegal images and someone gets

6   convicted and that all happens.  Then -- and these images

7   you've never seen before.  How do you add those to the

8   database?

9   A.    So if an image is flagged -- I think this is the question

10  you asked.  If an image is flagged that the database did not

11  recognize, it is flagged as potential child pornography and

12  sometimes it's updated.  You have to click that it's updated.

13  Or other times it's not.  It's what we choose.  But you would

14  have to update the database with the new hash values to add to

15  it.

16  Q.    Okay.  And so then from that point on -- so let's say,

17  for example, last year you had a case.  You got an image that

18  you have determined is definitely child pornography.  You've

19  added it to this database.  A year later you get another case

20  and you can see that there's a similar -- exact same hash code

21  in the new case that matches that one from the database.

22  A.    Sure.

23  Q.    Is that more or less how it works?

24  A.    Yeah.  And then you would have to go visually review it.

25  Q.    Right.  So -- but what it initially indicates to you is

1    that, hey, this hash code matches this known image hash code

2    and it's popping up and saying, hey, check this one because

3    this one definitely matches one we already know about.

4    A.    I wouldn't say know.  I would say potential.

5    Q.    Okay.  And then you verify by other review.

6    A.    The case agent would probably verify by other review.

7    Q.    Understood.  But it's helpful because let's say --

8    actually, let me back up real quick.  You get a lot of these

9    cases.  Fair to say that the number of images that you uncover

10   and find in these cases often is quite substantial?

11   A.    They are.

12   Q.    And so -- and you said before this is a lot of repeat

13   sometimes.

14   A.    Correct.

15   Q.    So there's similar -- there's videos you've seen more

16   than once, right?

17   A.    There are.

18   Q.    And you don't even need the hash code.  You already know

19   probably before you open it probably what it is because you've

20   seen it eight times.

21   A.    Potentially.

22   Q.    Particularly in a large case where there's a ton of

23   images, these MD5 hash codes can really be helpful because

24   rather than you have to go through or an agent go through and

25   review them one by one, it will give you kind of a cheat

1    sheet, like, check these ones first because these are highly

2    likely to be something that another person has reviewed and

3    indicated already is illegal.

4    A.    So when they are tagged with AXIOM, the way I do it, is I

5    will go through them at the beginning.  Those are removed.

6    And then I will go through the images that have not been

7    flagged and we'll flag the other ones.  And then at the end

8    we'll do a review of all the flagged images.

9    Q.    Okay.  So basically you separate those out first.  Keep

10   the ones that are flagged that have a match value, I guess, to

11   your -- the FBI database in Charlotte.  You look at some of

12   the other stuff that wasn't auto flagged.  And then at the end

13   you kind of put it all together and review the whole list; is

14   that correct?

15   A.    The hash value is set aside at first.  Then I will flag

16   the rest of them or attempt to.  And then we will go through

17   and review the -- all of them together.

18   Q.    Okay.  And so this database that Charlotte has, is that

19   shared with any other offices?  Is there any connection?

20   Like, does another FBI agency on the other side of the country

21   share their information and hash codes with you?

22   A.    No.  We keep it -- the database that we have we keep here

23   in Charlotte for the Western District.

24   Q.    Okay.  And AXIOM is only going to make a match or

25   populate with something in your database or is it possible or

1  do you in cases connect it to any other databases at all?

2  A.    So there is a database that I brought into ours.  I

3  created it with what we call golden hashes.  They are hashes

4  that are not -- let's say you did a fresh install of Windows.

5  With a fresh install of Windows, you have all these icons that

6  we know to be pure.  So we'll create a hash of that, or the

7  program will, and those hashes are added to our database.  So

8  we remove the ones we know are not.

9  Q.    Understood.  So like welcome.jpeg, or something, like

10  when Windows pops up.

11  A.    Correct.  On a desktop you'll normally get it when you

12  start up.

13  Q.    So that's kind of a filter process that you created to

14  make -- to weed out stuff that you don't really need to be

15  concerned with.

16        But as far as any, like, contraband or things that have

17  been marked illegal by another person, is there any other

18  database that AXIOM -- when you do your investigation, that

19  AXIOM can connect to to check for matches?

20  A.    Not that I'm aware of.

21  Q.    Okay.  And in this case, you reviewed at least these

22  ones.  And there's more, right?  I don't remember exactly how

23  many.  Did you do the MD5 hash match search for all this

24  stuff?

25  A.    AXIOM does it automatically.

1  Q.    So it automatically did it.  Did you get any matches for
2  these MD5 hash codes?

3  A.    I do not recall.  Honestly, I do not.

4  Q.    Okay.  But I guess in your investigation and preparing
5  your reports, there was never a note that, hey -- you never
6  noted it as happening.

7  A.    I do not remember if it happened.

8  Q.    Okay.  But fair to say it wasn't -- you didn't find a
9  hundred matches.

10 A.    I do not know.

11 Q.    Are you sure that there were any?

12 A.    I do not know.

13 Q.    So you got these -- these devices, they've got all these
14 file paths, all this stuff you guys have been talking about
15 here today, and your system automatically checks it for images
16 of contraband, and there's -- you don't remember if any of
17 them matched up.

18 A.    So the file paths the system is not going to check for
19 hash values because they are not images.

20 Q.    So they don't even have a hash value attached to them
21 either, that string of texts.

22 A.    Not that I'm aware of.

23 Q.    But the thumbnails, would they have one?

24 A.    The thumbnails are generated by the OS and they can
25 actually be different.

JASON WHITT - CROSS

1    Q.   Does it make a new hash value?

2    A.   It could.

3    Q.   It could.  Does it sometimes not?

4    A.   It's going to make a hash value whether it matches a

5    thumbnail that we have seen before or not.  It depends on the

6    OS.

7    Q.   But if it's a -- you know, if it's the same image, same

8    image, that would populate.  And none here that you recall,

9    right?

10   A.   I do not recall any of the hash values being marked or

11   flagged.

12   Q.   Approximately how many images, just in general, not

13   anything supposedly child pornography, but pornography in

14   general, do you have an approximation of how many different

15   images were found in this case?

16   A.   So during my review for the potential child pornography,

17   I do not note the adult pornography or what the count is, so I

18   do not know how many were images of adult pornography.

19   Q.   Is it a lot?

20   A.   I do not know.

21   Q.   You don't know?

22   A.   I really don't know.

23              THE COURT:  Can we have a brief sidebar, please.

24              (Sidebar conference as follows:)

25              THE COURT:  Mr. Ames, do you have a guess as to how

JASON WHITT - CROSS

1  much longer your cross is going to be?

2          MR. AMES:  Not too much longer.

3          THE COURT:  Can you quantify that?

4          MR. AMES:  You know me.  I can't stop talking

5  sometimes.

6          THE COURT:  To that end, you spent 45 minutes

7  establishing that none of the images that came off these

8  devices were known images.  That could have been done in two

9  questions and 60 seconds.  Okay.  Just a little gratuitous

10  advice.

11          MR. AMES:  No, I get it.

12          THE COURT:  What I'm trying to wonder is whether we

13  should -- if you're going to go another hour, I'll take a

14  break sooner than that.  But if -- I want you to finish if you

15  can, but I don't want to starve to death either.

16          MR. AMES:  Yeah.  I'm trying to think what I --

17          THE COURT:  I don't want to interrupt your cross if

18  it's almost over.  If it's going to have to be interrupted

19  anyway, then I'll do something different.

20          MR. AMES:  I think I'm getting close to the end.

21          THE COURT:  Thank you.

22          MR. AMES:  I won't make promises, but I'll try.

23          (End of sidebar conference.)

24          THE COURT:  Just scheduling issues, folks.  I can

25  look at the clock as easily as you can.

JASON WHITT - CROSS

1          Go ahead, Mr. Ames.

2              CROSS EXAMINATION (Cont'd.)

3     BY MR. AMES:

4     Q.   The number of images, pornography in general,

5     encompassing all of it, how many you weren't sure.

6     A.   I do not know.

7     Q.   Did you review any images that were not child pornography

8     or alleged child pornography?

9     A.   I did.

10    Q.   Okay.  Do you recall when or how many, anything like

11    that?

12    A.   I really cannot put a number to it.  There are images

13    that I reviewed that are not child pornography.

14    Q.   Okay.  Fair to say that it was the vast majority of

15    images that you reviewed?

16    A.   So the images that I reviewed are based off the -- the

17    ones I reviewed are based off the index searches, so I took

18    those where it led me.  So those are the ones that I vastly

19    reviewed.  There are images, videos inside of those folders

20    that are not child pornography.  But to give it a count, I do

21    not know.

22    Q.   Okay.  And in this case -- well, so the index search

23    you're referencing here, what was the index search that you

24    looked for that resulted in you looking at some images?

25    A.   For which device?

JASON WHITT - CROSS

1  Q.   Any of them.  Like, for example, the file names, from
2  what I can see, are mostly like IMG_99 whatever.
3  A.   So when we looked at the devices, the thumb drive, the
4  forward paths, the CPT, of course when we found those images,
5  we decided -- or I decided to see if there was any evidence on
6  other devices so I searched for CPT or EMOR.  That's where I
7  did see some on the devices.
8       As far as the IMG_3666, those were reviewed based off GPS
9  coordinates to a place up in Maine.  Once I saw that, we
10 started reviewing that because GPS coordinates can lead you to
11 certain images, and that's when I found that video.
12 Q.   Okay.  And so that was sort of the point here to get --
13 that's sort of, again, from here to here to here based upon as
14 the investigation flows.
15      Were there other search terms -- I know pthc is one.
16 Were there any other search terms that were used in that index
17 search on any device that you used here?
18 A.   I used pthc.  I also searched the image name, like
19 IMG_3666 forward names.  Those are a few that I remember
20 searching.
21 Q.   I guess -- I'm sorry, I suppose I mean more generic.
22 Other than pthc, is there another term that -- like Lolita.
23 Is there something else you looked for?
24 A.   No, I did this one just pthc.  I did not search for any
25 other because once I saw the folder path of pthc, a lot of

JASON WHITT - CROSS

1  those terms that I usually search for were located in the file
2  paths so I knew that they would hit also.
3  Q.   Understood.  That makes sense.
4       Is there -- is there any other -- is there any other --
5  any other device, other than the ones that are put into
6  evidence, that contain any indicia or appear to show any sort
7  of child pornography, or alleged, that you've seen that
8  haven't been put into evidence today?
9  A.   I believe everything has been put into evidence.
10 Q.   No other device that you are aware of has any alleged
11 pornographic materials.
12 A.   Outside of the screenshots of the thumb drive, I do not
13 know of any devices that have any pornographic material on
14 them.
15 Q.   Okay.
16 A.   Or potential child pornography material on them.
17 Q.   Understood.
18      When you say screenshots, what are you referring to?
19 A.   So it appeared that either somebody took a picture of the
20 screen or took a snapshot of the screen itself of the images
21 that I saw.
22 Q.   Are you -- a screenshot of -- can you -- I'm sorry, can
23 you be more -- elaborate a little bit.  Like a picture of a
24 screen --
25 A.   Like literally taking your camera and taking a picture of

JASON WHITT - CROSS

1    the screen.

2    Q.    Okay.  And what was that screen?

3    A.    It looked like a Mac and it had some images of the images

4    that we have been looking at today.

5    Q.    Okay.  So like the deepfakes or some other ones

6    potentially --

7    A.    The ones of the altered or modified images.

8    Q.    Okay.

9    A.    That I remember.

10   Q.    Got it.

11         So there's someone with a phone that takes a picture of a

12   computer screen like this?

13   A.    That's what it appears.  I did not analyze it.  I'm just

14   going off what it appeared.

15   Q.    And do you know -- I'm sorry, you said that.  That was on

16   a thumb drive?

17   A.    That was on a thumb drive.

18   Q.    That's not in evidence, correct?

19   A.    It is in evidence.

20   Q.    It is?

21   A.    Yes.  Evidence as in our evidence storage at the FBI.

22   Q.    Oh, you're right.  I meant in evidence at the trial.

23   It's not been admitted as an exhibit, correct?

24   A.    It is not in front of me.

25   Q.    Okay.  Is there any attribution to that thumb drive that

JASON WHITT - CROSS

1   you're aware of or have done?

2               MR. CERVANTES:  Objection.  Calls for speculation.

3               THE COURT:  Overruled.

4               THE WITNESS:  I did not look for attribution on that

5   thumb drive.  I did not forensically analyze it.

6   Q.   Okay.  Did you analyze it even if it's not forensic?

7   Have you looked through some of the documents for images on

8   it?

9   A.   I don't remember the contents of the documents.  I just

10  remember there's some emails and some screenshots or images

11  from a phone or a camera taking a picture of the screen.

12  Q.   Did you do any analysis of when those pictures were

13  taken, by whom or anything?

14  A.   Did not perform any forensic analysis on that thumb

15  drive.

16  Q.   Do you know where that thumb drive came from?

17  A.   Stated, I believe -- I believe it was from Kimberly

18  Tatum.

19  Q.   So when did you learn -- when did you learn that the

20  government had that?

21  A.   I do not recall.

22  Q.   Was it before or after you did an attribution of this

23  device and linked it to David Tatum?

24  A.   I do not recall.  I'm trying to put it together.  I just

25  do not recall.

JASON WHITT - CROSS

1   Q.   I understand.  It's been a long haul, I understand.

2        But fair to say, that -- if there's -- if the government

3   is in possession of some pictures of a computer screen showing

4   the evidence we're talking about that was given by Kimberly

5   Tatum, does that imply that she has access to this device?

6             MR. CERVANTES:  Objection.  Calls for speculation.

7             THE COURT:  Sustained.

8   Q.   Are you -- in your analysis did you -- did you observe

9   anything odd or any anomalies on any of these devices out of

10  the norm?

11            MR. CERVANTES:  Objection, vague.

12            THE COURT:  Sustained.  Be a little more specific,

13  Mr. Ames.

14  Q.   Did you find that there was any spyware installed on any

15  of the devices?

16  A.   I did not.

17  Q.   Did you look for that?

18  A.   I did not.

19  Q.   Are you aware whether or not there was any on any device?

20  A.   I'm aware that something was installed on a device.

21            MR. CERVANTES:  Objection.  Calls for hearsay.

22            THE COURT:  Well, what he's said right now doesn't,

23  so overruled.

24  Q.   Not repeating anything anyone said because that's

25  hearsay, but what is your understanding or what is your

JASON WHITT - CROSS

1   knowledge of it?

2   A.   I have no knowledge.

3            MR. CERVANTES:  Objection.  Calls for hearsay.

4            THE COURT:  Sustained.

5   Q.   In AXIOM -- let's say hypothetically there was something

6   like spyware or malware or something on the device.  Is that

7   something AXIOM could search for?

8   A.   I do not know.  I know that there is an option -- or

9   there is a category to look for certain types of things, but I

10  do not know what is in the database that it might find.  So I

11  don't know if it's antivirus or anything to delete evidence,

12  that kind of thing.

13  Q.   Are you aware of any sort of programs -- I'm using the

14  term spyware as kind of a blanket term here, but any program

15  spyware like that can do things like remotely access a device

16  or delete stuff or manipulate evidence or data?  Is there

17  anything you're aware of program wise like that?

18  A.   Personally?

19  Q.   Yes.

20  A.   There are --

21           MR. CERVANTES:  Objection, relevance.

22           THE COURT:  Let's ask the question, did you locate

23  any such software on any of the devices you examined?

24           THE WITNESS:  No, sir, I did not.

25  Q.   Did you look for it?

1  A.   No, sir, I did not.

2  Q.   But you're aware of something, there is an indication of

3  something, but you never looked for it.

4          MR. CERVANTES:  Objection.

5          THE COURT:  Asked and answered.

6          MR. AMES:  Okay.

7  Q.   I just asked is there -- are there any examples that

8  you've seen or are aware of that can remotely access a device

9  and, for example, as a result, create a QuickLook thumbnail?

10          MR. CERVANTES:  Objection.  Asked and answered,

11  vague, speculation --

12          THE COURT:  Sustained.

13          MR. CERVANTES:  -- relevance.

14          THE COURT:  Sustained.

15  Q.   Have you ever heard of TeamViewer?

16  A.   Have I heard of Team --

17          MR. CERVANTES:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  Have I heard of TeamViewer?

20  Q.   What's your understanding of what TeamViewer is, your

21  knowledge of it?

22  A.   So it's -- to my knowledge, TeamViewer is a program that

23  allows somebody to -- you have to give them access to remote

24  into your computer or just to see your screen or to give them

25  access to it.

JASON WHITT - CROSS

1  Q.  Hypothetical, that would allow -- Google Remote is
2  another example.  You can do that through Chrome, I think.
3  You can access a home computer from another device through
4  your browser.  Have you heard of that one?
5  A.  I'm familiar --
6         MR. CERVANTES:  Objection, relevance.
7         THE COURT:  Sustained.
8  Q.  If a person is able to remotely access through TeamViewer
9  or other similar software and things are done on -- remotely,
10 can that create new data on the other desktop device?  Like,
11 if I'm accessing my thing at home right now and I'm --
12        MR. CERVANTES:  Objection, speculation, relevance.
13        THE COURT:  Sustained.
14 Q.  Would your investigation in this case indicate to you if
15 there was any remote access or manipulation of any data?
16 Would your -- the way you've researched and done the
17 investigation, would you know or would you not know?
18 A.  I did not see any evidence of a TeamViewer or any other
19 remote --
20 Q.  I'm aware.  But you also didn't look for it, so you don't
21 know.
22        MR. CERVANTES:  Objection, argumentative.  Asked and
23 answered.
24        THE COURT:  It has been asked and answered.
25        (Counsel and defendant conferred.)

1    BY MR. AMES:

2    Q.    They talked briefly to you about creation and modified

3    dates.  That's also in some of this metadata.  Talked about

4    how it accesses when maybe the device is creating this quick

5    view thumbnail in that case.

6          What about the creation date or -- well, what's that,

7    first of all?

8    A.    The creation date of what?

9    Q.    A quick view image -- the quick view cache thumbnail that

10   we were talking about earlier.

