UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-157 |
| | ) | |
| vs. | ) | VOLUME III - REDACTED |
| | ) | |
| DAVID TATUM, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 4, 2023

APPEARANCES:

On Behalf of the Government:

      DANIEL CERVANTES, ESQ.
      MARK T. ODULIO, ESQ.
      United States Attorney's Office
      227 West Trade Street, Suite 1700
      Charlotte, North Carolina 28202

On Behalf of the Defendant:

      RYAN PATRICK AMES, ESQ.
      SeiferFlatow, PLLC
      2319 Crescent Avenue
      Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

THURSDAY MORNING, MAY 4, 2023

(Court called to order at 8:57 AM.)

THE COURT:  Good morning.

ALL COUNSEL:  Good morning.

THE COURT:  Juror number 11 was in a minor vehicle accident this morning.  She's fine, but she's shaken up and she's not going to be here.  So we've got our 12, thank goodness.

Are we ready for the jury?

MR. CERVANTES:  Yes, Your Honor.

(Jury entered the courtroom.)

THE COURT:  Good morning, members of the jury.

Juror number 11 was in a minor car accident this morning and she's fine, but she's shaken up a little bit and is not going to be joining us.  So we have the 12 we need to proceed.

I expect that you'll begin your deliberations not later than 11:30 and I don't intend to take a break between now and then; but if anybody needs one, please let me know.

As I told you yesterday, what we'll have this morning are closing arguments of the attorneys and then the final instructions from the Court.  Of course, I remind you that the arguments of the attorneys are not evidence and that the law, of course, comes from the Court.  For instance,

1  questions about the legality of the seizure of certain
2  evidence or the admissibility of evidence under the rules of
3  evidence are for the Court to decide.  The Court has decided
4  those issues and they're not for your consideration.

5       Now, the arguments will begin with the government's
6  opening argument and then the defense will present its
7  argument.  And then because the government has the burden of
8  proof, it is allowed a rebuttal argument after the defense
9  argument.

10       The jury is with the government.

11       MR. ODULIO:  May it please the Court, Dr. Tatum,
12  counsel, ladies and gentlemen of the jury:

13       This is the defendant setting up this phone to use
14  his 15-year-old cousin to produce and make child pornography
15  as she got undressed, used the toilet, and took a shower in
16  her family vacation home in Maine.  He saved that child
17  pornography from this phone.  After he deleted it from this
18  phone, he saved it on to that hard drive and transported it
19  here to North Carolina.  He possessed it and other child
20  pornography like it on that hard drive and used that MacBook
21  to access it and to view it.  He's guilty of all the counts in
22  the indictment alone for this conduct.

23       Count two charges production of that child
24  pornography video of M.C..  She came in here yesterday and
25  testified in front of you that she was 15 years old at the

1   time this was taken.  She identified the defendant in that
2   image of him gazing into this phone.  Setting it up to capture
3   her pubic region, her vagina, strategically on that floor.
4   Flushing the toilet after he left.  That's count two.
5            Count three is when he saved it onto that hard drive
6   and transported it into the Western District of North
7   Carolina.
8            And of course, you see there in count one the
9   possession and access with intent to view.
10           And the forensic examination of that MacBook and all
11  of these devices show that he did it.  He saved it for over
12  seven years along with his other child pornography.  And what
13  does that tell you?  Was this an accident?  Was this a big mix
14  up?  Was this planted by somebody else?  Of course not.  This
15  evidence that we've shown you proves that the defendant did
16  it.  That this was no accident or mistake.  It was deliberate.
17  It was intentional.  It was well planned with multiple steps.
18           And this picture of the defendant gazing into this
19  phone along with all the other evidence we presented proves
20  that he committed the three types of crimes charged in the
21  indictment.  And the M.C. video alone, that first bathroom
22  video alone, is sufficient to convict him of all these counts.
23  Let me say that again.  The video of M.C. that he produced is
24  sufficient to convict him of possession and access with intent
25  to view, production and attempted production as charged in

1  count two, and transportation of child pornography.

2          And make no mistake, ladies and gentlemen, one video
3  is enough.  One still from one video of child pornography is
4  enough.  You're not going to hear anything in the jury
5  instructions that say that there's got to be a quantity of
6  child pornography to convict.  One is enough.  And when it
7  comes to child pornography, one image is too many.

8          But we've given you much more evidence than the
9  single video that he produced in Maine.  We've shown you
10  pictures and other videos of child pornography.  We've shown
11  you forensics.  We've even shown you and played for you the
12  defendant's own statements he gave to the FBI when asked about
13  these images.  And all of those lead to the conclusion, the
14  only conclusion, that he's guilty.

15          Now, I'm going to take you through that evidence,
16  show you some of the elements, highlight some of the things
17  for you to consider.  But before we do that, let's knock out
18  some low hanging fruit, get it out of the way so you can focus
19  on other matters.

20          The first thing is this issue of child pornography
21  that you've heard about.  The Court is going to instruct you
22  and give you some instructions and I'm going to highlight some
23  of those briefly for you.

24          Child pornography involves the use of a minor
25  engaging in sexually explicit conduct.

1          It also involves images that have been created,
2    adapted, or modified to appear that an identifiable minor,
3    that is, it means that you can tell it's a kid, is engaging in
4    sexually explicit conduct.
5          Now, we've shown you both types during this trial.
6    Mr. Cervantes in his opening highlighted that for you, right?
7          The second category or bucket that we showed you,
8    those are the adapted, modified, you've heard it referred to
9    as morphed images.  Okay.  If they're sexually explicit, if
10   those adapted images are sexually explicit, they meet the
11   definition.  And they were, right?
12         All of the other images fall into that first
13   category involving a minor engaging in sexually explicit
14   conduct.
15         And look, there's a couple of other related concepts
16   here and I'm going to go through them, but it's not
17   complicated.  It either is or isn't child pornography, okay.
18   It's kind of like being pregnant.  You can't be half pregnant.
19   It can't be half child pornography.  And there is no ambiguity
20   with these images that we had to display for you.  And that
21   was not for the faint of heart, right?  It's our duty to
22   display those to you.  It's your duty to look at them.  And we
23   did it because when you go back into that room, you've got to
24   make that determination.  But in this case it's not even a
25   close call.

1          So that first category we'll talk about in a second.
2    There is a little bit of a nuance on that second category,
3    right?  If it's adapted or modified.  You'll hear the Court
4    tell you that as long as the face of the person depicted in
5    that image is a child, it's not relevant whether the adapted
6    or modified body that was put on that child is that of a minor
7    or an adult.  Set that aside.  The issue of concern is whether
8    or not it's sexually explicit, okay.

9          And what is sexually explicit?  Well, you don't need
10   to be any kind of learned person to know what that is, right?
11   It's sexual intercourse between a person of the same or
12   opposite sex.  It is masturbation.  It is a lascivious
13   exhibition of the pubic area, genitalia.  And all of the
14   images and the images that you have seen have fallen into some
15   or all of those categories.

16         Recall the first video we had to play for you of
17   those two girls on that bed having sex.  That's sexually
18   explicit conduct.  Recall the other images from the HP.  Of
19   those two videos, those were over 50 minutes long, we played
20   10 seconds for you.  Sufficient to establish what those were.
21   And they were child pornography, right?

22         What's lascivious exhibition?  Well, you're going to
23   hear from the Court it's when the image, the focal point of
24   the image is on the genitals or the pubic area; whether the
25   setting of the image makes it sexually suggestive; whether the

1  child is fully or partially nude; and whether the visual

2  depiction is intended to elicit a sexual response from the

3  viewer.  And that's important.  That's very important.

4       But again, those videos that I mentioned, we also

5  have the M.C. video, right?  Is she fully nude?  Yes, of

6  course she is, right?  We've got the prom picture.  A prom

7  picture.  Who does that?  A first day of school picture of

8  10-, 11-, 12-, 13-year-olds posted on Facebook adapted into

9  child pornography.  Who does that?  They were fully nude,

10 right?

11      What else?  Look at the setting, look at the focal

12 point.  They all meet the definition.

13      And what else can you take from this?  Well, they

14 were designed to elicit or intended to elicit a sexual

15 response.  How do we know?  FBI asked him about it, right?

16 And what did he say?  What did he use the images for?  Those

17 are his words.  You heard them.  We played them for you.  He

18 was clear.  There's no ambiguity about it.  They asked him

19 again, right?  What did he say?  Answered the question

20 already, right?  What does that -- how and to what extent does

21 that inform you with respect to these images?  It shows and

22 demonstrates, ladies and gentlemen, that this is child

23 pornography.  There's no ambiguity.  There's no argument here.

24      And again, one is enough.  One still is enough to

25 convict him.  It ain't complicated.  Common sense, good

1  judgment, and life experience.  That's why you're here.  And
2  that's what you're going to use in there to get through this
3  issue.

4          Okay.  What else?  Interstate commerce.  You heard
5  Mr. Cervantes ask forensic examiner Whitt these questions
6  about where this stuff was manufactured.  That's because, as
7  I'm going to go through with you with respect to each of the
8  counts, the law requires that some -- in some manner these
9  devices had to be manufactured outside of North Carolina or
10 the United States or had to move in interstate commerce,
11 right?

12         So in any permutation of what you're going to hear,
13 this child pornography was made with an item made outside of
14 the United States, right?  It was saved on an item made and
15 manufactured outside of the United States.  It was transported
16 from Maine to North Carolina on that item which is
17 manufactured outside of the United States.  And it was, of
18 course, actually transported across state lines.  So
19 interstate commerce, as you're going to hear, nothing burger.
20 We met it.  Check it off the box.  All of the interstate
21 commerce elements are going to be met and have been met.

22         Okay.  That's child pornography.  That's interstate
23 commerce.  What else?  Let's look at each of the counts.

24         Count one charges possession and access with intent
25 to view, right?  And here are the elements that the Court will

1    instruct you on.  And you'll have these instructions in the
2    back.
3                The first is the defendant knowingly possessed, or
4    accessed with intent to view, the child pornography.
5                That the material had been mailed or shipped in
6    interstate or foreign commerce.  That's the interstate
7    commerce element I talked about.
8                And then the last is when he possessed it, the
9    defendant knew the material contained child pornography.
10               All right.  Let's break that down.
11               Was it child pornography?  Is that even a legit
12   question?  Of course it is.  In all of its horror it is.
13               Okay.  The interstate commerce element is satisfied.
14               So how did we prove knowing possession?  Well, let's
15   look at the devices.  Two of these were taken right from him
16   by the FBI, right?  And I'll go through each of the devices in
17   this presentation, but what did they contain?  They contained
18   pictures of him.  They contained a picture of him, a video of
19   him producing child pornography, right?  Two of those devices
20   came from his wife who he lived with at the time.  The HP,
21   right, came from this home in Mint Hill.  Where did it come
22   from?  A home office, right?  Nice office.
23               What else was in that office?  Medication.  Whose
24   name was on it?  The defendant's.  Is there any ambiguity
25   about whose devices these were?  No, of course not.

1      When you consider the flash drive, what was on the
2 flash drive?  Images of minors he knew, prom date pictures,
3 pictures that he got off Facebook, right?  What does that tell
4 you about the knowing possession?

5      And during the interview with the FBI, the defendant
6 himself foreshadowed this idea of forensics, right?  The idea
7 that a forensic analysis of these devices are going to find
8 evidence, traces of what he did with them, right?

9      And Jason Whitt was on the stand a lot and it had to
10 do with forensic evidence, which is the kind of evidence that
11 the judge already talked about on the first day:
12 circumstantial evidence or indirect evidence.  Do you remember
13 that?  Remember the analogy Judge Bell used?  If you go to bed
14 at night and your driveway is dry and in the morning you wake
15 up and it's wet, it probably rained, right?  And he said the
16 law makes no distinction between direct and indirect evidence.
17 You can make your observation and develop an inference that of
18 course it rained.

19      But during this trial we got some suggestions,
20 right?  Hey, it rained in the driveway -- it rained overnight.
21 My driveway is wet.  It must have rained overnight.  Oh, no,
22 no, no, your sprinkler must have been on.  Well, my neighbor's
23 driveway is wet.  Oh, your sprinkler must have sprayed on him.
24 Well, my across-the-street neighbor's driveway is wet.  He
25 doesn't have a sprinkler system.  Well, the town well must

have leaked on it, right?  If no one saw the storm, it
couldn't have been.  Well, that's just not true.  And you know
that from life experience and common sense.  The law makes no
distinction.  The forensic evidence showed you what?  It
showed you the picture of his face right there that you see on
the screen.  It showed you what was saved on what devices and
what was plugged in and accessed.  And it was foreshadowed by
the defendant's own statement.

        So don't get bamboozled by that.  Indirect evidence
which we've offered you which has been corroborated through
other evidence demonstrates that he possessed these devices
knowingly.

        How did we do that?  We showed you the 1,118 file
names of pthc.  One thousand one hundred and eighteen.  And
I'm not going to read the names to you because you can see
them.  And they're disgusting.  They're abhorrent.  And the
other take away is these file names reference specifically
6-year-olds, 10-year-olds, 7-year-olds.  And there was a lot
of questions during the trial, hey, pthc could represent
adults, right?  I guess.  What do these files say?
Six-year-old, 7-year-old, 4-year-old.

        Focus on the evidence in front of you, not on
hypotheticals or what ifs or could haves or might coulds,
right?  This is what is in front of you in this trial and it
shows that these terms, which were accessed with that MacBook,

1  were oriented towards children, child pornography.

2         We showed you the PLIST.  Very similar evidence,

3  right?  Recently accessed videos, recently played videos on

4  the VLC.  Jason Whitt explained that to us so that a lay

5  person could understand.  What is the take-away?  That MacBook

6  which was in his possession had evidence that those videos

7  were played.  No one saw him do it.  Use your good judgment

8  and common sense when evaluating that argument, okay?  I know

9  you will.

10         These are his devices.  I'm going to talk about

11  attribution but before I do that, recall that the My Passport

12  on the top left was encrypted.  It had to be sent to Quantico.

13  Consider that fact when evaluating the evidence.  No one in

14  Charlotte was able to give the FBI that password.  It had to

15  be sent off.  And what did the evidence show with respect to

16  that hard drive?  It was plugged in and accessed to what?

17  That MacBook.  Who had the MacBook?  The defendant.  More than

18  that.  The user path, the folder path.  I saw you paying

19  attention.  The take-away there is what is a user path?  Who

20  is the user path?

