UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:22-CR-157
                         )
       vs.             )
                         )
DAVID TATUM,            )
                         )
         Defendant.    )
_____)

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 8, 2023

<u>APPEARANCES</u>:

On Behalf of the Government:

    DANIEL CERVANTES, ESQ.
    MARK T. ODULIO, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    RYAN PATRICK AMES, ESQ.
    SeiferFlatow, PLLC
    2319 Crescent Avenue
    Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

1                                

2       THE COURT:  The next matter is United States versus

3  Tatum, docket number 3:22-cr-157.  Mr. Tatum was convicted

4  following a jury trial on May 4, 2023.

5       Mr. Tatum, the probation office prepared a

6  presentence report which the Court has received and reviewed.

7  Have you read that report?

8       THE DEFENDANT:  Yes, Your Honor.

9       THE COURT:  Do you understand what's in it?

10      THE DEFENDANT:  Yes.

11      THE COURT:  Have you had all the time you would like

12  to discuss it with your attorney?

13      THE DEFENDANT:  Yes, I have.

14      THE COURT:  All right.  Mr. Ames, you have several

15  objections to the report so let's take them up in the order

16  that they appear in the presentence report.  The first

17  being -- I guess you have an objection that would not affect

18  the guidelines.  Well, let's just start with paragraph 33, the

19  application of 2G2.2(b)(2), the material involving a

20  prepubescent minor or a minor who had not attained the age of

21  12.  Let me hear from you on that.

22      MR. AMES:  Thank you, Your Honor.

23      So I think if we're considering the universe of

24  images and videos that would fall under this particular

25  section, I would say that it's in total -- or total candidates

1  that could apply to this section are there are four total
2  videos:  The first being the one from the cabin in Maine; the
3  second being the one was titled "LS" that was on a bed between
4  two women; the other two were the webcam videos that were
5  found on a desktop computer that were seemingly a bit older
6  that involved two people.  There were longer videos of what
7  looked like a webcam type of thing.
8          So starting with the videos, Your Honor, with
9  reference to this specific section, I think the video from
10 Maine we can exclude because it's pretty well established that
11 the victim in that case was 15.
12         The remaining three videos we do not have any
13 identified person.  We don't know how old any of the people
14 involved in those videos were.  And I wouldn't dispute that
15 there are sexual acts going on in those videos; however, this
16 enhancement is based on age.  We do not have any corroboration
17 of how old they are.  We don't know their dates of birth.  We
18 don't know who they are.  So we're beholding to making
19 estimates, I suppose.
20         THE COURT:  Well, let me ask you about that because
21 the enhancement applies if the person involved has not yet
22 attained 12 years of age or is prepubescent.
23         MR. AMES:  Yes, Your Honor.
24         THE COURT:  So can't the Court view the images and
25 determine whether the person depicted is prepubescent?

1          MR. AMES:  I suppose the Court can, Your Honor,
2    but --
3          THE COURT:  Isn't that what I have to do?  I'm not
4    begging to do that, but you've put me in a position where I
5    have to because the Court has to determine whether any of
6    these images depict prepubescent minors.
7          MR. AMES:  And, Your Honor, the problem that I run
8    into with this particular section is there's no definition for
9    prepubescent; and that may sound silly, but there isn't.  So
10   puberty, or when a person hits puberty, is not a definitive
11   line the way an age is.  It's different for different people.
12         It's also not clear if it means -- what does it
13   mean?  Does it mean you've got to the end of puberty?  Does it
14   mean literally before you have any indicia of any puberty?
15   And what is the evidence of being prepubescent versus
16   postpubescent or going through it?  I imagine it might be
17   secondary sexual -- or functions and such and, you know,
18   growing body parts and all the rest.  But determining that
19   without really a definition -- and I haven't found any
20   particular good case law, to be frank with you, Your Honor,
21   that --
22         THE COURT:  Well, there are many definitions of it
23   both in dictionaries and in medical journals, which the Court
24   researched some yesterday.  And it's essentially if there is
25   no physical indication of the onset of puberty, which in the

1  case of females is no breast development, no widening of the

2  hips, no pubic hair. Those are the three largest indicators,

3  although not the only.

4          And so as you say -- and I also could not find, at

5  least in the Fourth Circuit, any case law that says here's

6  what courts should look at to determine whether the images are

7  of a prepubescent minor. But I do think that the dictionary

8  definitions and the medical definitions give the Court

9  sufficient guidance.

10         So if you insist, I will view those images, although

11 my memory from the trial is there were no indications of the

12 onset of puberty of the girls who were shown in that I think

13 it was approximately 9-minute video on the bed. But if you

14 want to press the point or if you want to argue to me that

15 there are indications of the onset of puberty, we can do that.

16         MR. AMES: Your Honor, it's -- well, at a minimum I

17 think that the versions or clips played at trial were, of

18 course, truncated and shorter versions. Whether or not there

19 are indicia and whether or not it's something that is clearly

20 known -- for instance, I believe in a significant portion of

21 the webcam videos, they're mostly videos of them being topless

22 and having underwear on, to my recollection.

23         THE COURT: Mostly doesn't matter.

24         MR. AMES: I understand that, Your Honor. I say

25 that to say that it's -- even viewing it -- particularly we're

1    talking about some older videos that are grainy or whatnot

2    with a webcam that are harder to see things.  And I think it's

3    a difficult determination with no guidance.

4           And when -- I have also done the research and

5    looking into, like, the purpose of adding that in because it

6    was added in about 1991 to this framework.  And in essence,

7    what it -- I was able to glean from the legislative records

8    and comments and whatnot was that this was so that in a

9    circumstance, I guess, like this where we don't know the age

10   of a person, it gives the ability to at least have this

11   guideline apply when someone is very much under the age of 12.

12          THE COURT:  Well, that's fine for you to say.

13   That's not the law.  It's not very clearly prepubescent or

14   much below adolescence.  That's not what the guidelines and

15   the statute say, so let's stick to what the law actually is.

16          And also, while we're on this topic, what about the

17   modified images created from teengallery.com; wouldn't those

18   also be subject to consideration for the enhancement?

19          MR. AMES:  They may, Your Honor.  I mean, I would

20   say similar situation.  We don't know who those people are.

21   We don't know --

22          THE COURT:  Same answer.  Look, your arguments are

23   heard when they're made.  They're not heard any better or more

24   persuasively the fifth time you say them.

25          MR. AMES:  Well, with respect to Teen Gallery, as

1  the name implies, it's presumably a website where there are

2  images of teens which would imply 13 as the age range.

3  THE COURT:  It's the Deepfake modification that

4  would render them child pornography, right, of a prepubescent

5  minor?

6  MR. AMES:  Yes, Your Honor, I understand.  The AI

7  portion of it, whether or not it rendered -- well, whether or

8  not it rendered -- I guess we basically have to be in a

9  situation where that -- those images, I guess, didn't render

10  visible breast development, didn't render the other -- you

11  know, hips and the other things that you mentioned.  I mean,

12  my recollection of those, they all had breast development in

13  those and that's generated by the AI.  So I think the

14  enhancement could apply to someone who's under -- who's 11 or

15  younger if the person is that age.  If the person is -- it's a

16  good question, actually, whether --

17  THE COURT:  Let me cut to the chase here.

18  Mr. Cervantes, does the government intend to present

19  to the Court these images for its determination of whether

20  they're prepubescent?

21  MR. CERVANTES:  We're prepared to do so, Your Honor.

22  The Court can rely either on its memory of what was presented

23  at trial or I could play it and remove all doubt right now.

24  THE COURT:  Well, the Court's memory is pretty clear

25  with respect to the video and the modified Teen Gallery

1  images, that at least some, and I think it was essentially all
2  that were put into evidence, I don't know about what was in
3  the entirety, were all prepubescent showing no indicia of the
4  onset of puberty.

5        Now, Mr. Ames, if you want the Court to look at
6  something and argue that based upon what the Court is looking
7  at, there is evidence that puberty is onset, the Court will
8  look at any exhibit for which you want to make that argument.

9        MR. AMES:  If I can have one second, Your Honor.

10       (Counsel and defendant conferred.)

11       MR. CERVANTES:  Your Honor...

12       THE COURT:  Yes.

13       MR. CERVANTES:  If I may also add just in terms of
14  the definition of prepubescent, while the government agrees
15  with everything that the Court said, there is some guidance at
16  least in the statute.  The statute, 18 U.S.C. 2252A(b)(2),
17  where it describes the penalty for possession of child
18  pornography, it says that when the offense involves a
19  prepubescent minor or a minor who had not attained 12 years of
20  age.  I think there, at least, Congress is giving us some
21  indication about what prepubescent means.

22       THE COURT:  Well, it's not particularly helpful
23  because, again, when I was doing some reading yesterday for
24  females, puberty generally is anywhere from 9 to 13.  So
25  that's not a lot of guidance either.  That's why I'm sure the

1    statute says and the guidelines say but we're going to
2    definitely draw the line at 12, whatever is happening with
3    puberty.

4          So the problem with -- and the Court's -- you know,
5    unless it's obvious, the Court is uncomfortable looking at the
6    face and saying, okay, prepubescent, over and done.

7          And I think in your response to the objections to
8    the draft presentence report, you argued that one of the
9    witnesses -- and I think this is with respect to the photo of
10   the four girls that had been doctored -- that she had
11   testified that they were all prepubescent minors.  She didn't
12   say that.  I'm looking right here at the transcript.  She did
13   estimate their ages, one of which was as young as 10, which is
14   probably prepubescent but not medically necessarily
15   prepubescent, which is why I want to focus on the images
16   themselves.  We don't have to guess.  We can look at the
17   images.

18         I have looked at the images and am of the strong
19   opinion, well beyond a preponderance of the evidence, that
20   those images show no onset of puberty.  But if you want to
21   show me one and say -- tell me why I'm wrong, I'll do that.

22         MR. AMES:  Well, Your Honor, I mean, I would have to
23   show you all of them and convince you of all of them, I
24   suppose, for the guideline not to apply.

25         THE COURT:  Well, you know the ones that the

1   government is relying upon.  So if you want to -- if you want
2   to knock them down one at a time --

3        MR. AMES:  I'm sorry, Your Honor, but I'll just --
4   even in their response what I'll note -- and I understand the
5   Court's argument and position on the prepubescent portion of
6   it.  But in their own response they say the Passport contains
7   a video of child pornography, two naked minor girls
8   approximately 11 to 13 years old.

9        THE COURT:  Which is only half the consideration.

10       MR. AMES:  I understand, Your Honor.  But the
11  approximation that's been given by the government itself is
12  these are either 11, 12 or 13, and they're not sure which, in
13  that range.  And so --

14       THE COURT:  Let's try this again, Mr. Ames.  I'm not
15  basing this on the age, although I could certainly with
16  respect to the one who was testified to have been 10 years old
17  because that is under 12.  The others were either -- either 12
18  or 13, so that's not helpful, or clearly above 12.  But the
19  Court could easily go with the testimony that was not
20  controverted that at least one of the girls in the photo that
21  was modified was 9 or 10.  Okay.  Well, that gets us below 12.

22       MR. AMES:  Well, Your Honor, I would dispute that
23  being the case.  The -- again, these are also estimates of
24  somebody that was recalling when a photograph was taken from
25  approximately 15 years ago when they were younger, and that's

1  the basis for it.  There was nothing corroborating:  I know I

2  was in this grade because of this.  I know it was 1996.

3        THE COURT:  Oh, no, that's exactly how she did it.

4  That's exactly how she dated the photos.  She remembered what

5  age she was, where she was in school at the time the photo was

6  taken and then backed up from there.  And lest you are arguing

7  that she should not be credited or found credible by the

8  Court, the Court does find her credible; that her estimates

9  are accurate and reliable.

10        And again, one of the frustrations the Court has had

11  in this case is that we keep going around and around the same

12  things, making the same arguments without actually getting to

13  the point.  So let me try this one last time.

14        Mr. Ames, are there any of the images that the

15  government relies upon for this enhancement that you say show

16  indicia of puberty?

17        MR. AMES:  I think that either -- that they may or

18  it may be unclear, but, again, Your Honor, I don't know the

19  definition -- I don't know what the definition is.

20        THE COURT:  Okay.  Let's just stop here.

21        The Court finds -- well, let me ask the government

22  this first.  What consideration can the Court make of the file

23  paths that were in the folders?  I know that the videos

24  themselves were not recoverable, but there were, I think, tens

25  of thousands of file paths in a folder that were clearly

1   related to under 12 child pornography.  Can the Court make any
2   consideration of those?

3           MR. CERVANTES:  I think the answer -- I think the
4   answer is no, Your Honor, because that -- that speaks to his
5   intent which could show the Court what he's looking for and
6   why he's interested in these other pictures that we're
7   discussing.  But ultimately, the picture itself has to depict
8   the prepubescent minor.  And so I think the more appropriate
9   analysis would be to objectively view the picture and make a
10  determination based on what is depicted in the photograph
11  using the factors that the Court mentioned about development
12  of the minor.

13          THE COURT:  Well, wasn't the trial testimony from
14  your expert witness that those -- or at least some, a good
15  many of those video files had been viewed at one time?

16          MR. CERVANTES:  Yes.  The problem is that the
17  enhancement applies to images and images does require a real
18  person.  And without the actual images and videos in that
19  list, we cannot be for certain what it is that they actually
20  depicted.

21          THE COURT:  So even though we have thousands of
22  photos with the moniker preteen hardcore and some of the file
23  descriptions talking about 3- and 4-year-olds, without seeing
24  them you think that that's insufficient for the Court to find
25  by a preponderance of the evidence that those contained visual

1    depictions of child pornography under the age of 12.

2                MR. CERVANTES:  In an abundance of caution, Your

3    Honor, I'd say -- I'd recommend to the Court not to do that.

4    There's sufficient --

5                THE COURT:  I think I am going to do that as an

6    alternative and as an additional basis for finding the

7    enhancement because -- I hear what you're saying:  We don't

8    know; we don't see it.  But if you've got thousands -- and

9    there was a lot of testimony about what pthc means.  I think

10   the agent testified in their experience with respect to such

11   files that they almost uniformly show exactly what they

12   describe.  The Court in a lot of cases -- it sees way too many

13   of these cases -- has seen pthc photos that in the file line

14   say 4-year-old such and such disgusting act or 3-year-old such

15   and such disgusting act, and by golly that's what they show.

16               So the Court finds, absent a meaningful argument to

17   the contrary, that the video of the two girls on the bed

18   described to be between 11 and 13 showed no evidence of the

19   onset of puberty and are thus prepubescent.

20               And also, with respect to the Court's recollection

21   of the exhibits that were put in of the modified images from

22   the teengallery.com also showed no evidence of the onset of

23   puberty and are thus prepubescent.

24               That the photo of the four girls who ranged,

25   apparently, in age from 9 or 10 up through later teens, that

1  those had also been modified in a way that showed bodies that

2  showed no indication of the onset of puberty and are thus

3  prepubescent.

4  And the Court is also persuaded by a preponderance

5  of the evidence that the thousands of file photos that were

6  testified about in court that contained very graphic

7  descriptions of child pornography of children as young as at

8  least 3, that the Court is persuaded by a preponderance of the

9  evidence that the viewing of those images did occur at one

10  time by Mr. Tatum and that they did include depictions of

11  child pornography of a child yet -- under 12 years old.

12  And so for those reasons combined, the Court

13  overrules the objection to paragraph 33.

14  Now, the next objection is to paragraph 34, the

15  enhancement for sadistic and masochistic depictions of sexual

16  abuse in infants or toddlers.

17  Mr. Ames.

18  MR. AMES:  Your Honor, I think that -- well, I would

19  suppose that the objection in general is that that doesn't

20  apply to any child pornography, meaning an image or video with

21  a minor in it.  I believe that the -- that enhancement, as far

22  as I can understand the government's position, is that it's

23  related to the anime.