11   A.    If you could show it to me, I can probably answer --

12             MR. CERVANTES:  Objection.  Asked and answered on

13   direct and cross.

14             THE COURT:  Ask a question that I can guess where

15   you're going --

16   Q.    So there --

17             THE COURT:  -- and then I'll be able to better rule

18   on it.

19             MR. AMES:  That's fair, Your Honor.

20   Q.    So you talked earlier, I think, about is it like EXIF

21   data or something?

22   A.    EXIF data of an image, not of the QuickLook thumbnail

23   cache.

24   Q.    Right.  So EXIF data, is that something -- can you

25   describe if there's a distinction between a creation date in

1  the metadata or an EXIF date in the metadata.

2  A.   I don't quite understand -- I mean, if you could reword

3  it, I will try to answer it.

4  Q.   So does every image have EXIF data?

5  A.   A lot of images will retain their EXIF data, but the EXIF

6  data can be stripped out of an image.

7  Q.   So sometimes it has it; sometimes it doesn't.

8      Does it always also have -- or presumably always have a

9  creation date as well?

10          MR. CERVANTES:  Objection, relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  Creation date as when the image was

13  created?

14  Q.   I'm just saying -- look, there's been a bunch of metadata

15  that popped up on the screen.  I objected to it earlier.  I

16  need to know what it is.

17      So there's a creation date on every single one of those

18  documents.  There's also EXIF --

19          MR. CERVANTES:  Objection, argumentative.

20          THE COURT:  I haven't heard a question in there,

21  Mr. Ames.

22  Q.   What is the creation date?

23          MR. CERVANTES:  Objection, vague.

24          THE COURT:  Can you answer that?  What is a creation

25  date?

1          THE WITNESS:  What is a creation date?

2    Q.    Yes.

3    A.    A creation date is when the file was created.

4    Q.    And what's the difference between that and EXIF data?

5    A.    EXIF data is data about the image to where the EXIF data

6    retains all the creation date, modified date, the model -- or

7    whatever the camera was, GPS coordinates, shutter speed,

8    altitude.  So EXIF data retains all that information of the

9    image.

10   Q.    So a bit more detailed, fair to say.  EXIF data is more

11   than just a date.  The creation date is just a date, right?

12   A.    Creation date is a date.  EXIF data is information about

13   the image.

14   Q.    Does the EXIF data also have, like, a date of creation as

15   well or no?

16   A.    It does.  There's multiple dates of creation within the

17   EXIF data.

18   Q.    What are the multiple dates, as an example?

19   A.    An example is -- I don't know exactly what it's called.

20   There's a content created date.  There's a media created date.

21   Those are the two that I'm familiar with.

22   Q.    So sometimes you might see an image that has EXIF data

23   that says creation date this date and then you have a creation

24   date above that that's a different date?

25   A.    So inside the EXIF data, yes, you can see something that

1  was created on a date and then the media created date above
2  that could be different.
3  Q.   And then there's an access date also that is different
4  than those, correct?
5  A.   The access date is usually with the file or file system.
6  Q.   And is there any rhyme or reason why -- you said it can
7  be stripped or something.  Is there any rhyme or reason as to
8  why that happens, why one image might have this EXIF data and
9  one might not?
10  A.   Some images might not have EXIF data in totality.  The
11  reason sometimes it gets stripped is for safety.  If you
12  upload a picture to Facebook, I know they strip the GPS
13  coordinates out of it if it is there.  So there are reasons
14  why it is stripped out.
15  Q.   Okay.  Is that something that someone can manually do or
16  is it kind of --
17  A.   I'm sure if you have the knowledge, you can manually do
18  it.
19              (Counsel and defendant conferred.)
20  BY MR. AMES:
21  Q.   The -- and to be clear, that access date that we've
22  talked about with thumbnails and such tells us just when the
23  device was plugged in.  Is there a way to determine if
24  other -- is there any other way to determine whether or not an
25  actual video was actually watched based on that data?

1    MR. CERVANTES:  Objection.  Asked and answered.

2    THE COURT:  Overruled.

3    THE WITNESS:  Repeat the question.

4 Q.    Sure.  So let's say, for example, we see with some of

5 these images we talked about before access date 9/10/2021, and

6 we went over that earlier.  There's two, three in a row that

7 have the exact same access date, exact same access time.  Is

8 there any way to determine if these images were actually

9 opened and viewed or not?

10 A.    So the only thing we can determine about the QuickLook

11 thumbnail cache is that thumbnails were created from the

12 originals from the external or media plugged into the device.

13 Q.    So for instance, there's -- you're aware and familiar

14 with the video in Maine, the shower video, the first one, the

15 one with the cousin.

16 A.    The blond female.

17 Q.    Yes.

18 A.    Yes.

19 Q.    So it was indicated that that has a thumbnail on the

20 MacBook, you know, with an access date, right?

21 A.    If you could bring it up, I can...

22 Q.    What I'm trying to establish here, you didn't find that

23 video on the MacBook, right?

24 A.    I did not find that video on the MacBook.

25 Q.    So -- nor was there any evidence of it being watched or

1  viewed on the MacBook, correct?

2  A.   So there was a QuickTime Player X PLIST that does

3  reference the folder path for the IMG_3666.MOV, which goes to

4  say that it was played with a QuickTime Player X.

5  Q.   Okay.  But that's all it says.  It doesn't -- can you

6  tell us when someone supposedly watched any of -- any -- on

7  any of these devices, on the MacBook, when somebody watched

8  any video whatsoever?  Can you tell us a date and time when

9  that occurred?

10  A.   I did not find any dates associated with when they were

11  played.

12  Q.   Okay.  So there is nothing to tell us when and there's

13  nothing to tell us whether it ever even happened.  All we know

14  is that --

15           MR. CERVANTES:  Objection, argumentative.

16           THE COURT:  Overruled.  Go ahead.

17  Q.   At one time these devices were plugged in.  That's what

18  the evidence tells us.  That's the only thing we can glean

19  from it specifically is on a certain date and time --

20           MR. CERVANTES:  Objection, argumentative.  Asked and

21  answered.

22           THE COURT:  Overruled, but that exact question has

23  been asked enough times.

24           MR. AMES:  I think it's an important one, Your

25  Honor.

1    THE COURT:  Well, it may be important, but it
2  doesn't require six repetitions.  So if you have anything
3  else, ask it.
4    MR. AMES:  That's all for now, Your Honor.  I would
5  ask -- he might be someone I need to recall at some point.
6    THE COURT:  Members of the jury, this is a good time
7  to take our lunch break.  I'm not going to lecture you again.
8  Please abide by the Court's orders with respect to recesses.
9  And I'll ask you to be back here at 1:30.
10    Everyone remain seated while the jury clears the
11  floor.
12    And do leave your notes in the jury room.
13    (Jury exited the courtroom.)
14    THE COURT:  You may stand down.
15    (Witness stepped down.)
16    THE COURT:  Mr. Ames, do you want to discuss this
17  proposed jury instruction?
18    MR. AMES:  Yes, Your Honor, just briefly.
19    We -- I believe Your Honor addressed yesterday that
20  you want --
21    THE COURT:  Keep your microphone in front of you.
22    MR. AMES:  I'm sorry.  We wanted to discuss the
23  addition of the jury instruction.  I spoke to Mr. Odulio
24  last -- he emailed me last night.  We have a proposed version
25  we sent to you.

1          I just want -- I guess just noting for the record
2     that it's my understanding the Fourth Circuit does not have a
3     standard on this specifically that I can find.  There's some
4     other circuits that do have a standard that we have found, a
5     total of four to my understanding, and we've noted those for
6     Your Honor.  Three of them basically track what the proposed
7     instruction is, which was my -- you know, if I'm reading the
8     tea leaves, I imagine that that is -- something that is likely
9     in this case.
10          I do want to note that there is an Eighth Circuit
11     case that makes a distinction so there is a split among the
12     circuits on this issue.  That case in particular, the
13     distinction that they make, Your Honor, is that if the -- in
14     order to come within the child pornography statute, there does
15     have to be an actual image of sexual abuse.  Meaning that when
16     we have a situation like here where there's, you know, a head
17     of a person and a body of either an adult or it's a
18     conglomeration, or whatever, or a CGI, whatever it may be, on
19     the Eighth Circuit's version of things, it would not apply
20     because there's no actual abuse that occurred to any person,
21     and that that's where they distinguish it from the other
22     couple of circuits.  Because those circuits say even if
23     there's no actual abuse, meaning it's an adult body, for
24     example, on a minor's head and nobody was used, abused,
25     coerced, nothing, it's still pornography because it depicts

1  something that appears to be abuse.  That's the distinction.

2        The Fourth Circuit, as I'm aware, has never

3  addressed it.  Wanted to just put that on the radar.

4  Certainly our argument would be we would argue for the one

5  that does not -- that does require actual sexual abuse.  There

6  was no abuse in the images that are being put forth by the

7  government as far as the morphed stuff.

8        But understanding the Court's message yesterday

9  about preparing the instruction, that's why I jointly

10  submitted it with Mr. Odulio.  I wanted to note it for the

11  record and the basics of the argument.  I jointly agreed to

12  that language provided the Court wants to adopt that version

13  of the law.  I would object to it just for the record,

14  preserving that in the event that it goes to the Supreme Court

15  some day and this is decided for sure.

16        THE COURT:  All right.  Well, we'll go with the

17  majority view and I'll accept the instruction as proposed.

18        Does this adequately address, when combined with the

19  existing instructions, the issues that will be presented to

20  the jury?  For instance, a lot of those morphed images,

21  there's no question that the bodies appear to be minors.  I

22  didn't really catch any that I thought, oh, well, the jury

23  might get hung up on that one.  They might think that one was

24  the body of an adult.  But you may argue that.

25        MR. AMES:  I realized yesterday when I went home

1   that I think I was inartful.  What I should have said was that
2   the images are not, I mean, I guess, explicit -- they're not
3   explicitly clearly of minor children.  I'm doing a binary
4   thing, I suppose.  Is it an adult or a child?  I think it
5   could be ambiguous.  There's a third category of maybe it's a
6   little mishmash of everything, computer-generated.  Maybe it's
7   ambiguous.  So that's my fault.
8          THE COURT:  And if you want to argue that, that's
9   fine.  That's what this instruction is meant to address.  I
10  just wanted to make sure that both parties think with the
11  addition of this instruction, it will cover for the jury
12  everything they will be asked to decide.  Is that where we
13  stand?
14         MR. ODULIO:  Yes, Your Honor.
15         MR. AMES:  I believe so, Your Honor, yes.
16         THE COURT:  All right.  Anything else before we take
17  our lunch break?
18         Oh, Mr. Ames, you suggested there at the end that
19  you wanted that last witness to remain available.
20         MR. AMES:  Yes.
21         THE COURT:  I assume you're saying to be called
22  during presentation of your evidence if you present any.
23         MR. AMES:  Yes, potentially, Your Honor.
24  Potentially.  And I would just respectfully request that be an
25  option.  I need to look into a couple of things in case I need

1  to...

2          THE COURT:  All right.  Be forewarned, we're not

3  going to replow well-plowed ground.

4          MR. AMES:  I understand, Your Honor.

5          THE COURT:  If you have something in particular new

6  and different and relevant, I'll ask the government then to

7  keep that witness sequestered and available in the event that

8  the defense wants to call him during their case in chief.

9          MR. AMES:  Thank you, Your Honor.

10          MR. CERVANTES:  Your Honor, we would object to this.

11  I mean, the witness is here.  He's asked his questions.  We

12  don't have any redirect.  And he should be excused like any

13  other witness.

14          THE COURT:  Well, now, hold on.  As I qualified

15  there, if there's something new -- because he's only

16  allowed -- this is honoring the breach rather than the rule.

17  Cross is only supposed to cover the areas of direct.  As I

18  say, that's honored in the breach.  If there's something new

19  that could not have been brought out during cross examination,

20  I'll listen to it.  We may even have to get a sample of your

21  questions outside the presence of the jury because we're not

22  going to allow his recall just because you have now thought of

23  something you wished you had asked him.

24          MR. AMES:  I understand.

25          THE COURT:  So I know he would like to be in here,

1   but let's protect the record here and make sure he stays

2   sequestered.

3           MR. AMES:  Thank you, Your Honor.

4           THE COURT:  Mr. Odulio, did you want to say

5   something?

6           MR. CERVANTES:  Does that mean we can't confer with

7   this witness?

8           THE COURT:  No, that does not mean that because

9   there's not been any announcement that he's going to be

10  called.  I'm just trying to keep him sequestered in the event

11  that he is called.

12          MR. CERVANTES:  Okay.

13          THE COURT:  Recess until 1:30.

14          MR. CERVANTES:  Thank you, Your Honor.

15          (Lunch recess at 12:27 PM.)

16  WEDNESDAY AFTERNOON, MAY 3, 2023

17          (Court back in session at 1:28 PM.)

18          (Jury not present.)

19          THE COURT:  Mr. Cervantes, did I understand you to

20  say there would be no redirect of that last witness?

21          MR. CERVANTES:  Yes, Your Honor.

22          THE COURT:  For everyone's planning purposes, it is

23  highly unlikely that that witness will be allowed to be

24  recalled.  I won't foreclose the issue, but it's highly

25  unlikely.

M.D. - DIRECT

1          Now, is your next witness a 404(b) witness, Mr.
2     Cervantes?  I'm trying to remember from what you said this
3     morning.
4          MR. ODULIO:  Your Honor, the next witness is not a
5     404(b) witness.
6          THE COURT:  All right.  Are we ready for the jury?
7          (No response.)
8          THE COURT:  Call the jury.
9          (Jury entered the courtroom.)
10         THE COURT:  Please call your next witness.
11         MR. ODULIO:  Your Honor, the United States calls
12    M.D..
13              M.D., GOVERNMENT WITNESS, SWORN,
14                   DIRECT EXAMINATION
15    BY MR. ODULIO:
16    Q.   Good afternoon, ma'am.
17    A.   Good afternoon.
18    Q.   Will you please state your name for the jury and spell
19    your last name for the court reporter.
20    A.   Yes.  It's M.D., X-X-X-X-X-X-X-X.
21    Q.   Ms. M.D., where do you reside, city and state?
22    A.   I live in Detroit, Michigan.
23    Q.   Do you know an individual named David Tatum?
24    A.   Yes.
25    Q.   Do you see him in court today?

1    A.    Yes.

2    Q.    Can you identify him by where he's seated and an article

3    of clothing.

4    A.    Yeah.  He's right there in looks like a blue shirt.

5             MR. ODULIO:  Your Honor, if the record could reflect

6    the witness has identified the defendant.

7             THE COURT:  The record so reflects.

8    Q.    How do you know Dr. Tatum?

9    A.    We were in a relationship.

10   Q.    And approximately when was that relationship or what time

11   period?

12   A.    Probably 2000 -- started in 2009 or 2010.

13   Q.    And how long was it, approximately?

14   A.    A year, maybe a year and a half.

15   Q.    Okay.

16   A.    Something.

17   Q.    I'm just going to show you on your monitor what's been

18   marked for identification only --

19   A.    Okay.

20   Q.    -- as Government's Exhibit 4F10.

21        I'm going to ask you, Ms. M.D., do you recognize that

22   photo?

23   A.    Yes.

24   Q.    How do you recognize it?

25   A.    That is the first day of school and that's me, my

1  sibling, and my neighbors, and I shared it on Facebook.

2          MR. ODULIO:  Your Honor, the government moves 4F10

3  into evidence.

4          THE COURT:  It's admitted.

5          And if you would try and pin down a date for this

6  photo, please.

7          (Government's Exhibit Number 4F10 was received into

8  evidence.)

9  Q.  Ms. M.D., approximate date if you recall?

10 A.  Yeah, so let's see.  I graduated in '01 so it would have

11 been six years before that.  So 1996 maybe.

12 Q.  Okay.  Approximately '96.

13     Where was this photo taken?

14 A.  This was taken in Hong Kong.

15 Q.  And you were residing there for school at the time?

16 A.  No, my dad's job.  So we all lived there.

17 Q.  Could you identify where you are first in the photo.  And

18 I think you can just touch it --

19 A.  That's me.

20 Q.  -- and make a circle.

21 A.  That's me.

22 Q.  Okay.  And approximately what grade are you in?

23 A.  Either sixth or seventh grade.  I'm sorry, no, either

24 seventh or eighth grade.

25 Q.  And how old would you have been in that -- in either of

M.D. - DIRECT

1  those two grades?

2  A.    Well, let's see.  Graduated high school I was 18, right?

3  Yeah.  So either 12 or 13.

4  Q.    Okay.  When you were identifying the picture, you

5  identified some of the other individuals.  I think you said a

6  sister.  Could you circle your sister.

7              (Witness complied.)

8  Q.    And what is her name and approximately how old is she as

9  depicted here?

10  A.    Her name is A.D..  She's 18 months younger than I am so

11  she would have been, I guess, 10.  Nine or ten.

12  Q.    There's another individual with a red shirt with the

13  number 18 on it.

14  A.    Yes.

15  Q.    Do you know who that person is?

16  A.    Yes.  That is our neighbor.

17  Q.    And do you recall her name and about how old she was

18  here?

19  A.    She was -- yes.  That is L.B..  She was a grade younger

20  than me.  So she would have been, like, in fifth or sixth

21  grade.  So I think we said I was 12 or 13.  So 11 or 12.

22  Q.    And then there's a person with a striped shirt right next

23  to you on the other side.

24  A.    Yes.

25  Q.    Same questions.

E.H. - DIRECT

1  A.   So that's S.B..  She was a grade older than me.  So she

2  would have been, like, 8th or 9th grade, which would have made

3  her 13 or 14.

4  Q.   Okay.

5  A.   Right?

6  Q.   And then finally the person to the -- with the white --

7  plain white shirt holding a cup.

8  A.   Yeah.  She was in probably 11th grade at the time, so she

9  would have been 17.