21         Two things.  Number one, it matched the file path on

22  the hard drive where the child pornography was kept.  And the

23  second thing, the user path was this fella.  This fella, David

24  Tatum, Morphus.

25         Did it rain?  Did anybody see it?  Come on.  Come

1  on.

2  Attribution.  We presented evidence of attribution

3  on each of these devices.  Again, you recall Agent Whitt's

4  testimony.  He starts with a search for the child pornography

5  and he follows that evidence.  And when he followed the

6  evidence, he found that it was in the user profiles and

7  folders associated with the defendant and he found these other

8  documents in these devices.  And what do these documents show?

9  We showed you.  It's in evidence.  Mostly unchallenged.  What

10  are these?  His driver's license, his certificate of

11  completion for his fellowship in child psychiatry -- child

12  psychiatry -- tax returns, photos of ex-girlfriends, interview

13  schedule for his job here in Charlotte, and, importantly, a

14  resume.

15  What's highlighted there?  A phone number.  Why is

16  that highlighted?  What is that phone number tied back to?

17  This thing.  What is this?  This is his phone.  The user ID on

18  the phone says David's iPhone.  The resume has this phone

19  number on it.

20  Did it rain?  I think there might could have been a

21  hurricane after this trial.

22  So the conclusion is, of course, the only

23  conclusion, he knowingly possessed child pornography.

24  All right.  And we know that again because, look,

25  when they asked him about this stuff, this is what he said

that he used it for.  Recall the topic of the conversations
when this interview happened.  Those adapted or modified
images, which included -- one of those images was an image
that he downloaded from Teen Gallery of a clothed girl at a
pool holding a phone and it was adapted to display and make
the focal point her vagina in a lascivious manner.  That meets
the definition.  It's child pornography.  So keep that in mind
as you evaluate that admission.

Okay.  Count two, production.  These are the
elements of production.  And I started my talk with this
because, quite frankly, again, the video of M.C. totally
establishes -- that first bathroom video, as the Court will
instruct, establishes that.

Was the defendant -- was the minor under the age of
18?  Of course she was.

The defendant used or employed or persuaded or
induced the minor.  Used is what's in play here.

And again, whether or not the visual depiction was
mailed or actually transported, we've proven it was actually
transported in and affecting interstate commerce.

So what is used?  What is used?  We know the
defendant used M.C. to make child pornography.  She wasn't
aware that she was being used.  And that doesn't matter.
According to the instructions you're going to receive from
Judge Bell, it's really a non-issue.  Think about it this way.

1  You can use a shovel to dig a hole.  The shovel isn't aware
2  that it's being used to dig a hole but that hole exists.  Same
3  concept.  He used his cousin to make child pornography.

4        It was actually transported in interstate commerce.
5  It was produced using materials that affected interstate
6  commerce.

7        There's also a nuance to this count, ladies and
8  gentlemen, a distinction I ask you to keep in mind.  This is
9  also charged as an attempt.  And what that means is you can
10 convict the defendant if you determine that the defendant
11 intended to commit this crime of producing it and he took a
12 substantial step toward the commission of that crime.  And
13 what that means is you wouldn't even have to reach or resolve
14 the question of whether that image, that video met the
15 definition of child pornography if you concluded that he
16 intended, intended to use M.C. to produce that video and he
17 took a substantial step.  I'm not suggesting it doesn't meet
18 the definition.  Of course it does.  I'm pointing out a nuance
19 you're going to hear about from Judge Bell.  There's two paths
20 to liability there.  Either one he's guilty.

21        And what he did with M.C. wasn't an accident.  He
22 made other surreptitious videos too using the same phone,
23 saving it in the same location on the hard drive, and
24 accessing it to view it in the same way using that MacBook.
25 We showed you that.  And that evidence came in to demonstrate

1    to you that as charged in count two, he had the intent to
2    produce the video involving M.C.. And how can we discern
3    that? How can you fathom what's in a person's mind? Well,
4    you look at what else he does. And that's why this evidence
5    is relevant and that's why it was shown to you.

6          You recall, importantly, Jason Whitt established
7    that those files involving those other videos and the M.C.
8    video too were missing from this phone in the DCM folder,
9    right? Sequentially all the files were there, all the other
10   files were there except the child pornography files. What
11   does that tell you? Was this an accident? Did he delete
12   those out of the goodness of his heart? No, of course not.
13   It was not an accident.

14         One of the hardest things we showed you was that
15   patient video of F.L., the young lady who came in here,
16   identified herself in the video and identified the defendant's
17   voice. A patient, right? Someone who was purportedly being
18   treated and given care by the defendant. What is he doing?
19   What is he doing with his phone? What does that show you with
20   respect to his intent? Where was it pointed? In her pubic
21   region. What does that show you about his intent? Was it an
22   accident? Was it a mistake or was it deliberate? Was it
23   well-intentioned? Was it planned? If it was an accident, why
24   was it saved on that hard drive for all these years? If it
25   was an accident, why was it methodically deleted from his

phone?  It wasn't an accident, right?  And you can take that
evidence in deciding with respect to count two if he had the
intent to do it with M.C..

          We showed you again these forensics.  It reflects
that where that file was saved was plugged into that computer.
Simple as that.  It's not anything more complicated.  It
rained.  It rained.  That's what we showed you.  9/10/2021,
last accessed date on that folder.

          And here's what's even more telling.  The agents,
you heard in the interview, asked him I think on two
occasions, "Did you ever do anything with your patients?
You're a child psychiatrist."  What did he say?  "No, never
did anything.  Search my office.  Never did anything."  That
was a lie, right?  And you can consider that again when
determining whether this was a big mix-up.  If it was a big
mix-up, why lie?  He lied.

          What else?  The video -- the second bathroom video
of K.C..  We had Ms. E.S. come in here and identify her
cousin, right?  It was the family cabin in Maine.  You recall
the EXIF data.  Again, why was this presented?  Because it's
the same modus operandi.  Same camera angle designed to what?
Capture the pubic region of the person taking a shower, right?
Saved in what?  The same place.  Deleted in the same way.
Consider that when determining whether the evidence and the
burden has been met with count two.  It has.  And these other

1   videos show it.  Again, the same access date.  And, of course,
2   the M.C. video as well.
3           So you recall as well the testimony from E.S. who
4   testified about a conversation she had with the defendant 20
5   years ago when she confronted him about a video that he made
6   of her when she was a minor, 15, and of his own sister, right?
7   His own sister L.T. who was a year and a half younger than
8   E.S..  That makes her a minor too in that video.  And what did
9   he do?  Did he deny it?  No.  He admitted it.  He admitted it.
10  He even showed her how he did it in the crawl space in
11  Grandma's attic.  Moved the vent, right?  That's evidence
12  probative, relevant that you can use to discern whether that
13  intent element of count two, whether we've met our burden.  We
14  have.
15          And again, we end the segment with the defendant's
16  own words.  These agents asked him, "What are you into?"  And
17  he says, "I'm a voyeur."  What does that mean?  People being
18  videotaped without their knowledge, right?  That's what this
19  is.  That's what count two is.  That's what this other
20  evidence is.  And it's corroborated by the defendant's own
21  statement, right?
22          He's guilty of count two on either theory,
23  production or attempt.  Convict him.  Convict him.  He's
24  guilty.
25          Finally, the elements of count three,

1  transportation, quite frankly, is the easiest one.

2          The first is whether the defendant knowingly

3  transported child pornography in interstate commerce.  All

4  right.  We already did child pornography.  We already did

5  interstate commerce, right?

6          Did he do it knowingly?  All the evidence relating

7  to counts one and two establish that knowledge.  They all do.

8          Again, the EXIF data shows these videos were

9  produced in Maine.  The forensic data, frankly your common

10  sense, demonstrates that this was transported to North

11  Carolina on that device.  Accessed with intent to view on that

12  MacBook.  He's guilty of that.  We've proven it.  Convict him.

13          Now, as I demonstrated, all these elements are met

14  and in just a few minutes it's going to be up to you.  You're

15  going to go back there and consider all the evidence.  Some of

16  the evidence that I'm going to ask you to consider are the

17  defendant's own words.  We played it for you at the start of

18  this trial.  His own words that he gave to the FBI.

19          He said, "I've searched for teens.  I've used Teen

20  Gallery.  I went to a DeepFake website to adapt and modify

21  these pictures.  I got off on it."

22          "What does that mean?  Did you masturbate to it?"

23          "Yes."

24          He admitted he's into voyeuristic videos, right?

25  Which he explained as, quote, "people being videotaped without

1  their knowledge." He even said he deleted child pornography
2  and kind of foretold this issue with the forensics. You can
3  take that into consideration. It's powerful. His own words
4  are powerful because, as some people say, words matter. And
5  we've proven that here, right?
6         We've shown you a lot of forensics and that's
7  important too because it's circumstantial evidence of rain.
8  We've shown that. We've shown a hurricane to show you the
9  defendant's guilt. And the Court's going to again, has
10  instructed, direct is equal to circumstantial evidence. There
11  is no distinction under the law.
12         And importantly, right, what did we end the trial
13  with, the government's case in chief? We presented you those
14  victims. They took that stand. You heard from them. They
15  told their story.
16         And remember the testimony of E.S. most of all, his
17  cousin. She identified K.C. in that video, right? Told us
18  that she confronted him about the video that he made of her
19  and his own sister. He admitted to it. He even showed her
20  how, right? Do you remember the other aspect of her
21  testimony? She said, hey, the defendant promised me, promised
22  me, I'm never going to do it again, right? But we know that
23  was a lie. We proved it. Because he did it again and again
24  and again and again using these devices. He won't listen to
25  his own cousin.

1       Think about the oath he took when he was a doctor
2 and what he did using this phone, right?  Wouldn't listen to
3 his cousin, wouldn't listen to his oath.  But guess what.
4 He's got to listen to you, right?  He's got to listen to your
5 verdict.  He's got to.

6       So when you go back into that room, with your
7 verdict, with your verdict you can put an end to the
8 defendant's sexual exploitation of children once and for all.
9 Okay.  He's guilty.  We proved it.  Convict him.

10       THE COURT:  Mr. Ames.

11       MR. AMES:  Thank you, Your Honor.

12       All right.  Good morning, everybody.  Once again, I
13 wanted to say appreciate your time, appreciate your attention.
14 I know how difficult these types of cases are.  So I really
15 thank you for your service.

16       We talked the other day when we first came out here
17 on Tuesday.  You recall I told you a few things during the
18 opening argument.  I told you we were not going to hide the
19 ball on anything with regard to Mr. Tatum's prior conduct with
20 other people.  I said to you that he's an admitted porn
21 addict, admitted sex addict.  Has sought counseling for it.  I
22 told you that the government's case is going to include a lot
23 of evidence not just of what they're alleging in their
24 charges, but it was going to include a bunch of other evidence
25 as well.  And that their general gist of the information you

1  will receive would be that David Tatum is a pervert.

2         And we're not denying that he had prior acts that

3  were bad.  We're not denying that there aren't victims.  There

4  are.  And there are a few of them sitting over there right

5  now.

6         David Tatum betrayed his family.  David Tatum

7  betrayed the people that he trusted and who love him very much

8  and I'm sure he loves very much as well.  But he did terrible

9  things to them.

10         But that is not what you're weighing today.  What

11  you're weighing today is whether or not the government has

12  proven beyond a reasonable doubt that he committed the acts

13  specifically that they are alleging.  That's your role and

14  that's your job.  It is not to take an assessment of his

15  entire life and his entire history and punish him for

16  everything you've heard.  Your specific job is to weigh the

17  evidence for its relevant purposes and determine whether the

18  government has specifically met the burden for the charges

19  alleged.

20         I'm going old school with paper here.  I'm going to

21  run through that because I think there are a few points that

22  we need to address here.  Now, the U.S. attorney went over a

23  few of these.  I just want to quickly, while they're fresh

24  here in everyone's mind, go over them real quick.

25         The child pornography definition.  This is one that

1  you are going to have instructions on when you go in the back

2  and the judge will give you these instructions in detail.  But

3  what it entails is production of a visual depiction of a

4  minor.  That part is pretty straightforward.  Some of the rest

5  of it isn't.  There's an additional definition number two that

6  you probably don't have to worry about, but this is

7  specifically the instruction you're going to get later.

8          Now, keep in mind this is extremely important

9  because unlike what many people may think, a nude image of a

10  minor is not by itself child pornography.  It just isn't.

11  That's why you don't -- when you go home today, you're not

12  going to have to throw out the pictures of your kid taking a

13  bubble bath or running through sprinklers.  There can be art,

14  there can be pictures and photographs, a variety of those

15  involving nudity of minors.  It is not pornography by

16  definition.

17          The law states and gives you the definition, and

18  these are the categories.  There's a few extra ones that were

19  not just displayed so I'll give you all of them.  They need to

20  fit one of these five categories:  sexual intercourse,

21  bestiality, masturbation, sadistic or masochistic abuse, and

22  then finally, lascivious exhibition of anus, genitals, pubic

23  area of a person.

24          So you can pretty much eliminate one through four as

25  a general matter in the information and images that you have

1   seen.

2         The lascivious exhibition of anus, genitals, pubic

3   area is the definition that by and large we're dealing with

4   here.  But keep in mind the context of these other things that

5   you're looking at.

6         The requirement for something to be child

7   pornography is not just some nudity.  It's much more than

8   that.  It requires sexually exploitive -- sexually explicit,

9   rather, conduct.  And it's not enough that they're not just

10   nude.  It's not enough that the pubic region is visible.

11   That's not even enough under the statutory definition.  It

12   requires the lascivious exhibition specifically.  And not just

13   exhibition, lascivious.

14         Now, what does that word mean?  Well, Congress being

15   Congress, they didn't give us a definition.  There's none in

16   the statute.  But it is a fact for you to decide.  And the

17   judge is going to give you some guidance.  I'm going to show

18   you those factors -- some of them anyway.

19         You're going to have this list back there, but

20   essentially -- there's actually a total of six of these

21   factors.  They're not exhaustive nor all inclusive.  They are

22   not dispositive.  They are for your consideration, okay?  So

23   you don't have to -- there's no checking of a box on each.

24   There's no if I don't have one, then it's not or -- you just

25   have to look at these as -- taking these in advisement in

1  helping you determine when you're looking at or thinking about

2  a particular image, whether or not it constitutes lascivious

3  exhibition.