24  THE COURT:  That's right, isn't it, Mr. Cervantes?

25  MR. CERVANTES:  Yes, Your Honor.

1          THE COURT:  And of course, I'm sure you've read
2    their response to your objection to the presentence report
3    where they argue at length 2G2.2(b)(4), and a distinctive
4    nature of that is the offense involved material that then
5    portrays certain described things.  So their argument is if
6    the offense involved material and then this is what's in the
7    material, then the enhancement applies.  So that's their hook
8    to get to the anime.
9          MR. AMES:  Yes, Your Honor, and that's my
10   understanding as well.  I believe that the -- I guess the
11   theory would be 1466A, I think, 1466A would be the obscenity
12   statute that that would hypothetically be prosecuted under,
13   correct?  So I think that's the way that the -- I suppose the
14   material where it becomes a consideration as part of this case
15   in spite of not being charged with it, I suppose that's where
16   it comes in.
17          THE COURT:  And is relevant conduct under 1B1.3.
18          MR. AMES:  Yeah.  So if the Court is inclined to
19   agree that the phrasing of it as material means that it is
20   distinguished and distinct from the -- like the prior
21   objection where it does require a minor, it doesn't meet that
22   definition of child pornography which requires a person,
23   then -- if that's the Court's position as well, then I don't
24   really have much to argue as far as the -- that it wouldn't
25   apply to certain images.  I'm just making it clear it's not

1 applicable to child pornography. But if it's applicable to
2 something related that is material, then that portion I can --
3      THE COURT: Well, I was unable to find any case that
4 had ever upheld the position that you are making. I'm not
5 necessarily as good a researcher as you are. Are you aware of
6 any such authority?
7      MR. AMES: Your Honor, I'm not aware, frankly, of
8 this enhancement being applied to anime in the history of
9 America that I can find, so I don't know. That's the thing.
10 This is, in a lot of ways, a novel situation. And the
11 prosecution for cartoons or digital images and now as we get
12 into the brave new world of these AI websites, I imagine in
13 the future there will be more -- it will be something that
14 there's -- some case law develops on.
15      Right now I scoured and looked. I mean, as a
16 lead -- as a lead charge, I think, ever, maybe this 1466A has
17 been prosecuted, like, five times or six. It's not very many,
18 as a lead charge without, like, having a child pornography
19 charge either ahead of it or attached to it. I think that's
20 really it. I couldn't find any -- I can certainly be wrong,
21 but I couldn't find any indication of any time when the
22 4-point enhancement for that was applied. It may exist; I
23 just couldn't find it.
24      So, you know, it's one of those things too because
25 1466A, as I think the government concedes as well, doesn't

1  apply to the image count, for example.  So under the

2  guidelines as well, the number of images that are counted do

3  not include these animated images.  They would only include

4  one with an actual depicted minor.  So how and where we apply

5  these, it's a difficult question because I don't know how

6  often it's been done, to be frank.

7           THE COURT:  I expect your prediction is right that

8  as AI and other such technology develops, that those who are

9  inclined to this sort of conduct will engage in it and the

10 courts will be faced with this question.

11          But, Mr. Cervantes, let me hear from you on the

12 government's theory as to the applicability of this.

13          MR. CERVANTES:  Your Honor, the government reaffirms

14 its position in its brief which I won't belabor.

15          The government would like to move in evidence

16 Sentencing Exhibit Number 1 which is a compilation of a

17 sampling of the anime so that it's in the record and the Court

18 doesn't just have a reference to it in the PSR.  My

19 understanding is that defense counsel is not objecting to

20 foundation and authenticity, just the application of the anime

21 to the guidelines as he described.

22          THE COURT:  And is there any dispute that the images

23 shown in that anime, if this is an applicable enhancement,

24 would otherwise fit the description of sadistic and

25 masochistic depictions or sexual abuse of infants or toddlers?

1 Is there a dispute that that's what those images show?

2          MR. AMES:  If the -- if the Court applies the

3 standard to an animation or cartoon in the same general

4 fashion it would to an actual video, no, I don't think there

5 would be a particular dispute particularly if we're talking

6 about definitionally, I suppose.  I mean, as far as the case

7 law I have read, the -- it's crass, but sexual intercourse

8 with someone 3, 4, toddler age, in and of itself is a violent

9 image and meets that standard and that's what a lot of courts

10 have held.

11          THE COURT:  Correct.

12          MR. AMES:  So I think that there's -- on that just

13 at face value, yeah, I imagine the Court would find that if

14 that's the standard.

15          I would note the other -- the other hiccup and the

16 other problem with all of this is in some sense there is still

17 the 1466A standard where this is an obscenity matter that

18 requires some analysis anyway, I suppose, of whether or not

19 it's obscene or not because it's not pornography; it's

20 obscenity that we're talking about.  So whether or not in the

21 grand scheme of the whole thing, has it got any

22 literary/artistic merit or value according to the community?

23          THE COURT:  Well, you're going to have to convince

24 some other court of that.

25          MR. AMES:  I understand, Your Honor.

1          THE COURT:  All right.  So the Government's Exhibit
2   1 is admitted into the record.
3          (Government's Exhibit Number 1 was received into
4   evidence.)
5          THE COURT:  There doesn't seem to be any dispute
6   about what it portrays and the Court finds as a matter of law
7   that the -- those images as described and agreed to would
8   trigger the enhancement under 2G2.2(b)(4).
9          All right.  The next objection was to paragraph 35,
10  5-level increase relating to engaging in a pattern of activity
11  involving abuse or exploitation of a minor.
12          Mr. Ames.
13          MR. AMES:  Yes, Your Honor.  So my understanding of
14  the government's position on that would be that, first of all,
15  the production count in this case would be part one of the
16  pattern.  And then part two of the pattern would be one of the
17  prior bad acts that were discussed in trial.
18          I'm not going to belabor certainly the point that,
19  you know -- I understand what the precedent is.  I don't think
20  you can have a pattern with two.  That's neither here nor
21  there.
22          THE COURT:  It struck me as odd when I first took up
23  this profession that a RICO requires a pattern of activity, by
24  which they mean two.  I have trouble discerning a pattern from
25  just two dots, but so say the law.

1          MR. AMES:  I agree, Your Honor.  And so I think that

2     ostensibly there's two instances generally where the

3     government would go with this.

4          Number one is a -- there was some testimony about a

5     video that was allegedly taken some years ago, probably around

6     the year 2000, maybe before or maybe after, where there was a

7     surreptitious camera footage recording in a bathroom or shower

8     area in a family member's home in Atlanta that captured

9     allegedly the defendant's sister and another cousin.

10          THE COURT:  Well, the Court finds credible that

11     testimony, including the testimony that the defendant admitted

12     to such conduct; and so the Court accepts as fact that that

13     occurred as described by the witness.

14          MR. AMES:  Yes, Your Honor.  I suppose what I

15     would -- what my position would be is that nonetheless, the

16     witness that testified has not -- does not know the content of

17     the video, has not seen the content of the video.  There's no

18     evidence that there was nudity in it.  There's no evidence

19     that there was -- if anything was -- how much or if anything

20     was visible, the angle of it.  There's nothing.  We literally

21     have no evidence of what's in it.

22          And I honestly think it's similar to kind of the

23     position and the point Mr. Cervantes is making about the file

24     paths.  We can't see it.  How can we determine if it's

25     pornography if we can't see it, we can't review it?

1          So as a general matter -- I mean, the testimony at
2    trial was, "I was told by somebody else who did not testify, I
3    was told that this video existed."  There was no description
4    of what's in it.  The age estimate was unclear how that was
5    arrived at.
6          THE COURT:  No, the Court was persuaded with the
7    general accuracy of the date on that and it was well below 18
8    without any real doubt.
9          MR. AMES:  Right, Your Honor.  I guess my point is
10   that how does that person know when the video was made if
11   they've never seen it?
12         THE COURT:  Well, as I understand it, it was from
13   the defendant telling her when it was made.
14         MR. AMES:  My recollection, Your Honor -- and again,
15   I will defer to the Court certainly, but my recollection was
16   that it -- he acknowledged making a video or putting a camera
17   somewhere and showing the witness, you know, where it was and
18   how he did it.  And it was through a -- there was a vent or a
19   fan or something in an attic or ceiling.  And it was an old
20   video, like an old handheld type camcorder because this was
21   probably in the late '90s or something.  But as to when it
22   occurred, what was on it, that kind of thing, I believe at the
23   trial there was no evidence.  And it's not her fault.  She
24   hasn't seen it.  So --
25         THE COURT:  Yeah, I get your point on that one.

1          What do you say about the two what have been called
2     up-skirt videos of this former patient?
3          MR. AMES:  Your Honor, with respect to that, Your
4     Honor, so -- I mean, as a -- I suppose I would say, number
5     one, as a matter of law, it's not child pornography for a
6     couple of reasons.  Number one, the person in the video was 18
7     years old.  And number two, there was no actual, to my
8     understanding, exhibition or nudity.  It was an up-skirt photo
9     that --
10          THE COURT:  I'll disagree with you on that of what
11     it showed.  I think the video did show a lascivious focus on
12     inappropriate parts of that patient.
13          And with respect -- there's no doubt that she was
14     not actually under age at the time they were made.  She turned
15     18 five days before.  But what about the government's argument
16     that the defendant believed she was under 18 as reflected in
17     his notes made of that session and that that would make it an
18     attempt and an attempt under the statute would qualify for
19     consideration of part of the pattern?
20          MR. AMES:  Your Honor, on that point I would say,
21     number one, that the -- the reliance there is on a medical
22     record, as the Court is aware.  That same medical record is
23     self-contradictory in a couple of ways.
24          Number one, it indicates on the initial page, the
25     first page, that -- it's a write-up of a summary of the

appointment where it's indicated that she is 17. But on the final page of the report it says she's 18. And that's also something that the defendant would have prepared if we're looking at the total document.

Number two, Your Honor, the description in the document of what the subject of that video is wearing is jeans. And this is an up-skirt photo where the description of the clothing that the person is wearing is "well groomed in a T-shirt and jeans." So --

THE COURT: So we know that's not true.

MR. AMES: Know that's not true.

And my hunch and understanding of this all would be that this is a person that met with Dr. Tatum on a regular basis. That these reports probably got filled out every single time and there was probably a lot of filling in some blanks and leaving some other stuff in there and there's some phrasing that just gets left into these reports. And I say that because I have reviewed those reports and that's exactly what's going on.

So there are a series of appointments stemming back to March or April of 2015, all of which that same section begins with essentially the same phrasing, and it is that the "patient is a pleasant 17-year-old white female who I saw individually today." And that's the same opening line of every single appointment going back months and months.

1          THE COURT:  Well, which does indicate on the day in

2    question that that's what he thought she was:  17-year-old

3    pleasant white female.

4          MR. AMES:  Your Honor, that's possible.  But I think

5    more likely is that there are certain sections that get

6    updated to fill in some new things.  The rest of it is kind of

7    treated as boilerplate and it's continued on.  Because, again,

8    I can -- I have all of these in front of me.  The jeans

9    portion of it -- or what she was wearing was jeans.  For four

10   months she's wearing the same thing.  It says the same thing

11   as far as what she's wearing.

12          The other paragraphs -- the second reference to age

13   17 in a later section on that report on the day in question,

14   which was June 17, 2015, there's another -- the "patient is a

15   17-year-old girl with a chaotic childhood" and so on.  That's

16   later on in the report.  That phrasing is also in every single

17   one, including the one that comes a week later where the age

18   is correct and says 18 on the first page.  It still says 17 on

19   the second page.  Then it says 18 at the end.

20          So additionally, Your Honor, if the Court wants to

21   review -- I mean, I have highlighted all of the various ways

22   in which this report is just repeating certain language and

23   keeping it in there and only updating other things.

24          THE COURT:  Well, what would have been helpful to

25   the Court with respect to the argument you're making is if you

1  had actually filed a presentencing brief and attached things
2  you wanted the Court to look at.  It's a bit unfair to the
3  Court and to the parties, everybody who's spending time on
4  this, to say, Judge, please right now while we sit here look
5  at all these things I want you to see and consider.  I take a
6  great deal of time getting ready for sentencing hearings and I
7  would have been glad to do that if you would have put this up
8  there.  But I do not appreciate, Judge, I have all of these
9  reports.  You should look at them and see how repetitive they
10  are.  I'm not going to do that while I sit here.  You're going
11  to have to be -- if you want to have real specifics on
12  something -- and I think you've said what you have to say, but
13  I'm not going to review copious records for consistencies and
14  inconsistencies, as you described, for the first time during a
15  sentencing hearing.
16        MR. AMES:  Your Honor, I apologize, but I said this
17  at trial.  I said it in the closing.  I said it --
18        THE COURT:  And so the Court should have sua sponte
19  said, please, Mr. Ames, prior to sentencing if you would
20  provide me with those records so that I can anticipate your
21  argument at sentencing and be prepared?  That's what I should
22  have done?
23        MR. AMES:  Your Honor, the document that was entered
24  into evidence in and of itself is self-contradictory.  It says
25  she's 17 and it says she's 18.

1          THE COURT:  Okay.  I hear you.

2          MR. AMES:  It's a preponderance of the evidence.

3    It's more likely than not.  If there's two equally viable

4    positions, that doesn't meet the standard.

5          And again, we're not just talking -- we're talking

6    about a number on a paper to establish an intent to produce

7    child pornography, a typo, and when the same document says

8    she's 18 and the same document says she is wearing jeans.

9          THE COURT:  I understand your argument.

10         Mr. Cervantes, let me ask you a couple of things.

11         For the pattern enhancement, the government, as I

12   understand it, is relying on four things:  The count of

13   conviction, count two; the testimony regarding, I think it was

14   early 2000s video that was taken of the two girls in the

15   cabin; and then these two up-skirt videos of the patient; is

16   that correct?  Those are the four that the government relies

17   upon?

18         MR. CERVANTES:  Yes, Your Honor.  Each one of those

19   videos of the patient would count on their own, by the way.

20         And the Court said that the testimony -- with

21   respect to the testimony about the video that he made

22   previously, the Court said cabin.  It wasn't in the cabin.

23   The cabin was the place in Maine.  The witness, Ms. E.S.,

24   testified that the defendant's sister had described this video

25   that the defendant's sister saw where the defendant's sister

and the witness were depicted naked in the shower.  And the
witness confronted the defendant about that.  He admitted to
it.  And he showed her how he did it, where he did it.  And
the witness testified as to the age of her and the defendant's
sister at the time.  Her testimony was that they were both
under 18.  I think she said 15 and 16.

       THE COURT:  What about Mr. Ames' argument that we
don't know what those videos showed by way of like a
lascivious display?

       MR. CERVANTES:  I think based on a preponderance of
the evidence, the Court has sufficient there to show what it
actually displayed.  Also, the witness testified to what was
in the video as relayed to her by hearsay, which is admissible
in a sentencing hearing; and the Court need only determine
whether that testimony is credible.

       THE COURT:  Can you point me in the transcript
precisely to where that testimony was.

       MR. CERVANTES:  I'm sorry, I don't have a copy of
the transcript, Your Honor.

       MR. AMES:  Your Honor, I can probably pull that up.

       THE COURT:  I've got them.

       MR. AMES:  It's -- I know it's probably --

       THE COURT:  Remind me the...

       MR. CERVANTES:  Ms. E.S.

       THE COURT:  Ms. E.S.

1          MR. AMES:  It's probably late morning on the second

2     day, Your Honor.

3               (Pause.)

4          THE COURT:  Well, Mr. Cervantes, I've read that part

5     of Ms. E.S.'s testimony.  And she does recount the defendant

6     admitting to taking the video and showing her how he took the

7     video, but there's nothing in here about what the video would

8     have shown.  I mean, I can guess.