10  Q.   And do you recall her name, ma'am?

11  A.   M.B..

12          MR. ODULIO:  Your Honor, no further questions.

13          THE COURT:  Any cross examination?

14          MR. AMES:  No, Your Honor.

15          THE COURT:  All right.  Thank you.  You can stand

16  down.

17          (Witness stepped down.)

18          MR. ODULIO:  United States calls E.H..

19              E.H., GOVERNMENT WITNESS, SWORN,

20                  DIRECT EXAMINATION

21  BY MR. ODULIO:

22  Q.   Good afternoon, ma'am.  Could you please state your name

23  and spell your last name for the court reporter.

24  A.   My name is E.H..  Last name is X-X-X-X-X.

25  Q.   And tell us where you live, city and state.

E.H. - DIRECT

1  A.   Fayetteville, New York.

2  Q.   Do you know an individual named David Tatum?

3  A.   I did, yes.

4  Q.   Do you see him in court today?

5  A.   Yes.

6  Q.   Could you identify him, please, by where he's seated and

7  an article of clothing.

8  A.   He's seated on the bench on the right with a blue shirt.

9       MR. ODULIO:  Your Honor, if the record could reflect

10  the witness has identified the defendant.

11       THE COURT:  The record so reflects.

12  Q.   You said you knew him.  What time period was that,

13  Ms. E.H.?

14  A.   We dated in high school.

15  Q.   Could you give us an approximate time period for when

16  that would have been.

17  A.   That was my sophomore year of high school and his senior

18  year, so 2001.

19  Q.   And approximately how old were you in 2001?

20  A.   I was 15 at the beginning of the school year; 16 at the

21  end of the school year.

22  Q.   Okay.  I want to show you now what's been marked for

23  identification only as Government's Exhibit 4F2.

24       Do you see that on your screen, ma'am?

25  A.   Yes.

E.H. - DIRECT

1  Q.   What is that generally?

2  A.   That's me and David at his senior prom -- before his

3  senior prom.

4         MR. ODULIO:  Your Honor, may we publish -- move to

5  admit 4F2.

6         THE COURT:  It's admitted.

7         (Government's Exhibit Number 4F2 was received into

8  evidence.)

9         MR. ODULIO:  Publishing.

10 Q.   You mentioned the prom.  Let me just ask you this.  Do

11 you know who took that picture?

12 A.   No, I don't.

13 Q.   And do you recall when the prom took place,

14 approximately, Ms. E.H.?

15 A.   About the end of June.

16 Q.   And how old are you in this picture?

17 A.   I'm 16 years old.

18 Q.   And I think you already mentioned there's another

19 individual in this photo.  Who is that person?

20 A.   It's David.

21        MR. ODULIO:  Your Honor, no further questions.

22        THE COURT:  Any cross examination?

23        MR. AMES:  No, Your Honor.

24        THE COURT:  All right.  Thank you.  You may stand

25 down.

1    (Witness stepped down.)

2         MR. CERVANTES:  The United States calls M.C.

3         M.C., GOVERNMENT WITNESS, SWORN,

4              DIRECT EXAMINATION

5    BY MR. CERVANTES:

6    Q.   Good afternoon.

7    A.   Hello.

8    Q.   Can you please tell the jury your name and spell your

9    last name for the record.

10   A.   My name is M.C.  XXXXXXX is spelled X-X-X-X-X-X-X.

11   Q.   And where do you live, city and state?

12   A.   I live in Seattle, Washington.

13   Q.   Do you know David Tatum?

14   A.   I do.

15   Q.   What's your connection to him?

16   A.   We're cousins not by blood.  His grandfather married my

17   grandmother.

18   Q.   Do you see David in the courtroom today?

19   A.   Yes.

20   Q.   Can you describe an article of clothing that he's

21   wearing.

22   A.   Blue shirt, black tie.

23        MR. CERVANTES:  Your Honor, may the record reflect

24   the witness has identified the defendant.

25        THE COURT:  The record so reflects.

M.C. - DIRECT

1  Q.   I'd like to show you something on the screen.  It's

2  already been admitted as Government's Exhibit 1D.  I'm going

3  to play the first two seconds.

4          (Government's Exhibit Number 1D was published.)

5  Q.   Do you recognize that video?

6  A.   Yes.

7  Q.   How do you recognize it?

8  A.   It has been brought to my attention by the prosecution.

9  Q.   Have you seen that video in its entirety?

10 A.   Yes, I have.

11 Q.   Do you recognize that person depicted in the video?

12 A.   Yes.  That's me.

13 Q.   Okay.  Do you know more or less how old you were in that

14 video?

15 A.   Yeah, I was approximately -- I was either 14 or 15 in

16 that video.

17 Q.   How much older is David than you?

18 A.   He was either 17 or 18 when I was born.

19 Q.   Okay.  So 17 or 18 years older than you?

20 A.   Correct.

21 Q.   Do you recognize the background in that video?

22 A.   Yes, I do.

23 Q.   What is that?

24 A.   That is the bathroom in my family's cabin in Maine.

25 Q.   Who used that bathroom?

1  A.    Everyone.  There's two bathrooms in the house.  Sometimes
2  there would be 20 people coming to our family reunion, so most
3  people would use that bathroom.
4  Q.    Did you -- did you know that this recording -- these
5  images were being made of you?
6  A.    Absolutely not.
7  Q.    Did you -- when you had these family trips, did you see
8  David there?
9  A.    Yes.  He was there almost every year.
10  Q.    I'd like to show you what has been marked for
11  identification as Government's Exhibit 1D1.
12        Do you recognize this image?
13  A.    Yes.
14  Q.    Is this a screenshot from the video we just saw?
15  A.    Yes.
16            MR. CERVANTES:  Government moves 1D1 into evidence.
17            THE COURT:  It's admitted.
18            (Government's Exhibit Number 1D1 was received into
19  evidence.)
20  Q.    Who is that in this screenshot?
21  A.    That's David Tatum.
22  Q.    How do you recognize him?
23  A.    I've known him since I was born so I recognize his face.
24  Q.    Is there anything about the clothing that you recognize?
25  A.    Yeah, I recognize the jacket.  It was something he would

1    wear often at the cabin.

2            MR. CERVANTES:  No further questions, Your Honor.

3            THE COURT:  Any cross examination?

4            MR. AMES:  No, Your Honor.

5            THE COURT:  Thank you.  You may stand down.

6            THE WITNESS:  Thank you.

7            (Witness stepped down.)

8            MR. ODULIO:  The government calls E.S..

9            Your Honor, a portion of this testimony is 404, the

10    latter part of it.

11            THE COURT:  All right.  Just let me know when we get

12    to that point.

13            MR. ODULIO:  Yes, sir.

14                    E.S., GOVERNMENT WITNESS, SWORN,

15                        DIRECT EXAMINATION

16    BY MR. ODULIO:

17    Q.    Good afternoon, ma'am.

18    A.    Good afternoon.

19    Q.    Could you please state your name and spell your last name

20    for the court reporter.

21    A.    E.S., X-X-X-X-X.

22    Q.    Ms. E.S., where do you reside, city and state?

23    A.    Louisville, Kentucky.

24    Q.    Do you know an individual named David Tatum?

25    A.    I do.

E.S. - DIRECT

1  Q.   How do you know him?

2  A.   We are cousins.

3  Q.   Do you see him in court today?

4  A.   I do.

5  Q.   Would you please identify -- or could you please say an

6  article of his clothing and identify where he's seated.

7  A.   Bright blue shirt, black jacket.

8            MR. ODULIO:  Your Honor, if the record could reflect

9  that the witness has identified the defendant.

10           THE COURT:  The record so reflects.

11 Q.   I'm going to show you, Ms. E.S., a portion of

12 Government's Exhibit 1G which is in evidence.  And this is the

13 7-minute mark of Government's Exhibit 1G.

14           (Government's Exhibit Number 1G was published.)

15 Q.   Do you see that on your screen, ma'am?

16 A.   I do.

17 Q.   We'll take it off.

18      I'm going to ask you if you recognize the person in that

19 video.

20 A.   I do.

21 Q.   Who is it?

22 A.   That is my cousin K.C..

23 Q.   And do you recognize the room this is in?

24 A.   Yes.  That is the bathroom in our cabin in Maine.

25 Q.   Have you been there?

1   A.   Yes.

2   Q.   How many times have you been there?

3   A.   Oh, probably over 30.  I've been going pretty much every

4   summer since 1993.

5   Q.   You mentioned that it's in Maine.  Approximately where in

6   Maine is that?

7   A.   Bethel, Maine.

8   Q.   When you've gone has the defendant, David Tatum, been

9   there?

10  A.   Yes.

11  Q.   I'm going to show you now what's been marked and admitted

12  as Government's Exhibit 1D1.

13       Do you see 1D1, ma'am, which has been admitted into

14  evidence, on your screen?

15  A.   Yes.

16  Q.   Who is the person on the screen?

17  A.   David Tatum.

18  Q.   The room that's in, is that the same room --

19  A.   It is.

20  Q.   -- that we saw in Government's Exhibit 1G?

21  A.   Yes.

22  Q.   And how do you know that?

23  A.   That is the upstairs bathroom in the cabin.  The way I

24  can tell is because of the curtains, the way that the shower

25  is set up, and there is a toilet behind him which you can see

1   there is an aerosol can that would be resting on top of the

2   toilet.  That is absolutely the upstairs bathroom at our

3   family cabin in Maine.

4           MR. ODULIO:  Okay.  We'll take that down.

5           Your Honor, I'm going to get into it now.

6           THE COURT:  All right.  Members of the jury, this

7   issue came up yesterday.  You're about to hear some evidence

8   of a prior bad acts allegedly by the defendant, conduct for

9   which he has not been charged.  However, the law allows this

10  kind of evidence for certain limited purposes.  For example,

11  this evidence may be considered by you to prove the

12  defendant's motive, opportunity, intent, preparation, plan,

13  knowledge, identity, or absence of mistake or accident.  Keep

14  in mind the limited purpose for which this evidence is

15  admitted.  Most importantly, do not conclude from this

16  evidence that the defendant has bad character in general, nor

17  should you conclude because the defendant may have committed

18  the bad conduct in the past, that he is more likely to have

19  committed the crimes with which he is currently charged.

20          You may proceed.

21          MR. ODULIO:  Thank you, Your Honor.

22  BY MR. ODULIO:

23  Q.  Ms. E.S., have you ever talked to Dr. Tatum about any

24  surreptitious bathroom recordings of you?

25  A.  Yes, I have.

1   Q.   When did that conversation take place?

2   A.   It was around Christmas of 2002.

3   Q.   Where did that conversation take place?

4   A.   It was at our -- my great aunt's home in Atlanta,

5   Georgia.  We used to meet there opposite of when we would meet

6   at the cabin.  We'd meet at the cabin in the summer and we'd

7   meet in Georgia in the winter.

8   Q.   What did you tell Dr. Tatum about the surreptitious

9   video?

10   A.   I confronted him.  I told him that his sister had found a

11   video of she and I and I wanted more information about it.

12   Wanted to know why he had done it.

13   Q.   Okay.  So you confronted him about a surreptitious

14   bathroom recording of you and the defendant's sister.

15   A.   Yes.

16   Q.   How old were you in these videos?

17          MR. AMES:  Your Honor -- with respect, Your Honor,

18   I'm going to object to foundation for this.  My understanding

19   it's hearsay.  It's based upon --

20          THE COURT:  We've been over this.  Overruled.

21          MR. AMES:  Thank you, Your Honor.

22          THE COURT:  You may answer.

23          THE WITNESS:  I'm sorry, can you ask the question

24   again.

25   Q.   Yes.  Just listen to my question carefully.

E.S. - DIRECT

1    In this conversation you had with the defendant and
2  referencing this video, how old were you in this video?
3  A.   Fifteen or 16.
4  Q.   And you referenced the defendant's sister.
5  A.   Yes.
6  Q.   Is the defendant's sister older or younger than you?
7  A.   She is younger than I am.
8  Q.   By how much?
9  A.   By two years.
10 Q.   As a result of this confrontation, did the defendant say
11 anything to you?
12 A.   Yes.
13 Q.   Tell the jury what he said.
14 A.   He admitted immediately to taking the video.  He told me
15 it was a mistake and he told me he would never do it again.
16 Q.   Did he show you how he did it?
17 A.   He did.
18 Q.   What did he show you?
19 A.   He showed me in the upstairs bathroom in this home how he
20 was able to take the video.  There is a plastic fan register
21 on the wall that was not bolted in and so you could slide the
22 register to the side exposing a raw edge of drywall and you
23 can see through to a crawl space.  There are crawl spaces all
24 throughout this home in Atlanta.  And from that crawl space
25 you can look through the crack and see the entire bathroom.

F.L. - DIRECT

1          MR. ODULIO:  Your Honor, nothing further.
2          THE COURT:  Any cross examination?
3          MR. AMES:  One moment, Your Honor.
4          (Counsel and defendant conferred.)
5                      CROSS EXAMINATION
6  BY MR. AMES:
7  Q.   I have just one question.  How far apart in age are you
8  and Mr. Tatum, do you know?
9  A.   He's November '82.  I'm XXXX of '84.
10 Q.   November '82, and you said...
11 A.   XXXX of '84.
12 Q.   XXXX of '84.  Okay.
13         MR. AMES:  No further questions, Your Honor.
14         THE COURT:  Redirect?
15         MR. ODULIO:  Nothing, Your Honor.  May she be
16 excused?
17         THE COURT:  She may.  Thank you.
18         (Witness stepped down.)
19         MR. CERVANTES:  The United States calls F.L..
20             F.L., GOVERNMENT WITNESS, SWORN,
21         MR. CERVANTES:  Your Honor, may we have the
22 instruction?
23         THE COURT:  Yes.
24         Members of the jury, again, I'm led to believe that
25 this witness will be testifying about uncharged conduct,

F.L. - DIRECT

1   prior -- or other bad acts.  And so the same considerations
2   apply to this witness's testimony that I just instructed you a
3   few minutes ago.

DIRECT EXAMINATION

4

5   BY MR. CERVANTES:
6   Q.   Good afternoon.
7   A.   Hello.
8   Q.   Will you please tell the jury your name and spell your
9   last name, please.
10  A.   Hello.  My name is F..  My last name is L., X-X-X-X-X.
11  Q.   Can you tell them where you live, city and state.
12  A.   Absolutely.  I live at XX XXXXX XXX Webster, New York.
13  Q.   No, no, I'm sorry.
14          MR. CERVANTES:  Your Honor, may the record strike
15  the actual address.
16          THE COURT:  Yes, please.
17          THE WITNESS:  I'm sorry.
18  Q.   That's okay.  Just the city.
19  A.   I live in Rochester, New York.
20  Q.   Okay.  Great.
21       Do you know David Tatum?
22  A.   I do.
23  Q.   How do you know him?
24  A.   I met him through the hospital at inpatient, like
25  inpatient when I was in high school.

F.L. - DIRECT

1  Q.   And do you see him here in the courtroom today?

2  A.   I do.

3  Q.   Okay.  Can you describe the color of shirt that he's

4  wearing.

5  A.   It's like a cyan blue.

6        MR. CERVANTES:  Your Honor, may the record reflect

7  the witness has identified the defendant.

8        THE COURT:  The record so reflects.

9  Q.   You said you were in high school when you first met him?

10 A.   Yes.

11 Q.   Do you recall more or less how old you were?

12 A.   I was definitely under 18.  I would say junior or senior

13 in high school.

14 Q.   And had you been seeing him as a patient for some time?

15 A.   Correct.

16 Q.   And when is your birthday?

17 A.   My birthday is XXXX XX, 1997.

18 Q.   I'm going to show you a video that has already been

19 admitted in evidence as 1I, and I'm going to play you the

20 first ten seconds and then I'm going to stop and ask you some

21 questions, okay?

22 A.   Sure thing.

23        (Government's Exhibit Number 1I was published.)

24 Q.   I'm sorry, I'm going to let it play until you can hear

25 the other voice in the video, okay?

F.L. - DIRECT

1   A.   Okay.

2        (Government's Exhibit Number 1I resumed.)

3   Q.   Okay.  Have you seen the entirety of this video?

4   A.   I have.

5   Q.   And have you seen another two video recordings of you?

6   A.   I have.

7   Q.   And have you heard the audio to these recordings?

8   A.   Yes, I have.

9   Q.   Do you recognize who it is -- first let's talk about the

10  female that the image is directed to.  Do you recognize that

11  person?

12  A.   Yes.  The female in the video I recognize as myself as

13  well as the voice.

14  Q.   How do you recognize yourself?

15  A.   Well, I can recall the clothing I was wearing.  I can

16  tell you where each item was from.

17  Q.   From where?

18  A.   Well, the dress was from Pac Sun and the pink cardigan

19  was from Old Navy.  The brown and army green flip-flops were

20  also from Pac Sun.  And I still have the silver anklet.

21  Q.   Okay.  You said you recognized the voice as well.  Who is

22  that?

23  A.   The female voice in the video was myself.

24  Q.   And did you -- were you able to recognize the male voice

25  in the video?

284

F.L. - DIRECT

1   A.   Yes, I can recall that voice as Mr. -- Dr. Tatum.

2   Q.   Did you know that these recordings were being made of

3   you?

4   A.   I did not.

5           MR. CERVANTES:  No further questions, Your Honor.

6           THE COURT:  Any cross examination?

7           MR. AMES:  No, Your Honor.

8           THE COURT:  All right.  Thank you.  You may stand

9   down.

10          THE WITNESS:  Thank you.

11          (Witness stepped down.)

12          MR. CERVANTES:  May we have a minute to confer, Your

13  Honor?

14          THE COURT:  You may.

15          (Counsel conferred.)

16          MR. CERVANTES:  At this time the government rests

17  its case.

18          THE COURT:  Members of the jury, at this point in

19  the trial there's several scheduling and legal issues that I

20  have to take up with the attorneys.  So even though we've only

21  been here half an hour, I'm going to ask you to go back to the

22  jury room and give us a few minutes to do that and we'll get

23  back to you as soon as we can.  I'm sure you recall all the

24  rules.