4          But in particular, what's the exhibition part?  It

5  means a depiction that displays or brings to view to attract

6  notice to the genitals or pubic area of children to excite

7  lustfulness or sexual stimulation of the viewer.  Again, it's

8  not just someone standing there.  It requires specific focus,

9  exhibition.  And not just exhibition, lascivious exhibition.

10          And those factors can include the focal point.  Was

11  it the focal point, the main focus of the image?

12          Was the setting made to appear sexually suggestive?

13  Was there something within the image itself other than

14  potentially just the focal point, but was it -- where was it?

15  What was going on?  Those can be factors.

16          Whether the person is displayed in an unnatural,

17  inappropriate attire, inappropriate pose.

18          Whether they were fully clothed or nude.

19          And the final two:

20          Whether the depiction suggests coyness or

21  willingness to engage in sexual activity.

22          And whether the visual depiction is intended or

23  designed to elicit a sexual response in the viewer.

24          And as the judge will note below, it doesn't have to

25  involve all of them to be lascivious.  It's for you to decide

1    the weight.

2            And again, just because genitals, anus, anything is

3    visible is not enough.  It has more to it.  It requires more.

4            I just want to lay that all out so that -- my

5    sincere hope is this is not a circumstance where you go and

6    check a box and take things for granted.  This is important.

7    You have facts and things to weigh.  You're the fact finders

8    here.  You're the ones that make these decisions and it's

9    important that you do so carefully and with consideration.

10           I want to address a few of the main points, but one

11   thing I want to make clear.  There are three different types

12   of counts in this case.  They're similar in a lot of ways, but

13   they also have some distinct differences.  Count one is

14   possession, which is possessing it.  Count two is the

15   production, which means making or producing.  And count three

16   is the transport.  And the judge will lay those out as well

17   and the differences and distinctions, but throughout them the

18   definition of child pornography is going to be the same.  The

19   definitions and the factors you consider will be the same.  So

20   that analysis is going to carry out throughout this.  But some

21   of the other factors you're going to have to consider will be

22   slightly different.

23           What I want to note to you is that of all the

24   evidence, of every single piece of evidence that the

25   government has presented to you, I want to be clear, only one

of them, and one only, even can meet the definition of count two which is the production count.  The only video or image that meets that requirement is the video of his cousin M.C. taken with a camera in the bathroom getting in and out of a shower.  That is the only one.  It is not production to morph an image.  That is not alleged.  That one video is the only count that qualifies for count two.

So speaking on that video, what we observed and what the evidence provided was that this was at a cabin that the family goes to in Maine on a routine basis.  Cousin E.S. said that she's gone, like, 20 times, I believe.  Or many years.  Thirty, I don't know.  Very many times.

So in this bathroom you saw a video of what appeared to be David Tatum setting up a phone on a shelf somewhere in a bathroom.  He leaves the room.  Sometime later his cousin does come in, takes a shower and leaves.  And he comes back in to retrieve the camera.

So what the government is arguing and what they want you to glean from that is that that was meeting all of the elements, not just for count two, but for the rest, but specifically for the second count for production, that this was meeting this definition that it was child pornography, number one.  And number two, that it was done with intent to film her.  And number three, that it was, in fact, saved, transported later for the other counts.

1          So the analysis specifically, was it child
2    pornography?  Again, no one here is contending it's not --
3    it's good.  And frankly, I'm not contending it's noncriminal.
4    There are other laws that David Tatum has assuredly broken,
5    state laws, federal laws in other jurisdictions and elsewhere
6    with the conduct that you have seen.  But that is not for you
7    to decide.  You have three charges to decide and three only.

8          So whether or not he committed a crime in Maine in
9    some fashion under their laws, or in New York under their
10   laws, or even in North Carolina under the state laws here,
11   that's not for your consideration.  Whether or not he violated
12   a voyeurism statute, whether or not he violated someone's
13   privacy and that has a criminal implication.  You have
14   literally three charges to consider.

15         Here you would have to, in order to find him guilty,
16   determine that this was in fact child pornography.  Meaning it
17   meets those definitions that we just talked about.  That it's
18   either bestiality or intercourse or sadomasochistic or
19   exhibition of the pubic or genital region that is lascivious,
20   meaning sparking desire or whatnot in the viewer.  That's the
21   only definition that would even come close to qualifying
22   because there's clearly no intercourse.  There's clearly no
23   bestiality.  So you would have to find that this occurred with
24   an intention to do so, number one.  Not just an intention to
25   film, but an intention to use or coerce or cajole her in some

fashion to engage in explicitly sexual conduct.  That he had
to somehow intend that, have that happen, film it, and intend
to film it.  All of these things need to be met.

So you can review and -- was there any lascivious
conduct?  Was she doing anything sexual while she was there?
I submit she was not.  She didn't know the camera was present.
She took a shower.  She cleaned herself off and that's all she
did.  There was nothing sexual about it.

The government would like you to believe that
somehow it is sufficient that if a person looks at or views an
image and is aroused by it, that in and of itself is
sufficient.  It is not.  For instance, there is some of these
morphed images that the government has provided.  He had an
ex-girlfriend, the prom photo, for example.  Now, you'll have
to do an analysis if you're looking at that photo.  Is that
pornography?  Again, it's not good.  We're not condoning it.
But is it pornography?  Does it have the definitional meaning?
Lascivious.  Is it lascivious?  Is it focused on the genital
region?  I know this sucks to talk about, but that's what your
analysis is.  It doesn't.  It just doesn't.  It's literally a
person standing.

There are many other images just like that:  People
standing and that is all.  Nothing sexual at all with the
nature of the photo.  And the fact that he masturbated to it
or liked it does not change by magic what's in the photograph.

No more than if someone masturbates to a Sears catalog, it doesn't make the Sears catalog pornography. So you need to look and analyze and evaluate the image. That is your purpose here.

So please don't skip over the important parts here to determine whether in fact this is pornography and what his role was, particularly in count two. He placed a camera in a bathroom, but they also have to prove that he intended to create child pornography. That he intended to use or coerce M.C. to engage in sexually explicit sexual activity for the purpose of creating child pornography. That's the definition.

We have the video and that's essentially all that we have to establish what happened and what the circumstances were. That's the entirety of it. That's why they have brought in a lot of this other evidence that isn't charged today to try to show that he's consistent in his behavior and he does this a lot and he's done it before, right? That was the purpose. He's not charged with it, but that's why it's relevant.

They told you to listen to E.S. right at the end there, right? Again, E.S. was another one of David's victims. You heard about her story where back when she was 15 or so, high school age, there was a video taken of her taking a shower. It also included David's own sister. And she heard about this from David's sister and confronted him about it.

1          Now at that time, bear in mind, they were of similar
2     age.  They were about a year or so apart.  So he -- both
3     around 15, 16.  Like the age frames, it wasn't exactly clear.
4     So at that point in time, he was also high school age.  This
5     is not somebody who is 30 or 40 years old.  They're the same
6     age.

7          Additionally, it would seem to be the case that he
8     certainly would not have wanted to film his sister.  The
9     cousins are not blood related as testified to.  They are step
10    cousins.  So he's got this video apparently that his sister
11    was in.  I imagine that -- and you can decide based on what
12    you've heard whether that was an intentional act; that he was
13    intending to create that of his sister.  I would suggest
14    probably not, but you can decide that.

15         But you also heard that this cabin -- sounds like
16    they've got a pretty big family and they've got a lot of
17    people there and they're telling you how prolific he is at
18    this voyeurism stuff and placing cameras in bathrooms.  We
19    don't know how many times it's been done.  We don't know how
20    often it happens at the cabin.  We don't know if it was done 8
21    or 10 or 12 times that day with multiple people.  We do not
22    know because the evidence hasn't been presented.

23         So did he intend specifically for the camera to film
24    M.C. or did he intend for the camera to film whoever happened
25    to walk in?  We don't know.  They haven't given any evidence

1   or any surrounding circumstances. They haven't called anybody

2   that was there to corroborate who might have been there at

3   that particular date and time. They didn't give you any

4   pictures of what the shelf would have looked like and where he

5   placed it. They didn't give you anything. They just showed

6   you the video. And then they showed you a bunch of stuff that

7   happened at various other times to various other people and

8   want you to presume things based on that.

9        But I will tell you as far as the voyeurism evidence

10   is concerned, what you have seen -- while you didn't see this

11   video purported to have happened many years ago in high

12   school, you saw another video, same cabin, with another family

13   member who, again, I submit, is another victim. There's no

14   denying it. But that was of an adult. And again, probably a

15   violation of other laws but not these laws.

16        So who knows how many times, how often this may have

17   occurred, and if it was just something he was doing at a very

18   high clip with multiple people and happened to have one, maybe

19   other people, that he didn't intend to, we don't know. We

20   have nothing in regard to the intent in that specific moment.

21   We just have conjecture about it based upon past behavior.

22        But note too that of all the voyeurism videos that

23   you've been given, all the rest are adults. Again, they're

24   not good, but they're of adults.

25        The patient that he had, of course, is horrifying.

1   Taking an up-skirt photo of a person that's in your office and

2   putting their faith and trust in you to talk about what are

3   assuredly sensitive issues for somebody young and in high

4   school is horrific to do that, but it's not pornography and

5   it's not child pornography because the patient was over the

6   age of 18.  The government has argued and I think will argue

7   that, well, it was very close, by a few days.  Well, would

8   that not show that his intent here in his perverted behavior

9   was to avoid filming somebody under 18?  If he's had a

10  long-time patient week after week that he's meeting with and

11  he knows how old she is and he waits until the appointment

12  five days after she turns 18 and that's the video that he

13  takes, wrong as it is, it doesn't show an intent to film a

14  minor.  It shows literally the opposite:  the intent to film

15  an adult.

16          The government may go and show this exhibit now that

17  indicates the report says 17 years old on it.  She's not.  She

18  was 18.  It also doesn't describe the same clothes she had on

19  that day.  So they can pull that up.  Probably will.  But note

20  that she was literally 18.  He did know it.  It was another

21  part of the report where he notes that she's 18.  That's what

22  happened.  They didn't tell you a whole lot about it.  They

23  just introduced a document, but you can review the document

24  yourself and you can note what that document says that she was

25  wearing that day.  It was not a skirt, right?  So some of this

1   stuff is just left over from prior appointments presumably,
2   but you make that call.
3           Now, with respect to some of the other, again,
4   evidence that he's not charged with, there's this file list of
5   very suggestive names.  Horrifying stuff, no doubt.  Again, no
6   images.  Nothing.  It's literally just text.  I said that, I
7   think, in the opening.  I said it during trial.  The reason
8   that's critical is because we really don't know what it is.
9   No matter how suggestive it sounds or how horrible it is,
10  there's no evidence of what it is at all or where it came from
11  or anything.
12          And how does it get there?  This is important.  The
13  reason why I spent so long blabbering about the whole idea of
14  these cache files and the thumb drive, why I care so much and
15  why we're putting that forward so much is the government's
16  getting up here and arguing that access means something
17  different than access really means.  The suggestion is that
18  when you see this metadata and access, it means that the
19  person opened it or viewed it or did some tangible thing with
20  the item.  That's not what it means.  It just means one device
21  was plugged into another and that is all.  Mr. Whitt told you
22  about that.  We went over that very carefully and that's
23  important.
24          If you recall, I pulled up multiple instances of
25  screenshots and thumb shots and such on this MacBook that were

1    accessed allegedly on September 10, 2021.  They all had the

2    same access date.  Not only that, they had the same access

3    time.  Not only that, the same access second.  So unless he

4    was watching 85-some-odd videos simultaneously, I would submit

5    that, no, that access date is not a date that it was opened or

6    viewed.  It was only a date that somebody put some drive into

7    a computer and that's what creates it.  That's the point.

8         So look carefully.  You'll have the exhibits.  You

9    can look for yourself.  Recall I was asking what does this

10   even mean?  What is this stuff, the metadata?  Read through

11   it.  Look how the dates match up.  Look for other dates.  The

12   video of M.C., for example, there's a creation date and a

13   modified date from six or seven years ago.  There is no other

14   indicia of ever viewing or watching it in any recent term

15   whatsoever.  That is false.

16        I told you in the opening statements -- if you

17   recall, the government submitted to you that in their case

18   they were going to show you that the video of M.C. was played,

19   opened on the MacBook.  And I told you, no, they won't, if you

20   remember that.  Money back guarantee.  No, they will not prove

21   that because it didn't happen and they don't have evidence of

22   it.  Lo and behold, there is literally no video of it on the

23   MacBook.  What is there?  The quick view thumbnail.  That is

24   what's on it and that is all.  That's why we spent so much

25   time with that.  And how does the QuickLook thumbnail get on

1  there?  Putting the drive in populates it, just the thumbnail.
2  That's it.  You can't even access the thumbnail without
3  special software.  There's no video on the computer.  It's
4  just a thing that's on there that you can't even see.  So no,
5  all of this stuff that they're saying is accessed and viewed
6  on the MacBook, there is no evidence of.
7         Let's talk about this playlist again.  It's the same
8  concept.  Look at the playlist.  The entire list is populated
9  at the same time, June 29th.  They're going to tell you it's a
10  Morphus login.  They didn't look anywhere else that day, but
11  they're going to just assume because it says that, it was him.
12  You heard from at least a couple witnesses, but certainly from
13  the main investigator on the case, Mr. Atwood, Agent Atwood,
14  that we called, who had interactions with his wife and knows
15  that it was a jointly used device.  Knows that multiple people
16  did have access, did use it.
17         Again, I'm not suggesting that stuff was planted.
18  Don't get me wrong.  I'm not suggesting that someone got
19  framed here.  What I'm suggesting is just because there's some
20  image or something pops up, it's not -- the only conclusion
21  anyone could ever draw here is that it's David Tatum who's
22  responsible for this image.  That's not the case.  They want
23  to suggest that he's carrying around some images and watching
24  them constantly on a MacBook computer and deleting them, or
25  whatever the case may be.  No, that's not the case.  The only

1  remnants of it are because a drive gets plugged into a device.
2  That is it.  That is all.  The government's own witness told
3  you that.
4          That's the evidence on the MacBook.  And we don't
5  know when or who was on the computer and who might have
6  plugged the device in.  So to suggest that he was watching a
7  video on September 10th or something when there's multiple
8  instances of the exact same time having the exact same access
9  date, you can use your common sense on this.  It's just
10 thumbnails.  That's all it is.
11          So look carefully at the metadata.  Trust or not
12 trust it at your discretion.  That is your prerogative as the
13 jury.  But listen carefully to the instructions.  Think
14 carefully about the evidence and things you've heard,
15 particularly with regard to the analyst who gave you a lot of
16 detail, a lot of good information.  He provided a lot because
17 this is a digital case with digital evidence.  That's really
18 basically all of it as far as the tangible evidence other than
19 testimony.  So Mr. Whitt gave you a ton of information to
20 consider about how this process works.
21          I asked a lot of questions about -- we delved into
22 what is pthc, and such, in part because -- again, I guess you
23 can use a common sense assessment of it because there's no
24 specific definition that was given.  But preteen hardcore,
25 again, the evidence that is here for Mr. Tatum is (A) that he

1 doesn't know what that is, is not familiar with it, but (B) no
2 particular evidence to speak of that even implicates that
3 there was anything preteen or hardcore anywhere.  The only
4 implication are supposedly these file paths generally that
5 have some pretty horrific names.  But keep in mind this is a
6 person, as I said before, a prolific collector of pornography
7 in general, including a lot of adult pornography, including a
8 lot of anime.  We had a conversation about that too.  That's
9 the Japanese cartoons.  You can see some on Netflix, the
10 normal ones.  I've watched them.  They're fine.  There's a
11 subsection, subgenre that is some pretty nasty crap.  It
12 includes depictions of minors.  It includes them doing sexual
13 stuff in comic books and in videos and stuff.  We talked about
14 that.