9          MR. CERVANTES:  Your Honor, I would also add that

10    similar to the theory with the patient video, what he's trying

11    to --

12         THE COURT:  The intent.

13         MR. CERVANTES:  -- attempt is still on the table.

14    And the jury told us what his intent was specifically because

15    the Court responded to that question that they had.

16              Plus here is where all the other evidence comes into

17    play about what he intended to do and where the list of

18    thousands of videos also informs the Court about what the

19    intent was in recording and setting up that camera in the

20    bathroom.

21         THE COURT:  And what about Mr. Ames' argument

22    regarding the inconsistencies of the patient records that

23    would inform us what Mr. Tatum thought was the age of his

24    patient?

25         MR. CERVANTES:  I think it cuts against him because

1   it shows in fact the fact that he updated the record to show
2   that she was 18 shows that it's not just a copy and paste.  In
3   fact, he is paying attention to the age and he's writing down
4   what he believes.  And based on a preponderance of the
5   evidence, I think the evidence shows that he believed that she
6   was a minor.  And we're talking about five days' difference.
7   So unless there's something else that would suggest that he
8   knew that it was her birthday, there's no -- there's no record
9   of them talking about her birthday celebration or anything
10  like that in the notes.  And so there's nothing indicating
11  that he would have known that she turned 18 until later in the
12  records.

13          Mr. Ames pointed out a document from July 10, 2015,
14  in the patient's records where that same sentence says, "F.L.
15  is a pleasant 18 yo white female who I saw individually
16  today."  So that shows the Court -- that's July 10, 2015.  And
17  the video -- so her birthday is June 12, 1997, right?  So this
18  is a month later he's seeing her again and a month later when
19  he is writing down his notes, he updates the age.  That shows
20  the Court by a preponderance of the evidence that when he met
21  with her in June five days after her birthday, he believed she
22  was still a minor.

23          THE COURT:  All right.  And so the part of the
24  clinical notes from that day when the videos were made and the
25  part where it shows a date of birth, is that -- because I

1  think that's what Mr. Ames said, correct?

2          MR. CERVANTES:  Yes, Your Honor.

3          THE COURT:  And where does that appear?  I guess I

4  should look at at least that one.  I'm not going to look at

5  everything Mr. Ames wants me to look at.

6          MR. CERVANTES:  That is Exhibit 11 that was

7  introduced and admitted at trial.  I'm not aware of

8  anywhere --

9          THE COURT:  Does anyone have a hard copy of that?

10         MR. AMES:  I do, Your Honor.  It's the second to

11 last page.  I can approach --

12         THE COURT:  Well, I want to see the whole thing, the

13 whole clinical notes from that day.

14         MR. CERVANTES:  Your Honor, I have it digitally and

15 I could --

16         THE COURT:  It might be easier for me to just thumb

17 through it --

18         MR. CERVANTES:  Sure.

19         THE COURT:  -- rather than each of you point out the

20 parts of it you want me to see.

21         MR. CERVANTES:  Actually, Your Honor, I do have a

22 full copy of it here.  May I approach?

23         THE COURT:  Please.  And identify again what trial

24 exhibit this was.

25         MR. CERVANTES:  11.  And for the record, I'm showing

1    defense counsel.

2              THE CLERK:  I just gave you a PDF of it as well.

3              THE COURT:  I've got a PDF of it.  I can pull it up.

4              MR. CERVANTES:  Your Honor, I would also add to the

5    argument that the notes are done after the visit and so his

6    belief is when he's making the recording, not after when he

7    prepares the notes.

8              THE COURT:  Is there -- is there an indication in

9    this exhibit as to when the report was prepared?  Is there a

10   prepared date in here?

11             MR. AMES:  It's prepared that day.  I'm not sure

12   that --

13             THE COURT:  It says reviewed 6/17.

14             MR. AMES:  Your Honor, what I'm pointing to as far

15   as the 18 thing, I think, should be probably the second to

16   last page.  It's the page that has some blue boxes and says

17   "MEDICINE" in big letters.  That's where there's a description

18   of the patient that says "18-year-old female, provider David

19   Tatum" right beneath it where there's some prescription

20   medication information and so on.

21             MR. CERVANTES:  Your Honor, that is -- that appears

22   to be an automated entry.  That is not -- we're referring to

23   his actual notes.

24             THE COURT:  That looks like an automated entry to me

25   that the system would pull up from its document retention

system.

MR. AMES:  Your Honor, the -- I guess A, first, that there's no -- we don't know that.  And B, we don't know when exactly these reports are prepared.  And C, I think the government, as they alluded to, the following appointment, box 1 is updated to say 18, box 2 below for the medical decision-making history still says 17.  So there's still a typo below.  And that persists.  Other language just persists.

That's the point here is we're trying to derive an intention -- we're trying to derive knowledge or intent from this defendant based upon what -- even if the Court is not convinced it absolutely is, very well could be a typo and there's a very distinct possibility.  And we're ascribing a knowledge to him that he intentionally said I know this person is 17, I know this person --

THE COURT:  No, believed.  Doesn't have to know. Has to believe.

MR. AMES:  Or believe, Your Honor.

And I think I stated this at trial as well.  What's all this going to tell us here?  The videos that were created were done on June 17, five days after this person's 18th birthday.  That would suggest that the defendant knew when her 18th birthday was and took the first opportunity to take a video after she was in the age of majority.  It would certainly be a reasonable conclusion, rather than what would

1  be an apparent coincidence, that it just so happened after

2  that date.

3          There's no other videos of this particular person

4  that I'm aware of prior to the 17th of June in the months and

5  months that he's been treating her.  It's only immediately

6  after the 18th birthday.

7          And the only reason, the only reason this can even

8  be alleged as an attempt is because a medical record that we

9  don't know how it was prepared has a typo or some information

10 that's not updated in addition to a bunch of other information

11 that clearly isn't updated.  If we're talking about the face

12 of this document, we're saying -- we're deriving an intent to

13 do something, his belief that she was 17.  Was his belief also

14 that she was wearing jeans?

15          THE COURT:  Well, here's what I find to be the most

16 indicative part of this report that would inform us about

17 Mr. Tatum's belief at this time.  It's on page 4 and it's

18 under the "Chief complaint/reason for encounter" section.  And

19 it is very detailed about what was said, what was discussed

20 between them on that day.  That section is all about that day.

21 And on that day he says, "F.L. is a pleasant 17-year-old white

22 female who I saw individually today," and then goes on to

23 describe in detail what they talked about that day.

24          So a lot of this is clearly, at least by a

25 preponderance of the evidence, I think pretty clearly

1  generated by the system itself, which would explain some of

2  the inconsistencies that you referred to.

3  MR. AMES:  Your Honor --

4  THE COURT:  But again, by a preponderance of the

5  evidence, the Court finds that the most reliable indication of

6  the defendant's belief at the time that he took these up-skirt

7  videos was that the victim was 17 years old.  And so the Court

8  will overrule that objection.

9  Let me put one other finding on the record with

10  respect to the video of the two relatives in Atlanta.

11  The Court would find by a preponderance, but not by

12  any higher standard, but by a preponderance that the defendant

13  was attempting to make recordings of lascivious displays of

14  underage girls consistent with his obvious intent to do that

15  with respect to count two and his history in general with

16  trying to get and viewing such material, including this

17  up-skirt one.  So that's the weakest of the four, but by a

18  preponderance of the evidence, the Court finds that that was

19  an attempt to produce child pornography and thus finds a

20  pattern sufficient for the enhancement.

21  Now, I think there was -- the next one was paragraph

22  37, the enhancement for the number of images.  I believe --

23  although you objected to the draft presentence report, the

24  government, I guess, came to an agreement with you because

25  there's not a further objection with respect to that.  That

1  was reduced to fewer than 600 images in the final report.  So
2  there's nothing to resolve there, correct?
3          MR. AMES:  That's correct, Your Honor.
4          THE COURT:  Now, the last one, I think, is the
5  obstruction of justice enhancement.  So let me hear from the
6  government first on that because obviously they have the
7  burden of -- well, they do with all these enhancements, but --
8          MR. CERVANTES:  Your Honor, in support of this
9  enhancement we have three exhibits that we would move in
10  evidence marked as Sentencing Exhibits 2, 3, and 4.
11          Exhibit 2 is the actual recording that's discussed.
12  This is referenced in paragraph 15 of the PSR.
13          Exhibit 3 is the email from the ex-wife attaching
14  the recording and sending it to the FBI agent.
15          And Exhibit 4 is the list of -- basically the full
16  list of files referenced in that same folder path that has
17  files with the name pthc.  So as described in the government's
18  response, the trial exhibit was really a reduced version of
19  the files -- all of the files that are in the same folder
20  path.  The totality of all of the files in that folder path is
21  10,308 rows.  We filtered that so that only the file names
22  with pthc were the government exhibit, and that reduced the
23  list to 1,000 -- just over 1,000.  That's what was introduced
24  at trial.  To make it clear what we're talking about, just
25  focus on the pthc part.

1          For sentencing, we would move the entire list into

2    evidence.  There's 10,308 rows which have other descriptions.

3    The Court has experience seeing these kind of file names and

4    they're all consistent with child pornography.  And we would

5    move these three exhibits in evidence in support of the

6    government's response to this objection.  And I don't believe

7    that the defense has an objection to the authenticity and

8    foundation.  It's just an application.  And if that's correct,

9    I would move these exhibits into evidence and seek permission

10   to publish the exhibits.

11          THE COURT:  Yes, they're admitted.  And publish what

12   you think the Court should see and your accompanying argument.

13          (Government's Exhibits Nos. 2, 3, and 4 were

14   received into evidence.)

15          MR. CERVANTES:  Publishing Sentencing Exhibit 2

16   which is the recording.  And I'm playing from the beginning to

17   minute 2:33.

18          THE COURT:  I think you're the only one seeing it.

19          THE CLERK:  Yeah, I think you need to hit HCMI 2.

20          MR. CERVANTES:  One moment, Your Honor.  The audio

21   doesn't seem to be cooperating with me.

22          (Government's Exhibit Number 2 was published.)

23          MR. CERVANTES:  I'm fast forwarding to 3:40 to 3:57.

24          (Government's Exhibit Number 2 resumed.)

25          MR. CERVANTES:  And the reason why I fast forwarded,

1    Your Honor, is because a portion of that audio is redacted so
2    just to move over the white noise that's inserted into the
3    audio.
4            The government publishes Sentencing Exhibit 3.  I'll
5    leave this on the screen until the Court tells me.
6            (Court peruses Government's Exhibit Number 3.)
7            THE COURT:  So the phrase is he needed to get rid of
8    something, and then he said "getting rid of evidence" and
9    "trying to stay out of jail."  Are those phrases -- can they
10   be heard on the call because I didn't -- I don't think I heard
11   them just now.
12           MR. CERVANTES:  No, I think those are just her
13   paraphrasing her memory of the call.
14           THE COURT:  All right.
15           MR. CERVANTES:  And then --
16           THE COURT:  It's just that they were in quotes so I
17   wanted to make sure that's her -- not a quote, but her
18   reporting of her recollection of the call.
19           MR. CERVANTES:  Yes, Your Honor.
20           And Sentencing Exhibit 4, this is the full list that
21   I had mentioned.  It's 240 pages.  I'll scroll down to the
22   bottom.  There's 10,308 rows.
23           And I'm going to go to page 9.  And here the Court
24   can see starting -- starting around 357, and these are going
25   to be chronological now, I guess, just because of the way the

file convention is, but they start describing the ages of the victims. And so we start with 3-year-old.

Once we get to row 370, there's 4YO.

Row 386 talks about 5YO.

When we go to page 10, we continue with 5YO.

Then we move on to 6YO.

And the descriptions are consistent with the Court's memory of these kind of descriptions and I won't read them into the record.

Moving on to page 11, the ages go to 7YO, 8YO.

Going on to 12, 9YO, 10YO, and so forth and so on.

And so the obstruction of justice enhancement is based on the government's description. I won't belabor it more than what was already written in the response. But the fact that he went -- the timeline is also important which is described in the PSR. The timeline is that he met with the government. Got a copy of discovery. Understood what was happening. And then he goes into the attic. Gets rid of this hard drive. He makes his initial appearance the following month. He was very well aware that charges were coming. And the audio shows what it is that he was trying to do.

And Ms. Tatum's description of it also, I think, is important. That was her interpretation of the conversation and why he was going into the attic. It was to get rid of something.

1          And forensically, we have the evidence that shows
2     that there is a missing hard drive.  And I think from a
3     preponderance of the evidence, I think the Court can easily
4     conclude that that missing hard drive with the list of
5     10,000-plus file names that are consistent with child
6     pornography is the hard drive that he went and got from the
7     attic and he destroyed.  And under the obstruction of justice
8     enhancement in Section 3C1.1, that conduct squarely fits this
9     kind of conduct.
10          THE COURT:  Put on the record again the forensic tie
11     between what's referred to as the missing hard drive and these
12     file paths for child pornography.
13          MR. CERVANTES:  Sure.  So the forensic analyst,
14     Jason Whitt, testified that this list of pthc came from the
15     MacBook.  And it's a list that's generated when the user plugs
16     a hard drive into the computer and the computer, to help the
17     user, will remember all the file names and it records that.
18     So the next time you plug the hard drive in, it moves faster.
19     It operates faster.  It's trying to help the user out.
20          And so this list is generated and saved inside of
21     the MacBook.  That's how we're able to generate this list.  We
22     don't have the actual hard drive that had this list of files,
23     we believe, because it's the hard drive that he took from the
24     attic and destroyed.
25          THE COURT:  All right.  Thank you.

1      Mr. Ames.

2      MR. AMES:  Your Honor, I guess a couple of things.

3      Number one, this -- this would not technically be a

4  list of images; rather, it's probably a list of QuickLook

5  thumbnails that the MacBook generates automatically, not upon

6  access in the sense of opening it, reviewing it.  It's merely

7  a procedural thing that happens.  I just plugged my little

8  drive into my laptop.  If you do that on a Mac with anything,

9  and Mr. Whitt testified about that too, thumb drives, all

10  kinds of stuff.  Anything that can generate a thumbnail,

11  anything at all that can generate any sort of quick view type

12  of thumbnail can generate this automatically on the device.

13  You can't actually see the images because they're in a cache

14  folder, as he called it in Windows, QuickLook on Macs.

15      THE COURT:  So you -- I mean, I get what you're

16  saying.  You can't see -- if all you had was the MacBook, you

17  can't see where these file paths would have taken you.

18      Isn't the importance of this that at some point some

19  hard drive had those paths on it and that is proven by the

20  fact that it's -- those are on the MacBook in that format?

21      MR. AMES:  Your Honor, I would say -- I would say

22  first that a significant number of the images and things that

23  were presented at trial were thumbnail-based and did exist on

24  the Mac in that thumbnail form.

25      So for instance, there were -- the video from

1  Rochester with the patient, there was a thumbnail of that
2  video on the Mac.  The video wasn't there, images on it, but
3  the thumbnail in that folder existed so you could actually see
4  it.  These file paths do -- there is no even thumbnail
5  whatsoever.  They are just a string of texts that exist.
6          They want to make the inference on -- it's layered
7  inferences.  Number one, that these images were at some point
8  in time on this device or a device that had some images with
9  these names was plugged in.  We don't know when or by whom or
10 what the circumstances were.
11         THE COURT:  Well, I think that it's even more basic
12 than that.  What this shows is that at some time another hard
13 drive of evidentiary value, whatever it actually showed, but
14 of evidentiary value was connected to the MacBook and never
15 found.
16         MR. AMES:  Maybe.  We don't know.
17         THE COURT:  Something else had to be connected to
18 it, was the testimony of the forensic expert.
19         MR. AMES:  Yes, but we don't know what, we don't
20 know when, and we don't know anything period.
21         THE COURT:  Right.  Tell me if you disagree with
22 this.  The forensic testimony was that at some time some other
23 device had to be connected to the MacBook to generate those
24 file paths and that that device, whatever it was, was never
25 located.