25          (Jury exited the courtroom.)

Case 3:22-cr-00157-KDB-DCK   Document 89   Filed 11/27/23   Page 152 of 230

1          THE COURT:  Mr. Ames.

2          MR. AMES:  Yes, Your Honor.

3          THE COURT:  I assume you have a motion you want to

4    make.

5          MR. AMES:  Yes, a motion to dismiss at the close of

6    state's evidence, Your Honor.

7          Just briefly, a general -- a general concern about

8    the foundation as I've had a standing motion throughout the

9    trial, Your Honor.  The reliability, chain of custody in

10   particular on some evidence as well.

11         We have a situation here where there is very little

12   information about the origin, attribution of the devices

13   themselves.  The essential evidence that was presented as to

14   their authenticity was that an investigation was conducted and

15   followed up on at a lawyer's office with the defendant's wife

16   and that the device turned over ostensibly by her is the

17   purported device here.  That's really seemingly the

18   foundation.  As for the documents inside and chain of custody

19   not necessarily with law enforcement but prior to that, where

20   these devices came from, whether they had sufficient authority

21   to seize the devices, and so on and so forth.

22         And then from there, additional concerns about the

23   chain of custody within the FBI and within the government with

24   respect to certain devices.  There are multiple agents in this

25   case.  Only one of them testified.  There are -- the

1  testimony, in essence, for many of these devices was it was
2  seized in a meeting with Agent Brown present.  She was there.
3  Taken presumably into custody.  Copied by Mr. Whitt.  But in
4  particular with this hard drive, it was sent off to Quantico;
5  received back from Quantico.  Mr. Whitt took it out of
6  evidence when he did his analysis on this copy.

7          But chain of custody as to the in-between I don't
8  believe has been established.  I don't believe that and other
9  devices have had testimony about who logged them in and where
10 and who requested they be sent out.  I believe the agent who
11 sent out this device to be copied and that we have the
12 testimony about from Quantico never testified about anything,
13 nor any other of the foundation for any of the images or
14 items.  And while we heard from one expert on the copying
15 process, what we don't have is the in-between.

16         With respect to the evidence itself, there are, I
17 think, certainly images that have been seen that do not, as a
18 matter of law, constitute child pornography.  I'm not sure if
19 the government is specifically alleging any -- or arguing any
20 specific one of the shots that we've seen on here.  I know
21 certainly the one, my understanding, that constitutes the
22 production charge would be the one with Ms. M.C. in the
23 shower.  I believe as far as transport and possession, that
24 one also constitutes the basic premise as well.  And the
25 remaining generally for possession, but I'm not entirely sure

1  about that. I believe that's generally accurate. Perhaps the
2  HP Pavilion also transport, I don't know.
3          But what I will say is that certainly there are
4  images that the Court has seen, the jury has seen that has
5  been acknowledged even here that are just, you know, waist up
6  or do not show genitalia whatsoever that I think -- I would
7  argue as a matter of law are not pornography. I think that
8  other images fall in that same camp. As the analyst testified
9  to, he marked -- he marked in his analysis one himself, but
10  not the rest. And then it was shipped off to the agents to
11  give their take on what would be presented. We haven't heard
12  from them. We heard from the first one, Marisa Brown, prior
13  to the evidence being in court.
14          THE COURT: Well, we really don't need a witness's
15  opinion as to whether something is child pornography. That's
16  a question for the jury.
17          MR. AMES: Understood, Your Honor. I'm just saying
18  if -- I guess sort of what I'm getting at in part is I
19  understand that these are fact finding questions for the jury
20  with respect to the shower video and some of the other images.
21  I do understand. There are other images that very clearly are
22  not.
23          So one thing I do, in addition to the motion to
24  dismiss, if there's any -- when the time comes for instructing
25  the jury, avoiding any potential confusion with respect to

1   what image constitutes what just because there's a -- this

2   morphed image sort of production -- producing making an image

3   sounds similar to the producing statute, which it's not.  It's

4   a different -- the only production charge is with Ms. M.C. in

5   the shower.  That's the only one.  The rest of them are

6   something else.  And I just want to make sure that it can be

7   clarified, whether it has to be done in argument or the Court,

8   that that's -- that count in particular, that's the production

9   charge.  The other ones are not.  Because I don't want a

10  situation where the jury is reviewing morphed images and

11  mistakenly come to the conclusion that those are production

12  images.

13          THE COURT:  That might have been something that you

14  would have proposed in the jointly submitted jury

15  instructions.

16          MR. AMES:  Your Honor, we did speak about it prior

17  to trial and the -- we came to a meeting of the minds that it

18  generally lays it out, but I suppose what I'm -- I suppose

19  what I'm currently wondering is that are there any

20  restrictions on it in terms of -- because I understand -- I'm

21  not going to argue about length of sentence or anything like

22  that, but how to address that with the jury so as to not run

23  afoul of anything there, but needing to make it abundantly

24  clear that there's only one image -- or one video, rather,

25  that is considered production.

1          THE COURT:  That's correct, right, Mr. Cervantes,
2    that the one, the bathroom number one is the --
3          MR. CERVANTES:  Is the production charge.
4          THE COURT:  -- only evidence supporting count one,
5    production, correct?
6          MR. CERVANTES:  Count two.
7          THE COURT:  Count two, I'm sorry.
8          And I'm wide open to yet more changes to the
9    previously agreed to jury instructions.  We're going to need
10   to get it in writing because I send those back with the jury.
11   I don't mind telling them that the allegation with respect to
12   count two is the bathroom number one production and no other.
13   I'm willing to say that.  We'll just have to get that in
14   writing to Mr. Whelan somehow.
15         But with respect to the rest of your motions, I
16   think the chain of custody is sufficient from which the jury
17   could find that the items are reliable and relevant.  And, you
18   know, to a certain extent I'm not sure you and I understand
19   the evidence the same way.  These devices could have been
20   found on the sidewalk for all that matters.  The evidence
21   tying it to the defendant is the forensic evidence.  And so
22   there's been much ado over something that I think doesn't
23   matter particularly much, which is how the FBI came into
24   possession of it and its custody afterwards.
25         So all that to say that there is sufficient evidence

1  from which a reasonable jury could find beyond a reasonable
2  doubt the defendant's guilt as to each of the three counts.

3          Now, will there be defense evidence, Mr. Ames?

4          MR. AMES:  Your Honor, that's some -- we're having
5  that conversation because we weren't anticipating that.
6  However, the way the testimony has played out and the evidence
7  has played out, without the lead analyst -- lead detective or
8  investigator in the case testifying, nor another agent
9  testifying prior to the evidence coming in, cross examination
10 of Mr. Whitt who did not investigate the devices, anything
11 deeper than looking for images themselves that were flagged or
12 requested in a report of him, we're in a position where the
13 government's evidence has certainly at a minimum implied
14 certain things.

15          The reason, Your Honor, why I spent so much time
16 hemming and hawing over the idea of what constitutes access is
17 because prior to me doing so, the jury may very well have come
18 to the conclusion that access means literal access.  That he
19 accessed these on these dates and times.  And it's -- he's
20 looking at certain videos like this one of Ms. M.C. who has an
21 access date of September 10, 2021, 12 days before the FBI
22 meets with him.  When in reality there is no idea whatsoever
23 when or if this thing was ever accessed on a MacBook for sure.
24 Unclear as well on any other device.  So those issues are why
25 I was asking those questions.  And there's further --

1          THE COURT:  My question was, is there going to be
2   defense evidence?
3          MR. AMES:  Yes, there is, Your Honor.  I believe we
4   have to.  And I think we would call Agent Atwood.
5          THE COURT:  To what effect?
6          MR. AMES:  Under Rule 611(c) to ask questions about
7   the custody and chain of custody of devices.  To ask about
8   what, if any, investigation he did in his review of the
9   evidence.  We're talking here about a trial in which there was
10  one person put on the stand to talk about the review of the
11  evidence and the only review of the evidence that was
12  instructed to apparently and flagged by agents who didn't talk
13  about it.
14         THE COURT:  That happens all the time.  I don't
15  understand what the grave concern is here.
16         MR. AMES:  Because, Your Honor, these --
17         THE COURT:  Because it is common, it is ordinary, it
18  is the norm that not every case agent testifies in every trial
19  to everything they know.
20         MR. AMES:  And, Your Honor, I can -- in that case --
21  the alternative -- our -- who's been a consulting expert but
22  now may have to graduate because the devices that were seized
23  here have copious adult pornography on them that was glossed
24  over.  And I asked those questions, but there was no -- there
25  were no answers to them because the people that actually

1    reviewed it -- so the context here is important.

2            THE COURT:  So you want to put one of the case

3    agents up on the stand to ask them whether there was adult

4    pornography on some of these devices?

5            MR. AMES:  In addition -- there's other -- there's

6    other aspects, Your Honor.  But in general, the problem I'm

7    facing here is that a lot of the people that were very

8    integral into this process are not here to answer and clear up

9    very simple issues.

10           For example, you found and the government is

11   alleging a total of -- the morphed stuff aside, there's four

12   videos total of which no one is identified in any of them but

13   the Ms. M.C. video.  Most of the other -- I mean, very little

14   identification of anybody.  No identification of any known

15   victim --

16           THE COURT:  There were three videos --

17           MR. AMES:  -- other than --

18           THE COURT:  There were three videos and at least one

19   witness identified the person in each of those videos.

20           MR. AMES:  Your Honor, I'm talking about the ones

21   that are pornography, not 404.  I'm talking about -- videos

22   that would be alleging pornographic material are going to be

23   Ms. Connell's video and I presume -- I don't know for sure.

24   Maybe they're not arguing that.  But there are two or three

25   other videos that involved more sexualized activity whose

1  identity -- there's no identity of those people.

2            THE COURT:  So you're saying that there's some sort

3  of deficiency.  Are you talking about, like, the two young

4  girls that were in the bed together that no one has identified

5  who they are?

6            MR. AMES:  No, nobody has identified who --

7            THE COURT:  Who cares?

8            MR. AMES:  Because, Your Honor, there's a process by

9  which they check these.  And these videos in particular, Your

10  Honor, were found on an older device.  It's a device from

11  years ago.

12            THE COURT:  No, wait, wait, wait.  The jury can look

13  at that video and decide from what they see whether that fits

14  the definition of child pornography.

15            MR. AMES:  Sure.

16            THE COURT:  It doesn't matter whether that video can

17  be found in any database as a known example of child

18  pornography.  It doesn't make any difference.

19            MR. AMES:  With respect, I would submit it does,

20  Your Honor, because if it is found and flagged in a -- if it's

21  flagged I'm assuming it's inculpatory.  If it's not, I'm

22  arguing that's exculpatory.

23            THE COURT:  How so?  That somebody hasn't already

24  seen that picture and deemed it to be child pornography and

25  therefore the jury cannot deem it to be child pornography or

1  shouldn't consider child pornography because someone else

2  already hasn't?

3          MR. AMES:  Your Honor, part of the reason is I --

4  we're talking about a case here where 20-plus devices were

5  seized and searched.  A number of images.  Pawed through.

6  Sent to NCMEC; came back with zero.

7          THE COURT:  It doesn't make any difference.  It

8  doesn't make any difference whether we are seeing a child porn

9  video for the first time or not.  The question for the jury

10  is, is it child porn and is it attributable to this defendant?

11  Oversimplification, of course.  It doesn't matter whether any

12  other trial anywhere has ever seen that video.  It doesn't

13  make any difference.  It's not exculpatory if it hasn't shown

14  up somewhere else.

15          One way to have elicited it would have taken less

16  than 30 minutes.  From the agent you had up here is to ask:

17  Are there databases to which the FBI has access of known hash

18  tag child porn?  Yes.  Did you run the seized videos through

19  that database?  Yes.  Did it hit on any of those?  No.

20          That's about 60 seconds, not 30 minutes, and you

21  could have elicited the testimony that you now say is just so

22  desperately relevant and I'm telling you it's not relevant.

23          MR. AMES:  Your Honor, I did -- I asked specifically

24  about whether or not it was sent to any -- I asked

25  specifically the database that the government used in this

1 case and I was not allowed to ask about it.

2 　　　　THE COURT:  All right.  Mr. Ames, we're talking past

3 each other.  I'm telling you it is not relevant.  The Court

4 finds it is not relevant and there is no admissible evidence

5 with respect to whether or not the videos in question here are

6 in known -- in databases of known child pornography.  It makes

7 no difference.  It either is or is not child pornography, as

8 the jury will tell us.

9 　　　　MR. AMES:  Understood, Your Honor.  And in a future

10 case, if there is government evidence of not just NCMEC -- I

11 imagine I will be certainly filing matters to make sure that

12 that's not disclosed.  But there certainly is, in addition,

13 Your Honor, forensic information that is being -- that is --

14 you know, he has the right to confront accusers.  He has the

15 right to give the jury a fuller picture and full story.  I've

16 already instructed and told --

17 　　　　THE COURT:  I keep asking you what that story is

18 you're trying to tell.

19 　　　　MR. AMES:  Your Honor, because the government's

20 evidence as presented was that there are images and videos

21 that were accessed by him and playlists and PLISTS and things

22 accessed by him -- and we're talking largely about 404

23 evidence, not even substantive evidence.  We're talking about

24 the extraneous stuff.  They supposedly investigated -- or

25 supposedly accessed and viewed and seen by him and on things

1  and so on, and there's zero mention of the fact that there's
2  literally another person in the house that literally uses that
3  device as well and literally was spying on him and gathering
4  information, and she was giving that information directly to
5  Agent Atwood on multiple occasions --

6          THE COURT:  You can't get that in through Agent
7  Atwood.

8          MR. AMES:  I understand, Your Honor, but that's --

9          THE COURT:  Do you want to call his ex-wife as a
10  witness?  Is that what you're saying?

11          MR. AMES:  That's not what I want to do, Your Honor.
12  I want it to be at least established here that the devices in
13  question, particularly the MacBook, was a thing that they
14  shared together and she accessed on a routine basis which --

15          THE COURT:  The agent doesn't know that except from
16  having been told that.

17          MR. AMES:  The agent knows it because there were
18  pictures that she took of the screen of the device on multiple
19  occasions and they know she accessed it on multiple occasions
20  and took copies of all of those things.

21          THE COURT:  How does he know that other than
22  hearsay?

23          MR. AMES:  He's seen the images himself of the
24  computer screen.

25          THE COURT:  And what does he know of those images?

1          MR. AMES:  Your Honor, then I'd like to renew my --

2          THE COURT:  He knows what the ex-wife told him

3    about --

4          MR. AMES:  Your Honor, then I'll -- in that light

5    I'll renew my motion to suppress from earlier, then, because

6    if he --

7          THE COURT:  That's denied too.

8          Let me address Mr. Tatum about whether or not you

9    wish to testify.  If you would stand up, please, sir.

10         Mr. Tatum, you have a constitutional right not to

11   testify.  The burden of proof is on the government to prove

12   the elements of the offense beyond a reasonable doubt and you

13   are presumed innocent.

14         Do you understand that you have a constitutional

15   right not to testify?

16         THE DEFENDANT:  Yes, Your Honor, I understand.

17         THE COURT:  You also have a right to testify if you

18   would like to.  Do you understand that?

19         THE DEFENDANT:  Yes, I also understand that, Your

20   Honor.

21         THE COURT:  And if you choose to testify, you'll be

22   subject to cross examination by the assistant United States

23   attorney.  Do you understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And do you understand that it is your

1  decision and your decision alone whether or not to testify?

2          THE DEFENDANT:  Yes, I understand.

3          THE COURT:  And I don't want to know what you and

4  your attorney said to each other on the subject, but have you

5  discussed with your attorney whether or not you will testify?

6          THE DEFENDANT:  We have discussed it.  We have not

7  come to a decision.

8          THE COURT:  All right.  And the -- are you satisfied

9  with your attorney's advice with respect to this, whatever it

10  is?  I don't want to know what it is, but are you satisfied

11  with his advice?

12          THE DEFENDANT:  Under current circumstances, yes.

13          THE COURT:  Is there anything that you don't

14  understand about your right to testify or not testify?

15          THE DEFENDANT:  No, Your Honor, I understand my

16  rights.

17          THE COURT:  And you said you haven't made a

18  decision, but it's decision time.  It's now time for defense

19  evidence if there's going to be any, so the Court needs a

20  decision as to whether or not you're going to testify.

21          THE DEFENDANT:  Yes, I'd like to discuss this

22  further with my attorney.

23          THE COURT:  All right.  Is one of the attorney rooms

24  available?  I don't want to drag this out.  I know you need

25  some time, but we've got a jury sitting out there wondering

1  what we're going to do.

2            MR. AMES:  I understand.  Your Honor, we spoke about

3  it last evening as well and --

4            THE COURT:  Well, retire to your conference room for

5  further discussion.

6            (Counsel and defendant exited the courtroom.)

7            (Pause.)

8            THE COURT:  Officer, would you ask Mr. Ames to come

9  give me an update.

10            (Counsel and defendant entered the courtroom.)

11            THE COURT:  Mr. Tatum, have you made a decision

12  whether or not to testify?

13            THE DEFENDANT:  I'd like the Court to consider

14  something else before I answer.

15            THE COURT:  What would that be?

16            MR. AMES:  Your Honor, the defense has been

17  consulting with a forensic team, as the Court knows.  We did

18  not anticipate calling him for trial.  Did not ever think that

19  that would be something we were needing.  They were consulting

20  with us throughout the process.  We spoke over the lunch break

21  briefly with one of the analysts and I gave him an update on

22  some things.  Texted with him.