15           And we talked with Mr. Whitt about common things he
16 might see in terms of names.  We talked about the Lolita or
17 Loli or Lolicon and stuff like that.  He wasn't a hundred
18 percent familiar with exactly what it is, but he gave you a
19 couple of examples like, yeah, younger looking, even like
20 really, really young looking people in Japanese cartoons and
21 such.  Again, not child pornography because it doesn't meet
22 the definition of having, you know, a person in it that you
23 guys are tasked with doing today.  But it was on there.
24 There's a lot of it.  And note some of the file paths.  They
25 talked about the file paths.  That list they gave you has got

1   the name of a file that does not have -- they showed you a
2   file, but the list you have does not have the rest of the file
3   path.  So that file path is related to a comic book that says
4   the Loli part in there, Chapter 4, whatever it is.  Again, we
5   don't know what it is.  They didn't produce that.  But that is
6   one of thousands upon thousands.  I think they mentioned the
7   Loli search was like 10,000 files.  Again, we're talking about
8   a lot here, a lot of adult pornography too.

9         And so what the government has presented is a
10  handful of images and photos that are, other than the family
11  members that you've heard from, largely people we don't know,
12  don't know the age of, don't know the identity of, don't know
13  really where they came from, and don't know otherwise if they
14  are in fact child pornography because even if you see sexual
15  behavior that does meet the definition quite clearly, like a
16  sexual video that's obviously pornographic, you still have to
17  determine they're a minor beyond a reasonable doubt.  You may
18  think maybe, probably.  That's not good enough.  It is beyond
19  a reasonable doubt.

20        If you're a sports fan or something, if you've ever
21  seen where there's a play and they make a call, someone
22  challenges the call and they say, well, it's presumed that the
23  call on the field stands unless there's clear and convincing
24  evidence to overrule it.  Okay.  That's kind of how this
25  works.  He's presumed innocent and can only be convicted if

1    the government proves by clear and convincing evidence that
2    he's guilty.  But not even that.  It's a higher burden.  It's
3    a beyond a reasonable doubt burden, the highest one we have.
4    Clear and convincing evidence is a standard that they take
5    your kids away.  Beyond a reasonable doubt is harder.  So keep
6    in mind that that's the standard that you have to weigh all of
7    these decisions.
8            How old a person is beyond a reasonable doubt.  Not
9    based on assumption.  Based on the evidence that you have
10   heard and that only.
11           What about whether it's pornography?  Again, beyond
12   a reasonable doubt.
13           Whether or not they had the jurisdictional
14   requirements, all that word salad that the judge will tell you
15   about.  Beyond a reasonable doubt.
16           Whether or not they've properly attributed things
17   and all of that.
18           Take everything carefully, sincerely into
19   consideration because these are the easiest cases in the world
20   to gloss over.  These are the easiest cases to check those
21   boxes.  They absolutely are.  But you have a duty and I ask
22   sincerely that you think carefully about all of these issues.
23   You listen carefully to the judge's instructions and you
24   consider this for what it is, which is a series of conduct
25   that they're alleging that is specific and not related to some

1  of the other folks that came in.

2          Consider when you're looking at an image is this

3  pornography?  Is the focal point on genitals?  Is it

4  intercourse?  Is it that or not?  Is that present?  Is it nude

5  or not?  Is it all of those factors?  Consider each and every

6  one of them.  Consider them in the context broader of the

7  statute and what this is supposed to prevent.  The production

8  charge in particular is supposed to prevent the filming of

9  sexual abuse.  Look at the statute.  Read through it yourself.

10  Look at what the examples are of things that the government

11  would have to prove.  Look how severe they are.  And consider

12  the definition very carefully and ask yourself whether or not

13  that occurred here.

14          No matter what you think, no matter how horrible you

15  think the behavior was, the guilty verdict only comes, only

16  comes if you believe beyond a reasonable doubt that he

17  committed the specific acts specifically delineated in that

18  statute.  For count two it's only one video and only one video

19  applies.

20          You can also take into account to some extent things

21  you didn't hear about.  You can't speculate on evidence you

22  wish you knew, stuff you wish you knew, wish you heard about,

23  wish you saw.  You have to go with the evidence presented and

24  any reasonable inferences therefrom.

25          You're going to have those documents back there as

well to work from.  I would ask you to go through them
carefully.  Some of them may not be pleasant.  But in
particular, some of the metadata, some of the more technical
information.  And consider carefully whether or not some of
the allegations here are what they appear to be.  Again, we're
not saying anyone got framed or anything.  The question is
were they or were they not accessed on certain dates and
times?  Were they even on certain devices?  Is there any
evidence of any of these things?

          Be careful in going through that and be careful with
being overcome with emotion, which is pretty inevitable,
obviously, in a case like this.  It's hard not to be that way.
Okay.  I get it.  I understand.  But we've got a system here
that works for a reason.  We all have a part in that and you
have that today.

          And I really, really appreciate your time and I
appreciate your patience with me and all my blabbering all the
time.  I appreciate the people that came out to participate in
this trial.  I know that's hard.  You guys know it's hard too.
And I hope that you can do what is fair and what is right in
your serious consideration of all of the evidence.  And it's
not checking boxes and it's not just assuming things and it's
not easy whatsoever.  This should not be easy.  It's not easy
for anyone.  It should not be easy for you.  You have an
important, important job.  I know I keep saying it over and

1    over again like a broken record.  It's for a reason.  When I'm

2    repeating something and I can't stop talking, it's because I

3    think it's pretty damn important.  So please consider all of

4    those matters that I spoke about.  Think long and hard.  Think

5    carefully.  Ask questions if you have them.  Talk to each

6    other.

7             I appreciate your time.  Thank you.

8             THE COURT:  You have 23 minutes, Mr. Cervantes.

9             MR. CERVANTES:  Thank you, Your Honor.

10            Let's talk about what we agree with and what we

11   don't agree with because apparently there is some common

12   ground here.

13            Number one, defense agrees that Dr. Tatum is the one

14   who recorded, who made that recording of M.C..  That's beyond

15   dispute.  And the evidence proved it anyway.  His family

16   members identified him.  He's in the video.  That's not an

17   issue.  They've conceded it.

18            They also agreed this is criminal.  This is

19   criminal, ladies and gentlemen.  But they want a technicality.

20   Criminal, but not the criminality here.  We submit to you it

21   is the criminality here.  We're going to go through that.

22   We've gone through that.  Mr. Odulio explained that to you.

23   But they want you to find through some technicality that isn't

24   actually applicable and doesn't work with the facts of this

25   case to find him not guilty.

1     We also agree that we don't know how many recordings
2     he's made.  Who knows how many recordings the defendant has
3     made of other victims, of other minors, other adults.  How
4     many?  Only the defendant knows.  We found some.  We presented
5     those to you.  We found four:  The first bathroom video of
6     M.C.; the second bathroom video of K.C.; E.S. testified to one
7     of her and the defendant's sister when they were both minors;
8     and F.L..  She also testified he did those three sets of
9     recordings, which is another point of agreement.  He agrees to
10    that.  He agrees that he made that recording.  He agrees that
11    it was wrong.

12    We're not here, though, to say, hey, convict him
13    because of the F.L. recording.  To be clear, he's not charged
14    with that.  But that recording informs your decision of what
15    his intent is in making the recording of M.C., the first
16    bathroom video.  Where did he point it?  Where did he point
17    the camera?  What kind of voyeur is he?

18    A voyeur is someone who records other people.  Okay.
19    But he's a sexual voyeur.  He's not interested in recording
20    people without their knowledge going about their business in
21    everyday life.  He's interested in recording them in the
22    bathroom, the most intimate of places.  What happens in the
23    bathroom?  You take your clothes off.  Why didn't he do a
24    recording somewhere else?  Even a bedroom.  Lesser chance that
25    you're going to take your clothes off.  Maybe.  I don't know.

1    But a bathroom you're surely going to take a shower.  And he
2    knew exactly what was going to happen because he set it up 20
3    seconds before M.C. went in to go shower.  Then he comes in
4    right after, retrieves the camera and keeps it all these
5    years.  Where does he keep it?  Where does he save it?  He
6    didn't look at it and say, oh, boy, my 15-year-old cousin.
7    They're family.  There's no doubt -- although it wasn't
8    admitted to by defense here, but there's no doubt that he knew
9    how old she was.  They're family.  She was 15 at the time.

10          He didn't look at that and say, hey, I probably
11   shouldn't have done that.  No, he deleted it from his phone.
12   He put it in the hard drive.  He saved it for all these years.
13   Since 2016 that video has been saved.  And where is it saved?
14   In his library of pornography.  It's not saved in a folder
15   that says mistakes of my life, things I regret.  It's saved
16   together with his material that he uses to get off.

17          We don't agree on a lot more than we do agree on.
18   This isn't art.  None of these images are art.  None of these
19   videos are art.  He didn't ask M.C. on the stand:  Don't you
20   think this is an artistic view of you naked in the shower?  Is
21   that art?

22          He also misstated the law.  As the judge said, you
23   need to follow the judge's instructions.  But I'm going to do
24   my best to restate them correctly.

25          So the defense suggested to you that somehow M.C.

needs to do something in the video. It's on M.C.. Let's
shift the burden, ladies and gentlemen. Let's shift it to the
victim to make sure that this video can only qualify as child
pornography if the child is the one who does something sexual.
Let's switch the burden to the victim. He'd like that. The
law is not like that.

So the law -- this is the document that the defense
showed you. Definition of sexually explicit conduct.

Number 1, sexual intercourse.

So in terms of -- the pornography here, as I told
you in the opening, there's several portions, there's several
types, right? Let's go for low hanging fruit, as Mr. Odulio
told you. The first video we showed you of the two girls that
were approximately 11 to 13 years old. There's no doubt about
that. This doctor is a child psychiatrist. Most of his
patients, 75 percent of his patients were children. He knows
what children look like. And even if he didn't, just look at
the video.

Sexual intercourse. They were engaged in that.

The last category is the category that would apply
to the M.C. video because she did not engage in sexual
intercourse. So I guess we can agree on that.

So what does sexually explicit conduct mean when
we're talking about the lascivious exhibition of the genitals
or pubic area of a person? We're not here trying to prosecute

parents who are taking pictures of their kids and they happen
to be in the bathroom.  That's not what the law says.  It is
the lascivious exhibition.  And there's guidance that you're
going to get to what the lascivious exhibition of the genitals
means.  That's what makes it criminal, right?  And there are
factors.  These are factors, okay?  Some of the factors are
applicable here.

The first one, what is the focal point?  The focal
point, the angle of the video in the bathroom is directed
towards Monica's crotch.

Look at the setting.  It's in the bathroom.  As I
said, this isn't a voyeuristic video of them on their family
vacation and M.C. out on the lake or something like that.
This was designed to record her in her most intimate moment,
in the shower, to capture her naked.  Not just naked, but he
set it up from the ground up to capture her groin area.

Number four, she's nude.  Totally nude.

Number six -- this one, I think, is the most debated
between the two sides, right?  What is the -- what is the
intent or design of this video?  Does it elicit a sexual
response in the viewer?  The defendant has already told you
what he does with his material.  The defendant took the
actions of taking that video and preserving it.  What is it
designed to do?  It is designed to satisfy his urge to create
these videos, to satisfy his sexual urge.

1          What if -- what if M.C. in that video actually had
2     started doing something to herself, masturbating?  We wouldn't
3     be having this conversation, right?  The defendant doesn't get
4     a free pass just because the victim didn't do what he hoped
5     the victim would do.  Here what he tried to do was record her
6     in the bathroom so that he could use that video for himself.
7          He says that he's only interested in recordings of
8     adults, but that's not true.  His child pornography material
9     you've seen involves minors.  That can't be in dispute.  The
10    modified images, some of those girls were at least under 10
11    years old.  That's up to you to decide by looking at the
12    images.  I mean, you've seen them here.  You can tell.  Some
13    of you even told us during jury selection that you have
14    children.  You know what children look like even if you don't
15    have them.
16         But the facts contradict his contention that he's
17    only interested in adults.  Let's talk about F.L., for
18    example.  The defense was right, I was going to show you that
19    document.
20         This is the medical record of the defendant's
21    visit -- or Faith's visit with the defendant.  You can see
22    that he is the listed provider.  No doubt about that.  He
23    agrees that he treated her and even agrees that he made the
24    video.
25         What I want to highlight is that the defendant

believed that she was under 18, right?  The defense has
highlighted the fact that five days before this meeting she
had turned 18.  But what I'm asking you to do is look at what
the facts suggest to you was the defendant's belief of what he
was doing.  The facts show you that he believed she was 17.
He didn't know she had just turned 18 five days before, and he
tells you that in his notes.

He says, "F.L. is a pleasant 17-year-old white
female."  I'm showing you Government's Exhibit 11.  "She is in
12th grade at Penfield High School.

"F.L. is a 17-year-old girl who has a chaotic
childhood with a dysfunctional mother and is now being raised
by her father who is a single parent and works many hours a
week typically."

This is who he took advantage of.  He didn't
believe -- he didn't know she had turned 18.  So in his
mind -- in fact, what he tried to do was even make another
production video.  He's not being charged for the F.L.
conduct, I'll say it again.