1      MR. AMES:  I'd say that was the testimony, yes, Your
2  Honor.
3      THE COURT:  So then the question becomes -- and all
4  it has to be is whether it's of evidentiary value.  It doesn't
5  have to be the smoking gun.  It doesn't have to be 30,000
6  movies of child pornography.  Just of evidentiary value.
7      Now the question becomes -- since we, I think, are
8  fully persuaded that there is a missing hard drive that was of
9  evidentiary value, now the question becomes whether
10 Mr. Tatum's conduct with respect to visiting the attic and the
11 phone call with his wife, whether that is sufficient for the
12 Court to find by a preponderance of the evidence that that's
13 the missing hard drive and that his intent was to put that
14 evidence beyond the reach of the investigators.
15     MR. AMES:  Well, Your Honor, I would say we don't
16 know that -- we don't know that this is the drive.  We don't.
17     THE COURT:  I don't have to know.  I just have to be
18 persuaded by a preponderance of the evidence.
19     MR. AMES:  I understand, Your Honor.
20     This was a conversation -- a portion of a
21 conversation that we can try and infer the context certainly
22 of what was going on in and around this time frame, but we
23 don't know specifically what's being referenced.  This could
24 be some other unrelated matter, Your Honor.  Just -- I'm not
25 putting anything on him, but if there was evidence of some

other crime or evidence of a crime that someone else committed
or some other piece of damning information that was on there
that may exist.  We don't know if it's specifically related to
this case or something else or if there's -- we just don't
have any information with respect to that.  We don't know even
what these images are.

Again, I understand what the Court is saying.
They're suggestive file paths.  We don't dispute that.  But we
don't know anything other than speculation about how they got
where they got or what they were.  We don't know if they're
anime.  We don't know if they're pornography.  We don't know
how many years ago they were -- or if ever --

THE COURT:  Doesn't have to be any of that.  Again,
you're jumping over how the Court tried to frame the
discussion.  If this missing hard drive was of evidentiary
value, to argue that it may not have had good evidence on it
doesn't answer the question.

MR. AMES:  Well, I'm saying if we don't know what's
on it, how do we assess the evidentiary value?

THE COURT:  Well, one of the ways we can assess the
evidentiary value is to see what conduct Mr. Tatum took with
respect to it.  He went into his attic at night and hurriedly
gathered something up and rushed past his wife.  So he thought
it was important whatever this was.  And his too clever by
half explanation to his wife that he didn't want to talk about

1   it so she would have plausible deniability or even actual
2   deniability.  You can't testify to what you don't know.  So
3   obviously it had some evidentiary value about something.

4           And she asked specifically, "Up in the attic was it
5   a hard drive?"  And he said again, "Plausible deniability."
6   Which the reasonable inference from that is, yes, but
7   plausible deniability.  Because otherwise it would have been:
8   "No, it wasn't a hard drive, but I'm not going to tell you
9   what it is."

10          And then sort of the icing on the cake is his
11  statement that -- and this is in reference to going to the
12  attic, getting something, leaving, and not admitting to his
13  wife what it is.  "It's a lot better that this happened."
14  Meaning there's a lot less evidence now that I've done this.

15          That's the Court's finding by the preponderance of
16  the evidence; that it is most -- more likely than not -- I'd
17  say most likely that what he retrieved that night was the
18  missing hard drive that would have been of evidentiary
19  value -- I expect extreme evidentiary value, but certainly of
20  evidentiary value -- and that he acted intentionally in
21  retrieving that and putting it beyond the reach of the
22  investigators.  And so the objection to that enhancement is
23  overruled.

24          Now, I think that's all of the objections to the
25  presentence report, which means that the Court accepts the

presence report without change and finds that before
consideration of departure or variance, the guidelines provide
for an offense level of 43, criminal history category I, which
under the guidelines calls for a life sentence, but because of
the statutory maximums, the guideline range is 2 -- 720
months, which is 60 years.

Now, we went through all that exercise because, of
course, the Court's first mission is to correctly calculate
the guidelines, which I think I have. Now the question turns
to what is an appropriate sentence under the 3553(a) factors.
Those are not the same questions.

So let me hear from you, Mr. Ames, with respect to
an appropriate sentence.

MR. AMES: Thank you, Your Honor.

As the Court noted, he is a record level I. Has no
record at all other than one speeding ticket perhaps.

He is a very bright, very intelligent person who, as
he has -- or we have, I think, discussed previously and I
maybe got in trouble for it a little bit, but was going -- has
sought out help and therapy for this.

Ostensibly where the -- the onus or the crux where
this ultimately comes from in his background and history, Your
Honor, as far as I can tell in knowing him, is he was bullied
quite significantly as a child back in his days of middle
school. That sort of was a major factor in sort of the

turning to pornography and that kind of thing as an outlet for whatever he was feeling at the time.  I'm no medical expert. Obviously I'm no doctor about that, but that's -- in the treatment that he's done and others that have worked with him think that that -- and his family and his parents as well, think that that is a big part of it.

In addition, Your Honor, he was diagnosed at a young age with ADHD and so was -- once prescribed medication for the ADHD, started excelling.  Did very well in school.  Kind of came around.  Became much more happy, I think, in the high school and college years.  But perhaps that can also, you know, spur on -- the ADHD as a diagnosis can spur on some of the behavior.  I'm not suggesting, certainly, that that absolves him of blame.  All I'm suggesting is trying to create and figure out what is -- what's the reason, right? Because -- what's the reason to have these Japanese cartoons on your computer?  What's the reason to put a camera in a shower area of a family member?  Is it just happenstance?  I don't know.  But there may be some compulsory things that he's gone through, and I think that's a legitimate portion of all of this because I think anybody that is in this situation has some sort of demons to reckon with.

I apologize, my computer is not turning on.

One thing I will discuss as well and I do know, we submitted to the Court some letters on his behalf from some

friends, family members, colleagues, and so on there, Your
Honor.

And so again, with respect to his characteristics, I
think, Your Honor, as noted in the presentence report, the
probation officer did a very good job of outlining his
background, his work history.  He excelled in school.  He has
been a successful practitioner as a psychologist in various
regions and most recently here in Charlotte.  By all accounts
a very good record as a doctor.  Again, the -- my hunch
probably is that there was an expectation perhaps that, well,
when we investigate this and there's this sort of AI morphed
pornography stuff and this person is a doctor to patients that
are young, well, this is going to be a huge, really messy
situation if we find out that there's something untoward going
on with patients.

In the investigation there was the handful of
instances that the government produced with respect to
Rochester which was the up-skirt video that we've been
speaking about from 2015, in that time frame.  In Charlotte
there's no evidence of any impropriety with any patient, no
evidence of anything untoward with anyone.  Reviews have
been -- reports have been nonexistent.  There's been -- the --
his place of employment is aware of, obviously, what he's
charged with.  He self-reported to the medical board when this
got underway.  Cooperated with them.  Provided them

information.  When he was ultimately indicted on the
superseding indictment, at that point in time that nixed any
real hope of him having his medical license.  But nonetheless,
he was cooperative with them.  They recommended he go and seek
counseling and treatment.  He did that.  And so he takes very
seriously and I think by all accounts was a good doctor to
many people notwithstanding what happened to the victim in
this case.

Your Honor, with additional respect to -- reflecting
the seriousness of the offense, certainly, Your Honor, the
Court is well aware 2251 is a serious -- is as serious as it
gets in general short of a literal physical violence type of
criminal activity.  It's a statute that obviously requires a
mandatory minimum of 15 years and requires that presumably
because it's kind of multifaceted in general.  It's one that
involves victimhood in the sense of the abuse that happens to
the minor at the time and the re-victimization that occurs
when that imagery is out in the world forever and ever.  And
particularly it's a statute that's designed to go after people
that in tandem take the action of abusing a minor, which is
horrific in and of itself, but doing so for the purpose of
then later on profiting or humiliating and sharing with other
people the image that they created.  That's why this is such a
serious charge.  That's why this is such a serious statute and
a serious sentence.

1        That said, Your Honor, when we're considering the
2   guidelines -- reflecting the seriousness of the offense, we do
3   have to consider the offense in question and not the more
4   generalized, broad, what these usually are.  In this
5   particular case if we're considering what this is, it's not --
6   what I mean to say, Your Honor, it's not a blanket situation.
7   There's a spectrum of offenders and the Court should take into
8   account this behavior and compare it to other defendants and
9   compare what type of sentences they received based upon the
10  conduct that occurred.

11       In Mr. Tatum's case, he never physically abused
12  anyone.  He never physically assaulted, coerced, or did
13  anything of that nature.

14       Never -- never produced a video with the intent to
15  share it or give it to anybody else.  There's been no evidence
16  of that.  I don't think that exists.

17       And again, there's only -- well, there's only one
18  actual video in evidence that would constitute a production
19  count which is the video in Maine.  I understand the position
20  the government would take is that there are -- there were
21  attempts or unproven allegations with respect to Atlanta with
22  the cousin and the hospital one with the patient who was 18.
23  But nonetheless, this was not a situation of a prolific
24  producer of pornography.  That doesn't exist.  It was one
25  video from a number of years ago in -- couched within a bunch

1  of other voyeurism videos.

2         And that, Your Honor, is kind of the crux of a lot

3  of Mr. Tatum's problem is that he does have an apparent

4  predilection for voyeurism, meaning the liking -- basically,

5  being able to surreptitiously watch and observe somebody.  And

6  that, in large part, is the bulk of -- you know, there are

7  numerous videos, numerous images of this happening to numerous

8  people.  The vast majority of which are either adults or --

9  I'm not sure who they are.  But they certainly are not a

10 treasure trove of a whole bunch of instances of Mr. Tatum

11 going around and targeting minors for production purposes.

12 There is one video and there are a couple of pieces of

13 evidence that are not very specific about him engaging in what

14 is ultimately voyeuristic activity, which is placing a camera

15 where somebody doesn't know where it is, putting it in a

16 locker room, putting it in a shower, that sort of thing, where

17 a person can see another person in the nude.

18         And, Your Honor, I think there is a big distinction

19 between that, as horrible as it is -- and we have never shied

20 away from the fact that that's horrible, but there's a federal

21 statute for voyeurism.  There's a federal statute that does

22 target that specific behavior.  There's certainly state

23 statutes as well that target that behavior.  The -- I mean,

24 the voyeurism statute from the federal law is from right

25 around the same time, honestly, as the *Ashcroft* case and

everything back in -- and PROTECT Act back in 2003.  I think
there was -- a lot of it came into play back then.  And it,
you know, specifically goes into instances of when a person
has a reasonable expectation of privacy and they are filmed in
a private area and their breasts are filmed, and it goes into
a lot of the behavior that has been described as far as
Mr. Tatum is concerned.

The Congressional Record and the commentary and
everything likewise specifically indicates within it that this
is to -- the purpose of that voyeurism law is to curb the
filming of locker rooms, the filming of gyms and showers and
areas.  And it specifically references places where minors
would be, schools, and so on.  It's in there, meaning the
statute was contemplated to prevent the activity where a
person does something voyeuristic where it falls short of this
level of being the production of child pornography.  There are
some cases that deal with that where, like, some coaches were
filming people naked but not doing so in a way that is
pornographic; it's a picture of somebody naked.  And that's
why that statute exists because not every case is this and not
every case certainly can prove that there was a lascivious
exhibition or what the person's intent is.

So as far as Mr. Tatum is concerned, a lot of what
his conduct is is voyeuristic in nature and generally targeted
toward that, and that's what the evidence would show as far as

1  any production because there really aren't any beyond that and
2  this series and handful of some morphed images that were, I
3  think, roughly -- Mr. Cervantes can correct me if I'm wrong.
4  There was maybe a dozen or so total that were saved, I think.
5  I could be wrong.

6        And like I said, Your Honor, never shared, never
7  distributed, never posted, never for anyone's eyes but his.
8  And it doesn't make it right.  But also it doesn't make him a
9  person that targeted children for the purpose of profiting or
10  sharing or giving away private images of them after sexually
11  assaulting them.  If we're looking at the statute for the
12  production charge (A) through (E), it's raping a child,
13  committing acts of sodomy and incest with a child, it is
14  bestiality.  It is as horrific as horrific gets.

15        And the final one is a lewd and lascivious
16  exhibition, which is probably the only one that doesn't
17  require actually committing rape.  That section also has a
18  series of -- or that definition of child pornography when
19  it's -- what is lewd and lascivious?  You know, we believe
20  certainly in every case like this, but in the trial as well
21  with the *Dost* factors, what is that and what constitutes lewd
22  and lascivious?  And that can be any number of things.

23        And here it was more or less that these images were
24  pretty benign in the grand scheme of things.  And a lot of the
25  argument came down to what was his intent?  And that's what

1  the argument has been today.  What was his intent in doing
2  this?  He attempted to do it -- his intent was to film a
3  person that was naked.  Again, I say that not to condone it,
4  but to say that in the grand scheme of things, in the world of
5  people that get charged and convicted under this statute, I
6  imagine there are very few who in their entire lives have been
7  found to have one single video that constitutes production of
8  child pornography after a thorough investigation.  And it's
9  not just the items they seized initially.  There was Google
10 searches, there were Cloud drives, and so on and so forth.

11         If this was a person that was doing this around his
12 patients, if this was a person that was committing sexual
13 assaults on anybody, I imagine we would have heard about it.
14 We haven't.  There's been no evidence of any untoward.  This
15 is a person who engages in voyeurism.

16         The morphing thing is part and parcel of that as
17 well.  It's a program that a person can use to make somebody
18 naked and they don't know it.  And he never shared it with
19 anybody.

20         There does need to be adequate deterrence for the
21 conduct.  The production statute is quite adequate, I think,
22 at deterring conduct in a variety of ways because it does
23 require a mandatory 15 years.  It does require significant
24 post-supervised release once the person -- if they ever get
25 out.  I understand, Your Honor, that -- I mean, well, the kind

of sentences that are available in this particular case, it's
a mandatory minimum.  There's not much wiggle room, certainly,
in the type of sentence available in terms of it being served
as a prison sentence.

I know that Mr. Tatum will request, and his family
would really appreciate if he had the ability to go to a
facility where he can receive treatment himself as trying to
rehabilitate, help himself, but also, when appropriate,
counsel others.  Because regardless of everything, he's a good
doctor.  He's somebody that has helped people.  And to make
use of his time in a positive way, I think he does have the
ability to perhaps help fellow people who are going and
struggling through this.  So I know that he would appreciate
any recommendation the Court may be able to give with regard
to any sort of treatment or facility that may have some sort
of programs that might be suited to him.

Again, the guidelines range here is what it is.
It's life, Your Honor.  I would just submit that that's not
appropriate for this defendant.  Your Honor, life in prison
for somebody, again, who has not ever touched or harmed
somebody with physical violence.

Again, I'm not suggesting that there aren't victims
here.  We've certainly known that, acknowledged it.  The
families, I'm sure they will tell you just about how broken up
everything is and how much this has damaged and impacted them.

So it's not like I'm saying that there's nobody that's been harmed here.  And I'm not saying that nobody has a lack of long-term harm.  I know that there's trauma that comes with the knowledge that you have been filmed in the nude or an image of your body has been created and it's out there. That's part of why this statute is so serious.  That's why. Because it re-victimizes over and over again if it's out there.