23            And in light of some of the things that I think the

24  Court needs to -- that the jury needs to hear about with

25  regard to some of the forensic evidence that's not been able

1   to be established here, we would like to see if our expert
2   witness can come testify about those things in the case in
3   chief.  He is unfortunately farther away but could be here
4   tomorrow morning.  That's the issue that we're facing.  I can
5   elaborate further if the Court wishes.
6           THE COURT:  What reciprocal discovery have you
7   provided to the government with respect to this witness?
8           MR. AMES:  Your Honor, there hasn't been any
9   reciprocal discovery in terms of any reports or notes or
10  anything of that nature.  They have been on a consulting
11  fashion.  I can tell the Court that the only evidence that the
12  analyst has looked at are copies of data provided by the
13  government.  That's the extent of it.  It's literally the raw
14  data, the same stuff that Mr. Whitt looked through with Magnet
15  AXIOM.  And it would largely be testimony about some of the
16  dates, time frames, accesses, and so on and so forth, on the
17  device that we were not -- that some of those issues have not
18  largely been clarified and established.  And that is the
19  primary driving point for me.
20          And my position is that there are some important
21  timelines that need to be addressed that have not been that
22  give an impression of the evidence that I don't think is fair
23  to Mr. Tatum.  So it's largely in that vein.  I don't know if
24  that counts as a rebuttal of sorts.  I don't know, Your Honor,
25  but there --

1          THE COURT:  Mr. Cervantes, what do you say?

2          MR. CERVANTES:  We would object to that, Your Honor.

3    The jury is here.  We've been moving forward as scheduled on

4    this trial.  We have received zero information from them.  The

5    fact that they went with their expert, we don't sit there with

6    their expert to look at what they're looking at.  That's why

7    there's a request for reciprocal discovery, which we made and

8    we filed.  And we told defense counsel numerous times in

9    emails that -- we reminded him, hey, we haven't received

10   anything from you.  Do you have any discovery for us?  Do you

11   have any expert reports for us?  And the answer was either no

12   answer or no.

13         THE COURT:  And did the government provide an expert

14   report from its expert forensic witness?

15         MR. CERVANTES:  Yes, Your Honor.  Detailed.

16         MR. AMES:  Your Honor --

17         MR. CERVANTES:  And filed expert notices as required

18   by the rules.

19         MR. AMES:  Your Honor, I spoke with the U.S.

20   Attorney's Office -- and, again, he's right -- on multiple

21   occasions both in person and by email.  We had those

22   discussions.  I informed them throughout the pendency of this,

23   and I guess it's been since -- I guess since January or so,

24   that the intention here was -- the problem in this case,

25   there's a significant amount of devices and a significant

1  amount of data and a lot of it -- again, part of the reason
2  why I'm objecting to the foundation and hearsay, Your Honor,
3  is there are significant and important elements of these
4  crimes that are related to times and dates.  And the evidence
5  that the jury is considering is produced by a computer sitting
6  on a screenshot that was taken at some point in the past by, I
7  guess, Mr. Whitt and that is being claimed as a basis to
8  establish when and where things were made from -- created,
9  accessed, viewed, and so on.  And there's evidence to the
10  contrary that is sitting on the devices that Agent -- I
11  understand he didn't look through it, that's okay, but it's
12  out there now.
13          THE COURT:  You clearly anticipated that that's
14  evidence you wanted to put before the jury.
15          MR. AMES:  It is -- no, Your Honor, it is not.  I
16  did not anticipate, Your Honor -- first of all, the
17  government's estimate was a 3-day trial.  That's it.  So
18  that's -- the expectation here was not that we would be at
19  this juncture today.
20          Number two, it's not something I anticipated.  I did
21  not anticipate that we're going to call the lead agent in the
22  case nor the other agent in the case and have them say nothing
23  about any of the evidence itself.  Zero testimony about it.
24  The entirety of it is with Mr. Whitt which -- his contribution
25  is great.  But it also includes him reviewing evidence that

1    was flagged by them, vice versa.  There's a lot that wasn't

2    discussed and there's a lot that I would say needs to be

3    clarified and we can't clarify.  How am I supposed to clarify

4    that multiple people use this computer because that's what

5    the --

6              THE COURT:  You know exactly who the witnesses are

7    who could have provided that information.  Specifically, even

8    if your client doesn't want to testify, his ex-wife.  You

9    could have subpoenaed her.  She could prove exactly what

10   you're trying to prove.  You've chosen not to do that.

11             I'm not sure how your technical expert is going to

12   be able to say anything more than I see these other user names

13   on these things.  He doesn't know as a fact who else had

14   access to those computers, right?

15             MR. AMES:  I'm not going to say yes or no to that,

16   Your Honor.  I don't want to -- I don't know for sure whether

17   it's a fact.

18             THE COURT:  All right.  We're going to do this.

19   First of all, with respect to Agent Atwood, I'm not telling

20   you you can't call Agent Atwood.  I am saying you're not going

21   to be allowed to have him answer hearsay questions.

22             MR. AMES:  I understand.

23             THE COURT:  And I didn't hear a forecast of much by

24   way of hope for examination that wasn't hearsay.  But if you

25   want to call him and ask him questions, I'm not going to stop

1  you from doing that.  But he's not going to answer any hearsay

2  question.

3          MR. AMES:  Your Honor, the main thrust of this is

4  that the government has presented evidence to suggest, yeah,

5  this is a case that has a limited number of images and videos.

6  It's got a lot of 404 evidence.  It's got a lot of conjecture

7  about -- it's got file paths and strings about pthc.  And how

8  much pthc was found?  Goose egg.  Zero.  So it's to inflame

9  the jury.  It's to suggest certain things to them with zero

10 evidence, zero things to -- nothing to back it up.

11         THE COURT:  Save your closing argument for the

12 appropriate time.

13         MR. AMES:  And, Your Honor --

14         THE COURT:  All right.  I'm going to take a

15 20-minute recess and I'm going to think about this request.

16         MR. AMES:  Thank you, Your Honor.

17         THE COURT:  Ms. Kirk, if you would tell the jury

18 that we've been delayed and I expect to have them out here at

19 about 3:00.

20         By that time you will make a decision to call Agent

21 Atwood and I will have made a decision whether to allow this

22 undisclosed expert witness.

23         We'll be in recess until 3:00.

24         (Brief recess at 2:42 PM.)

25         (Court back in session at 2:58 PM.)

1          (Jury not present.)

2          THE COURT:  The Court in the exercise of its

3    discretion will not allow the defense to call an undisclosed

4    expert, particularly with the lack of reciprocal discovery.

5    It would be an ambush and unfair to the government.  I

6    certainly wouldn't allow the government to call an undisclosed

7    expert with no report provided.

8          It's been clear from at least the pretrial

9    conference that there are a great many things that you were

10   hoping to be able to put in front of the jury and you were

11   hoping to do that through government witnesses, but the

12   government witnesses that were called were unable to provide

13   the information that you wanted the jury to hear about.  The

14   government is under no obligation to call your preferred list

15   of witnesses so that you can get in what you hope to get in.

16   You could have easily, and I expect did, anticipate that there

17   could be a need to supply yourself the evidence that you

18   wanted the jury to hear.  You made a tactical decision not to

19   prepare for that defense and the Court will not allow this

20   late, undisclosed expert witness to provide that information.

21          Now, have you decided whether to call Agent Atwood?

22          (Counsel and defendant conferred.)

23          MR. AMES:  Yes, Your Honor, we'd like to call Agent

24   Atwood.

25          THE COURT:  All right.  And, Mr. Tatum, have you

1  decided whether or not to testify?

2           (Pause.)

3           THE DEFENDANT:  I'm leaning towards yes, Your Honor,

4  but I'd like to hear the testimony of the agent.

5           THE COURT:  All right.  Then we'll need an answer

6  immediately thereafter.

7           All right.  Call the jury.

8           MR. AMES:  I'm very sorry, Your Honor, very briefly.

9  I referenced a few minutes ago Rule 611(c), treating him, I

10 guess, as a hostile witness in the case in chief.  My

11 understanding is I'm allowed to ask somewhat leading questions

12 in that circumstance.  Hostile, but I'll be as nice --

13 cheerful as I always am.

14          THE COURT:  If by hostile you mean leading

15 questions, you may do that.

16          MR. AMES:  Yes, hostile in that sense, but I will

17 try not to be too bad about it.

18          THE COURT:  Just remember that it's the witness's

19 testimony that matters and you're not a witness.

20          MR. AMES:  Yes, Your Honor.

21          THE COURT:  All right.

22          (Jury entered the courtroom.)

23          THE COURT:  Members of the jury, I apologize for

24 that long delay.  Things went a lot longer than I anticipated

25 earlier.

SCOTT ATWOOD - DIRECT

1         Is there evidence for the defense?

2         MR. AMES:  Yes, Your Honor.  We'd like to call Agent

3    Scott Atwood.

4              SCOTT ATWOOD, DEFENSE WITNESS, SWORN,

5                    DIRECT EXAMINATION

6    BY MR. AMES:

7    Q.   Could you state your name for the jury.

8    A.   Hi.  My name is Scott Atwood.

9    Q.   And, Mr. Atwood, where do you work?

10   A.   I work with the FBI here in Charlotte as a special agent.

11   Q.   How long have you been doing that job?

12   A.   Almost 16 years.

13   Q.   Are you in any specific department or work on any

14   specific type of cases?

15   A.   I work on the Crimes Against Children Task Force here in

16   Charlotte.

17   Q.   Tell us a little bit about your background in that

18   regard.  A little bit.

19   A.   Not to bore the Court, but I've worked a number of

20   violations with the FBI and I've been working on a Crimes

21   Against Children Task Force for about the past two years here

22   in Charlotte.

23   Q.   And I'm sorry, do you recall approximately when you

24   started on that task force?

25   A.   I'm going to guess just about June of '21, 2021.

SCOTT ATWOOD - DIRECT

1  Q.   Were you on any other task force or team prior to that,
2  immediately prior?
3  A.   Yes, I was here in Charlotte.
4  Q.   Doing any particular type of cases immediately prior?
5  A.   I was on the Surveillance Operations Group.
6  Q.   What did you do there?
7  A.   Surveillance.
8  Q.   What kind of training or experience do you have in
9  surveillance in particular?
10  A.   They teach you at the FBI academy.  We do it throughout
11  the course of our duties routinely.  Attend surveillance
12  courses, driving courses back at the FBI academy.
13  Q.   So with respect to your -- what's your involvement with
14  this case?
15  A.   I was one of the case agents.
16  Q.   What does that mean?
17  A.   That means you handle most aspects of the investigation.
18  Handle it from start to finish.
19  Q.   And could you describe, I guess, what are some of those
20  duties?  What are some of the things you've done in this case?
21  A.   I started the case.  I got information from my supervisor
22  about the information that was referred to our office.  I
23  interviewed people.  I conducted review of digital evidence.
24  Made arrests.  Worked with the U.S. Attorney's Office.
25       Is that what you're talking about?

SCOTT ATWOOD - DIRECT

1  Q.   Yeah.  So you had a pretty significant role in the
2  prosecution of Mr. Tatum.
3  A.   Not the prosecution, but the investigation, yes, sir.
4  Q.   The investigation leading to the prosecution.  Gathering
5  the evidence and such.
6  A.   Yes, sir.
7  Q.   You said you initially got a report from your supervisor?
8  A.   Correct.
9  Q.   Who was the supervisor?
10 A.   Kevin Swanson.
11 Q.   Where does he work out of?
12 A.   Out of the Charlotte office.
13 Q.   And what was that report?
14      MR. ODULIO:  Objection.  Calls for hearsay.
15      THE COURT:  Sustained.
16 Q.   When you received the report, what did you do next?
17 A.   I read the information, the referral of information, and
18 it contained -- the referral was that someone else had
19 firsthand knowledge of Mr. Tatum --
20      MR. ODULIO:  Objection to this, Your Honor.
21      THE COURT:  No, that's fine.  Finish that sentence.
22      THE WITNESS:  The referral of information was that
23 Mr. Tatum -- the referral of the information was from a person
24 who had firsthand knowledge of Mr. Tatum possessing images of
25 young girls clothed and unclothed on his computer.

1  Q.    And what did you do after that when you received

2  information?

3  A.    The referral also indicated that Mr. Tatum was a doctor

4  at Atrium Health and that he worked with children.  And so

5  being that that's what we do on the Crimes Against Children

6  Task Force, our utmost important responsibility is protecting

7  children who are being victimized.  Being we knew or suspected

8  he had access to children on a routine basis, we sought to

9  prove or disprove the information that was referred to our

10  office.  So we sought out the person who reportedly had the

11  firsthand information and that was Kimberly Tatum, Mr. Tatum's

12  wife.

13  Q.    And at that point in time did you go and meet with

14  Ms. Tatum?

15  A.    We did.  The referral said that Ms. Tatum wanted to meet

16  with her attorney present.  So I contacted her attorney listed

17  in the referral and they agreed to set up a meeting between

18  myself, Agent Brown, and Ms. Tatum at her attorney's office.

19  Q.    Who else was present at that meeting, if you recall?

20  A.    Her attorney?

21  Q.    No.  Was there any other people from the government or

22  FBI involved?

23  A.    Not that I recall.  I think it was just Agent Brown and

24  myself.

25  Q.    During that meeting did you -- were you provided any

SCOTT ATWOOD - DIRECT

1  evidence or given anything?

2  A.   Yes.  Ms. Tatum provided us with a number of electronic

3  devices that she said Mr. Tatum used --

4          MR. ODULIO:  Objection, hearsay, Your Honor.

5          THE COURT:  Don't tell us what she said.

6          THE WITNESS:  Sorry.

7  Q.   I'm sorry.  Go ahead.

8  A.   Ms. Tatum provided us a number of electronic devices.

9  Q.   What were those devices?

10  A.   External hard drives, cell phones.  That's what I

11  remember.

12  Q.   How many devices were there?

13  A.   I don't recall exactly.

14  Q.   So you said hard drives -- I'm sorry.  You said hard

15  drives, cell phones.  Anything else?

16  A.   Not that I recall.

17  Q.   Were there any thumb drives?

18  A.   Yes, there were thumb drives.

19  Q.   How many thumb drives?

20  A.   One.

21  Q.   Did -- did you review any of these items at the lawyer's

22  office?

23  A.   No, not at the lawyer's office.

24  Q.   Did she bring any items that you did not seize or take

25  from her?

1   A.   Did I bring any items?

2   Q.   No, I'm sorry.  Did Ms. Tatum bring any other items with

3   her that she brought that you didn't take at that point in

4   time?

5   A.   In regards to the information, the referral of

6   information, no.

7   Q.   At that meeting I mean.

8        So she brought a number of devices.  Were there any that

9   you didn't take that she offered to you?

10  A.   No.

11  Q.   Okay.  Was this a -- what were the circumstances of the

12  seizure?  Was it based upon a search warrant?  Was it based

13  upon consent?  What was it?

14  A.   She gave it to us.

15  Q.   Okay.  So it was consensual?

16  A.   The giving of the devices?

17  Q.   Yes.

18  A.   Yes.

19  Q.   Those devices you mentioned, there was a hard drive?

20  A.   Yes.

21  Q.   And cell phones.

22       And what did you do with those devices?

23  A.   I took them back to the FBI, logged them in as evidence,

24  and obtained a search warrant from the federal courts to

25  examine those devices.

1  Q.   When did you obtain that warrant?

2  A.   I can't say specifically.

3  Q.   Was it that day or was it sometime later?

4  A.   I'm going to guess sometime later.  I cannot prepare a

5  federal warrant in a day.

6  Q.   Understood.

7       Was it roughly a week later, two weeks, something in that

8  ballpark?

9  A.   Honestly, I have no idea.  I'd have to review my case

10 log.

11 Q.   In the interim, did you look through any of the devices?

12 A.   Yes, I did.

13 Q.   And any other general investigation done in that time

14 frame to your recollection, I guess, beyond the meeting and

15 looking through a device?

16 A.   So one of the pieces of evidence that was given to us was

17 a thumb drive.  We took that back to the FBI office.  We

18 plugged it into a write blocking hardware that you guys have

19 been told about.  I'm not a techie so I don't understand all

20 that.  But we reviewed the thumb drive that was provided and

21 we observed on the thumb drive child pornography that was

22 consistent with the referral of information.

23 Q.   And so when you reviewed that, was it -- what were the

24 pictures depicting?  Was it the same things that have been put

25 into evidence or was it in some other format?

SCOTT ATWOOD - DIRECT

1  A.   Correct, it was the same thing that's put into evidence.
2  Q.   Were there any pictures of a computer screen within that
3  thumb drive?
4  A.   Yes, there were.
5  Q.   And you reviewed those images.  In your estimation or
6  opinion, were the images that you were seeing pictures of the
7  laptop that's in evidence?
8         MR. ODULIO:  Objection, opinion.
9         THE COURT:  Right, as to opinion.  Does it look
10 consistent to you?
11        THE WITNESS:  Yes, Your Honor, it looks consistent.
12 Q.   You said child pornography.  Are you referring to the
13 images that we've been discussing in court regarding the
14 morphing?  Is that what was on this drive?
15 A.   They appeared to have been altered, correct.
16 Q.   So morphed images and they're on a computer screen taken
17 as a picture with another device.
18 A.   That's what it appeared to be, yes.
19 Q.   And there's video of a computer screen as well.
20 A.   That's correct.
21 Q.   Do you recall approximately what point in time these
22 images, videos were initially created?
23 A.   I do remember there being -- in part -- in opening the
24 video, that there was a timestamp on the screen and so that's
25 what we tried to reference, obviously.

SCOTT ATWOOD - DIRECT

1  Q.   What was the general time frame?

2  A.   I have no idea.

3  Q.   Was it the day before that this was reported?

4  A.   I honestly -- there's been a lot of stuff and a long time

5  in this case.  I cannot recall.

6  Q.   Was it over a month after?

7           MR. ODULIO:  Objection.  Asked and answered.

8           THE COURT:  That's the last one.  You can answer

9  that.

10          THE WITNESS:  I honestly do not know.

11 Q.   You went and secured a warrant at that point, correct?

12          MR. ODULIO:  Objection, Your Honor.  He's asked

13 this.

14          THE COURT:  Overruled.

15          THE WITNESS:  No.

16 Q.   I'm sorry, I'm just trying to set the table for you.

17      You went and got a warrant sometime after that, right?

18 A.   No.  First we -- we sought to speak to Dr. Tatum being

19 the urgency of the issue and we obtained statements from him

20 also.