But this is instructive of what he was trying to do
when he made the video of M.C..  It's hugely important
because, as we've talked about, you can never really know.
Unless you have some way to look into his mind, you look at
conduct.  And that's just using your common sense.  We do that
all the time.  What someone intended to do, you look at the

1   circumstances and you decide what it's consistent with.  And

2   here he thought he was recording a 17-year-old girl.

3           Now, the defense also says that there's no evidence

4   that the defendant accessed the M.C. video.  First of all, we

5   don't have to prove that, right?  The elements for production

6   don't require us to show you that the defendant was sitting

7   there watching the video.  We could stop short at the moment

8   that he recorded that video because the crime is complete.  We

9   could show you that he completed the crime as soon as the

10  video was complete and everything we've shown you after that

11  is really just corroborating evidence, right?  Our job is to

12  prove this to you beyond a reasonable doubt, so we're going

13  beyond just proving the elements of the offense.  All of these

14  other facts, they don't go to establish the elements.  You'll

15  see that when you're breaking down the elements and what facts

16  support them.  It's not -- there isn't some requirement there

17  that the defendant viewed the image, right?  We're showing

18  that because it shows what he did with it.

19          And there's proof that he accessed it.  So contrary

20  to the defendant's statement, Exhibit 5K shows you -- this is

21  the metadata from the MacBook that has the same thumbnail as

22  the M.C. video, right?  It is a thumbnail created of the M.C.

23  video, excuse me.  It has -- the file name is the same file

24  name.  Thumbnail last accessed date/time:  September 10, 2021.

25  What does that tell you?  That tells you that the hard drive

1  was plugged into the MacBook.

2          What else did we show you about that hard drive?

3  That's the My Passport hard drive.  It was encrypted.  No one

4  knew the password to get into the hard drive.  We had to send

5  it to Quantico.  There's another important fact there.  The

6  only way that the Mac is going to be able to generate this

7  information about that file when the hard drive is plugged in

8  is because the hard drive is unlocked when it's plugged into

9  the Mac.  That is how the Mac can retrieve that data and store

10  it in its hard drive.

11          And how is it that the Mac could have accessed the

12  thumbnails of the image -- of the video?  How is it that the

13  Mac could have accessed all of this metadata about the M.C.

14  video?  That's because the user knew the password.  And the

15  only person in this courtroom who knows the password is the

16  defendant.  And it's not Kim because when she gave us the hard

17  drive, we obviously had to send it to Quantico.

18          But even if all of that fails, even if all of that

19  fails, which it doesn't, what is -- what was the defendant's

20  intent?  What was he trying to do?

21          So Mr. Odulio has explained to you that count two,

22  the production, has attempt.  It also includes attempt.  What

23  was the defendant trying to do with this video?  Because

24  again, the law is not going to give him a free pass just

25  because he was inept in committing his crime or because he was

1   fortunate enough that M.C. didn't do something to herself in
2   that video to make it clear that it's child pornography.  The
3   law does not forgive him as such.  Accordingly, when you're
4   charged with an attempt, you can be convicted of the
5   substantive offense if you have the intent to commit the
6   offense and you take a substantial step toward that offense.
7   Those are the first and second elements that you see on the
8   screen.  Intent to commit the offense and substantial step
9   toward it.  Everything we've talked about applies to that.
10          THE COURT:  Three minutes, Mr. Cervantes.
11          MR. CERVANTES:  Thank you, Your Honor.
12          Finally -- well, two more points that I'll try to
13  get into three minutes.
14          The -- we don't agree that the defendant doesn't
15  know what pthc is or that he didn't have -- that there was no
16  access.  So let me just go back to this really quick, this
17  list, right?  I'm not going to read these file names again.
18  This is 5C.
19          What is the evidence?  So this is just a list, data
20  that's pulled out of the MacBook.  It's a list of all these
21  horrible sounding files.  So that's evidence, right?
22          Mr. Whitt testified that in his experience, pthc is
23  consistent with child pornography.  And that in the rare, rare
24  situations, he has seen a few files with pthc that involve
25  adult pornography; but in those files, the file names, there's

usually some indication as well in the file name that there's something related to adult.

So go ahead and look through all of these 1,118 rows and try to find one of those rows that indicates adult and take that out. You're going to be left with probably another thousand, if that, just to be generous and to give him the benefit of the doubt. And it was rare.

But there's more because Exhibit 5D, right? This is the one that shows you what was played. This is the history of what was played on the MacBook, 5D. It shows you that this VLC was first run August 6, 2019. I asked Mr. Whitt so what does that mean? He said basically it means that these videos here were all played sometime after that date to the date that the MacBook was recovered. All right. So these videos. And these videos we linked back to three of them that were on this list showing that they were played. Those three -- I just took three examples -- were played sometime, because they're on this list, sometime after August 2019.

Finally, the defense wants you to believe that it's only child pornography if you can identify who the minor is. He's made some -- if you know the identity. And that's just simply not true. First of all, it's irrelevant when it comes to M.C. because obviously she's family. So I think he's suggesting that some of the other minors depicted in the other videos, it can't be child pornography unless you know the

1  identity.  And that simply isn't true, right?  It is use of a
2  minor.  We know that he used a minor.  We know he used M.C..
3  We know she's real.  You saw her.

4          And then identifiable minor, right?  What we're
5  talking about is the visual depiction has been created,
6  adapted, or modified to appear that an identifiable minor is
7  engaging in sexually explicit conduct.  You can use your
8  judgment and common sense.  When you walked in here the other
9  day, we never said, hey, leave your experience at the door and
10 just make decisions in a vacuum as if you have no real world
11 experience.  This is the point of having a jury because people
12 like you --

13         THE COURT:  I'm sorry, Mr. Cervantes, please
14 conclude.

15         MR. CERVANTES:  Use your common sense.  They're
16 minors.

17         Thank you.

18         THE COURT:  All right.  Members of the jury, I don't
19 like reading to you.  You probably don't like being read to.
20 But the instructions that I'm about to give you will be with
21 you in the jury room.  I don't expect you to memorize these.
22 In the sense they will be with you in the jury room, I need to
23 make sure that I say exactly the same thing out here, that you
24 will have virtually my words ringing in your ears in the jury
25 room.  So you can continue to take notes if you'd like, but

1  you will have these instructions.

2          I will now read count one in the bill of indictment,
3  to which I will refer to as the bill of indictment or just the
4  indictment.  I will then read the statute that the defendant
5  is charged with violating.  Finally, I will tell you the
6  essential elements of this offense.  You should keep in mind
7  as I review this charge that you will have a copy of the bill
8  of indictment with you when you go into the jury room to
9  decide this case so it will not be necessary for you to try to
10 memorize the charge.  I remind you that the indictment is not
11 evidence.

12          Count one reads:

13          From in or about July 16 through on or about
14 September 22, 2021, in Mecklenburg County, within the Western
15 District of North Carolina, and elsewhere, David Tatum did,
16 and did attempt to, knowingly possess, and access with intent
17 to view, any material that contained an image of child
18 pornography, as defined in Title 18, United States Code,
19 Section 2256(8), and that has been mailed and shipped and
20 transported using any means and facility of interstate and
21 foreign commerce, and in and affecting interstate and foreign
22 commerce by any means, including by computer, and that was
23 produced using materials that have been mailed and shipped and
24 transported in and affecting interstate and foreign commerce
25 by any means, including by computer.  All in violation of

1  Title 18, United States Code, Section 2252A(a)(5)(B)6.

2          You will note that the bill of indictment charges

3  that the offense was committed on or about a certain date or

4  dates.  The proof need not establish with certainty the exact

5  date of the alleged offense.  It is sufficient if the evidence

6  in the case establishes beyond a reasonable doubt that the

7  offense in question was committed on a date reasonably near

8  the date or dates alleged in the indictment.

9          Where a statute specifies several alternative ways

10  in which an offense can be committed in the disjunctive, or

11  using the word "or," the bill of indictment may allege the

12  several ways in the conjunctive, or using the word "and."  You

13  may find the defendant guilty of the offense if you find

14  beyond a reasonable doubt that he committed one or more of the

15  means of violating the statute.  Thus, where the indictment

16  uses the term "and," you may consider it as "or" unless I

17  specifically instruct you differently.

18          Title 18, United States Code, Section 2252A(a)(5)(B)

19  provides, in pertinent part, as follows:

20          Any person who knowingly possesses, or knowingly

21  accesses with intent to view, any book, magazine, periodical,

22  film, videotape, computer disk, or any other material that

23  contains an image of child pornography that has been mailed or

24  shipped or transported using any means or facility of

25  interstate or foreign commerce, or in or affecting interstate

or foreign commerce by any means, including by computer, or
that was produced using materials that have been mailed or
shipped or transported in or affecting interstate or foreign
commerce by any means, including by computer, shall be guilty
of an offense against the United States.

       For you to find the defendant guilty of possession
of child pornography as charged in count one of the
superseding bill of indictment, the government must prove the
following essential elements beyond a reasonable doubt:

       First, that the defendant knowingly possessed, or
accessed with the intent to view, any material that contained
an image of child pornography, as alleged in the superseding
bill of indictment;

       Second, that the material had been mailed or shipped
or transported using any means of interstate or foreign
commerce, or in or affecting interstate or foreign commerce by
any means, including by computer, or was produced using
materials that had been mailed, shipped, transported in, or
affecting interstate or foreign commerce by any means,
including by computer; and

       Third, that when the defendant possessed or accessed
with the intent to view the material, the defendant knew the
material contained an image of child pornography.

       I will now define certain terms used in the
definition of this offense.  You are to apply these

1  definitions as well as those I have given you previously as
2  you consider the evidence as to these offenses.  If I do not
3  define certain words, you will assign to them their ordinary,
4  everyday meanings.

5          The word "knowingly," as that term has been used
6  from time to time in these instructions, means that the act
7  was done voluntarily and intentionally, not because of mistake
8  or accident.

9          Ordinarily, there is no way that a defendant's state
10 of mind can be proved directly because no one can read another
11 person's mind and tell what that person is thinking.  But a
12 defendant's state of mind can be proved indirectly from the
13 surrounding circumstances.  This includes things like what the
14 defendant said, did, how the defendant acted, and any other
15 facts or circumstances in evidence that show what was in the
16 defendant's mind.  You may also consider the natural and
17 probable results of any acts that the defendant knowingly did,
18 and whether it is reasonable to conclude that the defendant
19 intended those results.

20         The government must prove beyond a reasonable doubt
21 that the defendant possessed a visual depiction.  To "possess"
22 something means to have it within a person's control.  This
23 does not necessarily mean that the person must hold it
24 physically, that is, have actual possession of it.  As long as
25 the visual depiction is within the defendant's control, he

 1  possesses it.  If you find that the defendant either had

 2  actual possession of the depiction, or that he had the power

 3  and intention to exercise control over it, even though it was

 4  not in his physical possession, you may find that the

 5  government has proven possession.

 6          The law recognizes that possession may be sole or

 7  joint.  If one person alone possesses it, that is sole

 8  possession.  However, it is possible that more than one person

 9  may have the power and intention to exercise control over the

10  visual depiction.  This is called joint possession.  If you

11  find that the defendant had such power and intention, then he

12  possessed the depiction even if he possessed it jointly with

13  another person.

14          "Child pornography" means any visual depiction,

15  including any photograph, film, video, picture, or computer or

16  computer-generated image or picture, whether made or produced

17  by electronic, mechanical, or other means, of sexually

18  explicit conduct where:

19          One, the production of such visual depiction

20  involves the use of a minor engaging in sexually explicit

21  conduct;

22          Such visual depiction is a digital image, computer

23  image, or computer-generated image that is, or is

24  indistinguishable from, that of a minor engaging in sexually

25  explicit conduct; or

1    Three, such visual depiction has been created,

2  adapted, or modified to appear that an identifiable minor is

3  engaging in sexually explicit conduct.

4    Additionally, you are instructed that as long as the

5  face of the person depicted in the image is an identifiable

6  minor, it is irrelevant whether the adapted or modified body

7  is that of an adult or a minor.  If such imagery reflects

8  sexually explicit conduct, it is child pornography.

9    The term "minor" means any person under the age of

10  18 years.  When you consider whether a person is under the age

11  of 18, you may use your life experience in observing children.

12  The government does not have to prove that the defendant knew

13  that the victim was less than 18 years old.

14    The term "sexually explicit conduct" means actual or

15  simulated:

16    One, sexual intercourse, including genital-genital,

17  oral-genital, anal-genital, or oral-anal, whether between

18  persons of the same or opposite sex; or

19    Two, bestiality; or

20    Three, masturbation; or

21    Four, sadistic or masochistic abuse; or

22    Five, the lascivious exhibition of the anus,

23  genitals, or pubic area of any person.

24    The term "lascivious exhibition" means a depiction

25  that displays or brings to view to attract notice to the

1    genitals or pubic area of children in order to excite

2    lustfulness or sexual stimulation in the viewer.  Not every

3    exposure of the genitals or pubic area constitutes a

4    lascivious exhibition.  In deciding whether the government has

5    proved that a particular visual depiction constitutes a

6    lascivious exhibition, you should consider the following

7    factors:

8            One, whether the focal point of the visual depiction

9    is on the minor's genitals or pubic area;

10            Two, whether the setting of the visual depiction

11   makes it appear to be sexually suggestive, for example, in a

12   place or pose generally associated with sexual activity;

13            Three, whether the minor is displayed in an

14   unnatural pose, or in inappropriate attire considering the age

15   of the minor;

16            Four, whether the child is fully or partially

17   clothed, or nude;

18            Five, whether the visual depiction suggests coyness

19   or a willingness to engage in sexual activity; and

20            Six, whether the visual depiction is intended or

21   designed to elicit a sexual response in the viewer.

22            A picture or image need not involve all of these

23   factors to be a lascivious exhibition of the genitals or pubic

24   area.  It is for you to decide the weight or lack of weight to

25   be given to any of these factors.  Ultimately, you must

1    determine whether the visual depiction is lascivious based on

2    its overall content.

3          "Visual depiction" includes undeveloped film and

4    videotape, and data stored on computer disk or by electronic

5    means which is capable of conversion into visual image, and

6    data which is capable of conversion into a visual image that

7    has been transmitted by any means, whether or not stored in a

8    permanent format.