The thing -- it may not give much solace, but I hope it gives a little bit, is that -- and this isn't just me as a defense attorney saying this.  It's what the evidence bore out.  There was no sharing of images.  There was no posting, there was no giving to anybody.  The government had password protected drives they had to get into.  These were not distributed on the internet.  Just as far as any victim in the case is concerned about that, that aspect, there was no evidence of sharing it and it -- and certainly the federal government has protocols in place that in this trial setting it does not get distributed in this setting either.  So I just want to make sure that people are aware that that has not occurred in this case.

I'd also note just the volume as well, Your Honor, to take into consideration here as well.  Again, if we're considering the wide breadth of these type of cases -- I know Your Honor has done plenty of these at this point.  Part of

the consideration, certainly, is the nature of what the stuff
is.  And part of the consideration is how much of the stuff
there is.  Again, for the production count, there is one
video.  There are four videos that have been -- in total of a
pornographic nature that have been given as evidence.  There
are some other images of the morphed variety that were also
given as evidence.  That's the extent of the child pornography
images that exist in this case.  That's why the guidelines
recommendation is the 300 to 600 images because it's four
videos which get you to 300 and then a little bit above that,
but not as much as 600.

There are certainly cases that have far more than
that and are far more egregious.  If I'm thinking about, like,
relative sentences and things to compare things to, well,
first, for just the possession aspect of it, the things that
were possessed, off the top of my head I know, you know, I had
the case with Mr. Bonds a year or so -- a year or two ago.  If
you recall, Your Honor, that was the case where the defendant
probably inadvertently uploaded a bunch of files he didn't
want to to a Google drive when he was backing up a computer.
NCMEC caught it in their filter and ultimately found that
there were 150 videos that constituted child pornography that
were on his device.  Those videos were an absolute horror
show.  I don't do a lot of these cases, but I do enough to
know that that was the worst I've seen.  And I think -- Your

Honor I don't think had the -- I won't say privilege, but you
didn't get to see those images. That was a plea situation.
But the descriptions of them, if I recall, Your Honor said,
"That's about the worst I've ever seen." And I wouldn't
disagree. Mr. Odulio was there, I think, too.

And the sentence there, there was a similar
situation in some context to Mr. Tatum in the sense that that
defendant, Mr. Bonds, had no criminal record. It was zero
points. Also, there was no evidence of him sharing,
transporting these images other than, you know, going from a
laptop of his to a Google drive of his. That was the only,
sort of, transport of any kind. No distribution. No criminal
record. But a whole lot of -- 40 times as many videos that
were attributed to Mr. Tatum. And again, with respect --
those were the worst of the worst.

The videos here, again, we made argument certainly
that some of the images that are here aren't -- don't even
qualify under the statute as child pornography. May qualify,
as the government argues, as an attempt at it, but not
actually fully completing that offense.

So the number of images is significantly lower than
a person that is often in these proceedings in the federal
system. I believe Mr. Bonds' sentence was ultimately -- for
the possession count was 84 months, again, for 40 times as
many images and ones that were significantly worse than what

1    were on Mr. Tatum's devices.

2              I know the government will say there's -- well, he

3    had these lists and he had these file paths and he had anime.

4    And that's correct, Your Honor.  There's copious amounts of

5    animated images.  And again, it's not me condoning or saying

6    it's good.  It's me saying in the grand scheme of things, if

7    we're looking at the spectrum or looking at a scale here of

8    what's the appropriate punishment for an offender, the person

9    who has actual images of actual minors, toddlers, and so on,

10   actually being violently harmed is the person that deserves

11   life in prison.  The person that has animated pictures, the

12   person that has images of people that are 11 or 12 or maybe 13

13   where it's unclear or we're having to have a discussion about

14   whether or not they're pubescent or not to determine whether

15   it qualifies under certain aspects for an enhancement, those

16   are the type of cases where the highest of the high punishment

17   is not what I believe the Court should do because if -- it's

18   hard to imagine a case that doesn't -- it's hard to imagine a

19   situation where -- particularly as we discussed in the brave

20   new world of AI, it's coming and these prosecutions are

21   coming.

22             And I do know and I certainly do -- concede the

23   argument that there needs to be a showing that this isn't

24   appropriate behavior and that it will be punished, but the

25   punishment should not be for the purposes of sending a

message.  It should not be for the purposes of putting a head
on a stake and saying here's what happens when you do this.
It should be appropriate to the conduct that occurred and the
images that he had.

The vast majority of the evidence that is put forth
by the government that is so damning is largely evidence of
things that there is -- they don't have and are speculating
about the contents of.  Just in particular, Your Honor, the
reason why I go -- I spent so much time belaboring this file
list and while at trial with Mr. Whitt I made him sit there
all day answering all my questions was specifically for this
reason.  We don't know what it is.  And in particular, this is
a person that the government has just said has maybe the
biggest anime collection they've ever seen, that has, as Your
Honor heard earlier, sadomasochistic, whatever, images,
cartoons on the device.  But they also want to simultaneously
say, hey, I know you didn't find any of that -- you didn't
find any sadomasochistic infant stuff anywhere on all the 21s
you found, but these file paths are definitely child
pornography.  They're not anime.  They're not nothing.
They're definitely child pornography.

Again, we don't know.  We don't know if they're real
children.  We don't know if they're animated.  We don't know
if they're cartoons.  We don't know if they're not any of
those things.  We don't know.  The file path, in fact,

1    frankly, Your Honor, that precedes all those names is a file
2    path that's the same as a bunch of anime as well.  It's
3    Lolicon something or other and day in the life.  It's an anime
4    folder path that is housing a lot of these.  And again, we
5    don't know what they are.  But there's just a blank
6    implication like that -- they're definitely preteen hardcore
7    actual children.
8            THE COURT:  You may not know the answer to this, but
9    the file names for the anime, do any of them go on to the
10   point like some of the other file names and end with
11   "3-year-old with dad"?  I mean, is that how any of the anime
12   films are described?
13           MR. AMES:  I'll be honest, Your Honor, I'm not a
14   connoisseur.
15           THE COURT:  No, I just thought you had looked at
16   this a lot more than I have.  What I'm trying -- the point of
17   the question is, is there a discernible -- is there a way to
18   be confident to any extent that when you're looking at a file
19   name, that's probably anime; and if you're looking at another
20   file name, that's probably real kids?
21           MR. AMES:  I don't -- and -- I don't know.  I mean,
22   there's -- there's -- the file lists have -- again, it's a lot
23   of images.  And again, we're also -- I haven't even discussed
24   the fact there's also just regular adult pornography too.
25   Again, we're talking about somebody that had a problem with it

1    and has coped with it and had a large collection.

2            But in a collection that vast and that large, where

3    we're talking about tens and tens and tens of thousands of

4    images, they found four total videos that could even reach the

5    definition of child pornography.  They found a handful, a

6    dozen or so of morphed images.  And they found other file

7    paths.  They found a whole lot of anime.  They found a whole

8    lot of adult porn, probably some that isn't all that, you

9    know, straightforward, I guess.  They found voyeurism videos

10   and all the rest.  But they didn't find a treasure trove of

11   actual child pornography, but they found a lot of perverse

12   things.  And they want to -- and they are pushing for a life

13   sentence largely on the basis of evidence that we don't have.

14           And I understand that the system has guidelines and

15   practices.  And I understand that the standard at sentencing

16   hearings is preponderance.  But I just ask the Court to keep

17   in mind that the enhancements involved that take this from

18   what would be an otherwise 20ish-some-odd-year sentence and

19   push it to the maximum that's allowed under the law is based

20   upon, in many ways, presumptions, assumptions.  We think

21   probably this happened.  We're inferring this.  This is most

22   likely what it is.  And we're relying upon in many cases

23   testimony and recollections from things that happened a very

24   long time ago and in some cases things that people had no

25   actual firsthand knowledge of.  Ages of when something was

taken.  What was the contents of a video that that person has
never seen?  These are some of the bases for -- a piece of
paper that says 17 instead of 18 is potentially the difference
between a sentence -- it's ten extra years.

So in the grand scope of it, I ask Your Honor to
consider this is not a case where, hey, there's a giant bucket
of everything.  We got him dead to rights.  This is a case
that has certainly a lot of nuance, but certainly a lot of
speculation as well.  And we can infer, but at the end of the
day, Your Honor, I think there needs to be some -- at least
some deference given to the relative lack of evidence that
we're having to just assume, well, it must have existed at
some point and so therefore we will go forward on that
assumption.

I would say, Your Honor, I mean, I think even in the
western district, last time I looked, a production count, the
average sentence that a person receives on production is
probably somewhere in the ballpark of 2, 250 months, or
something along those lines.  For possession charges it's
somewhere in the ballpark of probably 70 to 80.  And here the
recommendation is 720, I believe.  And...

THE COURT:  It's okay to stop.  You've said a lot.

MR. AMES:  I know, Your Honor.

THE COURT:  I know you're afraid to sit down and
then think, oh, dang, I meant to say that.

1          MR. AMES:  My entire life is always that, Your
2    Honor.
3          THE COURT:  I remember.  I used to stand right
4    there.
5          Look, I think I understand all of your arguments and
6    the equities on your client's behalf.
7          Mr. Tatum, you have the right to address the Court
8    if you'd like to, but you don't have to say anything.  Is
9    there anything you'd like to say?
10          THE DEFENDANT:  No, Your Honor.  I'm going to remain
11    silent.
12          MR. AMES:  Your Honor, could I please --
13          THE COURT:  You did think of something else.
14          MR. AMES:  I did think of something else.
15          THE COURT:  I knew you would.
16          MR. AMES:  I just want to -- I don't want to talk
17    directly to everybody, but please know that there's --
18    Mr. Tatum is not speaking on the advice of me.  It's my fault.
19    And, Your Honor, we're in that --
20          THE COURT:  Look, Mr. Ames, I understand.  He's
21    right to do that.  He went to trial.  I'm confident he will
22    appeal.  I encourage that he appeal.  He doesn't want to make
23    any self-incriminating statements that could be used against
24    him in the event that he's successful on appeal.  And he's
25    afraid that if he doesn't incriminate himself, he's going to

1  upset the Court for not showing remorse.  So no harm, no foul

2  by him not wanting to speak.

3            MR. AMES:  Yes, Your Honor, and I appreciate that.

4  I certainly -- I've told Mr. Tatum this too, is that I would

5  never -- in the times I've been in front of you, that's always

6  been the case; that you do not hold that against anybody

7  and -- but I also want to just say it because -- in case those

8  who may not be privy to these proceedings and not understand

9  that -- why someone can't just say, hey, I really regret this

10 or I'm sorry.

11           THE COURT:  Right.  Understood.

12           MR. AMES:  Yes.

13           THE COURT:  Mr. Cervantes.

14           MR. CERVANTES:  Thank you, Your Honor.

15           First I'd like to address the 3553(a) factors.

16 Next, there are some victims present in court and online that

17 would like to make some statements.  Then I'll address

18 restitution and special assessments very briefly.

19           THE COURT:  I hate to inconvenience all these

20 people.  We've been here for -- is it noon?

21           THE CLERK:  Yes.

22           THE COURT:  We've been here for 2-1/2 hours -- not

23 you all, but we have -- and I think some of us would probably

24 appreciate a 15-minute break.  I'm sorry to delay folks.  But

25 not only do we want to get this right, but we don't want to be

1  uncomfortable while doing it, especially our intrepid court

2  reporter who has to pay attention at all times.

3          All right.  So we're going to take a 15-minute

4  recess.

5          (Brief recess at 11:59 AM.)

6          (Court back in session at 12:10 PM.)

7          THE COURT:  All right.  Mr. Cervantes.

8          MR. CERVANTES:  Thank you, Your Honor.

9          There's been a lot of discussion about voyeurism and

10 these videos that the defendant has made, and I'd like to

11 address that and show for the Court a sampling of some of

12 these videos.  There's seven videos that the government has

13 identified.  We would ask to move them into evidence unless

14 there is an objection.  They're Sentencing Exhibits 5 through

15 11.  These are videos that have come from the defendant's

16 devices showing the surreptitious recordings.  And what's

17 important about them is the nature of the recording, the

18 extent to which he was doing this stuff, and it also addresses

19 some of the arguments that the defense was making.

20         THE COURT:  All right.  They're admitted.

21         (Government's Exhibits Nos. 5, 6, 7, 8, 9, 10, and

22 11 were received into evidence.)

23         MR. CERVANTES:  Publishing Sentencing Exhibit 5.

24         (Government's Exhibit Number 5 was published.)

25         MR. CERVANTES:  Publishing Sentencing Exhibit 6.

1           (Government's Exhibit Number 6 was published.)

2           MR. CERVANTES:  I'm pausing it at 10 seconds to note

3  the sound of a scale and this is a scale where I've stopped.

4  And I would direct the Court's attention to the videos that

5  were introduced at trial, one of them of the patient showed

6  that she was being weighed at a scale.

7           THE COURT:  I recall.

8           (Government's Exhibit Number 6 resumed.)

9           MR. CERVANTES:  Publishing Sentencing Exhibit 7.

10          (Government's Exhibit Number 7 was published.)

11          MR. CERVANTES:  Pausing at 18 seconds to show his

12  face there in the video.

13          (Government's Exhibit Number 7 resumed.)

14          MR. CERVANTES:  Publishing Exhibit 8.

15          (Government's Exhibit Number 8 was published.)

16          MR. CERVANTES:  Pausing at 7 seconds to note this

17  here, this is a white coat.  This is another doctor that he

18  was working with.

19          (Government's Exhibit Number 8 resumed.)

20          MR. CERVANTES:  That one goes on for 3 minutes and

21  39 seconds and it's just conversation with the camera pointed

22  directly up her skirt.

23          Publishing Exhibit 9.

24          (Government's Exhibit Number 9 was published.)

25          MR. CERVANTES:  I'll stop there for a moment to note

even in that last video we see the defendant using deception
to walk his victim to the car, having a conversation about
work; and without her even knowing, as she's reaching into the
car, he violates her and records what he records.  So the
defense was talking about and a lot has been made about how
nobody at work ever came out and said anything.  These people
don't know what's happened.  And part of the problem is that
we can't identify who they are.  The patient, what seems like
a patient that's being weighed at the scale, how old is she?
I don't know.  Maybe a minor.  Given the scope of his work, I
would assume that she is a minor.  And who was she?  I don't
know.  We tried to find out who she was, but it was just not
possible.  We ran into dead ends.

        And so this notion that these are -- and the
suggestion is these are sort of one-offs or he didn't do it to
other people at work, that everybody at work thought that he
was, you know, upstanding, it's probably true.  And it's all
related to this facade that he's put on in front of everyone,
even in front of his family about who he is versus who he
really is and nobody has known who he really is until this
case came to light.

        And I understand it's very difficult for some people
to really accept the reality of what the defendant has done,
but he has preyed on so many women.  As described in the
presentence investigation report at paragraph 17(f)(i),

there's a folder in his hard drive where there's 51 of these
videos of up-skirts.  And to show that they're not just --
first of all, they're saved there, right, because they're
taken with a phone and they only get there if someone
purposefully takes them from the phone and organizes them and
puts them together.  Plus there's 256 screen shots of those
videos showing the parts that were interesting to him.

And this isn't just about voyeurism, you know, and
going around recording people at work, potentially patients.
There may be other production charges there that we just
weren't able to develop.  But there's also Sentencing Exhibit
10 shows this went beyond to even other bathroom videos.  So
I'll publish Sentencing Exhibit 10.

(Government's Exhibit Number 10 was published.)

MR. CERVANTES:  Stopping at 13 seconds, the Court
may recall, this is the -- looks like the same red bag that
was used to hide the phone that was placed in the bathroom.
In the video related to count two, the production video, there
is an orange sort of banner that looks like a bag where the
phone was hidden inside of.  And here we see it again.  And
this shows -- this is like the serial recorder who has an MO,
who has an operation.  This isn't some fleeting moment of
interest in recording people.  He's got a manner in which he
does this and he continues to do it.