21 Q.   Understood.  You're right.  You went and approached him

22 in the parking lot of where he worked, I believe.

23 A.   Correct.  It's not our job to prove or disprove.  So

24 we're not in the business of ruining people's lives.  We

25 weren't going to go in there.  We knew him to be a

1 professional.  It's not how we conduct business normally.  So

2 we waited for him in an obscure area in an attempt to speak to

3 him.

4 Q.   And when he came outside after work, you had a

5 conversation with him.  It was in a -- I believe one of your

6 cars initially or something like that.

7 A.   So first we encountered Mr. Tatum outside the vehicle as

8 he was walking towards his vehicle.  Prior to that we had

9 already observed in plain view a bag that was consistent with

10 a laptop or a computer bag.  And so as he approached his

11 vehicle, we approached him and identified ourselves.  Asked if

12 he would voluntarily speak to us, which he agreed to do so.

13 And that exchange is where we initially obtained the laptop

14 bag from Mr. Tatum.

15 Q.   At what point in time did you receive the laptop bag from

16 him?  Was it, do you recall, beginning, middle, end of the

17 conversation?

18 A.   So it was in the initial encounter.  We -- Mr. Tatum

19 actually wanted to leave and go to a different area, which

20 being that we had already observed evidence of the crime -- in

21 our line of work, it's digital evidence so it can be easily

22 erased, obviously.  And so one of our other objectives is to

23 try and secure that evidence as best we can and then we seek

24 authority from the courts to examine those devices.

25        Being that we had reason to believe that the laptop was

SCOTT ATWOOD - DIRECT

1  in the vehicle, he wanted to leave, that was -- we didn't feel

2  that that could happen.  So we asked for a voluntary consent

3  search of his vehicle, which he did.  He walked us through

4  that, which we saw and observed a pillowcase with multiple

5  women's undergarments in there and other things.  And then

6  once we got to the passenger side of the vehicle, Mr. Tatum

7  opened up the door, reached in and grabbed the laptop bag and

8  secured it on his person, and then said we can search the rest

9  of the vehicle.

10     And so during that exchange we asked him what was in the

11 bag -- sorry, let me back up.  Prior to that we asked him if

12 he had a laptop, which he informed us was at his house and

13 that's another reason that he wanted to leave.  However, when

14 he consented to the search of his vehicle, he reached in and

15 grabbed the bag.  And when we asked him what was in the bag,

16 he said his laptop computer he remembered was in the bag.  And

17 so at that time I don't remember if it was Agent Brown or

18 myself informed him that that's the reason that we were there

19 and we wanted to talk to him, and that's when we took the bag

20 from him.

21     From there we asked if he would voluntarily agree to

22 speak to us, which he agreed to.  We went and sat in my

23 vehicle, Agent Brown in the front, which you've already heard,

24 Mr. Tatum and myself in the back seat, and we had a

25 discussion, which you've also heard the audio.

1    Q.    So the devices were seized and that was the laptop and
2    the thumb drive as well, correct, I believe?
3    A.    So during that conversation Mr. Tatum agreed to creating
4    images of child pornography and masturbating to them --
5    Q.    I'm sorry, Agent, the question was what you seized.  That
6    was all.
7    A.    I was trying to lead up to how we actually obtained -- we
8    didn't take everything in the bag.  We just took the computer
9    and the external devices that he said he stored child
10   pornography on that he didn't say were in the bag.
11   Q.    I understand.  I was just asking what were the things
12   that were seized.  What were they?  It was a laptop and a
13   thumb drive, right?
14   A.    That's the best of my recollection.  I can't -- I, again,
15   would have to review my notes.  That's my best recollection.
16   It was a flash drive.
17   Q.    And to be clear, he did not indicate he saved child
18   pornography.  He indicated he used the DeepFake website,
19   correct?
20   A.    At that point in time, he said he created images of his
21   high school girlfriend that he masturbated to and he saved
22   those images on external devices.
23   Q.    And you had seen those images already, correct?
24   A.    I had seen images that matched the description of the
25   questions that led us to the encounter with Mr. Tatum and the

1  questions that we were asking him about.

2  Q.    But specifically, you talked about the one that he said

3  about his ex-girlfriend, right?

4  A.    Correct.

5  Q.    And you had seen that one?

6  A.    At that point in time I didn't know who the images were

7  or what they depicted.  I believed them to be under the age of

8  18.  I believed them to be nude, appearing nude.  I believed

9  it to be child pornography.  And those were the images that I

10 was trying to ask Mr. Tatum about.  It's not something that we

11 come out and ask -- most people don't answer right off the

12 bat, yes, it's child pornography, so we have a discussion

13 about it.  That's why it took two or three hours.

14 Q.    And so you sat with him probably from what time?  I

15 understand you were waiting for him to get out of work.

16 Approximately what time did you initially engage with

17 Mr. Tatum?

18 A.    I have no idea.  It was after work.

19 Q.    So shortly after normal work hours.  It wasn't anything

20 crazy late at night or early afternoon, right?

21 A.    I'm a night person.  I don't really -- I can't answer

22 that honestly.

23 Q.    During that period of time, had you made any arrangements

24 with Kimberly Tatum to go and search the residence?

25 A.    During our initial encounter with Ms. Tatum...

1  Q.   What was that arrangement?

2  A.   No, that was not the answer, I apologize.  I didn't

3  complete that statement because it was hearsay and something

4  that Ms. Tatum told me.

5  Q.   It's not self objection.  I'm asking --

6          MR. ODULIO:  I'll do it, Your Honor.  Objection,

7  hearsay.

8          Thank you, Agent Atwood.

9          THE WITNESS:  Sorry.

10         MR. AMES:  That was convenient, I suppose.

11 Q.   So was there an arrangement or discussion -- did you tell

12 her anything or was there a discussion about going to the

13 house to get any items later that day or evening?

14         MR. ODULIO:  Same objection, Your Honor.

15         THE COURT:  Overruled.  You can answer that.

16         THE WITNESS:  Your Honor, respectfully I'm not -- I

17 don't know how to answer the question without --

18         THE COURT:  All right.  Let me ask the question,

19 then.  See if I can help.

20         During the course of this initial meeting and based

21 upon that meeting, did you and other agents make a plan to

22 visit the home and take possession of certain items?

23         THE WITNESS:  Being that our first priority was

24 speaking to Mr. Tatum, Agent Brown and myself decided that we

25 would go to his place of employment to attempt to speak to

1  him.
2          As I already explained about the preservation of
3  digital evidence, we believed there to be other devices at
4  Mr. Tatum's home that he had access to to store information
5  and so, yes, I -- we sent a team over there to attempt to
6  gain -- to attempt to gather those pieces of evidence.
7          THE COURT:  Thank you.
8  BY MR. AMES:
9  Q.  And the -- and the gathering of those pieces of evidence
10 was not done with a search warrant, correct?
11 A.  No, it was done by consent from Ms. Tatum.
12 Q.  And the time frame in which that consensual search of the
13 home occurred was when, to your knowledge?
14 A.  The time frame area, you're asking was it simultaneously
15 to us speaking to Mr. Tatum?
16 Q.  Yes.
17 A.  That is correct.
18 Q.  Did you call Kimberly Tatum or anybody else in the
19 household in advance to tell them what time to expect agents
20 to arrive?
21         MR. ODULIO:  Objection, Your Honor.
22         THE COURT:  Overruled.  Did you do that?
23         THE WITNESS:  I'm not sure.  I'm not sure.
24 Q.  Did you call another agent to -- did you call another
25 agent to inform him about what time to arrive?

1  A.   Again, two years ago.  This is a lengthy investigation.

2  We carry 15 investigations routinely.  The best of my

3  recollection would have been probably -- in these sorts of

4  cases, the offenders are sometimes violent.  I would not have

5  sent my own colleagues in blindly.  If there was a consent

6  search set up, it would have been speak to this person at this

7  address.  It's possible that that could have occurred.

8       I did not know -- we did not know if Mr. Tatum -- where

9  he would go after we spoke to him.  We were not interested in

10 arresting him.  That's why the consent conversation with him

11 was voluntary.  We suspected that he was going to go back to

12 his house and have access to all of those devices.

13      So that was the plan was to obtain those devices that we

14 thought were in question.

15 Q.   And you in that -- so you seized them, you said before,

16 from Mr. Tatum from the vehicle, correct?  That was not -- the

17 search of the inside of the car, I guess, was maybe

18 consensual.  But the seizure of the backpack devices was not,

19 right?

20 A.   So the way we actually obtained the laptop, which is what

21 I was trying to get to, was when we informed Mr. Tatum -- or

22 when Mr. Tatum decided he was free to leave and he wanted to

23 leave the interview with Agent Brown and myself, he wanted his

24 car keys and identification and reached for the laptop bag at

25 that point in time.  Being that we had already established

1  that the laptop was in there and contained images of child
2  pornography, we had to do an inventory of that bag being that
3  there was potential evidence in there.
4      And so at that time we did an inventory search of the
5  bag.  We took items that we thought were pertinent to our
6  investigation.  We informed him of that.  We gave him a
7  receipt for it.  This is what we're taking.  We didn't examine
8  those devices then.  We just took physical possession of the
9  items that Agent Brown presented to you.  And then that's when
10 we obtained the search warrant to examine them.
11 Q.  All right.  But in other words, he didn't voluntarily
12 hand those things over, correct?
13 A.  No.  We had already established they contained child
14 pornography.
15 Q.  Understood.  But the question I asked was he didn't
16 voluntarily hand you those two devices, did he?
17 A.  No, sir, he did not.
18 Q.  Those were seized from him, correct?
19 A.  That is correct.
20 Q.  Without his consent.
21 A.  Sure.
22 Q.  And simultaneously while that's happening, meanwhile at
23 his home there are agents meeting with Kimberly Tatum to seize
24 more items with her consent, correct?
25 A.  That is correct.  I think the jury has already heard that

1  they only searched items that were used jointly between

2  Kimberly and Mr. Tatum.

3  Q.    I want to just pose a hypothetical to you if I can.

4      Had David Tatum been at his home that night when the

5  officers arrived, would he have consented to the seizure of

6  these items?

7          MR. ODULIO:  Judge --

8          THE COURT:  Sustained.

9  Q.    Okay.  Bad question, then.

10     What time do you -- I mean, you met with him for a period

11 of time.  Do you know how long the other agents were at the

12 home that were seizing the items with the wife's consent?

13 A.    I have no idea.

14 Q.    Do you know what items they seized?

15 A.    I don't honestly.  I can't remember.

16 Q.    You stated that the only things coming into evidence were

17 things that the family -- or Mr. Tatum and Kimberly jointly

18 used; is that correct?

19 A.    Yes.

20 Q.    And those devices are the things that were sitting up

21 there earlier.  The MacBook that was jointly used.

22 A.    To my best recollection --

23          MR. ODULIO:  Objection, hearsay, Your Honor.

24          THE COURT:  No, go ahead and answer that.

25          THE WITNESS:  I believe the MacBook to be jointly

1  used.

2  Q.   And as well as, I guess, there was -- well, cell phone

3  probably not, but the -- what else was there?

4       Oh, the hard drive.  Where did that one come from?

5  A.   I believe there were two hard drives potentially that

6  Ms. Tatum gave to us.  One that she took from the laptop bag

7  in question when we encountered Mr. Tatum, either the -- I

8  can't remember.

9  Q.   So she took that out of the bag.  He didn't have that

10  with him on his person, correct?

11  A.   No, because she said --

12            MR. ODULIO:  Objection, Your Honor.

13            THE COURT:  Sustained.

14  Q.   Okay.  She had it with her at that initial meeting?

15  A.   She did.

16  Q.   And that device was given to you at that initial meeting

17  along with the thumb drive and such, correct?

18  A.   Yes, it was.

19  Q.   And this -- you said there were two.  Was one of those

20  devices the one that's in evidence right now?

21  A.   Yes, it is.  It's the Western Digital My Passport.

22  Q.   And was that device password protected?

23  A.   To the best of my recollection, it was.

24  Q.   And did Kimberly Tatum provide you with any password or

25  access to that device?

SCOTT ATWOOD - DIRECT

1  A.   She said --

2       THE COURT:  Sustained.

3  Q.   The question wasn't what she said.  The question was did

4  she provide you, give you a way to get into it?

5  A.   No.  She...

6  Q.   Did she know how to get into it?

7       MR. ODULIO:  Objection, Your Honor.

8       THE COURT:  His answer was complete.  He said no.

9  Q.   Was there any way to get into it even with her

10 assistance?

11      MR. ODULIO:  Objection, Your Honor.

12      THE WITNESS:  I don't know how to answer that.

13      THE COURT:  Sustained.

14 Q.   Did you have -- did you have to send the device to

15 Quantico, Virginia, in order to get into the device?

16 A.   Yes, we did.

17 Q.   So it required that -- it was taken out of Mr. Tatum's

18 bag supposedly and provided to you by the wife as a jointly

19 used item?

20 A.   I didn't say that the Western Digital was jointly used.

21 Q.   Is it your opinion that it wasn't?

22 A.   I don't have an opinion on that.

23      The MacBook was jointly used.

24 Q.   Okay.  You sat in this meeting.  Obviously, you were

25 gathering information and evidence.  Did Mr. Tatum, to your

SCOTT ATWOOD - DIRECT

1  recollection, talk at all about any devices?

2          MR. ODULIO:  Objection, Your Honor.

3          THE COURT:  Sustained.

4  Q.   Or did you question him about any other devices?

5  A.   I remember we had a discussion about where Mr. Tatum

6  liked to store the images that we were asking him about, the

7  child pornography images, and he said that he stored them on

8  thumb drives that he kept in his desk at the home.

9  Q.   Is that what he stated or did -- when you asked about the

10  location of a thumb drive, he said he thought it was in his

11  office or a desk at home, something to that effect?

12  A.   Yes, that's correct.

13  Q.   Okay.  During the time period where you were interviewing

14  him, you said that's a couple of hours, roughly.

15  A.   I believe so.

16  Q.   And was he trying to -- was he doing anything other than

17  speaking with you?

18  A.   Are you referring to was he making telephone calls?

19  Q.   Was he making telephone calls?

20  A.   He made a number of telephone calls.

21          MR. ODULIO:  Objection, Your Honor.

22          THE COURT:  Overruled.

23  Q.   How many telephone calls approximately?

24  A.   I couldn't even tell you.

25  Q.   Were you able to learn who he was calling or trying to

1  call?

2  A.   Yes.

3  Q.   Who was he trying to call?

4  A.   He was trying to call his father-in-law, Kimberly Tatum's

5  father.

6  Q.   Do you know who Kimberly Tatum's father-in-law is?

7  A.   His name is -- I'm drawing a blank right now.  Is it

8  Mr. Martin?

9  Q.   Do you know whether or not Mr. Martin was at the home at

10 that moment in time when these calls were being made?

11 A.   I'm not -- I can't say for sure.  I think -- I think he

12 was.  I don't know if he was there during or after.

13 Q.   Have you spoken with Mr. Martin as part of this

14 investigation?

15 A.   Yes, we have.  We spoke to him one time when we spoke to

16 Ms. Tatum at her home at -- or during the investigation.  Mr.

17 and Mrs. Martin were there and we spoke to them.

18 Q.   And so it was clearly -- to your recollection, did David

19 ever get through to anybody he was trying to call?

20 A.   No.  To the best of my recollection, he -- the calls went

21 unanswered.

22 Q.   Are you aware of or did you -- were you aware of anybody

23 having a conversation with Mr. Martin or any -- Mr. Martin

24 prior to this consensual search of the residence?

25           MR. ODULIO:  Objection, hearsay.

SCOTT ATWOOD - DIRECT

1          THE COURT:  Just as to whether you know of any such
2     conversations, not what they were.
3          THE WITNESS:  At this point in the investigation,
4     not well into the investigation, did we -- Agent Brown --
5     well, I'm not going to speak for Agent Brown, but well into
6     the investigation did I even know who Mr. Martin was.  I did
7     not know him.
8     Q.   I guess more or less what I'm driving at here is that
9     you're doing -- you're over here speaking with Mr. Tatum.
10    There's other people and other agents and other things going
11    on at the residence.  And I'm just asking if you're aware did
12    anybody have any conversations with Ms. Tatum, her father,
13    anyone else in the residence about what to do if Mr. Tatum
14    calls someone over there?
15         THE COURT:  Sustained.  The only way he would know
16    the answer to that is by hearsay.
17    Q.   Did you ever give instructions to Ms. Tatum or her family
18    not to answer his phone calls if he tried to call over there?
19         MR. ODULIO:  Objection.  Same objection, Judge.
20         THE COURT:  No, you can tell us what instructions,
21    if any, you gave anyone else.
22         THE WITNESS:  I did not give any instructions to not
23    answer the phone call.  I'm not sure where that's coming from.
24    Q.   Did you call anyone in advance of the consent search at
25    the residence or otherwise?

1    A.    I do not recall.  That's not normally how I would conduct

2    business.  I would have informed my colleagues about who and

3    what to do once they got there.

4    Q.    Is there a particular -- I think you elaborated perhaps,

5    but was the particular reason that you did these

6    simultaneously because you wanted to gather the evidence

7    while -- from the home while Mr. Tatum was not there?

8    A.    So prior to attempting to speak to Mr. Tatum and

9    conducting the search at the home, we had obtained referral

10   information there was child pornography potentially on

11   Mr. Tatum's devices.  We had observed information that backed

12   up the referral of information.  And so our job at that time

13   is to attempt to validate and preserve the evidence.

14        So, yes, there was a simultaneous agreement to attempt to

15   seize any potential evidence that's at the home.  Obviously, I

16   think that's understandable, in conducting investigations over

17   16 years, that if the person who resides in the home is

18   conducting crimes linked to digital evidence, that it's going

19   to be secreted.  Thumb drives are stashed wherever and we've

20   missed some throughout the years.  So that was part of the

21   plan is to conduct a simultaneous search in addition to the

22   interview.