9          The term "computer" means an electronic, magnetic,

10   optical, electrochemical, or other high speed data processing

11   device performing logical, arithmetic, or storage functions,

12   and includes any data storage facility or communications

13   facility directly related to or operating in conjunction with

14   such device, but such term does not include an automated

15   typewriter, or a typesetter, or a portable handheld

16   calculator, or other similar device.

17         The government must prove beyond a reasonable doubt

18   that the material had been mailed or shipped or transported

19   using any means of interstate or foreign commerce, or in or

20   affecting interstate or foreign commerce by any means,

21   including by computer, or was produced using materials that

22   had been mailed, shipped, transported in, or affecting

23   interstate or foreign commerce by any means, including by

24   computer.

25         A visual depiction was transported in or affecting

1   interstate or foreign commerce if it crossed between one state

2   and another or between the United States and a foreign

3   country.  Transmission of photographs or video by means of the

4   internet constitutes transportation in or affecting interstate

5   commerce.  However, you must find beyond a reasonable doubt

6   that the specific depiction in question was actually

7   transmitted by means of the internet, if we were dealing with

8   the internet which is not really the facts before you here.

9          A visual depiction was produced using materials that

10  had been transported in or affecting interstate or foreign

11  commerce if the materials used to be -- used to produce the

12  visual depiction had previously moved from one state to

13  another or between the United States and another country.

14         Here, the government alleges the computers used to

15  possess the videos and images in question were manufactured in

16  another state or country.  I instruct you that if you find

17  that the computers used to possess the videos and images were

18  manufactured outside North Carolina, that is sufficient to

19  satisfy this element.  The government does not have to prove

20  that the defendant personally transported the computers across

21  a state line or that the defendant knew that the computers had

22  previously crossed a state line.

23         I will now read count two in the bill of indictment.

24  With respect to this count, it only applies to what has been

25  referenced as bathroom one video or the M.C. video, which is

 1    Government's Exhibit 1D.

 2              Count two reads:

 3              From in or about July 2016 through on or about

 4    September 22, 2021, in Mecklenburg County, within the Western

 5    District of North Carolina, and elsewhere, David Tatum

 6    attempted to and did employ, use, persuade, induce, entice,

 7    and coerce Child Victim 1 to engage in sexually explicit

 8    conduct for the purpose of producing any visual depiction of

 9    such conduct using materials that had been mailed, shipped, or

10    transported in and affecting interstate and foreign commerce

11    by any means, including by computer, and the visual depiction

12    was transported using any means and facility of interstate and

13    foreign commerce.  All in violation of Title 18, United States

14    Code, Section 2251(a) and (e).

15              Title 18, United States Code, Section 2251(a)

16    provides, in pertinent part, as follows:

17              Any person who employs, uses, persuades, induces,

18    entices, or coerces any minor to engage in any sexually

19    explicit conduct for the purpose of producing any visual

20    depiction of such conduct, or attempts to, shall be guilty of

21    an offense against the United States if that visual depiction

22    was produced or transmitted using materials that have been

23    mailed, shipped or transported in or affecting interstate or

24    foreign commerce by any means, including by computer, or if

25    such visual depiction has actually been transported or

transmitted using any means or facility of interstate or
foreign commerce, or in or affecting interstate or foreign
commerce, or mailed.

For you to find the defendant guilty of using a
minor to produce a visual depiction of a minor engaging in
sexually explicit conduct as charged in count two of the
superseding bill of indictment, the government must prove the
following elements beyond a reasonable doubt:

First, that the minor was under the age of 18;

Second, that the defendant used or employed or
persuaded or induced or enticed or coerced the minor to engage
in sexually explicit conduct for the purpose of producing a
visual depiction of that conduct; and

Third, that the visual depiction was mailed or
actually transported or transmitted in or affecting interstate
or foreign commerce; or

That the visual depiction was produced using
materials that had been mailed, shipped, or transported in and
affecting interstate or foreign commerce by any means,
including by computer.

I have previously defined several of these terms,
including "minor," "sexually explicit conduct," "visual
depiction," and "computer."  You should apply those
definitions in deciding count two as well.

It is a crime for anyone to attempt to commit a

1  violation of certain specific laws of the United States even
2  if the attempt fails.  In this case the defendant is charged
3  in count two with committing the offense of employing, using,
4  persuading, inducing, enticing, or coercing a minor to engage
5  in sexually explicit conduct for the purpose of producing a
6  visual depiction of the conduct, or attempting to do so.
7          For you to find the defendant guilty of attempting
8  to commit the offense of employing, using, persuading,
9  inducing, enticing, or coercing a minor to engage in sexually
10 explicit conduct for the purpose of producing a visual
11 depiction of the conduct, you must be convinced that the
12 government has proved each of the following beyond a
13 reasonable doubt:
14         First, that the defendant intended to commit the
15 offense of employing, using, persuading, inducing, enticing,
16 or coercing a minor to engage in sexually explicit conduct for
17 the purposes of producing a visual depiction of the conduct;
18 and
19         Second, that the defendant did an act that
20 constitutes a substantial step towards the commission of that
21 crime and that strongly corroborates the defendant's criminal
22 intent and amounts to more than mere preparation.
23         A minor is "used" if they are photographed or
24 videotaped.
25         The term "producing" means producing, directing,

1  manufacturing, issuing, publishing, or advertising.

2          The government does not have to prove that the

3  defendant's sole purpose or the primary purpose of engaging in

4  such conduct was to produce a visual depiction, but the

5  government must prove that producing a visual depiction of the

6  sexually explicit conduct was one of the defendant's purposes

7  for using, employing, persuading, enticing, or coercing the

8  victim to engage in sexually explicit conduct.  And that it

9  was a significant or motivating purpose and was not merely

10 incidental to the sexually explicit conduct.

11          In determining -- in deciding whether the government

12 has proven that the defendant acted for the purpose of

13 producing a visual depiction of the sexually explicit conduct,

14 you may consider all of the evidence concerning the

15 defendant's conduct.

16          The term "interstate commerce" includes commerce

17 between one state, territory, possession, or the District of

18 Columbia, and another state, territory, possession, or the

19 District of Columbia.  Interstate commerce simply means the

20 movement of goods, services, money, and individuals between

21 any two or more states or between one state and the District

22 of Columbia.

23          "Foreign commerce" includes movement of goods,

24 services, money, and individuals from one country to another.

25          To satisfy this element, the government must prove

1  that the defendant's conduct affected interstate or foreign
2  commerce in any way, no matter how minimal.  The government is
3  not required to prove that the defendant knew his conduct was
4  in or affecting interstate or foreign commerce.  In
5  determining whether the defendant's conduct "affected
6  interstate commerce," you may consider whether the defendant
7  used means, instrumentalities, or facilities of interstate
8  commerce.  A facility of interstate commerce is some thing,
9  tool, or device that is involved in interstate commerce.  Cell
10 phones and the internet are both means, facilities, and
11 instrumentalities of interstate commerce.
12        The local or intrastate production of visual
13 depictions of a minor engaged in sexually explicit conduct
14 with a computer, a cell phone, or a camera that traveled in
15 interstate or foreign commerce is part of an economic class of
16 activities that substantially affect interstate or foreign
17 commerce.
18        The indictment alleges that the visual depiction was
19 actually transported or transmitted in or affecting interstate
20 or foreign commerce.  This means that the government must
21 prove that the visual depiction crossed between one state and
22 another or between the United States and a foreign country.
23        A visual depiction of a minor engaging in sexually
24 explicit conduct is "produced" using materials made -- excuse
25 me, materials mailed, shipped, or transported in or affecting

interstate or foreign commerce if the visual depiction is stored, created, or recorded on a device containing materials mailed, shipped, or transported in or affecting interstate or foreign commerce.

Simply stated, the phrase "transported in interstate or foreign commerce" means that the materials used to produce the visual depiction had previously moved from one state to another or between the United States and another country.

Here, the government alleges that the camera and film used to make the video in question were manufactured in another state. I instruct you that if you find that the camera and film were manufactured outside of North Carolina, that is sufficient to satisfy this element. The government does not have to prove that the defendant personally transported the camera and film across a state line, or that the defendant knew that the camera and film had previously crossed a state line.

I will now -- excuse me. I instruct you that a minor cannot legally consent to participating in illegal sexual conduct. A person under the age of 18 lacks the capacity to consent to illegal sexual conduct. Accordingly, any argument regarding a minor's consent must not be considered by you in reaching a verdict.

I will now read count three in the bill of indictment.

1          Count three reads:

2          From in or about 2016 through in or about

3     September 22, 2021, in Mecklenburg County, within the Western

4     District of North Carolina, and elsewhere, the defendant,

5     David Tatum, knowingly transported and shipped any child

6     pornography, as defined in Title 18, United States Code,

7     Section 2256(8), using any means and facility of interstate

8     and foreign commerce, and in and affecting interstate and

9     foreign commerce by any means, including by computer.  All in

10    violation of Title 18, United States Code, Section

11    2252A(a)(1).

12         Title 18, United States Code, Section 2252A(a)(1)

13    provides, in pertinent part, as follows:

14         Any person who knowingly mails or transports or

15    ships using any means or facility of interstate or foreign

16    commerce, or in or affecting interstate or foreign commerce by

17    any means, including by computer, any child pornography shall

18    be guilty of an offense against the United States.

19         For you to find the defendant guilty of

20    transportation of child pornography charged in count three of

21    the superseding bill of indictment, the government must prove

22    the following essential elements beyond a reasonable doubt:

23         First, the defendant knowingly transported, shipped,

24    or mailed any item or items of child pornography using any

25    means of interstate or foreign commerce, or in or affecting

interstate or foreign commerce, including by computer; and

Second, when the defendant transported, shipped, or mailed the items, the defendant knew the items were child pornography.

I have previously defined several of these terms, including "knowingly," "child pornography," and "computer." I also defined "interstate or foreign commerce" with respect to count two. You should apply those definitions in deciding count three as well.

Therefore, members of the jury, considering counts one, two, and three, I charge you that if you find from the evidence that each of the essential elements of a count has been proven beyond a reasonable doubt as to the defendant, then you must find the defendant guilty of the crime charged under that count.

However, if you do not so find, or if you have a reasonable doubt as to one or more of the essential elements of the crimes charged, it would be your duty to return a verdict of not guilty.

Does either party request a sidebar with respect to these instructions?

MR. CERVANTES: No, Your Honor.

MR. AMES: No, Your Honor.

THE COURT: All right. Members of the jury, that's as unpleasant for me as it probably was for you. I just hate

1  reading to people.  I haven't done that since the Harry Potter
2  books to my son.  And I read them all, every word of every
3  one.

4        So you have now heard the evidence and the arguments
5  of counsel for the government and for the defendant.  It is
6  your duty to remember the evidence whether it has been called
7  to your attention or not.  And if your recollection of the
8  evidence differs from that of the attorneys, you are to rely
9  solely upon your recollection of the evidence in your
10  deliberations, the same as I have said many times before with
11  respect to the law.  The law comes from the Court, not from
12  the lawyers.

13        As jurors, you must decide this case based solely on
14  the evidence presented here within the four walls of the
15  courtroom.  This means that during your deliberations, you
16  must not conduct any independent research about this case, the
17  matters in the case, the individuals or groups involved in the
18  case, or any legal concepts.  Your duty to follow this
19  instruction is a serious responsibility and the failure to
20  follow it may result in being found in contempt of court.

21        During your deliberations you must not communicate
22  with or provide any information to anyone by any means about
23  this case.

24        I have not reviewed the contentions of the parties,
25  but it is your duty not only to consider all of the evidence,

but also to consider all of the arguments, the contentions and
positions urged by the attorneys, and any other contention
that arises from the evidence and to weigh them all in the
light of your common sense and as best you can determine the
truth of this matter.

The law, as indeed it should, requires the presiding
judge to be impartial. Therefore, do not assume from anything
I may have done or said during the trial that I have any
opinion as to what your verdict should be. I do not.

I instruct you that a verdict is not a verdict until
all 12 jurors agree unanimously as to what your decision
should be. You may not render a verdict by a majority vote or
by any other voting mechanism other than a unanimous verdict
of 12.

The Court suggests that as soon as you reach the
jury room before beginning your deliberations you select one
of your members to preside as foreperson. The foreperson has
the same vote as everybody else but just serves to lead the
discussion.

If you need to communicate with me once you have
begun deliberating, the foreperson will send a note to me
by -- I think there's a buzzer in there that will ring through
into here that will let us know you need to communicate with
us. Just push that button and write down a note and tell me
what you need to ask or any other reason you need to reach out

1  to me.  But if you do send me a note, do not tell me how you
2  stand in your vote.  If you're 6-6, 11-1, I don't care and I
3  don't want to know.  If you have a question, just ask me the
4  question.

5          As soon as you have reached a verdict as to the
6  count alleged in the indictment, you will return to the
7  courtroom and your foreperson will, upon my request, hand the
8  verdict sheet to the clerk of court.  There are places on the
9  verdict sheet for the foreperson to enter the verdict, sign
10  it, and date it.

11         During the trial, of course, there were many items
12  put into evidence.  If you need to see any of those items, let
13  me know that.  That's all electronically available.  Well, for
14  the most part except for electronic devices.  And Ms. Kirk
15  will show you how to use the electronic evidence system to
16  access any of the exhibits you need to see.  So if you need
17  that, let me know and we'll set that up for you.

18         If you need a break during deliberations, you may do
19  so in the jury room.  Or if you need a break outside the jury
20  room, if you have -- someone needs to smoke, for instance,
21  you'll be escorted out of the jury room by a court security
22  officer.  But if you are not together, that is, if someone is
23  in the restroom, for instance, do not deliberate.  Have no
24  deliberations unless all 12 of you are present at all times.

25         All right.  So, members of the jury, please now take

1  this case and, as best you can, tell us the truth of the

2  matter.

3           Once deliberations start I don't want you leaving

4  the courthouse facility so we're going to have lunch brought

5  in for you.  I don't know if you already knew that.  I hope we

6  chose correctly, or you did.

7           All right.  The case is now with the jury.

8           (Jury exited the courtroom at 11:10 AM.)

9           THE COURT:  Mr. Ames, have you and your client come

10  to a decision about what you want to do with the forfeiture

11  count in the event of a guilty verdict?

12           MR. AMES:  Yes, Your Honor.  Your Honor, yes, we

13  spoke about it last evening and confirmed just now again that

14  he's fine with not having the jury consider that and that Your

15  Honor can do so.

16           THE COURT:  All right.  Thank you.

17           Anything else we need to address while the jury is

18  out?