(Government's Exhibit Number 10 resumed.)

1          MR. CERVANTES:  He shows his face in this video just

2     like he did in the video in count two.

3          And fast forwarding to 5:49.  I'm not going to play

4     that part, but it does depict -- a female does come into the

5     bathroom to bathe and he captures her as well.  She does look

6     more developed in that video so I don't know if that's a

7     minor.  But there are bathroom videos in addition to videos of

8     people at work.

9          And not just that, Sentencing Exhibit 11, this one

10    shows really the...

11          (Government's Exhibit Number 11 was published.)

12          MR. CERVANTES:  This one shows the depravity of the

13    defendant stocking a woman at the grocery store with her two

14    kids in a grocery cart.

15          One moment, Your Honor.

16          That last one shows the nature and the extent -- the

17    nature and circumstances of the defendant's MO in recording

18    women in the community, females.  He was indiscriminate.

19    We're not dealing with simply a peeping Tom or voyeur.  We're

20    dealing with someone who's creating content.  He's producing

21    this kind of content, whether it's minors or adults.  And this

22    is digital content that can be stored indefinitely.  It can be

23    shared.  I understand that there wasn't evidence in this case

24    about distribution, but that's the problem.  And we all know

25    that digital images remain indefinitely depending what you do

1    with them.  And each time that the defendant watched these
2    videos, these victims are re-victimizing -- or being
3    re-victimized by the defendant's conduct.

4            So like it or not, let's call it -- whether you call
5    it a voyeur that's interested in looking at people or not,
6    when the voyeur records children naked in the bathroom, that's
7    child pornography.  When the voyeur is trying to record the
8    private areas of a minor during a private session, that's
9    child pornography.

10           So the defense talked about what the statute was
11   designed to do and suggested that this production statute was
12   really designed to criminalize people for producing and then
13   sharing.  And that's not true, as the Court knows.  There's a
14   separate statute for the distribution of child pornography and
15   that's not what he was charged with.  He's charged with
16   production.  And the simple fact of producing child
17   pornography is what the statute is designed to criminalize.
18   It is designed to criminalize the exact conduct that the
19   defendant has done in this case.

20           The defense talked about only one video of
21   production, but that's not entirely true.  There were three
22   videos of the patient who testified, Ms. F.L., at trial.  And
23   I don't know how many other videos that he made of his
24   patients at work who are minors because we couldn't identify
25   other minors.

1          The defense also talked about not having a treasure
2     trove of images and videos here.  And that's kind of ironic
3     because we don't have that mainly because he destroyed that
4     evidence and so he shouldn't get the benefit of the doubt
5     whatever doubt there may be.  We know what the file names
6     were.  We know in our experience what those files are.  We
7     know in our experience that those files, when they have those
8     descriptions and you open them, they're not anime.  They are
9     exactly what they purport to be.  And we don't have the actual
10    videos and images listed in that exhibit that I displayed to
11    the Court at Exhibit 4 because it was destroyed by the
12    defendant, as the Court rightly found in the obstruction of
13    justice enhancement.

14          The defense also cited to another case called Bonds.
15    Bonds is not similar to this case.  Bonds pled, number one.
16    He was not charged with production, number two.  He pled to
17    possession.  He got 84 months, but he pled.

18          A better comparison would be the case called Deritis
19    which is a case that this Court was involved in and this Court
20    sentenced Deritis to 50 years in February -- February 28,
21    2023, of this year.  He produced.  He was charged with
22    production.  He was a hands-on offender, but he was charged
23    with production.  And there were bathroom videos as well.  He
24    got 50 years.

25          So what we're dealing with here is someone who is

1  indiscriminate about who his victims are. He has victimized

2  his cousins, his sister, minors, adults, a mom of two kids at

3  a grocery store, colleagues at work, patients.

4  And he told the FBI what he did with this material.

5  He masturbated to it. That was his own admission, with the

6  material that he collected and viewed.

7  He put himself in a position of trust. He put

8  himself in a position of trust with children to learn their

9  deepest, darkest secrets that they may not even be telling

10  their patients and he took advantage of that. And using that

11  he recorded at least one victim. He's been doing this for a

12  long time.

13  The pretrial sentencing report at paragraph 17(f)(i)

14  shows that the earliest surreptitious recording is dated

15  March 2008. This is a long-standing issue. And it's

16  escalated. It's escalated into his own profession to the

17  point where he was so bold that he would just videotape

18  anyone, even this lady that he walked to her car. And just a

19  quick snap and now that's recorded forever in his library to

20  do as he wishes.

21  The destruction of evidence is an aggravating factor

22  that the Court should consider. When faced with the reality

23  of what was about to happen, he didn't come clean. He

24  didn't -- which is his right. He doesn't have to -- he has a

25  right to a trial, which he took advantage of. But the reality

is that when he was faced with charges, he destroyed evidence.
And that is an aggravating factor. And we consider these
aggravating factors in determining what to do, what to
recommend to the Court, and whether there's anything
mitigating in the record that would suggest that he should get
a downward variance from the guideline range.

This is someone with means, intelligence, support of
a family. There's no reason for him to have done this. Which
makes him arguably even more dangerous, and doing it for such
a long time.

With respect to the need for the sentence imposed to
reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense, there
are few things that are more serious than preying on minors.
And it's not just the video of Ms. M.C., it's also the list
that shows exactly what he was interested in, the list of
10,000-plus files. What he did to Ms. M.C. was unfair and
inexcusable. He was family. She trusted him. She trusted
him also in the context of his role as a doctor. And he
violated that trust for his own sexual gratification.

The use of AI also shows the dangerousness of this
case and the importance of this case. It shows the
dangerousness he poses to society where he can take any
innocent photo of anyone, of someone's childhood, something
that happened years ago, and convert it into a sexual tool for

1    his pleasure.  We only need to listen to the victim impact
2    statements to understand the impact the defendant has had on
3    their lives as a result of his selfish conduct.

4           The need for the sentence imposed to afford adequate
5    deterrence to criminal conduct.  With regard to that factor,
6    this is an appropriate case to send a message of what happens
7    when people use technology to create child pornography.  That
8    message should be strong and it should be clear that it will
9    not be tolerated.  It will be prosecuted.  And it's not
10   something that the government will look to very kindly.

11          The message should be sent.  But even if the public
12   won't be deterred -- and I have been in the courtroom where
13   the Court has addressed that issue and determined -- or
14   questioned the deterrence impact of a sentence imposed in
15   this -- in any particular case.  Are offenders actually
16   deterred by sentences?  Even putting that aside, this Court
17   should deter this defendant from his conduct which he has been
18   doing for a long time and will continue to do unless this
19   Court sentences him to a lengthy sentence.

20          With regard to the need for the sentence imposed to
21   protect the public from further crimes of the defendant, no
22   woman, no matter their age, was safe around the defendant.  A
23   guideline sentence is appropriate to keep him away from
24   further violating the women in this community.

25          Although the -- the guideline range is 720 months,

1 Your Honor. We think he should get every single day of that.

2 However, we're asking for 600 months -- it's a variance of 120

3 months -- because the defendant is 40 years old and a

4 600-month sentence, we believe, is appropriate. It's

5 sufficient but not greater than necessary to punish and deter

6 the defendant's conduct.

7 There's nothing mitigating about this case that we

8 can think of. The defense's argument seems to be minimization

9 of the type of conduct involved in this case, which the jury

10 decided emphatically that he was guilty of. And the

11 guidelines are what they are. Congress has told us what this

12 offense -- the sentencing commission has told us what this

13 offense should be -- what the guideline range should be for

14 this kind of offense. And so we would ask that the Court

15 impose a sentence of 600 months on the defendant which is the

16 equivalent of 50 years.

17 Your Honor, at this time the government has -- would

18 like to present the victim impact statements from six

19 individuals.

20 THE COURT: All right. Thank you.

21 MR. CERVANTES: The government will first ask

22 Ms. M.C. to make a statement.

23 MS. M.C.: Hello. Can everyone hear me okay?

24 THE COURT: Yes.

25 MS. M.C.: Firstly I would like to thank the Court

for their flexibility and accommodations in letting me give my statement virtually today.

My name is M.C. and I was unknowingly videotaped by the defendant when I was a child. He videotaped me undressing, showering, and dressing again in the family cabin that has had five generations of my family walk through its doors.

We had one main cabin bathroom that he taped me in and I wonder if I will ever be able to face returning to the cabin that was once the safe space for much of my family. Even if I make it back, I am prepared to find out that it has been tainted for me. The defendant has ruined the sanctity of the space my family has congregated at for generations, a space I know will never be replicated.

The same summer I was videotaped, I confided in the defendant about mental health issues I was having. His career in psychiatry and my trust in him at the time made him the ideal confidant. His trust in our family also led my parents to seek his advice. I constantly wonder if he decided to surreptitiously videotape me before or after he learned I was struggling. Regardless, these events couldn't have been more than a few days apart.

He kept and accessed the video he took of me until it was seized in 2021. That summer he also began asking me deeply personal questions with sexual undertones. Asking if I

was a masochist, if I liked to get hit, and if I liked getting my hair pulled. He then pulled my hair. Because I was 15 I thought all of this was fun between cousins.

I was first called by the FBI in September of 2022 and I believed it was a scam. I had no idea why they would be calling me. I sat in a chair across from an agent and a victim specialist who had several manila folders containing evidence. I can't describe the moment when they showed me my 15-year-old naked body. First, I was confused. Second, I was humiliated. Third, I was disgusted. And lastly, I felt betrayed.

It is hard to even remember what happened that day and for the days after. I remember calling my mom and trying to explain and make sense of what happened. I remember not being able to look at myself in the mirror for weeks. I remember obsessing over my privacy in a way that I never had before. Since that day I have felt uneasy showering or using the restroom even in my own home and I often check for cameras or anything else that could be out of place.

Since my involvement in this case came to light, my entire family has been turned upside down. While parts of my family have been incredibly supportive to me and the other victims, other relatives promise that this trial of his peers would prove his innocence. Messages from his family came through the grapevine often, letting the victims and my family

know that he was an addict but definitely not a pedophile.  It
did not matter that I was a child when he violated me.  He was
such a successful doctor and this entire case was an
orchestration against poor Baby Day Day, the name family
members called the 40-year-old man indicted on these heinous
crimes.  I was told over and over what happened to me was bad
but not bad enough to ruin his promising life.  I must forgive
him and move on.  There has never been responsibility taken
for his actions or even acknowledgment.

    During the trial the defendant and his family
consistently sat outside the courtroom or courthouse during a
break in session making it impossible for me and the other
victims to move around, use the restroom or leave for the day
in peace.  We were made to feel like a thorn in his side this
entire process.

    On May 4 when we heard the jury's verdict, guilty on
all counts, I hoped that this was everyone's opportunity to
move on.  Our justice system prevailed and we could move
forward.  I could go home and get back into a normal routine
along with the other victims.  I could begin the healing
process with the family that has had my back from day one:
blood relatives, non-blood relatives, family and friends.

    I wish this was the case.  Instead of that being
respected, the defendant's family has harassed me and the
other victims forcing us to keep reliving what has happened

1  over and over.  I cannot listen to people tell me he was a
2  wonderful father before he was caught.  I cannot listen to
3  people tell me over and over that there is this set of
4  alternate facts that we are not privy to that would have,
5  could have, or should have proven his innocence.  We all
6  watched him set up the camera to tape me, my other cousin, and
7  his patient.
8        The constant campaign for the redemption of a child
9  sex predator is impeding me from healing.  I have been told
10 that I cannot formulate my own opinions or thoughts, my mind
11 has been poisoned, and I will live a life void of happiness if
12 I do not forgive the defendant and move on.  I have lost many
13 family members through the last year due to this, which was
14 extremely difficult to come to terms with.
15        I want to move forward on my own terms.  I will not
16 forgive the defendant.  Our family will not be the same moving
17 forward and I am at peace with that.  There is no excuse for
18 what he did to me, my cousins, his ex-girlfriends, and his
19 patient.  He needs to be held accountable for his actions.  I
20 hope he doesn't have the opportunity to have any contact with
21 any children and endanger them in the future.
22        Thank you for listening.
23        THE COURT:  Thank you.
24        MR. CERVANTES:  The government would call E.H. who's
25 here in person.  Up front, Your Honor?  She would like to read

1   her statement.  May she come to counsel table?

2           THE COURT:  She may.

3           MS. E.H.:  Hello, Your Honor.  My name is E.H.

4           I dated the defendant in high school and accompanied

5   him to his senior prom.  My memories of my whole high school

6   experience are tainted by this trial and the information it

7   has brought to light.  It now disgusts me that as a child I

8   deliberately chose to spend time with the defendant.  I feel

9   debased, horrified, ashamed, and unclean.  I'm outraged that

10  he chose to create and keep such pictures of me.  In this

11  digital age it is horrifying to realize that pictures of me,

12  innocent pictures, may be taken and twisted without my consent

13  for purposes that are illegal and disgusting.  I am angry

14  because I feel I have been dragged unwillingly into an

15  untenable situation.  I feel used as an object rather than

16  acknowledged as a person.

17          I feel that I cannot trust cameras and cameras are

18  literally everywhere in our lives.  I was a child when the

19  photos were taken that have now been so horribly twisted.  How

20  can this be that there exist pictures of me for which I did

21  not pose or consent?  I did not in any way commit any poor

22  judgment that might result in such pictures, except that of

23  having previously interacted with the defendant.  To put it

24  plainly, this mess is not my fault, but it is now part of my

25  life to deal with.

1          I now live with fear that some day these pictures
2    may surface in a public setting.  These awful things never
3    should have existed in the first place.  I live with the
4    feeling that there is something unclean very close to me that
5    I'm unable to wash away.  I feel very strongly that wrong has
6    been done to me and that I have done nothing to deserve it.
7          Worse than for myself alone, I now also live with
8    the fear that my two children may some day be confronted with
9    the ugliness contained in these pictures.  What if my two
10   children should some day be subject to harassment or worse
11   because of these pictures?  If I did not deserve this, they
12   certainly did not deserve it.  I'm trying to raise my children
13   to be compassionate, kind people who understand that every
14   life has dignity and value.  As a parent I think it's
15   important to demonstrate the values that we hope to instill in
16   our children.  That's one reason why I chose to travel to be
17   here physically in this courtroom.  I took time off from my
18   work as a nurse, a bedside nurse, at the hospital to travel to
19   be here.  I want to physically stand for basic human decency
20   and also for our American justice system.
21          During our time in high school, the defendant and I
22   both participated in a volunteer program called Youth Court.
23   Teenage volunteers like us would take on the roles of lawyers,
24   judge, and bailiff.  Minors who had committed misdemeanors
25   would come before Youth Court and receive a sentence of

1    restitution in the form of community service and a letter of

2    apology.  I mention all this because it was the culture at

3    Youth Court to take into consideration whether the offender

4    had admitted their guilt.  If the offender appeared to realize

5    the negative consequences of their actions or the hurt that

6    they had caused to others, then the teen volunteers would hand

7    down a lighter sentence.

8            I mention this because it's ironic.  One of the most

9    difficult things about this trial for me is how it has been

10   such a long, drawn out process and how staunchly the defendant

11   appears to believe that he has done nothing wrong or illegal.

12   The defendant had many chances during this time to admit his

13   guilt and seek to make amends.  At no point did he choose to

14   do so.  The outrage of being forced to publicly show my face

15   alongside these twisted pictures ought never to have happened.

16   Rather than making amends and attempting to heal some of the

17   hurt that he has caused, the defendant has spent his time and

18   energy attempting to skirt responsibility for his actions.