23   Q.    And was Mr. Tatum made aware that while he was in your

24   custody in the parking lot, that his home was being searched

25   by other agents?

1  A.   I'm not sure about -- I'm not sure of that.  I'm not sure

2  that I -- he was aware of that.

3  Q.   Did you ever tell him or give him any information that

4  we're simultaneously right now going and looking through your

5  home and seizing other devices and electronics?

6          MR. ODULIO:  Objection to the relevance of this.

7          THE COURT:  Sustained.

8  Q.   Did you ever give him an opportunity to object to the

9  seizure of any items in his home?

10         MR. ODULIO:  Objection, Judge.

11         THE COURT:  Sustained.

12         Mr. Ames, to the extent your questions are addressed

13 to legal issues and the legality of the seizures, those are

14 issues for the Court that have already been decided by the

15 Court --

16         MR. AMES:  Understood, Your Honor.

17         THE COURT:  -- and need not be further explored for

18 those purposes.

19 BY MR. AMES:

20 Q.   After you -- after you disembarked with Mr. Tatum, after

21 that you went and obtained a search warrant, correct?

22 A.   Correct, after we obtained all the devices and had a

23 chance to breathe.  It was a lengthy 24 hours.

24 Q.   And so what was the basis for that -- was the basis for

25 the search warrant anything in addition to the investigation

SCOTT ATWOOD - DIRECT

1   or is it the thumb drive that you had looked at on the 22nd?

2           MR. ODULIO:  Objection, relevance.  Calls for a

3   legal conclusion.

4           THE COURT:  Sustained.

5   Q.   Did you do an investigation into whether or not Dr. Tatum

6   ever harmed any patient or abused any patient?

7           MR. ODULIO:  Objection, relevance.

8           THE COURT:  Sustained.

9   Q.   Did you do any investigation into his job at Atrium

10  Health?

11          MR. ODULIO:  Objection, relevance.

12  Q.   You already testified --

13          THE COURT:  You can answer that.  Did you do any

14  such investigation?

15          THE WITNESS:  We verified that he was employed as a

16  psychiatrist at Atrium Health.

17  Q.   Did you do any investigation as to whether or not there

18  had been any improper behavior or inappropriate --

19          MR. ODULIO:  Objection, Your Honor.

20          THE COURT:  Sustained.

21          MR. AMES:  I understand, Your Honor, but his initial

22  testimony is the whole --

23          THE COURT:  Sustained.  Don't -- don't need an

24  explanation.

25          MR. AMES:  I understand.

1        THE COURT:  The reason for your asking the question
2   was disallowed.  Just ask another question.
3   Q.   Where did you go from there in your investigation?
4   A.   Once we obtained the search warrant, we sought to examine
5   the devices to see if they contained any child pornography.
6   Q.   Did you -- when did you search the -- when did you start
7   looking through those devices, approximately what time frame?
8   A.   I can't say specifically.  Probably a week or two later.
9   Q.   And one of the devices -- you said that one was sent to
10  Quantico for -- to try to get into that device, correct?
11  A.   Correct.
12  Q.   And that's a device that -- withdrawn, Your Honor.
13       Have you had subsequent contact with Ms. Tatum or anybody
14  else in her family as part of the investigation?
15  A.   As -- throughout the investigation we -- Ms. Tatum
16  provided information periodically.  But we did our best to
17  limit our exposure to Ms. Tatum, so much so that as we met
18  with her in preparation --
19       MR. ODULIO:  Objection, Your Honor.  Relevance as to
20  this answer.
21       THE COURT:  Sustained.
22  Q.   I understand.  But she provided a lot of information to
23  you, correct?
24       MR. ODULIO:  Objection.  Same objection, Your Honor.
25  This is hearsay as well.

SCOTT ATWOOD - DIRECT

1        THE COURT:  Sustained.

2   Q.   When you're reviewing -- I imagine you were here for

3   Mr. Whitt and his testimony about the process of reviewing

4   these devices; is that correct?  You were present for that

5   part?

6   A.   Did I hear the testimony?

7   Q.   Yes.

8   A.   Yes.

9   Q.   And part of that, as he testified, there are

10  circumstances -- sometimes he's looking through devices and

11  flagging things, sometimes vice versa.  Do you recall flagging

12  any items in an HP Pavilion desktop?

13  A.   I do, yes.

14  Q.   And do you recall doing so in any -- in any of the other

15  devices, just flagging anything and reviewing it?

16  A.   There were a number of devices seized in this case.  I

17  reviewed most of them and flagged multiple items.

18  Q.   How many total devices have been seized at this point,

19  approximately?

20  A.   I think there's probably 20ish.

21  Q.   And the forensic searches that have been conducted, does

22  that include -- I mean, includes broad, broad strokes,

23  correct?  There's a lot of images that are gone through both

24  by the analyst and by the agents, correct?

25  A.   Yes.

1    Q.    And was -- is it fair to say there's a significant amount
2    of pornography that was found on the devices seized from David
3    Tatum?
4    A.    There was a good bit.
5    Q.    In terms of images and videos, thousands and thousands;
6    is that fair to say?
7    A.    I can't say.  I wouldn't want to speculate on that.  I
8    didn't --
9    Q.    It's a lot.  We can put it that way.
10   A.    It's a good bit.
11   Q.    And the vast majority of that was adult pornography and
12   was not submitted here in court today, correct?
13   A.    There was a good bit of adult pornography.
14   Q.    And I imagine -- or I guess are you familiar with the
15   term pthc?
16   A.    I am.
17   Q.    And how -- you've worked with cases before in the last
18   couple years that involve material of that variety.
19   A.    Correct.
20   Q.    What, in your experience, does that generally entail when
21   you -- that kind of material?
22            MR. ODULIO:  Objection, Your Honor.
23            THE COURT:  Sustained.
24   Q.    The images that you reviewed that are entered into
25   evidence, there's other adult images that were not entered; is

SCOTT ATWOOD - DIRECT

1  that correct?

2          MR. ODULIO:  Objection, relevance.  Your Honor, he's

3  not charged with adult --

4          THE COURT:  Right, of course he's not.  Of course

5  he's not.  And I don't think it's particularly relevant, but

6  you can answer that question.

7          Were there images of adult pornography that were not

8  offered into evidence?

9          THE WITNESS:  Yes.

10 Q.   And did that include some of the morphed images?  Were

11 there adults and people that were also morphed and put into

12 evidence -- or not put into evidence?

13         MR. ODULIO:  Objection, Your Honor.

14         THE COURT:  Sustained.

15         Mr. Ames, the Court wouldn't have allowed adult

16 pornography into evidence.  It wouldn't be relevant or

17 admissible.

18         MR. AMES:  I'm sorry, that adult pornography would

19 not be relevant?

20         THE COURT:  Your question has been ruled irrelevant.

21         MR. AMES:  Understood, Your Honor.

22 Q.   From there, Agent Atwood, there was a device that was

23 sent to Quantico.  It comes back.  Eventually later on in the

24 investigation some charges came.  What -- did you arrest

25 Dr. Tatum at one point in time after there were charges?

1  A.   Yes, we did.

2  Q.   Subsequent to that did you conduct a review of any

3  other -- or more devices at any point?

4  A.   Yes, we did.

5  Q.   Did you do any -- did you conduct any review of the

6  MacBook laptop in particular?

7  A.   I did review the MacBook on multiple occasions.

8  Q.   Did you -- when you're doing your analysis or

9  investigation, did you look to determine if there was any

10  spyware on the device?

11  A.   I can't say that I did specifically.

12  Q.   Okay.  Did anybody to your knowledge?

13  A.   Not to my knowledge.  I wouldn't know.

14  Q.   Was the FBI informed at any point in time that there may

15  have been spyware on the device?

16           MR. ODULIO:  Objection.  Calls for hearsay.

17           THE COURT:  Sustained.

18  Q.   Have you had conversations with anybody else -- or did

19  you have -- did your investigation involve anybody else in

20  Ms. Tatum's family?

21  A.   No, our investigation did not involve anyone else or

22  focus on anyone else but Mr. Tatum.

23  Q.   The -- did you have any more recent conversations with

24  anybody in Ms. Tatum's family?

25           MR. ODULIO:  Objection, Your Honor.

SCOTT ATWOOD - DIRECT

1          THE COURT:  Sustained.

2    Q.    Have you learned anything about the evidence in the FBI's

3    custody that turned out to not be the original copy?

4          THE COURT:  Sustained.

5          MR. ODULIO:  Objection.

6    Q.    Have you learned anything recently that involves

7    additional copies of evidence?

8          MR. ODULIO:  Objection.  Sidebar, Your Honor.

9          THE COURT:  Yes.

10          (Sidebar conference as follows:)

11          MR. ODULIO:  We object to this whole line of

12   questioning.  We think it's irrelevant.  The Court's already

13   ruled on aspects of this line of questioning.  As such, I

14   think it's clear that it's got no relevance here in the case.

15          MR. AMES:  I don't think I've crossed the line.

16   There's a motion in limine with regard to talking about

17   criminal charges involving family.  Again, I've told the Court

18   I don't intend to do that.  I think it's relevant that a

19   device that was purported to be an original turned out not to

20   be.

21          THE COURT:  First of all, that's a gross

22   overstatement of that particular device.  It hasn't been

23   offered into evidence.  And it was a predicate to initiate the

24   investigation.  So that line of questioning is irrelevant for

25   our purposes today.  So let's get away from your suppression

1   theory of there were these flash drives that were handed over
2   to the FBI at the beginning of the investigation and there's
3   something wrong with them.  We're not going there anymore.
4           MR. ODULIO:  Your Honor, we'd also ask if there's
5   more questions like this, if the Court can consider some kind
6   of limiting instruction to the jury concerning the legal
7   process here because I don't like the implication.
8           THE COURT:  Yeah.
9           MR. ODULIO:  It's not fair.
10          THE COURT:  We'll take that up at jury instructions,
11  but you are inviting the Court to give an instruction that
12  essentially says you're wrong.  Okay.  So --
13          MR. AMES:  No, I --
14          THE COURT:  -- tread carefully.
15          MR. AMES:  I understand, Your Honor.  And I'll speak
16  with Mr. Tatum about the circumstance and let him know that as
17  well.
18          THE COURT:  All right.
19          (End of sidebar conference.)
20                  DIRECT EXAMINATION (Cont'd.)
21  BY MR. AMES:
22  Q.   How many investigations in general have you done for
23  pornography-type cases?
24  A.   Quite a bit.
25  Q.   And the style or type of images that you would typically

1  see in a file called pthc, could you give an overview -- what

2  does that generally in your experience entail if you open an

3  image that says pthc on it?

4          MR. ODULIO:  Objection, Your Honor.

5          THE COURT:  Sustained.  We're not here about

6  generalities.  Ask another question.

7          (Counsel and defendant conferred.)

8  BY MR. AMES:

9  Q.  Would you categorize or characterize the images submitted

10 into evidence to be hardcore in this case?

11         MR. ODULIO:  Same objection, Your Honor.

12         THE COURT:  Sustained.  That's not an element of the

13 offense.

14         MR. AMES:  Agreed, Your Honor.

15 Q.  So are some of the images that you have reviewed

16 inconsistent with pornography in light of the fact there's not

17 lasciviousness?

18         MR. ODULIO:  Objection, Your Honor.

19         THE COURT:  Sustained.

20         MR. ODULIO:  It's the same question.

21         THE COURT:  Sustained.  The evidence will be

22 submitted to the jury, the jury will receive the Court's

23 instructions, and the jury will find the facts that you are

24 now exploring.

25 Q.  What are the criteria that you use when you flag an image

SCOTT ATWOOD - DIRECT

1  as potential child pornography in your investigations?

2  A.    Whether they look like a child and they're naked.

3  Q.    So that's the entirety.  Are you making any

4  determinations otherwise?  Just nudity and age?

5  A.    I'm not making the determination.  I'm flagging it for my

6  review.  I ask my colleagues to review who also have similar

7  experiences.  I look for characteristics, hip width, breast

8  size, prepubescent, facial features.

9  Q.    Understood.  And when you have -- when you have images

10  that you've located, are there any processes that you use to

11  verify whether they have been previously indicated as

12  pornographic or --

13              MR. ODULIO:  Objection, Your Honor.

14              THE COURT:  You can answer that.

15              THE WITNESS:  Can you restate the question, please.

16  Q.    Is there a database you might send images to to confirm

17  whether or not they may be pornographic or previously

18  identified as child pornography?

19  A.    Are you asking about NCMEC?

20  Q.    Yes.

21  A.    Yes.  That's one of the criteria that we would do

22  normally in our investigations.  If we see images that we

23  think are child pornography that fit the criteria, we have a

24  way to submit those images to NCMEC based off the hash ID.

25  You've been given information already about the hash ID and

SCOTT ATWOOD - DIRECT

1   how it changes.  A cache image is different -- it's my
2   understanding that a hash ID for cache images is different
3   than a regular image itself.  So the hash ID sometimes can
4   be --
5             MR. ODULIO:  Objection to the narrative.
6             THE COURT:  No, that's fine.  Probably be helpful to
7   the jury.
8             THE WITNESS:  The hash ID can be invalid a lot of
9   times as far as submission.
10  Q.    Did you submit any in this case?
11  A.    Yes, we did.
12  Q.    Did you get any matches for child pornography?
13  A.    To the best of my -- so NCMEC will not -- NCMEC only
14  advises that it's child pornography if the victim has been
15  identified.  So that's two separate things.  We submit the
16  submission to NCMEC --
17            MR. ODULIO:  Objection.  This is all hearsay, I
18  think, Your Honor.
19            THE COURT:  It's fine.  This will be helpful to the
20  jury.
21            THE WITNESS:  We submit the hash ID to NCMEC of
22  suspected child pornography or just if NCMEC knows of the
23  image.  That's really the submission.  Because NCMEC is the
24  houser of child pornography submitted by law enforcement.  If
25  we suspect it being child pornography, we'll submit the hash

SCOTT ATWOOD - DIRECT

1   ID.  NCMEC will tell us, yes, that hash ID has been submitted
2   before, meaning other law enforcement has encountered that
3   image or, yes, this hash ID matches this victim.
4          And so we've done both of those in this case.  We
5   submitted the hash IDs to see if NCMEC knows of any potential
6   victims and we've submitted victim notifications to where the
7   in-person victims that you've heard from today now have
8   notifications in NCMEC.
9   Q.  So with respect to images that were otherwise on devices
10  that were not morphed pornography or whatnot, at any point in
11  time in the investigation, was there ever an indication or a
12  match to NCMEC or any other database that confirmed identified
13  child pornography?
14         MR. ODULIO:  Objection, Your Honor.
15         THE COURT:  Sustained.  It's irrelevant and a
16  wrongly worded question at that.
17  Q.  Was there ever a hash tag match at any point in time with
18  anything you found in the 20 devices that confirmed or
19  identified that it was --
20         MR. ODULIO:  Objection, Your Honor.  It's the same
21  question.
22         THE COURT:  Sustained.  That match doesn't make it
23  or not make it child pornography.  As the witness just
24  testified, that match only identifies whether that image has
25  been previously identified by another law enforcement agency.

SCOTT ATWOOD - DIRECT

1    The ultimate question for the jury is whether the images that
2    have been presented to it are in and of themselves child
3    pornography, not whether NCMEC has copies of them.
4              MR. AMES:  I understand.
5              THE COURT:  So that line of questioning is
6    irrelevant.  Please move on.
7              MR. AMES:  One moment, Your Honor.
8              (Counsel and defendant conferred.)
9              THE COURT:  Any additional questions, Mr. Ames?
10   BY MR. AMES:
11   Q.   Agent Atwood, did you ever, later on in the
12   investigation, seize any other items from Mr. Tatum at any
13   point as well?
14   A.   Yes, we did.
15   Q.   Those were not -- those did not contain any contraband,
16   correct?
17             MR. ODULIO:  Objection, relevance.
18   Q.   To your knowledge.
19             THE COURT:  You can answer that.
20             THE WITNESS:  I would have to look at the list -- I
21   don't believe so -- of when they were seized.
22             (Counsel and defendant conferred.)
23             MR. AMES:  No further questions, Your Honor.
24             THE COURT:  Any cross examination?
25             MR. ODULIO:  Your Honor, no.

1      THE COURT:  All right.  Thank you.  You may stand
2   down, Agent.
3      THE WITNESS:  Thank you, Your Honor.
4      (Witness stepped down.)
5      THE COURT:  Further evidence for the defense?
6      (Counsel and defendant conferred.)
7      THE COURT:  Mute your microphone, please.
8      MR. AMES:  Yes, Your Honor.
9      (Counsel and defendant conferred.)
10      THE COURT:  Further evidence for the defense,
11   Mr. Ames?
12      (Counsel and defendant conferred.)
13      MR. AMES:  I'm sorry, Your Honor, I'm trying to...
14      THE COURT:  I understand.
15      THE DEFENDANT:  Your Honor, I was not --
16      THE COURT:  Wait, wait.  No, no, don't speak in open
17   court.
18      Members of the jury, let me ask you to retire to the
19   jury room for just a few minutes.
20      JUROR NO. 4:  We know the rule.
21      JUROR NO. 13:  Just getting our steps in.
22      (Jury exited the courtroom.)
23      THE COURT:  What did you want to say, Mr. Tatum?
24      THE DEFENDANT:  So I wasn't expecting to have to
25   testify today.  I am not -- my lawyer has advised me not to

1  testify.

2          THE COURT:  I don't -- really, really don't want to

3  know what you and he said to one another.

4          THE DEFENDANT:  Okay.  You know, I think that --

5  should I testify I'd like to be able to tell my story.  I'd

6  like to be able to explain what happened in a narrative

7  fashion.

8          THE COURT:  No, sir.  No.  Examinations go as you've

9  seen, question and answer, because some of what witnesses

10  might otherwise say would be inadmissible and the only way for

11  the Court to police that is to hear the question and make a

12  determination whether the answer to that question would be

13  admissible.  So you won't be able to testify in a narrative

14  fashion.