19           MR. CERVANTES:  No, Your Honor.

20           MR. AMES:  Your Honor, I didn't want to interrupt

21  during closing arguments because I think that's rude.  I do

22  want to note there was a position stated that the encrypted

23  hard drive being attached to the MacBook would not populate

24  this metadata with regard to the QuickLook thumbnails and such

25  that was made during closing argument.  I didn't object at the

1  time.  Again, I didn't want to interrupt.  But I certainly do
2  object to that statement being submitted.  It was not in
3  evidence, number one.  Number two, it was something that was
4  asked about to which the analyst, Mr. Whitt, said he wasn't
5  sure.  He doesn't know and wasn't sure.
6          You know, I specifically -- I think my question --
7  it was a leading question, but it was:  Have you heard about
8  anything with encrypted drives and such with Apple products in
9  particular about them bypassing that encryption stuff despite
10 having a password?  There was an exchange about it, to which
11 my best recollection, Your Honor, and I'm not a thousand
12 percent sure but pretty sure that Mr. Whitt said he wasn't
13 sure about encrypted drives being inserted and therefore
14 populating these thumbnail -- this thumbnail evidence is what
15 the government is relying on as a time frame of when things
16 were accessed.
17         THE COURT:  Well, with respect to any potential
18 misstatements of the evidence, we'll have to rely on the
19 jury's recollection of the evidence, as I have instructed them
20 more times than not.  And even with respect to your both
21 opening and closing arguments, you injected supposed facts
22 that were not in evidence, particularly that Mr. Tatum is a
23 sex addict and has sought treatment for such.  There was no
24 evidence to that effect.  You said it both during opening and
25 closing.  We'll hope the jury abides by the Court's

1  instructions to consider only evidence that was admitted and
2  not the arguments of counsel.
3          Now, I'm going to ask everyone to stay within
4  finding distance.  The jury will probably send a note out
5  fairly quickly asking for the exhibits, but I didn't want to
6  just necessarily put that on them.
7          Obviously with respect to the alleged child
8  pornography, we'd have to bring them back out here.  That's
9  not on the JERS system.  We'd have to bring them back out and
10 put them in the jury box and let them see anything they want
11 to see again.  So please stay close and available in the event
12 that we get a question from the jury because I don't want to
13 delay answering their question because I can't find any of
14 you.
15         All right.  We'll be in recess pending word of the
16 jury.
17         (Recess pending a verdict at 11:14 AM.)
18                         *****
19 THURSDAY AFTERNOON, MAY 4, 2023
20         (Court back in session at 1:45 PM.)
21         (Jury not present.)
22         THE COURT:  All right.  We have a question from the
23 jury which I'll read to you.
24         It says, "Do we consider the defendant's motivation
25 and point of view of what he thought would be 'lascivious

1  exhibition' when he took the 'Monica' video, or do we view the
2  video in a vacuum to determine if the video is 'lascivious
3  exhibition?'  Do we consider his parking lot interview where
4  he admits to being a voyeur and 'getting off' if we consider
5  the video not as a stand-alone but from the defendant's point
6  of view and his motivation for taking it?"

7          I think the correct legal answer is:  "It is for the
8  jury to determine whether an image or video is lascivious as
9  the Court has defined it for you.  In considering this
10 question, the jury may consider all of the evidence and draw
11 reasonable inferences from the evidence.  The defendant's
12 motivation or opinion regarding lasciviousness is not
13 controlling."

14         MR. CERVANTES:  May we confer?

15         THE COURT:  You may confer, yes, of course.

16         (Counsel conferred.)

17         MR. CERVANTES:  Your Honor, the instruction seems
18 fine to us except the last sentence.  We would ask that the
19 last sentence either be struck or more specific reference to
20 number 6, the last bullet for the definition of lascivious
21 exhibition because that last sentence seems to be inconsistent
22 with that last bullet point.

23         THE COURT:  Yeah, what I'm wondering there is -- and
24 I get your point.  When it says "whether the visual depiction
25 is intended or designed to elicit a sexual response in the

1  viewer," who's the relevant viewer there?  Is it the person in
2  this case who produced it or in this case is the juror the
3  viewer?

4           MR. CERVANTES:  We would argue that it's the
5  defendant, Your Honor.

6           MR. AMES:  I would argue at a minimum it's vague,
7  Your Honor.  It could be -- it could be the juror or it could
8  be the royal we.  It could be a potential viewer.

9           I think this is one of the more difficult aspects of
10 the analysis for the jury in general.  There's actually a
11 decent amount of case law because so many of these cases, when
12 we're in a situation where there's not this just clear and
13 utterly overt sexual nature to a video, this is often -- we're
14 often in category 5 and we're often in the *Dost* factor number
15 6 as one of the sticking points.

16          You know, I've just kind of browsed through
17 recently.  There's some cases very similar.  *McCoy* out of the
18 Eighth Circuit from last year.  There's one I was looking at
19 just yesterday actually, *U.S. versus Hillie* out of DC.  And
20 this is actually -- this case has gone up and down and up and
21 down a little bit where there's been a rehearing.

22          But the most recent, United *States v. Hillie*, number
23 19-3027, a decision from 6/28/2022.  It involves -- just
24 pulling up the facts here, Your Honor.  The jury convicted
25 Hillie of producing and possessing child pornography.  The

1 panel reversed the conviction based on -- it held that a child
2 does not engage in a lascivious exhibition under
3 2256(2)(A)(v) -- (5), I guess, unless she displays her private
4 parts "in a manner that connotes the commission of one of the
5 other four sexual acts in the list."
6      And then that was the initial part -- the initial
7 definition. And then upon rehearing and reconsidering it, the
8 Court then said that -- and clarified it's commonly defined as
9 lustful, tending to arouse sexual desire. And the phrase
10 lascivious exhibition of the private parts -- sorry --
11 basically, just that the -- the summary is that it objectively
12 needs to be sexually suggestive in this opinion in *Hillie.*
13      There's also an Eighth Circuit case that I read a
14 little -- just actually about an hour ago. It involved a
15 shower in defendant's master bathroom. The district court
16 sentenced defendant. The Eighth Circuit reversed finding the
17 evidence presented was insufficient. The Court explained that
18 the underlying indictment prevents a person from using a minor
19 to engage in sexually explicit conduct, which I think is the
20 same theory here. Congress in turn defined sexually explicit
21 conduct as lascivious exhibition, not mere nudity, applying
22 the statute. The Court concluded no reasonable jury could
23 have found -- sorry, Your Honor, I'm looking right here. But
24 I can give you a citation for that as well. *United States*
25 *versus McCoy*, M-c-C-o-y, number 21-3895. That's also from

1  last year, 2022.  And there's a few others.

2          I think that in many that I've read, the -- with

3  this particular *Dost* factor and this particular situation of

4  potentially a use argument and this viewer issue, I have seen

5  at least a few of the circuits talking about a more objective

6  standard within kind of the four corners of the video.

7          Also, the Third Circuit said similar back in 2021 --

8  no, actually, December of last year.

9          So I think it's a hard question, long story short.

10 But I think recent decisions from other circuits have put it

11 as a more objective test, not subjective from the person who's

12 producing or creating.

13          And moreover, Your Honor, as was argued previously,

14 the statute doesn't require the producer to view it.  I mean,

15 that was an argument made to the jury in closing.  And so

16 whether or not the viewer needs to even view the thing in the

17 first play, if that's true, then their subjective belief about

18 what is lascivious or what counts as lascivious doesn't seem

19 to carry a significant amount of weight versus the objective

20 image on the screen itself.

21          THE COURT:  Mr. Cervantes, what do you say?

22          MR. CERVANTES:  I say that the issue that defense

23 counsel is raising in citing to *Hillie* is not -- first of all,

24 not binding Fourth Circuit precedent.  I do agree that *Hillie*

25 would suggest that you need to look at the viewer.  But

there's also other decisions talking about the objective
characteristics of the video and also the conduct that the
defendant did with the video, including to look at it.

I think that the most appropriate instruction here
would be to instruct them along the lines of what the Court
said in the first part, which is to consider all of the
evidence and then apply those -- the evidence to the factors
listed on page, I have it as 13 of my version, but the page
with the *Dost* factors.  That would be the most appropriate
thing, I think.

MR. AMES:  Your Honor, there's another one, *United
States versus Heinrich*, 21 -- *Heinrich*, H-e-i-n-r-i-c-h,
number 21-2723.  That's the Third Circuit.  That's from this
year.  That was a case where defendant had a conviction and
wanted to introduce a report -- a psychological type report to
show that his production was supposed to be something showing
beauty, or whatever, and wanted to introduce it.  And the
Court said no, you can't because, and I quote, the report is
inadmissible because under the statute his reason for taking
the pictures is irrelevant.  It punishes those who orchestrate
objectively sexually explicit conduct involving a minor in
order to take pictures of the conduct.

So in other words, what he wanted it to be or what
his intention was in that case, again, it's an objective
standard of what was it.  Was there a sexual act or explicit

1   act or not, period?

2          The *Hillie* case, in fact, if I remember right in the

3   factual basis, I think it involves a shower as well.

4   Almost -- and very similar, and a person cleaning themselves

5   and doing regular bathroom things, if I'm recalling correctly.

6   So factually, it's also very, very similar.

7          MR. CERVANTES:  Your Honor, if I may actually cite

8   some Fourth Circuit precedent.

9          I would direct the Court's attention to *US v.*

10  *Courtade*, 929 F.3d 186.  It's from 2019.  Also involving a

11  surreptitious recording in the bathroom shower.  In *Courtade*

12  the video did not depict the minor engaging in sexual conduct

13  or activity connoting a sex act.  Yet the Fourth Circuit

14  concluded the video was lascivious because, quote, "far from

15  depicting merely a girl showering, drying off, and getting

16  dressed, the video contained extensive nudity -- including

17  shots of her breasts and genitals -- that was entirely the

18  product of an adult man's deceit, manipulation, and

19  direction."

20         And so in that case the Court upheld the application

21  of the *Dost* factors and a shower video just like this was

22  found to be lascivious merely because of the defendant's

23  actions.

24         And so I don't think it's fair to just say the

25  viewer in the objective sense.  I do think that the *Dost*

 1 factors consider and look into what it is that the defendant
 2 did to obtain this video.  And in this decision the Court
 3 looked at the defendant's conduct.  So I do think it has an
 4 element of what the defendant thinks and is doing.
 5         MR. AMES:  Your Honor, just briefly.
 6         In the *Courtade* case the victim is a young girl who
 7 the defendant plies with ice cream and tells her that the
 8 camera is off and goes and puts his hands into a shower and
 9 takes very affirmative acts to further the use or coercion, or
10 whatever the theory is, I don't know for sure, but I would
11 imagine more than just use.  We're talking about someone that
12 is actually taking active steps to put a camera in his hand,
13 tell her certain things about it.
14         THE COURT:  I don't think those factual distinctions
15 inform the issue particularly.  The two things I'm trying to
16 weigh here is obviously it would never be enough if it's
17 purely subjective because then a defendant could subjectively
18 find something to be -- find something that would elicit a
19 sexual response that wouldn't, by any measure, be lascivious.
20 They can be attracted to elbows and that wouldn't make it
21 lascivious even if they were -- even if that elicited a sexual
22 response from them.
23         But on the other hand, the -- I think that there's
24 some element to -- and I'm not sure the right word is
25 intention as you quoted the Fourth Circuit case.  It seems to

1  me that we can craft an instruction based upon some of what
2  you just read to further explain sub-portion 6 to say among
3  the things the jury can consider are, and then list the things
4  the Fourth Circuit said were reasonable considerations in the
5  determination of lasciviousness.

6       MR. CERVANTES:  It was extensive nudity, including
7  shots -- so extensive nudity and the product of the adult
8  man's deceit, manipulation, and direction.

9       MR. AMES:  Your Honor, I just -- can I please point
10  out in the -- literally in the decision it's distinguishing
11  from a case -- this is quoting from this Fourth Circuit case.
12  "Here, the video's objective characteristics -- the images and
13  audio contained within its four corners, irrespective of
14  Courtade's private subjective intentions -- reveal the video's
15  purpose of exciting lust or arousing sexual desire."

16       The next paragraph:  "Far from depicting merely a
17  girl showering, drying off, and getting dressed, the video
18  contains extensive nudity -- including shots of the breasts,"
19  and so on.

20       The point being, Your Honor, it's making its ruling
21  and decision distinguishing it from a case that would be
22  barely similar to David Tatum's case and the video at play
23  here.

24       THE COURT:  I'm not sure that distinction is as
25  broad or extensive as you're suggesting.

```
1              Mr. Whelan, do you have that case pulled up?
2              MR. WHELAN:  Yes.
3              THE COURT:  Can you just email it to me.
4              MR. WHELAN:  Yes.
5              MR. ODULIO:  Your Honor, if I may on *Courtade*?
6              THE COURT:  Yes.
7              MR. ODULIO:  I think the point counsel is making is
8    actually reinforcing the government's view, which is the
9    Fourth Circuit has said that in considering this issue, the
10   Court can look beyond just the mere four corners of the image.
11   You look at the actions and the intent of the person producing
12   the video.
13             So I think the Court is right factually.  It's
14   actually of no moment.  What's of moment is the Fourth Circuit
15   saying, hey, you ought to look at that.  And that, Your Honor,
16   that reasoning, is at odds with and cannot be countenance with
17   *Hillie*.  That's why *Hillie* is not the law of the Fourth
18   Circuit and is wrongly decided in the department's perspective
19   and is not controlling here.
20             THE COURT:  I think the Fourth Circuit itself -- I'm
21   not real clear on this -- is perhaps not taking a directly
22   contrary position to *Hillie*, but I think they've been critical
23   of *Hillie*, if my memory serves on this issue.
24             MR. AMES:  I'm not positive either, Your Honor.
25   I --
```

1          THE COURT:  Hold on just a second, everybody.  Let
2  me read the case and then we can discuss it further.
3          (Court peruses document.)
4          THE COURT:  Well, the circuit -- I remember this
5  case now from prior cases.  Of course, the circuit described
6  the problem of trying to decide whether subjective intent
7  comes into play and says we don't have to in this case, so
8  this can be done on an objective basis.  So it doesn't express
9  an opinion on whether there is any subjective element to this
10 part of the analysis.

11         It does seem like when they go on to describe the
12 things that make it objectively reasonable, some of them sound
13 kind of objective to me, frankly.  The producer was actively
14 engaged in positioning and directing and filming, which sounds
15 to me kind of subjective rather than objective, but that's not
16 how the Court of Appeals saw it.