19           I would ask the Court that since it appears that the

20   defendant is still not ready to take responsibility for his

21   actions or try to make amends, that the Court please do so for

22   him.  I would ask the Court for the maximum penalty for the

23   defendant.  In this way I would hope that the defendant would

24   realize the gravity of his actions.  The hurt and damage

25   caused by him are immeasurable, but some amends should be

1  made.  I ask for restitution for myself.  I also ask that the
2  Court to do all in its power to prevent other children from
3  being so harmed by the defendant in the future.

4          While I have previously stated, and it's true, that
5  I have been greatly impacted by the events of the past few
6  years leading up to this trial, and while my negative
7  experiences have been extreme, I also want to unequivocally
8  state that I am stronger than ever.  By his actions the
9  defendant attempted to reduce me to an object, to less than a
10 person.  His attempts have failed.  I am stronger than that.
11 While I am afraid, I am able to rise above my fear.  He has
12 not won.  While I am disgusted, I am constantly finding beauty
13 and joy in life.  While I'm outraged, I am standing calmly now
14 for justice.  I will not be beaten down.  I will not be broken
15 and I will not be silenced.  I have passed through this
16 crucible and I will go on with my life.  And I have a greater
17 understanding and compassion for all other women and children
18 so affected.  I will rise above all this ugliness and I will
19 continue to turn toward the light.

20          Thank you.

21          THE COURT:  Thank you.

22          MR. CERVANTES:  Next, Your Honor, the government has
23 a statement written by Ms. S.B.J.  May I read it?

24          THE COURT:  You may.

25          MR. CERVANTES:  "As a parent I am reminded daily how

quickly my children transform into young men, then adults, and perhaps have their own families one day. We only get 18 birthday celebrations before they are off on their own, 13 first day of school pictures, a video of their first bike ride without training wheels, one graduation day, and so on. Special memories made and pictures taken to document these precious times. A childhood photo of a milestone often pinpoints the relationships that were important to you at the time, friends and family who gather in the photo. A single image or a single moment holds so much meaning.

"It's a very strange and unsettling realization that as an adult woman in her 40s, I became a victim of child pornography. These shocking and unfathomable words offered to me over the phone in a scary and surreal phone call. The day that I learned of David Tatum and what he did to me shook my world. So many questions were unanswered. Who is he? Why does he have a picture of me? Has he been stalking me? What did he do with this picture? Who has seen it? I felt violated, overwhelmed, and unable to do much else except to cry and try to make sense of this shocking news.

"I then show up in life as the person I wanted to be during this time. What David Tatum did to me has taken an emotional toll on me. In the images that David Tatum manipulated, I was 15 years old, the second oldest person in the picture of six children assembled in front of my home for

a quick back to school picture before the bus picked us up.
David Tatum turned a childhood memory, a picture of me, my
siblings, and our closest family friends into a pornographic
picture. David Tatum took the excitement of a new school
year, the love and support of great family friends, and
closeness of me and my siblings and he created an image to
sexualize us children for his benefit. David Tatum took that
cherished memory and turned it into a new memory, one that
elicits nausea, fear, and overwhelming discomfort and distrust
within me.

"Upon learning what David Tatum did to me, I was
immediately negatively impacted. I hid in the bathroom to
make and take phone calls for fear of my children learning
about what had happened to me and their aunt. I experienced
sleepless nights, absent-mindedness and sadness. I cried a
lot. I missed work and I wasn't the leader or teammate I
promised to be in my business. My business suffered from the
emotional toll this has taken on me. My mind was and still is
occupied by what he did to me and others. I have lost some
trust in others and I fear how others will victimize me and my
children.

"I am afraid to show up in court today. I am afraid
of showing my face on screen today by participating virtually.
Will he get off on seeing me? Will he sexualize me? I fear
that when he created child pornography using my image online,

others will have access to that image as well.  I fear
coworkers, family, community members or other pedophiles will
have access to this image.

"David Tatum's sentencing sets a precedent for other
perpetrators who use AI to create child pornography.  He
should get the highest jail time possible to establish a
standard with which pedophiles using AI are held to in the
future.  Images of children and AI technology are very
accessible on the internet so I believe this type of crime
should be addressed with firm repercussions from the courts.

"I have also lost some trust in medical
professionals because of David Tatum.  In addition to jail
time, I hope that the courts will revoke his medical license
or any credentials that will allow him access to children in
the workplace.  He should be placed in the National Registry
for Sex Offenders and any other state or national system that
protects children from pedophiles.  The repercussions of his
actions on my life are significant and I hope to stop this
from happening to other children.  It makes me sick to my
stomach to know that he had access to children in his daily
life at work as a child psychiatrist.  I want justice for my
sister, for my friends, for myself, and for the other victims
David Tatum has impacted.

"Sincerely, S.J."

Your Honor, may I read the statement of Ms. L.C.?

1          THE COURT:  Yes.

2          MR. CERVANTES:  "A photo that Mr. Tatum had altered

3    for the purpose of pleasuring himself was of me, my sisters,

4    and our neighbors on our first day of school.  We were a group

5    of children waiting for the school bus.  It was a happy

6    memory.  I was going into my last year in middle school and I

7    had only turned 13 a couple months earlier.  Mr. Tatum has

8    taken that memory and turned it into something grotesque and

9    obscene.  When I found out about his crimes against me and my

10   loved ones, it brought so much fear, anger, and confusion into

11   my life.  Now, when I think of that time in my life, my middle

12   school years, he is always a part of my thoughts.  When I

13   think of our friends who were in the photo with me, he is

14   always a part of my thoughts.  He has inserted himself into my

15   relationship with my sisters whom he also violated.

16          "I fear artificial intelligence because of him and

17   when I see or hear of AI, there he is in the back of my head.

18   I fear social media because of him.  I worry for my own

19   children's safety far beyond what I already feared prior to

20   knowing of his crimes against me, my loved ones, and those

21   that trusted him.  I have been unable to see a therapist since

22   I learned of his profession and how he used his authority to

23   violate his patients.

24          "The saddest part is that I don't even know this

25   man.  Have never met him before in my life.  But he has

1   impacted it so much and in such a negative way. I often think
2   about how his actions have impacted those that trusted him,
3   both as a loved one and an authority figure. And knowing that
4   a man who is capable of such horrible and evil actions used an
5   image of me to pleasure himself makes me feel disgusted,
6   demeaned, and violated all the more. This man has committed
7   heinous crimes and the impact of his actions even to the least
8   of his victims has been immense. I wish that he had never
9   inserted himself into my life or the lives of my loved ones,
10   but he never gave me the choice.

11        "L.C."

12        Your Honor, at this time the government would ask
13   Ms. F.L. if she wants to make a statement.

14        MS. F.L.: Hello. I am Ms. F.L.

15        It started off like almost every other day, waking
16   up and barely able to breathe. My chest burned and I felt as
17   if I was drowning in my own body. Instead of going home after
18   school, finding a smoke spot was the intention to rid of the
19   troubles in my mind and at home. Smoking went from once in a
20   while to all the time. I couldn't eat without it. It started
21   to get complicated being a senior in high school needing a
22   substance constantly to calm the nerves. I couldn't imagine a
23   day without it. The pain seemed unbearable this day. I
24   couldn't live like this anymore. With no outlets and no one
25   to confide in, I found a ride to the hospital, my last resort.

I knew it went against my father's wishes.  Everything was fine; and if it wasn't, I was ungrateful.

Upon arriving to the hospital, I was terrified.  I couldn't notice my surroundings besides the overwhelm of an overpopulated room.  I wanted the help, but I was losing grip.  The heavy breathing and panic had activated.  It felt worse than ever.  The desk asked for my name, but I couldn't speak.  It was late at night by the time I was admitted to 3900, the child psych unit.  From there I was assigned a room.  Exhausted from experiencing flight or fight for hours, I passed out quickly.

Waking up I was in an unfamiliar place.  The floors slate and the walls dove.  The light was too bright for my eyes after the darkness of sleep and the air contained an undertone of bleach.  There was nothing in the room besides the white bed I had slept on.  There were many nurses and other teens on the floor, but what set me apart was that I had come voluntarily.  Although I had come close to suicide many times, I was in an extremely vulnerable position.  Anyway, I met with the treatment team daily throughout the duration of my week's stay to discuss new practices of sober and healthy living.

This is when I was assigned to Dr. David Tatum, child psychiatrist.  It was a good fit for me at the time.  I couldn't connect well with women due to my existing

abandonment issues stemming from my incarcerated alcoholic mother.

Upon discharge I continued to see Dr. Tatum through outpatient. He was transferring at the same time as me. I thought it was meant to be and I trusted him. I had fallen through the cracks for so long, felt alone for so long. No one looked out for me, but I thought Dr. Tatum did. Finally I had somebody. I never wanted more than a doctor/patient relationship. Although the truth I'd hear eight years later would come as a huge shock.

In February of this year I was contacted by the FBI. They showed me a picture of under my dress. I was so confused. I knew it was me immediately, but I didn't understand where in the world this was coming from. When I heard the doctor's name, my heart fell to the floor. The one person that I thought had looked out for me had been violating me. I felt so uncomfortable, skeeving from my own body. Later I viewed a video of the defendant placing a video camera underneath my dress. I could hear my personal information in the background. I had no idea and I couldn't believe that.

I immediately questioned myself and my adequacy considering my memory was so different from this. I doubt my own judgment. I even looked for the doctor years later to potentially help my traumatized sister who's in middle school. God, how would I have ever lived with myself if that

potentially proceeded inappropriately.

I was, I am so betrayed. It's nearly incomprehendible. Not only was this the one adult I thought I had, but he was my psychiatrist. I confided in him. In his profession he took an oath. My psychiatrist is supposed to be someone I could put my faith into. And now I don't trust. I'm skeptical of my own current therapist and anyone else's genuine motives.

Nevertheless, now I spend my time talking of the defendant instead of many other aspects in my life that need to be addressed. I still wonder what I did. I've been diagnosed with PTSD. This hits me at random times and completely flusters me. It's been incredibly difficult to write because I've been on constant high alert and solely existing on survival mode.

When this first came up, I nearly felt as if I was the senior in high school of the past, my emotions unmanageable. I don't want to sit and think about what you did to me because it shatters the little worth of myself I have left. The truth is now no one was there for me. You deceived me and you used me for your personal gain. I thought you were great. But humans are multidimensional and you were harmful to me as well. This has been detrimental, more than an inconvenience to my life really. Every time it comes back up my life seems to spiral. I have fallen back on old habits

1    looking for an escape.  I failed all of my college courses for

2    the semester.  Dealing with the FBI, having to travel,

3    testifying in court was all too much, too stressful.  And you

4    are still taking from me.  I was notified in February,

5    cooperating in April, flying in May.  Received another call in

6    October.  Now I'm here again in November.  This is taking up

7    my life.

8           Because of what you did, I'll never have a male

9    psychiatrist again.  And that's really too bad.  The lack of

10   responsibility is another form of malpractice, insinuating I

11   might be lying.

12          At last I'm just glad I've had the opportunity to

13   tell this Court how the defendant's actions have impacted my

14   security, my safety, my self-worth, my self-confidence, and my

15   everyday life.

16          Thank you.

17          THE COURT:  Thank you.

18          MR. CERVANTES:  The government calls Ms. E.S.

19          MS. E.S.:  The last time I took a shower without

20   thinking about being filmed was in 2002.  I was 18.  I've

21   spent my entire adult life checking every bathroom I enter for

22   a camera before I use it.  I check hotel rooms, bars,

23   restaurants, airports, baseball stadiums, Disneyland.  Even

24   the homes of my friends and acquaintances do not feel safe.  I

25   have been looking for cameras so often and for so long that I

completely lost track of the fact that normal people don't do this.  It is humiliating.  Just knowing I've been filmed before is enough to make me want to climb out of my skin.  I can never loosen the grip of this intrusive thought that will shower with me for the rest of my life.  It is the kind of filth you can never wash off.

This impact was particularly insidious.  At 18 I couldn't comprehend how problematic it was that there was a tape out there of me and David's sister, both obviously underage, taking turns showering after a swim.  For a long time I successfully compartmentalized my anxiety about bathrooms and my adoration for David who I had known, loved, and looked up to my entire life.  He said he was sorry and I believed him.

In November 2021 David confessed he was seeking help for sex addiction and that he might be in some trouble.  I believe good people can make bad mistakes and still deserve the chance to do better, so I offered to accompany him to Kansas where he would undergo an assessment to determine his fitness to remain a licensed physician.  I thought I was supporting my cousin on his tenuous first steps toward recovery.

This impact hit harder.  While I did not know the breadth of David's crimes on the Kansas trip, David did.  Days after I had returned home, I still felt deeply unsettled.  In

hindsight, I can see the sudden and stark incongruence between David's words and his actions.  He was not humbly seeking help for an illness, but, rather, looking to do or say whatever it took to beat the test and get back to work.  I now know the breadth of David's crimes and when I think too much about the Kansas trip, I feel physically ill.

By far the most damaging impact of David's crimes has been the impact to our family; specifically, to my relationship with his sister who is my lifelong best friend. We have watched our family disintegrate into something unrecognizable.  One of our most beloved and vocal members remains heavily in denial.  David does not grant his family peace.  Instead, he doubles down and fans the fire.

My best friend and I have talked to each other nearly every single day about every single thing for more than 25 years.  She is now stuck in an impossible situation that shows no signs of improving.  We are distant, reduced to superficial pleasantries as we each try desperately to protect the other from further harm.  We are being torn apart through no fault of our own and it is destroying us.  The agony is indescribable and it feels like part of me has died.

For over a year I was included in regular email blasts which detailed David's plight as an unfairly maligned victim of a vengeful ex.  It is a special hell to be a victim reading about how wonderful your victimizer is.  It became so

unbearable I sent an impassioned plea to my entire family
begging them to see the truth and accept it.  Even with all
that I have lost as a result, I do not regret sending that
email.

The response was swift and cruel.  Behind my back
the family was cautioned that I'm extremist and toxic.  They
were encouraged to stop talking to me all together.  I was
accused of influencing other victims with my hatred, as if
they were incapable of having their own feelings about their
victimization.  I was publicly shamed and called severely
mentally ill for spreading lies about David.  I was scary and
demented, an angry woman hell-bent on revenge.  Nobody spoke
up for me.  And this is the narrative that persists to this
very moment.  David is a victim and I'm the problem.

David violated my sense of privacy and safety
forever and he has irreparably destroyed my family.  I've come
a long way since 2002.  I have learned that when someone shows
you who they really are, you should believe them.  David
continues to inflict pain despite knowing how much pain he has
already caused.

I hope the Court considers just how far David still
has to go in his recovery and provides him the opportunity to
engage in meaningful treatment for his attraction to minors
and voyeurism.  But above all, I hope the Court considers a
sentence that ensures David cannot hold a position of

1  authority over a child ever again.

2          Thank you.

3          THE COURT:  Thank you.

4          MR. CERVANTES:  Your Honor, just a few words on

5  restitution and the special assessment.

6          THE COURT:  I was going to ask where we stand on

7  restitution.

8          MR. CERVANTES:  On restitution we're almost there.

9  Out of the six victims, we have requests from -- finalized

10 requests from five and so just one is pending.  I have

11 discussed this with defense counsel.  He's aware.  And we'll

12 try to work it out, but we do ask the Court to set the

13 restitution hearing for 90 days from now just to have more

14 time to finalize that.  We anticipate finalizing it well

15 before the 90 days.

16         THE COURT:  That impacts any consideration of the

17 special assessments as well.

18         MR. CERVANTES:  Yes, and I was about to get to that,

19 Your Honor.

20         So I think the Court can take into account that four

21 of the victims are asking for the minimum which is 3,000.  So

22 that's $12,000.  And the one that's pending I don't think is

23 going to be much more than that.  So it would be 12,000 plus

24 the pending request for restitution.

25         So unless the Court has questions about that, I'll

1   move on to the special assessment.