15          THE DEFENDANT:  And I wouldn't be allowed to testify

16  about anything regarding hearsay.

17          THE COURT:  Correct.

18          MR. AMES:  Unless there's an exception to it.

19          THE COURT:  Right.  There are some exceptions, but

20  I -- I'm trying to guess what of those might apply here, but

21  none of them are obvious to me.

22          So I need your decision, Mr. Tatum.

23          (Pause.)

24          THE DEFENDANT:  Would I be allowed to testify

25  tomorrow?

1        THE COURT:  No, sir.  We're not going to waste an
2  hour of trial time.  The testimony will begin today.  I don't
3  know if it will conclude today.  We'll just have to see how it
4  goes, but it will certainly begin today.
5        THE DEFENDANT:  Will I have additional time to
6  confer with my attorney before testifying?
7        THE COURT:  You mean before making the decision?  We
8  have an hour left in the day roughly and the jury has already
9  lost a good bit of it because of some of these issues which
10 were easily anticipated, I'm sure were anticipated, and much
11 discussed between you and your attorney.  I'm not going to
12 continue to waste the jury's time while you continue to wonder
13 whether to testify.  It's just time to decide.
14       MR. AMES:  I advise against it.
15       THE DEFENDANT:  I choose not to testify.
16       THE COURT:  Thank you, sir.
17       I think that -- the Court is satisfied that the
18 defendant is fully aware of his right both to testify and not
19 testify.  I'm also well persuaded that he has had lengthy
20 discussions with his attorney on that issue and has made a
21 considered and thoughtful decision not to testify.
22       Would there be any other evidence, then, Mr. Ames?
23       (Counsel and defendant conferred.)
24       MR. AMES:  I think the defense would rest, Your
25 Honor.

1          THE COURT:  All right.  I'll ask you to make that
2   announcement once the jury comes back just to let them hear
3   it.  I'll ask if there's additional evidence, at which point
4   you can rest your case.
5          Will there be rebuttal evidence?
6          MR. ODULIO:  No rebuttal, Your Honor.
7          THE COURT:  All right.  Well, then, the Court's plan
8   is that, you know, I have just a very few minutes of general
9   instructions; and since we have some time on our hands, I'll
10  give those.  But I won't ask counsel to begin closing
11  arguments tonight.  There's no way we'll get through that.  So
12  you can be prepared for that at 9:00 tomorrow morning.
13         MR. AMES:  Your Honor, is there another jury
14  instruction to deal with?
15         THE COURT:  Well, there was one.  I've been thinking
16  about that since.  You wanted the Court to explain to the jury
17  that the evidence with respect to count two consists only of
18  bathroom video one and, you know, I may be able to just say
19  that rather than putting it into the written instructions.
20         MR. ODULIO:  That's fine, Your Honor.  If the Court
21  wants something in writing, we'll work with Mr. Ames to give
22  that to you, but I think doing it verbally is fine.
23         THE COURT:  All right.  Let's bring the jury.
24         (Jury entered the courtroom.)
25         THE COURT:  Is there further evidence for the

1   defense?

2           MR. AMES:  No, Your Honor.

3           THE COURT:  Any rebuttal evidence?

4           MR. ODULIO:  No, Your Honor.

5           THE COURT:  All right.  Members of the jury, that's

6   the close of all of the evidence that either party wishes to

7   offer.  We have three things left to do.  One, I have a set of

8   instructions that I give every jury in every criminal case

9   because these things apply to every criminal case.  Then in

10  the morning we will have closing arguments from counsel and

11  then my concluding instructions which are specific for this

12  case and these offenses.  And so all we're going to do yet

13  this afternoon, and it won't take me very long, is to go

14  through these instructions that apply in every criminal case.

15  And then I'll release you for the evening.

16          As I told you in the preliminary instructions, it is

17  your duty and your responsibility in this trial to find the

18  facts.  You may find those facts only from the evidence which

19  has been presented during this trial.  The evidence consists

20  of the testimony of the various witnesses, the exhibits which

21  have been admitted into evidence by the Court, and any

22  stipulation between the parties.  Although I don't believe the

23  parties did stipulate to any facts.

24          In reaching your decision as to the facts, it is

25  your sworn duty to follow the law as the Court instructs you.

1   You will apply this law to the facts that you find from the
2   evidence and render your verdict.

3           If during their closing arguments the attorneys
4   refer to concepts of the law or what the law is, and if you
5   detect any difference between what they say the law is and
6   what I say the law is, you go with what I say.  And same with
7   the facts.  If the lawyers recite the evidence to you and it
8   doesn't agree with your memory, you're to be guided by your
9   memory and not what the attorneys say.

10          I'm confident that none of the attorneys would
11  intentionally misstate the law or the facts, but mistakes can
12  be made with respect to the law and people's memories differ
13  on what the evidence is.  But you always go with what I say
14  about the law and what you remember about the facts.

15          You are required to perform these duties without
16  bias, prejudice, or sympathy for either party.  The law does
17  not permit jurors to decide cases on the basis of bias,
18  prejudice, or sympathy, or any other basis than on the facts
19  and the law.

20          This case involves charges brought against the
21  defendant by a bill of indictment.  You are reminded that an
22  indictment is but a formal method of accusing the defendant of
23  a crime.  Its purpose is to inform the defendant of the
24  charges against him and bring him to trial.  It is not
25  evidence of any kind against the defendant, nor does it permit

1  any presumption or inference of guilt.  In other words, an

2  indictment is not consistent either with guilt or lack of

3  guilt.  It simply puts that question at issue for your

4  decision.  It is up to you to decide whether the government

5  has proved each element of the crimes alleged in the bill of

6  indictment beyond a reasonable doubt.

7       You are here to decide whether the government has

8  proved beyond a reasonable doubt that the defendant is guilty

9  of the crimes charged.  The defendant is not on trial for any

10 act, conduct, or offense not alleged in the indictment.

11 Neither are you concerned with the guilt of any other person

12 or persons not on trial as a defendant in this case.

13      Every defendant in a criminal case is presumed to be

14 innocent and this presumption continues throughout the course

15 of the trial.  This presumption will end only if you reach the

16 jury room and arrive unanimously at the conclusion, if you do,

17 that the government has shown to your satisfaction that the

18 defendant is guilty beyond a reasonable doubt.

19      This burden on the government does not change at any

20 time during the course of the trial.  The presumption of

21 innocence in favor of a defendant is not a mere formality to

22 be disregarded by the jury at its pleasure.  It is a

23 substantive part of our criminal law.  Accordingly, the

24 government must prove each of the elements of the crimes

25 charged in this indictment beyond a reasonable doubt before

1    there can be a conviction.

2         The term "reasonable doubt" means just what it says.

3    It is a doubt based upon reason and common sense.  Its meaning

4    is no doubt self-evident and understood by you and the Court

5    will not attempt to define it any further.

6         As I told you earlier in the trial, there are two

7    types of evidence from which a jury may properly assess in

8    determining whether the government has met its burden of proof

9    as to any offense.  One is direct evidence, such as the

10   testimony of an eyewitness.  The other is circumstantial

11   evidence.  Circumstantial evidence is evidence of facts or

12   circumstances from which the existence or nonexistence of

13   other facts in controversy may be inferred.  The law makes no

14   distinction between direct and circumstantial evidence but

15   simply requires that before convicting a defendant, the jury

16   must be satisfied of the guilt of the defendant beyond a

17   reasonable doubt from all of the evidence in the case.

18        While you should only consider evidence presented

19   during the trial of the case, you are permitted to draw such

20   reasonable inferences from the testimony and exhibits as you

21   feel are justified in the light of common experience.  In

22   other words, you may make deductions and reach conclusions

23   which reason and common sense lead you to draw from the facts

24   which have been established by the testimony and evidence in

25   this case.

1          Certain of the government's exhibits included
2   transcripts.  You'll recall the audio that also had
3   transcripts with it.  You're instructed and reminded that
4   whether the transcripts correctly or incorrectly reflect the
5   content of the conversation or the identity of the speakers is
6   entirely for you to determine.  You should make this
7   determination based on the testimony regarding the preparation
8   of the transcripts, your own comparison of the transcripts to
9   what you have heard on the recordings, and any other relevant
10  evidence or testimony.  Should you determine that the
11  transcripts are incorrect or inaccurate in any respect, you
12  should disregard them to that extent.
13         You also heard evidence that the defendant made a
14  statement outside of court to two FBI agents.  In determining
15  whether any statements claimed to have been made by the
16  defendant outside of court was knowingly or voluntarily made,
17  you should consider the evidence concerning such a statement
18  with caution and great care and should give such weight to the
19  statement as you feel it deserves under all of the
20  circumstances.  You may consider in that regard such factors
21  as the age, training, education, occupation, and physical and
22  mental condition of the defendant, his treatment while under
23  questioning, and all the other circumstances in evidence
24  surrounding the making of the statement.
25         You are not required to accept testimony even though

1  the testimony is uncontradicted and the witness is not
2  impeached.  You may decide because of the witness's bearing
3  and demeanor, or because of the inherent improbability of his
4  or her testimony, or for other reasons sufficient to you that
5  such testimony is not worthy of belief.
6          The testimony of a witness may be discredited or
7  impeached by showing that he or she previously made oral or
8  written statements which are inconsistent with his or her
9  present testimony.  The earlier contradictory statements are
10 admissible only to impeach the credibility of the witness and
11 not to establish the truth of these statements.  It is the
12 province of the jury to determine the credibility, if any, to
13 be given the testimony of a witness who has been impeached.  I
14 don't recall impeachment testimony, but if you recall some,
15 that is the instruction to apply to it.
16         You also heard during the trial testimony of
17 witnesses who were recognized by the Court as experts in
18 particular fields.  I will remind you that a person's training
19 and experience may give him specialized knowledge in a
20 technical field.  The law allows that person to state an
21 opinion about matters in that particular field.  Merely
22 because the witness has expressed an opinion does not mean,
23 however, that you must accept this opinion.  The same as with
24 any other witness, it is up to you to decide whether you
25 believe his testimony and choose to rely upon it.  Part of

1  that decision will depend on your judgment about whether the
2  witness's background, training, and experience is sufficient
3  to give the opinion that you heard.  You must also decide
4  whether the opinions were based on sound reasons, judgment,
5  and information.
6          Your decision on the facts of this case should not
7  be determined by the number of witnesses testifying for or
8  against either party.  You should consider all of the facts
9  and circumstances in evidence to determine which of the
10  witnesses you choose to believe and not believe.
11          The law does not require either the defendant or the
12  government to cross examine any witness.  You may not draw any
13  inferences from the fact that the government or the defendant
14  did not cross examine a witness.
15          The defendant has elected not to testify in this
16  case.  The Court instructs you that he has a constitutional
17  right not to take the stand and testify and not to speak at
18  all or offer any evidence, the burden of proof being entirely
19  upon the government.  You must draw no adverse inferences of
20  any kind from his exercise of his privilege not to testify.
21  This right is a fundamental one in American criminal law and
22  one which cannot be disregarded by the jury at its pleasure.
23          The lawyers for both sides objected to some of the
24  things that were said or done during the trial.  You may
25  recall that.  This simply means that the lawyers were

1  requesting that I make a decision on a particular rule of law.

2  Do not hold that against either side.  The lawyers have a duty

3  to object whenever they think that something is not permitted

4  by the rules of evidence.  Those rules are designed to make

5  sure that both sides receive a fair trial.  Do not draw any

6  conclusion from such objections.  These relate only to the

7  legal questions that I must determine and should not influence

8  your thinking.  If I sustain an objection, the witness was not

9  allowed to answer it.  If I overruled the objection, the

10 witness was allowed to answer the question and you should

11 consider that answer as you would any other.

12      Let me emphasize that a lawyer's question is not

13 evidence.  At times a lawyer may have incorporated into a

14 question a statement that assumes certain facts to be true and

15 asked the witness if the statement was true.  If the witness

16 does not answer or denies the truth of the statement and if

17 there is no other evidence in the record proving that the

18 assumed fact is true, then you may not consider the fact to be

19 true simply because it was contained in the lawyer's question.

20      On the other hand, if the witness adopts or agrees

21 to the assumed facts in his or her answer, then the witness

22 may be considered to have testified to the facts assumed in

23 the question and his or her testimony is evidence of those

24 facts.

25      You may use your notes, if any, taken by you during

1  the trial.  You are instructed that your notes are only a tool

2  to aid your own individual memory and should not be

3  substituted for your memory.  If you chose not to take notes,

4  remember it was your individual responsibility to listen

5  carefully to the evidence.  You cannot give this

6  responsibility to someone who did take notes.  We depend on

7  the judgment of all members of the jury and you must all

8  remember the evidence in this case.

9           I will remind you that the punishment provided by

10  law for the offenses charged in the indictment, should there

11  be a verdict of guilt, is a matter exclusively within the

12  province of the Court and should never be considered by the

13  jury in any way in arriving at an impartial verdict as to the

14  guilt or lack of guilt of the accused.

15           All right.  So -- and I know it's only 4:30, but the

16  closing arguments will take a little while and I don't like to

17  split them up, and we'll have time tomorrow to deal with all

18  of this.  So I'm going to release you tonight.  Should be the

19  last night where you'll have to put people off from wondering

20  how your day went.  But, you know, we're getting close.  So

21  please don't talk to anybody about this case.  Don't let

22  anybody talk to you about it.

23           Don't start forming your opinions.  The trial is

24  close to being over but it's not over.  You need to hear the

25  closing arguments of the lawyers and you need to get what we

1    call the substantive instructions from the Court, the law that

2    applies specifically to these charges.  And then when that's

3    over, you can retire to the jury room and begin forming your

4    opinions during your deliberations together.

5              So as always, leave your notes in the jury room and

6    we will see you tomorrow morning at 9:00.

7              Everyone remain seated while the jury clears the

8    floor.

9              JUROR NO. 13:  What time do we come back tomorrow?

10             THE COURT:  9:00.  Sorry if I didn't say that.

11             (Jury exited the courtroom.)

12             THE COURT:  Just to be double clear, count two

13   applies to what has been referenced as the bathroom one video,

14   correct?

15             MR. ODULIO:  Yes, Your Honor.

16             MR. CERVANTES:  Would Your Honor like an exhibit

17   number reference?

18             THE COURT:  Sure.

19             MR. ODULIO:  Your Honor, Exhibit 1D.

20             THE COURT:  All right.  How long would counsel like

21   for closing arguments?

22             MR. ODULIO:  Your Honor, we'd like one hour, please.

23             THE COURT:  Mr. Ames?

24             MR. AMES:  At least one hour, Your Honor.

25             THE COURT:  Let me say this.  My experience in the

1  four years since I've been on the bench is attorneys grossly
2  underestimate how long their arguments are going to take, but
3  I hold them to it every time.  So I want to give you enough
4  time, but I am going to hold you to whatever we agree on.  An
5  hour seems sufficient to me.
6        Mr. Ames, do you --
7        MR. AMES:  I think that should generally be
8  sufficient.  There's a lot of variables and different types of
9  things going on in the evidence here, but I think that should
10 be sufficient, Your Honor.
11        THE COURT:  All right.  I'll hold both sides to it.
12 Of course, the hour for the government includes their rebuttal
13 argument, which, again, in my experience gets short shrift
14 from the U.S. Attorney's Office in lots of trials.  They leave
15 themselves about all of three minutes to do a rebuttal, which
16 I always think should be balanced the other way.  But I'll
17 give each side an hour.  I think that's plenty.  You'll lose
18 the jury if you talk to them more than an hour.  Now, I say
19 that even though I once gave a 5-1/2 hour closing, but there
20 was 72 counts and it was a 3-week trial.  But an hour it is
21 and we'll start up with the government at that time.
22        Anything else we need to address tonight?
23        MR. ODULIO:  Your Honor, there is, I think, the
24 issue of forfeiture, jury trial for forfeiture.
25        THE COURT:  Yes.  Thank you --

1          MR. ODULIO:  And I think the inquiry is whether or

2     not the defendant wants a jury forfeiture should there be a

3     guilty verdict.

4          THE COURT:  Yes.  Thank you for reminding me of

5     that.

6          Mr. Ames.

7          (Counsel and defendant conferred.)

8          THE COURT:  If you want to have the evening to talk

9     with him about it -- I mean, I don't know if he wants to make

10    a snap decision or not.

11         Mr. Tatum, the issue is if there is a guilty

12    verdict, then the forfeiture count in the indictment comes

13    into play and you're entitled to have the jury decide that

14    issue.  It is often left to the Court to decide or there's

15    even a consent to forfeiture following a guilty verdict if

16    there is one.  That's the issue we're talking about here.

17    I'll give you the evening to talk to Mr. Ames about --

18         MR. AMES:  Thank you, Your Honor.

19         THE COURT:  -- if there is a guilty verdict, what

20    you want to do with the forfeiture count.

21         MR. ODULIO:  Nothing else from the government, Your

22    Honor.

23         THE COURT:  Mr. Ames, anything else to do today?

24         MR. AMES:  I don't think so, Your Honor, no.

25         THE COURT:  The Court will be in recess until 9:00

1    tomorrow morning.  Please remain here until the CSO let's

2    everyone know that the jury has cleared the floor, which I

3    hope there's still a CSO to tell us that.  One of the counsel

4    can step out if you'd like to get confirmation you're not

5    going to get otherwise.

6                   All right.  We're in recess.

7                   (Evening recess at 4:31 PM.)

8                            * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   UNITED STATES DISTRICT COURT

 2   WESTERN DISTRICT OF NORTH CAROLINA

 3   CERTIFICATE OF REPORTER

 4

 5

 6            I, Cheryl A. Nuccio, Federal Official Realtime Court

 7   Reporter, in and for the United States District Court for the

 8   Western District of North Carolina, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code, that

10   the foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is

13   in conformance with the regulations of the Judicial Conference

14   of the United States.

15

16            Dated this 13th day of September 2023.

17

18

19                              s/Cheryl A. Nuccio

20                              Cheryl A. Nuccio, RMR-CRR
                                Official Court Reporter
21

22

23

24

25
```