17         They do have some helpful language in here when
18 they're concluding that the video there was objectively
19 lascivious and says simply "because the images and audio --
20 revealing deceit, manipulation, and the careful directing and
21 filming of a young girl resulting in footage of her breasts
22 and genitals -- makes clear that the video's purpose was to
23 excite lust or arouse sexual desire in the viewer."  Which,
24 again, sounds to me like it has an element of subjectivity in
25 there.  The circuit said, no, not so, but that's just how it

1 strikes me.

2 So I think to best be faithful to the Fourth Circuit

3 on this, I'm going to have to craft some manner of

4 incorporation of the language I just read into this answer to

5 the jury's question and make it descriptive of what is being

6 discussed in point 6 that we've all been talking about, the

7 things the jury can consider. Thoughts?

8 MR. CERVANTES: We agree, Your Honor.

9 MR. AMES: I want to make sure that I understand,

10 Your Honor. The instruction would involve descriptions

11 from -- of certain behavior?

12 THE COURT: No, I'm going to have to -- and I'm not

13 going to do this sitting in front of you, and I hate to delay

14 the jury any further. I'm going to go out and try -- and I'll

15 come back, of course, and bounce it off of everybody. But I

16 want to describe for the jury some of what the Fourth Circuit

17 has told us in answer to their question. I think that you're

18 right, it's not as -- the answer that I crafted before would

19 not be of particular help to the jury, I don't think. And

20 perhaps not even accurately describes the state of the law.

21 MR. CERVANTES: Well, Your Honor, on that point, the

22 first part of what you described in considering all of the

23 evidence, I took it to mean what the Fourth Circuit was saying

24 in this opinion, which is consider all of the factors, all of

25 the things that happened to make the video to begin with and

1   not just look at the video itself, which is what the Court in

2   *Courtade* is saying.  That they not only look at the video, but

3   they look at what the defendant did to make the video, the

4   angle, selecting the angle.

5           So in that paragraph that the Court read where it

6   starts "on its face, then, the video depicts," and it goes on

7   to cite *United States versus Ward* and they quote specifically,

8   "When a photographer selects and positions his subjects, it is

9   quite a different matter from the peeking of a voyeur upon an

10  unaware subject pursuing activities unrelated to sex."  And

11  here we have that.  And I think what the Fourth Circuit is

12  saying is, we can -- without getting into the mind, because

13  they didn't decide that issue here, we can at least dispose of

14  the issue by looking at the conduct that led to the creation

15  of the video, which we argued the angle of the camera being on

16  the floor.

17          MR. AMES:  But the description he just gave is

18  backwards.  They were, again -- they were -- the position was

19  the *Ward* case is -- if you read it again, he's talking about

20  this is -- this *Ward* case is different than a situation where

21  it's literally just a peeping Tom type of situation where

22  there's not a person actively directing, manipulating, having

23  someone move anywhere in particular, which is what this case

24  is.  It's literally no contact whatsoever.  It's just sitting

25  on a shelf.

1          And I'll note, Your Honor --

2          THE COURT:  Well, wait a minute.  There's certainly

3     deception involved in hiding, so that's a common element in

4     these.

5          MR. AMES:  Yes, which --

6          THE COURT:  There's also a question of positioning

7     given where the camera was hidden.  So this is not as distinct

8     as you suggest.

9          All right.  I think I've heard all the argument I

10    need to.  I'm going to try to craft something here.  Tell you

11    what it is.  Perhaps hear some additional brief discussion

12    about it.  And then we're going to give the jury the Court's

13    best opinion.  I'll be back with you as soon as I can.

14         MR. CERVANTES:  Thank you, Your Honor.

15         (Brief recess at 2:18 PM.)

16         (Court back in session at 2:38 PM.)

17         (Jury not present.)

18         THE COURT:  All right.  So during the break we've

19    also looked at what's essentially a circuit split on this.

20    Some say that point number 6 contains subjective elements,

21    some say it does not.  The Fourth Circuit says, yes, there's a

22    disagreement among the circuits and we're not going to take a

23    position yet.

24         So in working through this, I think the Court is

25    going to have to take a position from among the circuits

1  because otherwise I'm not fairly answering the jury's

2  question.  I tried to structure some language that might give

3  them some guidance without really answering their question,

4  but that doesn't strike the Court as being fair to the jury.

5            So the Court's proposed instruction to be sent back

6  is:  "It is for the jury to determine whether an image or a

7  video is lascivious as the Court has defined it for you.  In

8  considering this question, the jury may consider all of the

9  evidence and draw reasonable inferences from the evidence.

10 Among the circumstances the jury may consider are the

11 selection and positioning of the subject; whether the video

12 contains extensive nudity, including video of her breasts and

13 genitals; and the entirety of the context in which the video

14 was made, including the defendant's motivation and intent."

15           I'm siding with the circuits that have said that

16 there's an element of that in it.  I understand you object,

17 Mr. Ames.

18           MR. AMES:  Yes, Your Honor.  And in particular

19 because I think some of the language just mirrors some of the

20 factors that are already present.  For instance, the amount of

21 nudity.  Nudity is already a factor.  The --

22           THE COURT:  I understand the argument.  But I'm

23 reading Chief Judge Gregory's opinion where he said that one

24 of the reasons that the video in that case was objectively

25 lascivious was because of those kind of facts.  And I'm trying

1  to track the circuit to the extent the circuit is giving me

2  any guidance.  I understand your argument that it's redundant,

3  repetitive, and unnecessary.  Is that the argument?

4        MR. AMES:  Your Honor, the language it's tracking,

5  is it from -- which case is it?  Is it the *Courtade*, or

6  whatever it is called?

7        THE COURT:  Yes.

8        MR. AMES:  So if you don't mind, Your Honor, can you

9  read the instruction again.

10       THE COURT:  Sure.  "It is for the jury to determine

11 whether an image or video is lascivious as the Court has

12 defined it for you.  In considering this question, the jury

13 may consider all of the evidence and draw reasonable

14 inferences from the evidence.  Among the circumstances the

15 jury may consider are the selection and positioning of the

16 subject; whether the video contains extensive nudity,

17 including video of her breasts and genitals; and the entirety

18 of the context in which the video was made, including the

19 defendant's motivation and intent."

20       The first two-thirds of that sentence are

21 essentially paraphrases or near quotations from the *Courtade*

22 case.

23       Emmett, can you hand that up to me so I can sign it.

24       MR. AMES:  Sorry, I apologize.  I'm looking for the

25 language.

1              THE COURT:  No, I understand.  Look, that's the
2    instruction I'm going to give.  I know that you object to it
3    and I'm confident in the event of a conviction you'll appeal
4    it and perhaps this time the circuit will answer the question
5    for us.  But that's my best judgment of what the law should be
6    and what my best guess the Fourth Circuit and/or the Supreme
7    Court will find it to be.
8              MR. AMES:  So I --
9              THE COURT:  That's it.  Discussion over.  I mean, I
10   hear your objection.  I understand your objection.  And I'm
11   taking my best shot at giving them what I believe is the
12   correct statement of the law.
13             (The Court's response was tendered to the jury.)
14             MR. AMES:  Would you mind -- would you mind reading
15   the question for me one more time so I can just jot it down,
16   Your Honor?
17             THE COURT:  Sure.  I'll let you come up and just
18   copy it verbatim.
19             MR. AMES:  That would be perfect.  Thank you.
20             THE COURT:  Sure.  Both sides, of course, are
21   invited.
22             We'll wait for Ms. Kirk to get back to do that.  And
23   we can make additional copies.
24             Emmett, if you would print what went back to the
25   jury.

1          We'll be in recess pending further word from the
2  jury.
3               (Recess pending a verdict at 2:45 PM.)
4                            *****
5               (Court back in session at 3:02 PM.)
6          THE COURT:  All right.  I'm told we have a verdict.
7  Please bring in the jury.
8               (Jury entered the courtroom.)
9          THE COURT:  Has the jury reached a verdict?
10          JUROR NO. 12:  Yes, Your Honor.
11          THE COURT:  And are you the foreperson?
12          JUROR NO. 12:  Yes, Your Honor.
13          THE COURT:  If you would please hand the verdict
14  form to Ms. Kirk.
15               (Verdict form tendered to the Court.)
16          THE COURT:  In the matter of the United States
17  versus David Tatum, we, the jury, find:
18          As to count one, the defendant guilty.
19          As to count two, the defendant guilty.
20          As to count three, the defendant guilty.
21          Is this your verdict, so say you all?
22               (Affirmative response.)
23          THE COURT:  Do you wish to poll -- the jury to be
24  polled, Mr. Ames?
25          MR. AMES:  Yes, Your Honor.

1            THE CLERK:  Ladies and gentlemen of the jury, in the

2    case of the United States of America versus David Tatum, you

3    have returned a verdict of guilty as to the three counts in

4    the superseding indictment.

5            Junior number 1, was this your verdict and is this

6    still your verdict?

7            JUROR NO. 1:  Yes.

8            THE CLERK:  Juror number 2, was this your verdict

9    and is this still your verdict?

10            JUROR NO. 2:  Yes.

11            THE CLERK:  Juror number 3, was this your verdict

12    and is this still your verdict?

13            JUROR NO. 3:  Yes.

14            THE CLERK:  Juror number 4, was this your verdict

15    and is this still your verdict?

16            JUROR NO. 4:  Yes.

17            THE CLERK:  Juror number 5, was this your verdict

18    and is this still your verdict?

19            JUROR NO. 5:  Yes.

20            THE CLERK:  Juror number 6, was this your verdict

21    and is this still your verdict?

22            JUROR NO. 6:  Yes.

23            THE CLERK:  Juror number 8, was this your verdict

24    and is this still your verdict?

25            JUROR NO. 8:  Yes.

1        THE CLERK:  Juror number 9, was this your verdict
2   and is this still your verdict?
3        JUROR NO. 9:  Yes.
4        THE CLERK:  Juror number 10, was this your verdict
5   and is this still your verdict?
6        JUROR NO. 10:  Yes.
7        THE CLERK:  Juror number 12, was this your verdict
8   and is this still your verdict?
9        JUROR NO. 12:  Yes.
10       THE CLERK:  Juror number 13, was this your verdict
11  and is this still your verdict?
12       JUROR NO. 13:  Yes.
13       THE CLERK:  Juror number 14, was this your verdict
14  and is this still your verdict?
15       JUROR NO. 14:  Yes.
16       THE COURT:  All right.  Members of the jury, I think
17  I said this during jury selection, that I'm always impressed
18  with every juror and how seriously you take your duty, and
19  it's particularly true in this case in some ways.  You ought
20  to be lawyers.  I hate to criticize you like that, but you
21  ought to be lawyers in some ways.  The question you asked and
22  the reason it took some time to give you an answer is because
23  when you were asking about lasciviousness and essentially
24  whether that's a totally objective standard or is there a
25  subjective element to it, well, we have 12 circuit courts of

1   appeal in this country.  Some of them say it's all objective.
2   Some of them say, no, there's a subjective element to that.
3   We sit in the Fourth Circuit Court of Appeals and they have
4   said, yes, there's a circuit split and we're not saying yet
5   which side we're on.  Of course, I'm bound by Fourth Circuit
6   precedent.

7          So having read the cases, I was more persuaded by
8   those courts that think that there is a subjective component
9   to that point that you were asking about; that it's not purely
10  objective.  But I expect we'll get an answer from the Court of
11  Appeals at some point on that.

12         But I say that just, again, to thank you and
13  congratulate you for how seriously you took this.  Obviously,
14  you dove into the case and gave it significant thought.

15         If any of you would like to remain in the jury room,
16  I'd be glad to come meet with you and talk about federal
17  procedure, the rules of evidence, anything that you're kind of
18  curious about.  It is not a command performance.  You have
19  done your duty.

20         And you will not be instructed as to what to do
21  after this.  You may talk to whomever you want or you can
22  refuse to talk with whomever you want.  But I very much thank
23  you, as I'm sure all the participants in this trial do, for
24  your seriousness and your consideration.

25         But if you do want to stay, just stay in the jury

1  room.  Let Ms. Kirk know that you want to meet with me.  I
2  have a few minutes worth of things I have to do.  Then I'll
3  come find you, if you want to.  You are free to leave.  But do
4  leave your badges and your notepads behind.  Thank you very
5  much.

6              (Jury exited the courtroom.)

7              THE COURT:  Now, as to the forfeiture count, since
8  that's been left to the Court, let me ask whether the parties
9  would be amenable to the two of you getting together and see
10  if there's a consensus with respect to that.  You might be
11  able to come up with a proposed joint order.  If need be, if
12  we need a hearing, let me know that as well and we'll schedule
13  one since we're not under a particular gun for that.

14              Now, with respect to Mr. Tatum's release status,
15  what is the government's position?

16              MR. ODULIO:  Your Honor, our position is that under
17  3143, by operation of law, he ought to be detained.

18              THE COURT:  Mr. Ames, I'll be glad to hear from you,
19  but let me preface it by saying Section 3143(a)(2) tells this
20  Court that the defendant shall be detained, except under a
21  couple of exceptions that don't apply here, because under
22  3142(f)(1)(A) this is considered a crime of violence pursuant
23  to 3156(a)(4)(C) and the word "shall" does not seem to give
24  the Court any discretion in this matter.

25              So, Mr. Tatum, you will be confined pending

1  sentencing.  The U.S. Probation Office is going to prepare a

2  presentence report.  It is a pretty lengthy document from

3  which the Court gets to know more about you, more about the

4  circumstances of this case perhaps.  And that takes about 60

5  to sometimes 90 days.  And then the Court schedules

6  sentencings just as soon as they're ready and the Court's

7  schedule allows, so we'll try to keep this thing moving

8  forward.

9              Yes, Mr. Ames.

10             MR. AMES:  Nothing, Your Honor.  I appreciate it.

11             THE COURT:  All right.  Mr. Tatum is in the custody

12  of the marshals.

13             All right.  The Court is in recess until next

14  Wednesday at 9:30.

15             (End of proceedings at 3:11 PM.)

16                          *****

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7   Reporter, in and for the United States District Court for the

8   Western District of North Carolina, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16         Dated this 13th day of September 2023.

17

18

19                        s/Cheryl A. Nuccio

20                        Cheryl A. Nuccio, RMR-CRR
                          Official Court Reporter

21

22

23

24

25