2           THE COURT:  All right.  Please.

3           MR. CERVANTES:  So with regard to the special

4   assessment, the government is asking that the Court issue an

5   order of $50,000 in total for counts one, two, and three.  As

6   the Court knows, the Court has to consider the factors in

7   3553(a) and 3572.  The government reincorporates its previous

8   arguments with respect to 3553(a).  And with respect to

9   3572(a), the first, second, and fourth bullets of that

10  subsection are particularly relevant and important for the

11  Court's consideration we think.

12          The first one with regard to the defendant's income,

13  earning capacity, and financial resources has been pretty

14  obvious throughout the trial, the PSR as well, given his

15  profession.  I recognize he probably won't practice again, but

16  he's extremely talented and intelligent.

17          And with regard to financial resources, the

18  supplement to the PSR confirmed that the sale of the marital

19  home happened last month and so there's a significant amount

20  of money there that the defendant will have access to in

21  addition to his own bank accounts which are detailed in the

22  PSR.

23          With regard to the burden that the fine -- the

24  special assessment will impose upon the defendant, we believe

25  that it is appropriate and that it will not -- it is $50,000,

1  but it won't burden him to the extent that he won't be able to
2  do anything else in his life given the resources that he has
3  access to.

4        And the fourth factor is the one that I think the
5  Court was alluding to, whether restitution is ordered and the
6  amount of that restitution.  I think ultimately the
7  restitution -- 12,000, plus the pending victim -- is not going
8  to go beyond 50,000.  I think it's going to be a lot closer to
9  12,000, but I don't know that for sure yet.

10        THE COURT:  I think I also read that of the proceeds
11  from the recent sale of the marital home, his intention was to
12  set aside a hundred thousand of his share of that for the
13  upkeep of his daughter.

14        Am I remembering that correctly, Mr. Ames?

15        MR. AMES:  I don't remember the exact number, Your
16  Honor.  I'll have to ask about that.  But that's correct.  So
17  there was a joint bank account that the wife took into her
18  possession when this all got started.  That was roughly a
19  hundred thousand, I think, a little bit more than that.  He
20  hasn't requested that back in general and has allowed that to
21  be part of the keeping of the upkeep of his daughter while
22  this has played out over the last couple of years.  But that
23  was essentially the primary account that the couple had.

24        There was some, you know, money in equity in the
25  house which did sell last week.  I sent the probation office

some documentation of that.  Those funds are being held in a trust account currently by, to my understanding, his wife's attorney pending resolving their equitable distribution and divorce.

But I can tell the Court that I've spoken with Mr. Cervantes today.  Mr. Tatum is more than willing to make sure that the restitution is paid in the short-term when that process goes through and distributed.  I've explained to him the order of operations and sort of how these funds go out and that the restitution is right towards the top.  And so I think there can be an arrangement, particularly with the sale of that house.  I believe the total proceeds are around 360ish thousand.  Obviously that's marital, not taxed yet, I presume, and split in some fashion.  So it's not all his, but there will be some that can go to that purpose.

There is also the consideration, obviously, Your Honor, that this is a case where he has a daughter that's 5 years old that he loves very much.  And we know for certain it's 15 years either way and he is not going to be a person that is in her life while she is a minor and able to take care of her the way he could before.  The ability for him to support his daughter and the child support that he can give to her is, frankly, limited to whatever assets he currently has which have to go a long way and last until another 13 or 14 years.  So I ask the Court to take that into consideration,

that it's probably either a lump sum or a trust situation so
that he can try to make sure as best as he is able to provide
for his daughter over the coming years.

And as Mr. Cervantes mentioned, I mean, I think it's
a foregone conclusion that his ability to earn money as a
professional practicing psychiatrist is over.  His medical
license is not coming back.  Whenever he is out and trying to
find work in the future some day, it will not be in that
profession and so there's limited means, basically.

But we understand the appropriateness of the
restitution and I have spoken to him.  We will get that paid
quickly.  And any remaining portion will have to be, I guess,
resolved as the divorce goes and the equitable distribution
goes, Your Honor.  So that's kind of the overview.

THE COURT:  All right.  Anything else,
Mr. Cervantes?

MR. CERVANTES:  No, Your Honor.  Thank you.

THE COURT:  Let me -- you can sit down, Mr. Ames.

Let me first talk to the victims in this case.  I
know you're worried about these pictures popping up and the
re-victimization that would come from that.  In fact, the
re-victimization of even having to worry about them popping
up, that's one of the things that informs sentencings in most
child pornography cases, most of which are different from this
one because most of them do involve sharing.  There are these

1  despicable photos and videos that are created, often by the

2  caregivers of these children, and the inhuman acts that are

3  done on them, and they're created for the purpose of sharing

4  and they're out there forever. And that's why a lot of

5  victims in these cases get notices from courts all over the

6  country notifying them that they are once again victims

7  because the government has identified their depictions of

8  abuse as having been once again seen.

9      That's not going to happen to you. There is no

10  reason to believe that the images involved in this case were

11  ever shared or ever can be shared. I don't know if you have

12  any more trust in me than you do in some others, but I have no

13  reason to believe that these videos were ever shared or ever

14  can be. So as traumatizing as all of this is, please don't

15  carry that with you the rest of your life.

16      Now, to get down to the considerations that the

17  Court is required to make in fashioning an appropriate

18  sentence.

19      The Court understands the childhood difficulties

20  that your lawyer addressed. And I don't doubt that you have

21  some sort of disease or defect that has influenced your

22  conduct in this. Indeed, people engaged in these offenses

23  have to be one of two things, evil or mentally ill, because

24  nobody else wants to look at this stuff. Now, that's an

25  explanation, not an excuse.

1          I have listened to the victims, of course.  And it's
2     always moving.  And you do have to take into account, you
3     know, what is the exact seriousness of this offense?  Well,
4     you can hear some of it in their voices.

5          Now, I know that some of you folks will not be
6     satisfied for anything less than the longest sentence the
7     Court can give.  I'm not going to do that.  That's 60 years.
8     He's 41 almost, in weeks.  It is a de facto life sentence.
9     And not only is a de facto life sentence unjust, I believe,
10    there does have to be room among these various defendants.

11         If he was a stepfather who sexually molested his
12    3-year-old stepdaughter, put it out on the internet and it was
13    shared for the rest of that girl's life, his guidelines would
14    be exactly the same.  There's got to be a distinction.  As
15    reprehensible as this conduct is, as many victims as it
16    created -- and when I say victims, I mean not just you all,
17    but even the women and perhaps girls who are completely
18    unaware that they've been victimized, but they have been.

19         The families have been victimized.  I read the
20    letters before coming into court that were read today.
21    Mr. Tatum has destroyed this family, broken it up, perhaps
22    irreparably.  You still have your supporters.  I understand
23    when mothers or grandmothers or any other family member still
24    love you and will support you and be there for you.  I don't
25    understand -- well, I do understand.  But I caution that

1 ignoring reality and thinking that you're not guilty of this
2 offense, because you are, you're very guilty, and I hope
3 people can come to accept that and still love you. Being
4 guilty of this offense does not make you unhuman or unworthy
5 of love, but it shouldn't split your family up.
6       You know, one thing you can do if this case is
7 upheld on appeal and so your Fifth Amendment rights are no
8 longer necessary, I hope you will reach out to all of your
9 family and say, "I did this, I'm sorry. Please come back
10 together."
11       The Court also notes from paragraph 67 of the
12 presentence report that the defendant has been classified as a
13 medium risk group on sexual recidivism for males scale. So
14 the Court does have to consider that it's not that he's
15 unlikely to recidivate, nor is it, you know, some sort of
16 certainty.
17       The Court also does consider what are called
18 unwarranted sentence disparities among defendants, and that's
19 some of what I was talking about before: That these would be
20 the guidelines for people who committed a lot worse acts. I
21 am not minimizing anything that happened to you all, but I do
22 have to be a little bit realistic. These are nudes. These
23 aren't 3-year-olds being raped. I have to take that into
24 account. Some of these are not even you, as you know. It's
25 just your head. I know it's disturbing to look at that and

1    see an adolescent or preadolescent body on your head, but it's
2    not you.  And that's different than some cases and I have to
3    make a distinction in those.

4          Now, a couple of cases have been pointed out
5    specifically to the Court.  The case against Mr. Bonds, some
6    of the distinctions I think Mr. Cervantes pointed out.  One,
7    he only had one count, I think, of possessing with intent to
8    view.  I believe that's correct.  And he did plead guilty,
9    acknowledging his guilt, showing some remorse, doing what he
10   could to make things better for those he had hurt.  And he
11   hadn't created any child pornography.  He was just downloading
12   it and viewing it.  So he's less culpable than Mr. Tatum.

13         Mr. Deritis, who I think was also pointed out either
14   by -- I guess, Mr. Cervantes.  One of the distinctions -- two
15   of the distinctions that come most to mind about Mr. Deritis
16   who did get a 50-year sentence, as I recall, he was a hands-on
17   offender with his -- I think it was his stepdaughter, not his
18   actual daughter but his stepdaughter.  Creating photographs of
19   his own stepdaughter, including of a sexual hands-on nature.
20   And he testified and told some of the biggest whoppers you
21   ever heard in your life.  Far beyond failing to show remorse,
22   he just lied his tail off.  And he's worse than Mr. Tatum
23   because of that.

24         And so, you know, what the Court is supposed to do
25   is -- and this is in the statute -- impose a sentence that is

1  sufficient but not greater than necessary to apply all of the

2  factors that the Court is required to consider.  And of

3  course, that's a great challenge.  But I think in balancing

4  all the things we've talked about, I think I can achieve that.

5          So pursuant to the Sentencing Reform Act of 1984 and

6  *U.S. versus Booker*, it is the order of the Court, having

7  considered all of the 3553(a) factors, that the defendant is

8  hereby committed to the custody of the United States Bureau of

9  Prisons to be imprisoned for a term of 120 months on count

10  one, 360 months on count two to be served consecutively to

11  count one, 240 months on count three to be served concurrently

12  with counts one and two, for a total sentence of 40 years.

13          Forty years may be a de facto life sentence.  I know

14  there are lots of ways you can earn time off in prison, but

15  you're going to be mid 70s and up probably when you're

16  eligible.  I don't intend to give a de facto life sentence,

17  but I recognize that could be the rest of your life.  But it's

18  still a just sentence under these circumstances.

19          It is recommended that he be incarcerated at FCI

20  Butner because they have excellent medical facilities and I

21  believe they have probably the best in the BOP for sexual

22  predator violators and can provide some treatment I hope that

23  will do some good here.

24          It is ordered that the defendant be required to

25  support all dependents from prison earnings while incarcerated

1  as outlined in the presentence report.

2          The Court further recommends that he be allowed to

3  participate in any educational and vocational opportunities

4  while incarcerated.

5          The Court calls to the attention of the authorities

6  that he has a history of mental health issues and recommends

7  that he be allowed to participate in any available mental

8  health treatment programs and also recommends that he

9  participate in a sex offender treatment program while

10 incarcerated.

11          Upon release from imprisonment, the defendant is

12 placed on supervised release for a term of 30 years.  I think

13 that will cover the rest of your life no matter when you get

14 out.  This term consists of 30 years on each of counts one,

15 two, and three, all such terms to run concurrently.

16          Within 72 hours of release from the custody of the

17 Bureau of Prisons, you are to report in person to the

18 probation office in the district into which you are released.

19 And while on supervised release, you shall not violate any

20 federal, state or local law, and shall comply with each of the

21 discretionary conditions of supervised release that have been

22 adopted by this Court and each of the standard sex offender

23 conditions of supervised release.  The need for each of those

24 I hope is obvious to any reviewing court.  But nonetheless, no

25 objections were filed to the anticipated imposition of those

1    conditions.  The Court has reviewed them with respect to this

2    particular defendant and finds that each of them is necessary,

3    appropriate, and proper for this defendant's supervised

4    release.

5           As a special condition of supervised release, the

6    defendant shall participate in a mental health evaluation and

7    treatment program and follow the rules and regulations of that

8    program.  The probation officer, in consultation with the

9    treatment provider, will supervise the defendant's

10   participation in the program, and the defendant shall take all

11   mental health medications as prescribed by a licensed health

12   care practitioner.

13          As a second special condition, the defendant shall

14   not communicate or otherwise interact with child victim 1,

15   either directly or through someone else, without first

16   obtaining the permission of the probation officer.

17          And as a final special condition of supervised

18   release, the defendant shall not engage in an occupation,

19   business, profession, or volunteer activity that would require

20   or enable him to have access to minor children without the

21   prior approval of the probation office.

22          Now, let me state with respect to the sentence,

23   obviously the Court had to resolve several objections to the

24   presentence report.  And although the Court believes it got

25   each of those correct, the court of appeals might disagree.

1    But whatever the guidelines are, if the court of appeals
2    disagrees with this Court's decisions, this Court's sentence
3    of 40 years is what it considers the appropriate 3553(a)
4    sentence.  Whether that is a downward variance from some other
5    guidelines, within some other guidelines, or an upward
6    variance of some other guidelines, the Court finds that that
7    is the appropriate sentence under 3553(a) and within the
8    statutory maximums.
9            It is ordered the defendant pay the United States a
10    special assessment of $300.
11           The Court is not going to impose a fine since there
12    are restitution obligations as well as some upcoming special
13    assessments, and that a fine is unnecessary and perhaps
14    impossible.
15           But the Court has considered the financial
16    information appearing on pages 18 and 19 of the presentence
17    report and finds that in addition to an anticipated
18    restitution amount somewhere between 12,000 and let's call it
19    30 -- I can't imagine it being any more than that; but even if
20    it was a little bit more than that, it wouldn't matter.  The
21    Court finds that he has the financial wherewithal without harm
22    to himself or to his other obligations to make the following
23    special assessments which are imposed.
24           A special assessment of $5,000 per count pursuant to
25    18 U.S.C. Section 3014 and the provisions of the Justice for

1  Victims of Trafficking Act of 2015, and a special assessment
2  of 50,000 -- $17,000 per count on each of counts one and three
3  and 50,000 on count two pursuant to 18 U.S.C. Section 2259A
4  and the provisions of the Amy, Vicky and Andy Child
5  Pornography Victim Assistance Act of 2018.
6          The Court will leave open for 90 days the question
7  of the restitution amounts to the particular victims in this
8  case.
9          The defendant shall make an immediate payment
10 towards monetary penalties in the amount of $500.
11         If the defendant is unable to pay any monetary
12 penalty immediately, during the period of imprisonment,
13 payments shall be made through the Federal Bureau of Prisons
14 Inmate Financial Responsibility Program.
15         Upon release from imprisonment, any remaining
16 balance shall be paid in monthly installments of no less than
17 $50 to commence within 60 days until paid off.  Throughout the
18 period of supervision, the probation officer shall monitor the
19 defendant's economic circumstances and shall report to the
20 Court with recommendations as warranted any material changes
21 that affect the defendant's ability to pay any court-ordered
22 penalties.
23         Mr. Tatum, you can appeal your conviction, and I
24 encourage you to do so.  You can also appeal your sentence.
25 But any notice of appeal has to be filed within 14 days of

1  entry of the Court's judgment.  If you're unable to afford the

2  cost of an appeal, if you ask, the clerk of court will prepare

3  and file a notice of appeal on your behalf at no cost to you.

4        I suggest you discuss these rights with your

5  attorney, but do you understand them as I have explained them

6  to you?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  All right.  This matter is concluded.

9  Mr. Tatum is remanded to the custody of the marshals.

10        The Court is in recess.

11        (End of proceedings at 1:28 PM.)

12                          *****

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7   Reporter, in and for the United States District Court for the

8   Western District of North Carolina, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16         Dated this 22nd day of December 2023.

17

18

19                    s/Cheryl A. Nuccio

20                    Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25